**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: 415-373-1671
Fax: 415-484-1294

*Attorneys for Lead Plaintiffs*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| NEIL COSTANZO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DXC TECHNOLOGY COMPANY, HEWLETT PACKARD ENTERPRISE COMPANY, RISHI VARNA, TIMOTHY C. STONESIFER, JEREMY K. COX, MUKESH AGHI, AMY E. ALVING, DAVID HERZOG, SACHIN LAWANDE, J. MICHAEL LAWRIE, JULIO A. PORTALATIN, PETER RUTLAND, MANOJ P. SINGH, MARGARET C. WHITMAN, and ROBERT F. WOODS,<br><br>Defendants. | Case No. 5:19-CV-05794-BLF<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date: June 4, 2020<br>Time: 9:00 a.m.<br>Place: Courtroom 3, 5th Floor<br>Judge: Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................i

TABLE OF AUTHORITIES .........................................................................................................ii

I.      INTRODUCTION ................................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................................... 3

    A.      Events Leading to DXC's IPO: an Undisclosed Plan for Massive Personnel Cuts................... 3

    B.      The Misrepresentations and Omissions in the Registration Statement. .................................... 5

    C.      The Undisclosed Extreme Personnel Reductions Devastate DXC. ........................................... 6

III.    ARGUMENT ....................................................................................................................... 7

    A.      Plaintiffs State Claims for Violations of Section 11 of the Securities Act. ............................... 7

        1. Legal Standard. ..................................................................................................................... 7

        2. The Complaint Alleges Material Misstatements and Omissions............................................ 8

        3. Defendants Had a Duty to Disclose Omitted Facts Under Items 303 and 503...................... 13

        4. Defendants' Statements and Omissions are not Protected by the Safe Harbor. ..................... 16

                    a)  The Safe Harbor does not Apply to this Initial Public Offering............................ 16

                    b)  DXC's Statements of Present Fact and Omissions are not Protected.................... 17

                    c)  The "Cautionary" Language was Inadequate or Itself Misleading......................... 19

                    d)  Defendants' Actual Knowledge of the Undisclosed Facts is Pled. ....................... 21

        5. Defendants' Statements and Omissions are not Immaterial Puffery ...................................... 22

        6. Defendants' Statements and Omissions are not Immaterial Opinion ..................................... 24

    B.      The Individual Defendants and HPE are Liable under §15 of the Securities Act. .................... 25

IV.     CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................ 7

*In re AT&T Corp. Sec. Litig.*,
    2004 U.S. Dist. LEXIS 29588 (D.N.J. Sept. 2, 2004) ................................................... 16

*In re Atossa Genetics Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) .................................................................................... 20, 24

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...................................................................... 9, 10, 11, 21

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997 (9th Cir. 2002) ......................................................................................... 9

*Cai v. Switch, Inc.*,
    2019 U.S. Dist. LEXIS 116702 (D. Nev. July 12, 2019)............................... 14, 16, 20, 25

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989)......................................................................................... 22

*City of Dearborn Hgts. Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017)......................................................................................... 24

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................................ 21

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ....................................................................................... 21

*Dahhan v. OvaScience, Inc.*,
    321 F. Supp. 3d 247 (D. Mass. 2018) ...................................................................... 18, 19

*In re Daou Sys., Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) .............................................................................. 7, 8, 10

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ...................................................................................... 25

*In re Exodus Commc'ns, Inc. Sec. Litig.*,

   2005 WL 1869289 (N.D. Cal. Aug. 5, 2005)................................................................ 10

*Flynn v. Sientra, Inc.*,

   2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) .............................................. 12

*Gerneth v. Chiasma, Inc.*,

   2018 WL 935418 (D. Mass. Feb. 15, 2018)................................................................. 15

*Golub v. Gigamon, Inc.*,

   372 F. Supp. 3d 1033, (N.D. Cal. 2019) ..................................................................... 21

*Herman & Maclean v. Huddleston*,

   459 U.S. 375 (1983)...................................................................................................... 8

*Hildes v. Arthur Andersen LLP*,

   734 F.3d 854 (9th Cir. 2013)......................................................................................... 8

*J&R Mktg. v. GMC*,

   549 F.3d 384 (6th Cir. 2008)....................................................................................... 15

*Kaplan v. Rose*,

   49 F.3d 1363 (9th Cir. Oct. 11, 1994)......................................................................... 10

*Khoja v. Orexigen Therapeutics, Inc.*,

   899 F.3d 988 (9th Cir. 2018) .................................................................................. 8, 10

*Litwin v. Blackstone Grp., L.P.*,

   634 F.3d 706 (2d Cir. 2011) ........................................................................................ 14

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,

   416 F.3d 940 (9th Cir. 2005). ...................................................................................... 19

*Matrixx Initiatives, Inc. v. Siracusano*,

   563 U.S. 27 (2011).................................................................................................. 9, 10

*In re Mikohn Gaming Corp. Sec. Litig.*,

   2006 U.S. Dist. LEXIS 62713 (D. Nev. Aug. 31, 2006) ............................................. 22

*Miller v. Thane Int'l, Inc.*,

   519 F.3d 879, (9th Cir. 2008)................................................................................ 11, 20

iii

*Mulligan v. Impax Labs., Inc.*,

36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................................ 22

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

320 F.3d 920 (9th Cir. 2003) ................................................................................................... 11

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,

780 F. App'x 480 (9th Cir. 2019) ............................................................................................ 19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,

575 U.S. 175 (2015) .......................................................................................................... 21, 24

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,

759 F.3d 1051 (9th Cir. 2014) ................................................................................................. 18

*Prodanova v. H.C. Wainwright & Co., LLC*,

2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) ........................................................................ 19

*In re Quality Sys., Inc. Sec. Litig.*,

865 F.3d 1130 (9th Cir. 2017) ..................................................................................... 18, 19, 22

*Reese v. Malone*,

747 F.3d 557 (9th Cir. 2014) ....................................................................................... 10, 11, 12

*In re Restoration Robotics, Inc., Sec. Litig.*,

417 F. Supp. 3d 1242 (N.D. Cal. 2019) .................................................................................. 14

*Robb v. Fitbit Inc.*,

216 F. Supp. 3d 1017 (N.D. Cal. 2016) ............................................................................ 13, 22

*Siracusano v. Matrixx Init., Inc.*,

585 F.3d 1167 (9th Cir. 2009) .......................................................................................... 11, 21

*In re Snap Inc. Sec. Litig.*,

2018 WL 2972528 (C.D. Cal. June 7, 2018) .......................................................................... 21

*In re STEC Inc. Sec. Litig.*,

2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) ...................................................... 19

*Steckman v. Hart Brewing*,

143 F.3d 1293 (9th Cir. 1998) ........................................................................................... 13, 14

iv

*In re Time Warner, Inc. Sec. Litig.*,

  9 F.3d 259 (2d Cir. 1993) .................................................................................................... 25

*In re Ubiquiti Networks, Inc. Sec. Litig.*,

  33 F. Supp. 3d 1107 (N.D. Cal. 2014) ................................................................................ 11

*In re Violin Memory Sec. Litig.*,

  2014 U.S. Dist. LEXIS 155428 (N.D. Cal. Oct. 31, 2014) ............................................. 8, 13

*Westley v. Oclaro, Inc.*,

  897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................................................ 19

*Zaghian v. Farrell*,

  675 F. App'x 718 (9th Cir. 2017) ................................................................................... 19, 21

*In re Zynga Inc. Sec. Litig.*,

  2015 U.S. Dist. LEXIS 38722, (N.D. Cal. Mar. 25, 2015) ................................................ 11

**Statutes**

15 U.S.C. §77k(a). ...................................................................................................................... 8

15 U.S.C. §77z–2(b)(1)(A) ....................................................................................................... 17

15 U.S.C. §77z–2(b)(2)(D) ....................................................................................................... 16

17 C.F.R. §229.303(a)(3)(ii) ..................................................................................................... 13

17 CFR § 229.503(c) ................................................................................................................. 15

**Other Authorities**

69 Am. Jur. 2d Securities Regulations – States §101, n.93 (2003) .......................................... 17

*Sec. Offering Reform*, SEC Release No. 8501,

  2004 WL 2610458 (Nov. 3, 2004) ...................................................................................... 15

*Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Cos., Inv.*

  *Adv., Inv. Cos., & Mun. Sec. Issuers*,

  SEC Release No. 1149 (July 29, 1998) ............................................................................... 15

## I.    INTRODUCTION

This action arises out of Defendants' violation of Section 11 of the Securities Act of 1933, which imposes strict liability on issuers for materially false and misleading statements or omissions contained in a registration statement used to offer securities to the market. Plaintiffs purchased or otherwise acquired the newly-issued common stock of DXC Technology Company ("DXC"), a new IT services company formed by the combination of Computer Services Corporation ("CSC") and the Enterprise Services division of Hewlett Packard Enterprise Company ("HPE"), pursuant and/or traceable to DXC's February 27, 2017 prospectus and registration statement ("Registration Statement").

The Registration Statement highlighted the 178,000 employees that the combined company brought to its existing clients and would use to attract new ones, and the "size and scale," breadth and experience of the new company's workforce, portraying it to investors as a key strategic reason for the merger that would give it a competitive advantage. At the same time, regarding key financial reasons for the merger, DXC represented that the merger presented certain "synergies." Specifically, the Registration Statement claimed that pursuant to DXC's plan, it would achieve $1.0 billion in savings in its first year ($1.5 billion for the first year run rate), but assured investors that DXC's plan was focused on "align[ing] its costs with its revenue trajectory," and to the extent the savings came from personnel reductions, they would come from "workforce optimization" and "elimination of duplicative roles." Accordingly, analysts and investors alike were led to expect a well-staffed IT services company, with only redundancies cut, but the amassing of talent otherwise maximized.

In stark contrast to the rational workforce optimization process presented in the Registration Statement, in reality, DXC planned a dramatic and accelerated workforce reduction in the first year after the merger, totaling $2.7 billion, or nearly *double* the first year run-rate of $1.5 billion represented to investors in the Registration Statement. Worse, the cuts were to be primarily in DXC's key client-service personnel. This actual, undisclosed plan – misrepresented in and omitted from the Registration Statement – involved major undisclosed risks that the draconian cuts to DXC's workforce would be far too large, too soon, resulting in client dissatisfaction and departure of key employees, and materially harming DXC's ability to generate revenue, which did occur.

This undisclosed plan took shape well before the Registration Statement. Indeed, from at least May 2016, when the merger was announced, Defendant J. Michael Lawrie, then-President and CEO of CSC, and incoming Chairman, President and CEO of DXC, had begun planning the strategy and composition of DXC, which he communicated to his top managers, including Stephen J. Hilton, whom Lawrie had recruited to CSC as a right-hand man and who was named incoming EVP and head of the largest of DXC's three divisions, Global Delivery. Together with Lawrie and a small set of executives, Hilton both ran CSC and planned the merger from May 2016, until the Registration Statement's effective date of February 27, 2017 and the merger's completion about a month later. Boutros Decl. Ex. H (ECF 40-8), ¶51. As part of their planning, including DXC's first-year budget, Lawrie told Hilton he wanted to cut $2.7 billion in expenses the first year. While Hilton agreed to this over the long run, he and the other division heads "repeatedly" protested such dire cuts so soon, telling Lawrie they would inevitably be "disastrous" for revenues, and were clearly not "aligned" with revenue trajectory (as DXC represented). But Lawrie would not be convinced, and, as Hilton stated, "demanded" $2.7 billion in cuts the first year (primarily Global Delivery personnel). Despite DXC's internal plan, the Registration Statement identified only $1.0-$1.5 billion in cuts, failing to disclose both the true $2.7 billion amount, and the extreme risks therefrom, which were discussed among DXC's top management well before the Registration Statement. Defendants also had an affirmative duty to disclose this material information under SEC Regulation S-K Items 303 and 503, besides their duty to disclose information required to make their statements not misleading.

Ultimately, these undisclosed facts and risks devastated DXC's revenues and income, just as insiders had warned Lawrie. Within a year, news began to emerge that DXC had fired some 20% of its workforce, or 35,000-36,000 of its personnel, mostly from the critical Global Delivery division, that there was "chaos" in DXC's ranks, and that customers were halting work due to service dissatisfaction resulting from the personnel cuts. In July 2018, Lawrie terminated Hilton himself for not executing his plan ruthlessly and quickly enough. When the inevitable revenue and income shortfalls began, DXC's stock price dropped 45%, harming DXC's investors.

Faced with these allegations, DXC resorts to a hodge-podge of boilerplate or misguided arguments, none of which have merit. For example, Defendants laud themselves in saying they

succeeded in making $1.0 billion in cuts the first year, and their initial results were well-received; but of course this is not the issue, and even Enron's results were initially well-received, until, as here, the misrepresentations were revealed. Defendants also try to discredit Hilton, after he sued DXC for improper withholding of bonuses, and attempt to twist some of his statements. But Defendants cannot dispute Hilton's key assertions, which are credible and corroborated by subsequent press accounts; and in any event, such disputes are improper to resolve on this motion.

Defendants' contention that some of their statements were protected by the PSLRA's safe harbor for forward-looking statements is similarly unavailing. The safe harbor, which does not apply to IPOs, is inapplicable here. Moreover, Defendants' statements concerned present facts, or at least, "mixed" facts, rather than forward-looking facts. Nor does the safe harbor protect Defendants' alleged omissions. And DXC's supposed "cautionary" language was itself woefully deficient, and in some cases itself misleading. Nor can Defendants escape liability by discounting their material misrepresentations and omissions as mere corporate "puffing" or matters of opinion. The public and market reaction as DXC's true plan was revealed substantiate this. As discussed more fully herein, Plaintiffs have alleged sufficient facts to plead Defendants' violation of the Securities Act. Defendants' motion must be denied.

## II.    STATEMENT OF FACTS

### A.    Events Leading to DXC's IPO: an Undisclosed Plan for Massive Personnel Cuts.

In May 2016, CSC and HPE announced the merger of CSC and the Enterprise Services division of HPE ("HPES"), and the public offering of common stock of the combined entity, DXC. ¶¶2, 33, 37-39. (Unless otherwise indicated, citations to "¶_" are to the Amended Class Action Complaint (ECF 29) ("AC" or "Complaint") and capitalized terms are as defined in the AC). Defendant Lawrie, the former President and CEO of CSC, was named as the incoming Chairman of the Board, President and CEO of DXC. ¶23. In such capacity, Lawrie set the strategy and planning for DXC leading up to, and through, the merger. ¶¶48, 50-62. While at CSC, Lawrie recruited and hired Hilton to lead its Global Infrastructure Services ("GIS"), including implementing certain of Lawrie's cost-cutting initiatives. ¶¶44-46. After the May 2016 merger announcement, Lawrie, as DXC's incoming CEO, organized the new company into three divisions, Build, Sell, and Delivery. Hilton was named EVP and head of the Global Delivery

division. Approximately three-quarters of DXC's total personnel were located within the Global Delivery division, providing support to the Sell and Build divisions. ¶¶44, 46-49.

While the merger was completed April 1, 2017 (¶37), the planning for it began at least as early as its May 2016 announcement, including the planning of DXC's 2017 budget. ¶¶47-50. As part of the planning and budgeting, Lawrie told Hilton he planned to achieve major cuts to DXC's expenses, primarily by cutting personnel in Global Delivery. Critically, Global Delivery was to house DXC's IT personnel who served its clients. ¶50. However, by the time of the Registration Statement's February 27, 2017 effective date (and contrary to DXC's statements therein, as explained below), at Lawrie's behest, "DXC had already planned a dramatic and accelerated workforce reduction at a scale much larger than what was indicated to investors." ¶¶3-4.

Hilton personally warned Lawrie that his plan for "[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers [*i.e.*, division leaders]." ¶¶5, 52. Indeed, instead of targeting $1.0 billion in cuts the first year (with a run rate of $1.5 billion by the end of year one) as the Registration Statement told investors, at Lawrie's insistence, DXC's internal budget "demanded" that Global Delivery make ***$2.7 billion*** in cuts the first year. ¶¶3, 53; ECF 40-8, ¶68. While Hilton had agreed in principle that Global Delivery could "***ultimately***" achieve a target of $2.7 billion in savings, contrary to Defendants' disputation, Hilton was clear that such aggressive cuts would have to be implemented *over time* to prevent significant loss in quality of customer service (¶51; ECF 40-8, ¶65), and that the undisclosed plan to cut *$2.7 billion within 12 months* would be "disastrous." ¶52; ECF 40-8, ¶67. (Unless otherwise indicated, all emphasis is added.)

Hilton stated that Lawrie's plan for massive cuts in Global Delivery would mean having "to fire far more people far more quickly, with the resulting negative impact on customer satisfaction" and, inevitably, revenues; that he "***repeatedly advised Lawrie about his reservations concerning the pace of cuts***;" and that based on these discussions, Hilton believed "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction." ¶¶5, 50, 52-54; ECF 40-8, ¶¶67-68. Although these material risks and facts contradicting Defendants' public statements existed and were internally discussed among Hilton, Lawrie and others at

DXC prior to Registration Statement's effective date leading up to the Merger, neither the $2.7 billion long-term target, nor the mind-boggling target of $2.7 billion in twelve months, were disclosed in the Registration Statement. ¶¶53-54.

The drastic cuts demanded by Lawrie are corroborated by news accounts demonstrating that his directives were being substantially executed from the very beginning. ¶¶58, 65-74. By the first year after the Merger, DXC slashed Global Delivery's workforce by about 20%, or 36,000 employees in a single year, as the British IT news website *The Register* confirmed. ¶¶56-57. Lawrie himself admitted on an August 8, 2017 earnings call that "In our delivery and support organizations, we have removed 4 management layers." ¶58. Despite the frenetic pace of cuts under Hilton, with a 20% workforce reduction in a year, one of the reasons Lawrie cited for terminating Hilton was "[f]ailure to meet the target in Lawrie's budget for spending cuts within the Global Delivery division." ¶62; ECF 40-8, ¶¶83, 99a (also indicating Lawrie considered meeting 80% of his internal budget as the minimum to earn any bonus); ¶67 (firing another senior manager for 10-15% shortfall from *internal* budget). Thus, Lawrie's internal budgets (rather than "aspirational," as DXC misinterprets Hilton's bonus claims) were serious, every effort was to be made to make them, and failure had consequences.

**B.    The Misrepresentations and Omissions in the Registration Statement.**

To effectuate the merger, DXC filed a Registration Statement in order to register 141 million shares of new common stock, solicit investors to purchase DXC shares, and convince CSC shareholders to vote for the merger, pursuant to which they would exchange their CSC shares for DXC shares. ¶¶2, 37-38. As usual, investors paid particular attention to DXC's reasons for the merger, strategic plans and corresponding financial effect on the combined company. In this regard, the Registration Statement, in discussing the "net synergies" and "strategic and financial benefits" of the merger, highlighted as a "Strategic Consideration" for the merger that, "with *a collective workforce of approximately 178,000 employees* ... the *size and scale of the combined company* [would] enhance its ability to provide value to its customers through a broader range of resources and expertise to meet their needs," as well as the "strong customer relationships that the management and employees … will bring to the combined company" ¶79, citing ECF 40-1 (Boutros Decl. Ex. A) at 68-69.

Having highlighted the size of DXC's workforce as one of its most important assets, the Registration Statement also promoted cost savings as part of the "net synergies" of the merger, but misleadingly indicated to investors that the impact on DXC's vaunted workforce would be through "workforce *optimization*" (focusing on efficiency), and at most the elimination of "*duplicative* roles and other *duplicative* general, administrative and overhead costs." Thus, under "Financial Considerations," the Registration Statement falsely represented that "the Merger is expected to produce first-year *synergies of approximately $1.0 billion post-closing*, with a *run rate of $1.5 billion by the end of year one*." ¶79, citing ECF 40-1 at 69; *see also* ¶77. It elsewhere explained that those amounts were "calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale … as well as *cost synergies expected from workforce optimization* such as *elimination of duplicative roles and other duplicative general, administrative and overhead costs*." ¶77, quoting ECF 40-1 at 131. The Registration Statement also claimed that DXC's "plan … includes a cost reduction initiative *to align its costs with its revenue trajectory*." ¶77 (ECF 40-1 at 45, 149).

Even the Registration Statement's "risk factors" section contained statements that were materially misleading when made. For example, DXC misleadingly purported to warn that its ability to provide customers with competitive services depended on its ability to "*attract and retain*" personnel, and that "[t]he loss of personnel *could* impair [its] ability to perform under certain contracts, which could have a material adverse effect" (¶90), when DXC itself had already planned mass terminations.

Given DXC's statements, JP Morgan reflected the market's expectations in its April 19, 2017 analyst report citing potentially "$1.1 billion in cost cutting over three years," including "workforce optimization," while noting the sensitivity to "a big cost takeout of labor" (*i.e.*, anything bigger) given DXC's stated need to have sufficient personnel to service its clients. ¶59.

**C.    The Undisclosed Extreme Personnel Reductions Devastate DXC.**

With the massive cuts, Lawrie got his hoped-for cosmetic short-term EPS boost. ¶¶63, 65, 72. Given the nature of DXC's contracts, the impact of the bloodletting on its revenues and earnings had a built-in lag. ¶64. However, by Fall 2018, leaks to the media revealed the impact of the prior massive headcount reduction on customer support problems (¶66). News accounts described DXC current and

former employees confirming that "customer support … is strained due to the headcount reduction (*id.*); the "latest" senior management firings; that DXC "'is in chaos as all the cuts are leading to mounting customer complaints,'" and "'is descending into turmoil'" due to the cuts and adverse impact on serving customers ¶67; *see also* ¶¶68-70. Rather than being "aligned" with "revenue trajectory" the draconian cuts were "chaotic," "non-collaborative" and arbitrary. ¶¶60-61.

Similar media reports ensued, and the inevitable negative impact on revenue and EPS hit in Q1 2019, when DXC reported a 17% year-to-year EPS decline, and disappointing revenue guidance, attributed in the industry press as the natural result of its excessive cost-cutting. ¶¶69-70.

After further disappointing quarterly results, in September 2019, DXC replaced Lawrie as President and CEO with Mike Salvino. ¶¶71-72. Following another poor quarter, Salvino acknowledged the service delivery and personnel retention problems resulting from Lawrie's undisclosed draconian workforce reduction plans, noting that DXC need to "stabilize key accounts," "ensure that our delivery is meeting our clients' expectations" and that employee satisfaction and retention problems presented execution problems with DXC's customers, "which results in lower margins, delayed revenue and bookings as customers have placed the additional work on hold." ¶74.

By the initial filing of this action, DXC stock traded at $32.70 per share, nearly 45% below its $59 price at the time of the Merger. ¶75.

## III.    ARGUMENT

### A.    Plaintiffs State Claims for Violations of Section 11 of the Securities Act.

#### 1.    Legal Standard.

A Rule 12(b)(6) motion should be denied if the complaint "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005).

Section 11 imposes liability on "every person who signed [a] registration statement" that contains "an untrue statement of a material fact" or "omit[s] to state a material fact required ... to make

the statements therein not misleading," as well as any director or "every person who, with his consent, is named is named in [such] registration statement as being or about to become a director, [or] person performing similar functions." 15 U.S.C. §77k(a). Section 11 "places a relatively minimal burden on a plaintiff," as it "was designed to … impos[e] a stringent standard of liability on the parties who play a direct role in a registered offering" and "to provide greater protection to purchasers of registered securities." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-383 (1983) (footnotes omitted). As long as "a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Id*. at 382. Once a material misrepresentation or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.*; *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013).

Plaintiffs' Section 11 claims are subject to Rule 8(a)'s notice pleading standards. *See In re Violin Memory Sec. Litig.*, 2014 U.S. Dist. LEXIS 155428, at *23-25 (N.D. Cal. Oct. 31, 2014). Neither Rule 9(b) nor the PSLRA's heightened pleading standards apply, especially here, where no §10(b) fraud claim is asserted (*id.*), and Defendants emphasize Plaintiffs' disclaimer of fraud allegations. Defendants' Brief ("DB") 14, 24. While a court may consider materials incorporated into the complaint or properly subject to judicial notice, they should not be used to dispute well-pleaded facts or where their substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018). A court should especially guard against defendants' attempts "to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.* at 1002-03.

2.      The Complaint Alleges Material Misstatements and Omissions.

"The plaintiff in a §11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *See Daou*, 411 F.3d at 1027 (citation omitted).

A statement or omission "is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal*

*Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 44, 47 (2011).

Defendants' statements concerning the workforce of the combined company, including its purported size and breadth to service customer relationships, were false and deeply misleading, as they failed to disclose that, spearheaded by Lawrie, DXC in fact had a plan at the time that focused on massive employee headcount-related cost reductions, dwarfing the amount publicly disclosed in the Registration Statement. ¶¶3-6, 42, 53, 56-57, 78. It was thus misleading to stress, as one of the primary "Reasons for the Merger" - "Strategic Considerations," that "with *a collective workforce of approximately 178,000 employees* ... the *size and scale of the combined company* [would] enhance [DXC's] ability to provide value to its customers through a broader range of resources and expertise to meet their needs," as well as the "strong customer relationships that the management and employees … will bring to the combined company" (¶¶77, 79, *supra*), when by that time Lawrie had internally set plans for well over 20% of those employees – in the most critical customer-facing roles – to be eliminated in the immediate term. ¶¶52-53, 56-57, 62.

The Registration Statement represented (multiple times) that DXC's target was to achieve savings of "approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one." ¶77. This statement was false when made, because at that time DXC had an undisclosed, internal budgeted target of $2.7 billion in savings the first year post-merger, nearly double the amount represented to investors. ¶¶3, 5, 53-54, 78d., 80c., 89.

Relatedly, the Registration Statement falsely claimed (as one of the "Financial Considerations" for the merger, and elsewhere) that any personnel-related cost reductions would consist of "workforce *optimization*" and at most the elimination of "*duplicative* roles and other *duplicative* general, administrative and overhead costs." ¶¶77, 79. These statements were false when made, as DXC's plan at the time was for massive headcount reductions to achieve Lawrie's mandated drastic, undisclosed cost-cutting targets, without regard to "optimization" or eliminating "duplicative" roles (¶¶3-4, 6, 40-42, 60, 78a., 80a., 89), as subsequent accounts confirmed (¶¶53-54, 56-58, 66-74). Similarly, the Registration

Statement falsely claimed that DXC's "plan … includes a cost reduction initiative *to align its costs with its revenue trajectory*" (¶77), when its undisclosed plan entailed wildly accelerated and excessive cost-cutting, that was cannibalizing to revenues, "chaotic," "non-collaborative" and arbitrary. ¶¶60-61. Plaintiffs thus adequately allege false statements. *See Daou*, 411 F.3d at 1020, 1027 (sustaining claims for misrepresentation of levels of employee turnover); *Kaplan v. Rose*, 49 F.3d 1363, 1371-72 (9th Cir. Oct. 11, 1994). Under §11, nothing more is required. *See In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289, at *13 (N.D. Cal. Aug. 5, 2005).

Further, it is well-settled that "'once [DXC] chose to tout [*inter alia*, (i) the size and scale of the combined company's workforce and its breadth to service customer relationships, (ii) cost reduction targets of $1.0 - $1.5 billion in the first year post-close, (iii) that any personnel reductions would focus on "workforce *optimization*" and at most the elimination of "*duplicative* roles," (iv) that its plan had "a cost reduction initiative *to align its costs with its revenue trajectory*," and "initiatives to improve execution"], they were bound to do so in a manner that wouldn't mislead investors.'" *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (quoting *Berson*, 527 F.3d at 987); *see also Matrixx*, 563 U.S. at 44-45 (duty to disclose triggered by choosing to make statements that can mislead investors); *Khoja*, 899 F.3d at 1009; *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) (omission of contrary internally available information rendered statement misleading and actionable). In other words, having made such representations, the Registration Statement was false and misleading in failing to disclose DXC's true, internal plan to cut critical staff by nearly double the amount told to investors, and despite the dire warnings of top management of the inevitable adverse impact on DXC, which did occur. *See also* §III.A.3 below (Items 303 and 503).

Likewise, DXC's discussions of potential failure to achieve the projected cost synergies, or being unable to "hire," "attract" or "retain" sufficient personnel, were deeply misleading, due to the plan it had in place to massively reduce key personnel; and, contrary to a "risk" of "failing to achieve" cost reduction targets, the *opposite* extreme was happening, as DXC was targeting cutting exponentially more than publicly stated, in a reckless, arbitrary and self-destructive manner, at Lawrie's insistence, for short-term appearance. ¶¶60, 79-80, 89-90. It is well-settled that purported risk disclosures such as these can themselves be misleading and actionable. *See Siracusano v. Matrixx Init., Inc.*, 585 F.3d 1167, 1181-82

(9th Cir. 2009) ("risk factors" held misleading and actionable); *Berson*, 527 F.3d at 986 (cautionary language misleading where investors told contract cancellations "may" occur although facts suggested they were "at serious risk of being cancelled"); *In re Zynga Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 38722, at *17-18 (N.D. Cal. Mar. 25, 2015) (liability under §10(b) where company "warned investors that changes ... *could* materially adversely impact its business" but "Plaintiff contends that Defendants knew about the specific content of an impending change ... that would in fact" have such an impact). No ordinary investor would be able to divine DXC's extreme change in strategy from such misleading statements. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("the disclosure required by the securities laws is … measured … by the ability of the material to accurately inform rather than mislead"); *see also Reese*, 747 F.3d at 570. Defendants cite no substantive cases, and none at all from this circuit, to the contrary (DB 19-20). And even assuming the cuts could not formally be announced until after the merger (DB 20), as stated, Plaintiffs plead that Lawrie's plan was in place well before then.

Moreover, there is no serious question that Defendants' misrepresentations and omissions concerning DXC's true plan for extreme workforce reductions were material. First, the sheer dollar and headcount amount of the planned personnel cuts, among DXC's most critical client-servicing staff, is self-evidently material. ¶¶53-57. Second, Defendants themselves highlighted the importance of the size and scale of DXC's workforce, the total target amount of all cost-cutting measures, and the purportedly carefully calibrated manner of any reductions for "duplicative" roles, prominently showcasing them among the "Reasons for the Merger" – "Strategic Considerations" and "Financial Considerations." Third, when, as DXC's top management warned Lawrie, the "disastrous" cuts impacted DXC's earnings and their extent was revealed, DXC's stock dropped approximately 45%, further indicating the materiality of the undisclosed facts. *See, e.g., No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (stock drop following disclosure supported finding of materiality). In any event, materiality cannot be resolved on a motion to dismiss where, as here, it is not "so obviously unimportant to an investor, that reasonable minds cannot differ on the question of materiality." *Siracusano*, 585 F.3d at 1178; *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1126 (N.D. Cal. 2014), *aff'd in part, rev'd in part and remanded*, 669 F. App'x 878 (9th Cir. 2016) (resolution of materiality for §11 purposes rarely appropriate to decide on motion to dismiss).

Defendants suggest Plaintiffs insufficiently allege that DXC's statements were false when made, and are really challenging "unexpected" "setbacks" "in the execution of its plan" some two years later. DB 2, 13, 15, 22. However, this ignores that the gravamen of the Plaintiffs' claims is that Defendants made misleading statements touting the size of DXC's combined workforce, and the size and nature of its planned reductions, when in fact, at the time, Lawrie had an internal budget planning for nearly double those reductions, developed following the May 2016 announcement of the merger, and as part of the 2017 budget process for DXC, with implementation set to begin immediately upon the April 1, 2017 merger completion. Hilton alongside Lawrie orchestrated and planned the merger from May 2016 through April 2017 (¶¶44, 47, 50-53; ECF 40-8, ¶51), and during this process Hilton "repeatedly advised" Lawrie against his undisclosed internal plan, especially as Lawrie's planned cuts were in critical areas that Hilton and top managers warned would directly harm customer relations and inevitably revenues. ¶¶5-6, 49-50, 52, 54. Moreover, that the truth would ultimately emerge much later is not unusual, but typical, in securities cases, which often have class periods spanning years. *See Reese*, 747 F.3d at 574 (events "months and years" after statements can be used to show falsity at the time); *Flynn v. Sientra, Inc.*, 2016 U.S. Dist. LEXIS 83409, at *36 (C.D. Cal. June 9, 2016) ("That Sientra had not yet felt the loss resulting from [the alleged undisclosed facts] when it allegedly made these statements does not make the statements any less misleading").

Contrary to Defendants' spin (DB 20-21), Plaintiffs do not allege DXC intentionally tried to cripple itself. This is not a Section 10(b) case and Plaintiffs will not speak to Defendants' motive. Rather, Plaintiffs allege Defendants' material misrepresentations and omissions concerning the undisclosed drastic personnel cuts; those cuts did end up crippling DXC, and the timeline was "destructive," as Hilton and others warned, regardless of Lawrie's or others' motive. Likewise, while Defendants assert that the fact that "internal disagreements or concerns existed at the time of the Registration Statement" not need be disclosed (DB 22), they again ignore that it is the failure to disclose the then-existing internal plan to reduce the workforce by nearly double the amount publicly stated (which caused those disagreements), that renders Defendants' statements actionable.

Defendants also suggest Hilton's complaint states the $2.7 billion cost cut was not in DXC's first-year plan (DB 21). To the contrary, Hilton clearly states, "Lawrie's internal budget targets

demanded that Global Delivery achieve approximately $2.7 billion in savings in the first year." ECF 40-8, ¶68. Putting aside whether Defendants are playing word games about public versus undisclosed plans, attempts to dispute facts and inferences are not for this motion. *See Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1029-30 (N.D. Cal. 2016) (resolution of factual disputes as to falsity "not appropriate for resolution on a motion to dismiss").

Similarly inappropriate on this motion, DXC now seeks to denigrate Hilton (who was once part of DXC's formal succession plan), since he sued DXC after ultimately himself falling victim to Lawrie's undisclosed personnel massacre in July 2018; but there could not be a better-placed insider to corroborate Plaintiff's allegations. *See* ¶¶44-50; ECF 40-8, ¶¶59-63. Hilton's division, Global Delivery, contained three-quarters of DXC personnel, and provided most of the customer support for products sold (¶¶64, 67). As DXC admits, it settled Hilton's claims (DB 2).

### 3. Defendants Had a Duty to Disclose Omitted Facts Under Items 303 and 503.

SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") imposes an affirmative a duty on issuers to disclose "*any known trends or uncertainties* that have had or that the registrant reasonably expects will have a *material favorable or unfavorable impact on net sales or revenues or income* from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues … the change in the relationship shall be disclosed." *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998) (noting Item 303 requires disclosure of known trends "reasonably likely to have material effects on the registrant's financial condition or results of operation."). "'[A]ny omission of facts 'required to be stated' under Item 303 will produce liability under Section 11.'" *Violin Memory*, 2014 U.S. Dist. LEXIS 155428, at *50 (quoting *Steckman*, 143 F.3d at 1296).

Here, as described above, Defendants failed to disclose that, leading up to the IPO, DXC's senior executives were aware of—and actually discussed—concerns that implementation of Lawrie's aggressive workforce reduction plan, due to its magnitude and accelerated timing, would negatively impact client service delivery, retention of necessary personnel, and future revenues and profitability. That plan was thus certainly a substantial and known uncertainty that existed prior to the IPO which "[DXC] reasonably expect[ed] [would] have a material impact on net sales, revenues, or income from

continuing operations." ¶87. Defendants' failure to disclose this known trend was a violation of Item 303 and, thus, of Section 11. *See Steckman*, 143 F.3d at 1296; *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 710-71, 715-20 (2d Cir. 2011) (sustaining Item 303-based §11 claim under Rule 8(a) where defendants failed to disclose subsidiary's shift toward more risky strategy and plaintiff pleaded plausible inference of actual knowledge); *Cai v. Switch, Inc.*, 2019 U.S. Dist. LEXIS 116702, at *15-16 (D. Nev. July 12, 2019) (failure to disclose change in sales strategy actionable under Item 303). Thus, Defendants' contention that Plaintiffs have not pled that any material impact was likely to result from the trends or uncertainties alleged to have existed at the time of the Registration Statement is without merit, and their citation to *In re Restoration Robotics, Inc., Sec. Litig.*, inapposite. 417 F. Supp. 3d 1242, 1263-65 (N.D. Cal. 2019) (some "undisclosed" facts took place well after IPO, sales alleged to be decreasing were actually increasing, and plaintiffs actually "allege[d] Defendants did *not* know of problems pertaining to [alleged issues];" other aspects of §11 claim sustained).

Defendants again mischaracterize Hilton's account of Lawrie's extreme workforce cuts, as "subjective" accounts of "one" former employee, "years" after the merger, after DXC "moved the goalposts on him," which is wrong on all counts. Hilton simply related the fact of the undisclosed plan for extreme cuts which he personally discussed *prior to* the merger with Lawrie, and is corroborated by numerous sources; and stated that other division heads expressed the same concerns. Further, that Lawrie may have later "began moving the goal posts for Global Delivery in ways apparently calculated to ensure Hilton's failure" (DB 2, 15, 21-22, citing ECF 40-8, ¶88), appears petty (and *de minimis*), but in no way changes the fact that by the time of the Registration Statement, Lawrie had a plan for massive personnel cuts of about $2.7 billion, dwarfing what was represented to investors. Defendants' distortions of Hilton's account are inappropriate on this motion.

Defendants employ a gimmick argument, contending that Plaintiffs' disclaimer of allegations of "fraud" allegations in ¶100 (the prefatory paragraph of the Section 11 count), included to avoid any specter of the complaint "sounding in fraud" and triggering different pleading standards, somehow means Plaintiffs are ineligible to plead "known trends" or risks for purposes of Items 303 and 503 (DB 4, 23-24). This argument is a non-sequitur, and unsurprisingly, Defendants cite no authority adopting it. Plaintiffs disclaimed "fraud, recklessness, or intentional misconduct" (¶100) which are the indicia of

*scienter* for purposes of Rule 9(b) or the PSLRA, but did *not* disclaim "knowledge" (even though Defendants misleadingly suggest they do, DB 4), for purposes of Item 303 and 503. The two concepts are not the same. *See, e.g., J&R Mktg. v. GMC*, 549 F.3d 384, 392 (6th Cir. 2008) ("Section 11 does not amend Item 303's requirement of knowledge. Instead, Section 11 does not impose a further requirement of knowledge, as a fraud action would").

Similarly, SEC Reg. S-K Item 503(c) ("Item 503") requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors "must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment." *Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Cos., Inv. Adv., Inv. Cos., & Mun. Sec. Issuers*, SEC Release No. 1149 (July 29, 1998). Item 303 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004); *see Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *4 (D. Mass. Feb. 15, 2018) ("a complaint alleging violation of Section 11 in Item 503 disclosures must 'allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely affect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor.'") (citations omitted).

Here, the Registration Statement violated Item 503 by failing to adequately disclose the risks posed by DXC's actual workforce reduction plan, even though they were some of the most significant factors that made an investment in DXC shares speculative or risky. Specifically, the Registration Statement omitted that, in fact, DXC's true, internal plan was to achieve approximately $2.7 billion in cost savings in the first year after the merger, primarily by terminating tens of thousands of DXC's most highly-skilled, client-facing employees, and the severe risks to expected revenue and income therefrom. ¶89. These severe risks were not only known to DXC and top management, but protested by top management to the plan's originator, Chairman and CEO Lawrie, because the excessive cuts would be "disastrous for DXC's long-term revenues" as they "could not be achieved … without negative impacts

on customer satisfaction." ¶¶52-54. Yet, the Registration Statement disclosed neither the internal plan to cut $2.7 billion in costs the first year, nor the concomitant (warned of) risks that this would cripple DXC's workforce infrastructure, significantly harm DXC's ability to deliver on client contracts, endangering its longer-term revenue, and harm DXC's ability to attract or retain other personnel needed to service those contracts. ¶89.

As described above in §III.A.2, in the over 24 pages of risk disclosures in the Registration Statement, DXC failed to include any risk disclosures concerning the then-existing plan to cut $2.7 billion in costs the first year, primarily from its top client-servicing employees, and that this would likely materially harm revenue and income. Defendants' boilerplate warnings that they "cannot predict with certainty if or when these cost and revenue synergies … and benefits will occur, or the extent to which they actually will be achieved," and that their "[r]ealization" "could be affected by … factors beyond … [DXC's] control," that DXC "may have difficulty attracting, motivating and retaining executives and other employees" and that its ability to "provide customers with competitive services is dependent on [DXC's] ability to attract and retain qualified personnel" (DB 5, 12) lacks the specificity required under Item 503, and, tells investors nothing about DXC's undisclosed plan to *cut* such personnel, *en masse*. *See Cai*, 2019 U.S. Dist. LEXIS 116702, at *15-17 ("The court is not aware of any language in the registration statement that indicates the specific risks arising from Switch's new sales strategy…. Further, [plaintiff] alleges that once Switch disclosed its sales strategy along with its potential effects on revenue, Switch's stock price dropped by 22.3%.... *This is precisely the type of risk that item 503 requires issuers of securities to disclose*.").

4.    Defendants' Statements and Omissions are not Protected by the Safe Harbor.

a)    *The Safe Harbor does not Apply to this Initial Public Offering.*

The PSLRA safe harbor provisions do not apply to initial public offerings of stock. 15 U.S.C. §77z–2(b)(2)(D). Here, while the transaction was not a vanilla IPO (resulting as it did from spin-offs), it entailed the issuance of a brand new, never-before publicly traded security, of a new (and thus previously non-reporting) company, having all the salient hallmarks of an initial public offering and invoking the policy behind extra scrutiny of new securities of new companies, trading publicly for the first time. *See In re AT&T Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 29588, at *36 n.6 (D.N.J. Sept. 2, 2004) ("these

forward-looking statements are not protected by the safe harbor because they were made in connection with an initial public offering. The Prospectus makes clear that the Wireless IPO was for 'a *new class* of [AT&T'] common stock' [and] stated that '... shares of AT&T Wireless tracking stock *have not been publicly traded before this offering.*'"). DXC's Registration Statement states, "There currently is no trading market for shares of Everett [a new spinoff by HPE of HPES] to common stock. Everett intends to file an application to list its common stock on the NYSE under the symbol 'DXC.'" ECF 40-1, at 64, 130 (referring to "[t]he new company"); ¶37.  This comports with the common definition of an initial public offering as being the "first offering of equity securities of an issuer to the public pursuant to a registration statement." 69 Am. Jur. 2d Securities Regulations – States §101, n.93 (2003). As Defendants' counsel has written, "*Spin-offs are complex IPOs* with a sophisticated tax overlay .…" https://www.lw.com/Reports/PracticeAndIndustryReport.aspx?topicid=638. Thus, the safe harbor is inapplicable.

Further, if the initial offering of DXC shares is not deemed an initial public offering, then it should be considered an offering by CSC. Under the PSLRA, the safe harbor does not apply to any forward-looking statement "(1) that is made with respect to the business or operations of the issuer, if the issuer … (A) during the 3-year period preceding the date on which the statement was first made … (ii) has been made the subject of a judicial or administrative decree or order arising out of a governmental action that … (iii) determines that the issuer violated the antifraud provisions of the securities laws." 15 U.S.C. §77z–2(b)(1)(A)(iii). On June 5, 2015, less than three years before the Registration Statement, the SEC entered an administrative order finding that CSC had violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j, one of its antifraud provisions. *See* Apton Decl. Ex. 1 filed herewith. Thus, forward-looking statements regarding CSC's business (*i.e.*, those Defendants contest) are not entitled to protection under the Securities Act safe harbor.

b)     *DXC's Statements of Present Fact and Omissions are not Protected.*

Even if the safe harbor did apply here, Defendants cannot escape liability, as their statements concerned or omitted present facts, or at best, were "mixed" statements that both concerned present facts and looked to the future; such "mixed" statements are not entitled to the safe harbor, at least with respect to the part of the statement that refers to the present. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130,

1141-42 (9th Cir. 2017) ("a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements … with forward-looking statements"). In *Quality Sys.*, the Court emphasized that the "safe harbor is designed to protect companies … from suit when optimistic projections of growth in revenues and earnings are not borne out by events" but "is not designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Id. Quality Systems* reflects the Ninth Circuit's most recent analysis of mixed statements of existing and forward-looking facts, and undercuts Defendants' reliance on *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014), and the district court cases pre-dating *Quality Sys.* (DB 9-11).

Here, DXC conveyed to investors its plan for cost savings, stating that it expects the merger will produce first-year savings of $1.0 billion, with a run rate of $1.5 billion by the end of year one, and that "[t]he $1.0 billion post-close and $1.5 billion run rate … *were* each calculated by estimating the expected value of … cost synergies expected from workforce optimization such as elimination of duplicative roles," and that DXC *had* a "plan …which *includes* a cost reduction initiative to align its costs with its revenue trajectory" and "initiatives to improve execution in sales performance and accountability." ¶77; ECF 40-1 at 45, 149. These statements conveyed misrepresentations of *current* fact because they indicated *there existed a current* plan for $1.0 to $1.5 billion in cost cuts, which *had already been calculated using* cost savings from workforce "optimization" and elimination of "duplicative" roles as a basis, and that DXC's *existing* plan "*includes*" a cost-cutting plan to align costs with revenue trajectory, and improve sales performance accountability. In fact, as explained above, these statements were false and misleading because there already existed DXC's true, undisclosed plan, which *had set nearly double* the stated amount, or $2.7 billion, as the cost-cutting amount, and *had not* been aligned to revenue trajectory, and gravely undercut "sales performance and accountability." *See Quality Sys.*, 865 F.3d at 1141-42 (safe harbor inapplicable to "mixed" statements, where company made representations about sufficiency of its pipeline – amounting to planned revenues, and comparable to the planned costs here – based on certain estimates); *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018)("the

element of Defendants' statements that pertained to the status of Defendants' *current* expectations or status were not forward-looking, and are not protected by the safe harbor.") (emphasis in original).

Further, the material omitted facts described above, including the true $2.7 billion cost-reduction mandate within the first year, and attendant adverse facts and risks; as well as the "known trends and uncertainties" reasonably expected to have material effects, and known risks, that should have been disclosed under Items 303 and 503, are not subject to the safe harbor. *See Prodanova v. H.C. Wainwright & Co., LLC,* 2018 WL 8017791, *34 (C.D. Cal. Dec. 11, 2018) (safe harbor "does not apply" where statement allegedly "misleading because it omitted a disclosure of a present fact," including pertaining to a future announcement); *Dahhan*, 321 F. Supp. 3d at 254 ("[o]missions of existing facts are not forward-looking statements, and are not protected by the PSLRA safe harbor.").

*c)*      The *"Cautionary" Language was Inadequate or Itself Misleading.*

Similarly, Defendants' argument that their "cautionary language" immunizes them as a matter of law is unavailing. *First*, as to Defendants' above-described omissions, or "mixed" forward-looking and current status statements, virtually no cautionary language will be sufficient. *Quality Sys.*, 865 F.3d at 1148 ("virtually no cautionary language" can shield misrepresentations or omissions of present fact).

*Second*, to the extent Defendants' statements regarding future forecasts and events may be considered forward-looking, they were not accompanied by "meaningful" cautionary statements that conveyed "substantive information about factors that realistically could cause results to differ materially from those projected." *In re STEC Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 75093, at *26 (C.D. Cal. June 17, 2011) (quotations omitted); *see also Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (warnings insufficient as they "did not 'counterbalance [the] misleading impression created by [the initial misrepresentations]'") (citation omitted); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 919-20 (N.D. Cal. 2012) ("The cautionary warning ought to be precise" and "relate directly to" the misleading aspect of the challenged statement). The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the cautionary language prong of the safe-harbor provision. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). To constitute meaningful cautionary language, a disclaimer must "sufficiently address *the harm that resulted.*" *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (reversing dismissal).

Risk warnings must be clear enough that "'reasonable minds' could not disagree that the challenged statements were not misleading." *In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017). The "warnings" Defendants cite here are boilerplate, obligatory disclaimers that do not come close to meeting this standard, and tell investors nothing about the actual, highly material facts then-existing, and their likely material impact on DXC.

Thus, Defendants do not dispute that DXC planned and implemented Lawrie's undisclosed cost-cutting strategy, but instead claim they warned there was "[n]o assurance" of DXC's success in the realization of various synergies from the merger, including cost reduction synergies, or the timing thereof. *See* DB 11-12 (citing the following cautionary statements: "success in realizing [such] benefits, and the timing of their realization, depends on the successful integration" of the companies; DXC "cannot predict with certainty if or when these … synergies … will occur, or the extent to which they will … be achieved;" "[r]ealization of any benefits and synergies could be affected by … factors outside [our] control;" "[t]he amount of synergies actually realized … could differ materially from the expected synergies;" and "[i]f the integration is unsuccessful or if [DXC] is unable to realize the anticipated synergies..., there could be a material adverse effect on [DXC]").

These disclosures, however, were extremely generalized and did not disclose the central facts at issue here. Obviously, no ordinary investor would be able to divine that, contrary to its representations of $1.0 to $1.5 billion in cuts, DXC had adopted an undisclosed cost-cutting plan nearly double the amount represented to investors, primarily by terminating its most critical client-servicing staff, together with the virtually assured devastating impact on revenues and income, from such boilerplate hypotheticals, which could apply to the merger of any two companies. *See Miller*, 519 F.3d at 886 (courts must assess registration statement disclosures considering "[t]he fair and reasonable implication an ordinary investor would derive from" a disclosure); *Cai*, 2019 U.S. Dist. LEXIS 116702, at *15 ("the sections [of the registration statement] defendants quote do not indicate that [the company] had already changed its … strategy").

Defendants also invoke the misleading "warnings" cited above (§§II.B., III.A.2), that DXC's ability to provide customers with competitive services depended in part on its ability to "*attract and retain* qualified personnel;" "[t]he loss of personnel *could* impair the ability of the combined company

to perform under certain contracts, which could have a material adverse effect," and "if [DXC] does not hire, train, motivate and effectively utilize employees with the right mix of skills and experience … to meet the needs of its clients, its financial performance could suffer." DB 12. But, as stated above, these statements, cast as hypotheticals, tell investors nothing about DXC's undisclosed plan to *itself cut* such personnel, *en masse*, and thus were themselves misleading. *See Siracusano*, 585 F.3d at 1181-82; *Berson*, 527 F.3d at 986; *see also Zaghian*, 675 F. App'x at 720 (generic risk warning not meaningful regarding specific sales risk at issue, due to company's strategic choice); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018)("[H]ypothetical risk disclosures … do not absolve Defendants of their duty to disclose known material adverse trends").

Defendants' remaining cases are inapposite, as they turned on either statements that were simply were not material or misleading, facts that were clearly known or disclosed, or disclosure of the exact facts alleged to be undisclosed, rather than on boilerplate risk disclosures as here. *See Intuitive Surgical*, 759 F.3d at 1056 (where complaint alleged defendants knew or should have known business was "decreasing because of the economic downturn," annual report warned "an economic downturn 'may have significant impact'" on customers' ability to buy products); *In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010) (failure to state claim where company previously disclosed it was having difficulties with junior sales force, which it sought to realign, but was ultimately unsuccessful); *Golub v. Gigamon, Inc.*, 372 F. Supp. 3d 1033, 1048-50 (N.D. Cal. 2019) (failure to allege falsity; reliance solely on omissions where court declined to extend *Omnicare* to §14(a) claims; proxy warned that "[i]n light of the foregoing factors and the uncertainties" "stockholders are cautioned not to place undue, if any, reliance on the projections"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1053, 1062 (N.D. Cal. 2012) (in projections case, complaint alleged myriad reasons why company failed to meet projections; lack of qualified personnel was only one, minor reason, and it was included among robust risk disclosures).

                           d)       *Defendants' Actual Knowledge of the Undisclosed Facts is Pled.*

Lastly, the safe harbor does not apply as Plaintiffs have adequately pled Defendants' actual knowledge of the critical facts rendering the challenged statements (assuming they were forward-looking) false and misleading, namely, that Lawrie (as discussed among top management) had

established an undisclosed plan to achieve $2.7 billion in cost-reductions the first year post-merger, nearly double the amount represented to investors. *See* §§II.A., III.A.2; §III.A.3 (Plaintiffs nowhere disclaim pleading actual knowledge, only "fraud"). Likewise, DXC's reach outside the pleadings to cite its own press release to argue that DXC "achieved" $1.0 billion in savings (DB 13), is no defense, where the crux of the allegations is that DXC misrepresented its undisclosed, then-existing plan for far deeper and faster personnel cuts than represented. Even granting DXC's assertion of "over $1.1 billion in savings" at March 31, 2018, further discovery is needed to test this assertion, including when and how those savings were realized and booked, or how much "over" that figure was cut (the reported number of jobs cut suggest a higher figure). Any further disputation of facts concerning the false and misleading nature of DXC's statements must await discovery. *See Robb*, 216 F. Supp. 3d at 1029-30 (resolution of factual disputes as to falsity inappropriate on pleadings); *In re Mikohn Gaming Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 62713, at *46 (D. Nev. Aug. 31, 2006) ("actual knowledge" under safe harbor pled "only generally for a Securities Act claim.").

5.     Defendants' Statements and Omissions are not Immaterial Puffery

As Defendants recognize, "puffery" is at bottom a dispute over materiality. DB 16. As such, Defendants bear a heavy burden in seeking dismissal, one they cannot carry here. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) ("this Court will only grant Defendants' motion to dismiss on the ground that the statements are 'puffery' only if it concludes that the statement is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'"). In the Ninth Circuit, "[w]hat might be innocuous puffery or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *Mulligan*, 36 F. Supp. 3d at 966 (inappropriate to determine "puffery" by "plucking the statements out of their context"); *see also Quality Sys.*, 865 F.3d at 1144 (recognizing that where, as here, statements go "beyond 'feel good' optimistic statements" or "subjective or emotive" descriptions, they cannot be dismissed as mere puffery).

Defendants defend only three statements as inactionable puffery, but their arguments miss the mark. First, Defendants challenge the Registrations Statement's claims that the merger would generate

enormous "net synergies" and "strategic and financial benefits." DB 16. These statements are alleged to provide context for Defendants' other representations in those sections discussed above, *e.g.*, that "with *a collective workforce of approximately 178,000 employees* ... the *size and scale of the combined company* [would] enhance [DXC's] ability to provide value to its customers through a broader range of resources and expertise to meet their needs," the "strong customer relationships" those employees "will bring to the combined company," and the assertion that the merger would generate $1.0 - $1.5 billion in first year synergies, from workforce "optimization" and elimination of "duplicative" roles (¶¶77, 79 citing ECF 40-1 at 68-69). The assertion of such "net synergies" and "strategic benefits" was misleading because the reasons given therefor were misleading, due to the misstated and omitted facts concerning the undisclosed, wildly excessive workforce reduction plan, which also rendered the synergies impossible. Thus, Defendants' authorities (DB 16) are inapposite because these statements were misleading not merely by themselves but in conjunction with the surrounding statements.

Second, Defendants label as mere "puffery" (DB 16) their assertions that DXC had a "turnaround plan" "which includes a cost reduction initiative to align its costs with its revenue trajectory" and "initiatives to improve execution in sales performance and accountability." ¶77; ECF 40-1 at 45, 149. As stated, these statements conveyed misrepresentations of current fact because they indicated there existed a plan, which DXC stated entailed $1.0 to $1.5 billion in cost cuts, that DXC had carefully calibrated (focusing on savings from workforce "optimization" and elimination of "duplicative" roles) to align costs with revenue trajectory, and improve sales performance accountability. In fact, as explained above, these statements were *materially* false and misleading (not "puffing") because DXC's true, undisclosed plan had set nearly double the stated amount, or $2.7 billion, as the cost-cutting amount, which Hilton and other senior managers protested precisely because it was *not* aligned to revenue trajectory, but recklessly cut jobs without regard to revenue impact, and would gravely undercut revenues and "sales performance and accountability."

Third, Defendants contend that certain of their "risk disclosures" that DXC may not "hire," "attract" or "retain" sufficient personnel with "skills and experience" "to enhance [DXC's] ability to provide … its customers [with] a broader range of resources and expertise," were "puffery" (DB 17). Putting aside the awkwardness of Defendants undermining their purported "meaningful" cautionary

language as mere "puffery," Plaintiffs have already demonstrated that these statements were themselves false and misleading, and failed to disclose material facts. *See* §§II.B., III.A.2. and 4.c). Indeed, the undisclosed massive, intended cuts here distinguish this case from mere corporate cheerleading, and mere shortfalls, as in Defendants' cases.

### 6.    Defendants' Statements and Omissions are not Immaterial Opinion

Defendants also seek to avoid liability by claiming broadly that their statements concerning (i) synergies, and the "the potential impact of [DXC's] turnaround plan," and (ii) "the effectiveness of [DXC's] hiring practices," were inactionable statements of "opinion." DB 17-18. It is unclear what specific Defendants statements claim are "opinions," and why. However, Plaintiffs have explained above how DXC's statements concerning synergies, including representations regarding "optimization" and elimination of "duplication," were part of false and misleading assertions and omissions, that were material (not mere "opinion") and actionable; that DXC's statements concerning its "turnaround plan" were misleading due to the misrepresentation that it included initiatives to "align [DXC's] costs with its revenue trajectory" and "improve execution in sales performance and accountability" (not opinion); and misleadingly "warned" that DXC "might" fail to "attract" or "retain" personnel, when it had a plan to terminate them *en masse* (also not opinion).

Even accepting Defendants' incorrect premise, statements of opinion are actionable under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), if "the speaker did not hold the belief she professed" or if "the supporting fact[s] she supplied were untrue." *Id.* at 185-86. Moreover, a statement of opinion may be reasonably interpreted as indicating "the speaker knows facts sufficient to justify him in forming the opinion, or that he at least knows no facts incompatible with the opinion." *Id.* at 191. An opinion is thus actionable, regardless of the speaker's subjective belief, if that statement "omits material facts about the issuer's … knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor" "would take from the statement itself" (*id.* at 189-90); or "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Hgts. Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (DB 18); *see also Omnicare*, 575 U.S. at 185-86; *In re Atossa*, 868 F.3d at 802.

Here, Defendants were aware of Lawrie's existing parallel plan to cut costs nearly double the amount publicly stated, with Hilton and others "repeatedly" telling him it would be "disastrous" for revenue. *See In re Time Warner*, *Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (duty to disclose alternatives to company goal may arise even when "under active and serious consideration"). Under the above authority, Plaintiffs thus sufficiently allege (i) the speaker(s) could not and did not believe the assertions professed, even if negligently, (ii) the facts DXC supplied were untrue; or (iii) Defendants knew of facts incompatible with their statements, and/or omitted material facts rendering their statements misleading to reasonable investors, or conflicting with what investors would take away from such statements; or were aware of undisclosed facts seriously undermining the statements' accuracy.

**B.    The Individual Defendants and HPE are Liable under §15 of the Securities Act.**

Defendants do not challenge Plaintiff's Section 15 claim except insofar as they challenge an underlying §11 violation. DB 24. Because Plaintiffs have stated a §11 claim against Defendants, the §15 claim should be upheld as well. *See Cai*, 2019 U.S. Dist. LEXIS 116702, at *20.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied in its entirety. Alternatively, should the Court dismiss any aspect of the Complaint, Plaintiff respectfully requests leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: April 9, 2020                                   Respectfully submitted,

                                                              **LEVI & KORSINSKY, LLP**

                                                              */s/ Adam M. Apton*
                                                              Adam M. Apton (SBN 316506)
                                                              Adam C. McCall (SBN 302130)
                                                              Email: aapton@zlk.com
                                                              Email: amccall@zlk.com
                                                              388 Market Street, Suite 1300
                                                              San Francisco, CA 94111
                                                              Tel.: 415-373-1671
                                                              Fax: 415-484-1294

                                                              **GLANCY PRONGAY & MURRAY LLP**
                                                              Robert V. Prongay (SBN 270796)
                                                              Kara Wolke
                                                              1925 Century Park East, Suite 2100
                                                              Los Angeles, California 90067

Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: kwolke@glancylaw.com

*Attorneys for Lead Plaintiffs*
*and Lead Counsel for the Class*