# Exhibit 1

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 9804 / June 5, 2015

SECURITIES EXCHANGE ACT OF 1934
Release No. 75110 / June 5, 2015

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3662 / June 5, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16575

| | |
|---|---|
| **In the Matter of**<br><br>   **COMPUTER SCIENCES**<br>   **CORPORATION, MICHAEL**<br>   **LAPHEN, MICHAEL**<br>   **MANCUSO, WAYNE BANKS,**<br>   **CLAUS ZILMER, AND PAUL**<br>   **WAKEFIELD**<br><br>**Respondents.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER ("ORDER")** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Claus Zilmer and pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Exchange Act against Computer Sciences Corporation ("CSC"), Michael Laphen, Michael Mancuso, Wayne Banks, and Paul Wakefield (collectively with Zilmer, "Respondents"); and that public administrative proceedings be, and hereby are, instituted against Laphen, Banks, and Wakefield pursuant to Exchange Act Section 4C and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") that the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order, as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1]:

**SUMMARY**

1.      From 2009 to 2011, CSC engaged in a wide-ranging accounting and disclosure fraud that materially overstated its earnings and concealed from investors significant problems with its largest contract.  Former CEO Michael Laphen approved CSC's use of improper accounting models for the company's multi-billion dollar contract with the United Kingdom's National Health Service ("NHS").  Laphen and former CFO Michael Mancuso also failed to make required disclosures and made misleading statements to investors about the NHS contract. And in one quarter, CSC's former Finance Director for the NHS account prepared a fraudulent accounting model in which he included made-up assumptions to avoid a negative hit to CSC's earnings.  As this was occurring in the United States and the United Kingdom, senior CSC finance personnel in Australia fraudulently overstated the company's earnings using "cookie jar" reserves and by failing to record expenses as required.  Separately, CSC finance personnel in Denmark engaged in a variety of fraudulent accounting manipulations that also overstated the company's earnings.  Throughout this period, CSC's most senior executives and various finance personnel repeatedly failed to comply with straightforward accounting standards and disclosure rules.

2.      CSC's[2] contract with the NHS was a significant source of concern for the company.  It was the company's largest, and most high profile contract, and CSC experienced substantial difficulties performing as required, even after the contract was amended in 2009 to give CSC additional time to meet deadlines it had missed.  CSC's failure to meet its deadlines would have significantly reduced the profit the company could make from the project.  Under the

---

[1]      The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]      The NHS awarded the contract to a CSC affiliate in the UK, CSC Computer Sciences Ltd., which performed the NHS contract.  Throughout this document "CSC" may refer to CSC, the issuer, or its foreign subsidiaries or affiliates.

relevant accounting standards, every time CSC forecasted that it would earn a lower profit margin than it had previously expected, it was required to report a reduction in its earnings.

3.      In September 2009, CSC finance personnel responsible for the NHS contract prepared an initial accounting model that reflected the NHS contract was no longer profitable. This was a significant change from prior models, which had forecast a 16% profit margin.  In response, Robert Sutcliffe, the Finance Director on the NHS account, led a fraudulent "gap closing" exercise in which his team simply contrived assumptions about additional revenue CSC would earn on the contract.  These assumptions had no basis in reality.  The accounting model they prepared artificially restored the forecasted profit margin to its previous level, thereby avoiding the material reduction in operating income that GAAP required CSC to record.

4.      With delays continuing, the NHS account team warned Laphen and Mancuso that CSC would need a "major contract reset" and would need to "re-cast" its accounting models in the future.  In late 2009, Laphen and Mancuso were aware that CSC began using proposed contract amendments that CSC was negotiating with the NHS, and that Laphen and Mancuso hoped the UK government would agree to implement, as the basis for CSC's accounting models rather than the enforceable contract with the NHS.  They did so even though the assumptions in the company's accounting models bore scant relation to the actual contract.  Most significantly, notwithstanding CSC's delays and the UK government's criticism of CSC's performance, these accounting models assumed the UK government would agree to pay substantially higher prices than required by the contract for less work so that CSC could maintain its expected profit margin.

5.      As CSC's delays continued and its profit margin under the enforceable contract declined, and with CSC and the NHS unable to reach agreement on potential amendments, the account team avoided recording material reductions in CSC's earnings by adjusting the models to assume the UK government would agree to pay progressively higher prices.  CSC included these assumptions in its models for a two-year period despite the NHS's repeated rejections of CSC's proposed amendments, even though NHS personnel and UK government officials stated frequently they were unhappy with CSC's performance, and even after the Chair of the UK's Public Accounts Committee was quoted publicly as saying CSC's proposed contract amendments were "unspeakably unacceptable" and "[t]here is no way these guys ought to be working for the government."  This was a clear violation of GAAP.  CSC also failed to comply with GAAP by failing to impair the value of its contract assets when it ceased to be probable that the company would recover its investment in the program.

6.      CSC also made misleading statements to investors and failed to make required disclosures regarding the NHS contract.  On two occasions in 2009, Laphen told investors that CSC had met, and expected to continue meeting, its deadlines.  These disclosures were misleading because they failed to inform investors that CSC was not achieving the milestones set

forth in the contract; that Laphen was referring to informally revised deadlines[3]; that CSC was engaged in an ongoing dispute with the NHS about which milestones applied; that CSC's deployment projections were falling far short of expectations; and that the NHS had sent letters asserting that CSC was in default and demanding that CSC pay penalties.

7.      In violation of multiple disclosure requirements, Laphen and Mancuso repeatedly failed to inform investors of these issues.  They also failed to disclose that CSC was calculating its profit margin for the NHS contract using its proposed contract amendments — instead of the binding contract between the parties — and that CSC would have to record a material decrease in its earnings unless the NHS and various other UK government bodies agreed to amend the contract to require them to pay CSC significantly higher prices.

8.      In addition, CSC made misleading statements and failed to make required disclosures to investors about the relationship between the NHS contract and one of CSC's most important financial metrics, free cash flow.[4]  The NHS had agreed to provide CSC cash advances to help offset the company's costs.  Although GAAP allowed CSC to record these advances as operating cash flow, rather than financing cash flow, they were effectively loans.  CSC effectively paid the NHS a 5% interest rate for the advances and refunded the portions of the advances that CSC was unable to earn in revenue.  CSC's former Treasurer had recommended to Mancuso that CSC lower the amounts of the advances because the high costs of the arrangement resulted in an economic loss for CSC.  However, Mancuso rejected this recommendation.  He directed that the advances continue because they allowed CSC to meet its cash flow targets.  The amounts of these advances as a percentage of CSC's free cash flow, and the amounts CSC returned to the NHS as its delays continued, increased substantially — peaking at 63% of CSC's free cash flow in Q4FY2011, with the company subsequently returning 93% of that advance when the NHS finally ended the arrangement in FY2012.

9.      In violation of SEC disclosure rules, Mancuso repeatedly failed to disclose that these unusual advances from the NHS comprised significant proportions of its free cash flow results.  Moreover, on two occasions, Mancuso made misleading statements to investors about the advances.  During CSC's year-end earnings calls for FY2009, a financial analyst asked Mancuso whether CSC had received "any large prepayments" from NHS or other clients during the fourth quarter of FY2009.  Even though he knew that CSC had indeed received a large prepayment from the NHS in that period, Mancuso replied that the company had not.  And during CSC's year-end earnings call for FY2010, Mancuso led investors to believe CSC had not received a large advance from the NHS, telling investors that CSC had achieved its free cash flow results "the old fashioned hard way."  Mancuso attributed CSC's cash flow results, which he

---

[3]      The NHS agreed to a new set of deadlines it identified as "highest priorities (and bare minimum[s])" but noted that these were not "in any way a waiver of CSC's obligations to deliver its contracted requirements."

[4]      Although free cash flow is a non-GAAP metric, many CSC analysts consider it to be an important performance metric because it reflects how much cash the company is generating.

described as "a glowing achievement" and "not unnatural," to improvements in working capital and receivables.

10.     In addition to the accounting and disclosure violations involving the NHS contract, two of CSC's international businesses ignored basic accounting standards to increase their reported profits. In Australia, CSC's two most senior finance executives in the country, regional CFO Wayne Banks and Controller Edward Parker, fraudulently manipulated the company's earnings through excess accruals they maintained in "cookie jar" reserves and by failing to record expenses as required. This fraud alone overstated CSC's consolidated pretax income by over 5% in Q1FY2009, and allowed CSC to meet analysts' earnings targets in that period.

11.     And during FY2010, CSC's Nordic region engaged in a variety of accounting manipulations to fraudulently inflate its operating results. These included improperly accounting for client disputes, overstating assets, and capitalizing expenses. The fraudulent conduct involved Finance Director of the Nordic region Paul Wakefield and other employees in Denmark. CSC's Nordic region engaged in this misconduct to improve operating income in a region that was struggling to achieve budgets set by CSC management in the U.S. During FY2010, the accounting fraud in Denmark overstated CSC's consolidated pre-tax income by 5% in Q1FY2010, 3% in Q2FY2010, 4% in Q3FY2010, and 7% in Q4FY2010.

## RESPONDENTS

12.     Computer Sciences Corporation sells information technology services. It is a Nevada corporation headquartered in Falls Church, VA. CSC's common stock is currently registered with the Commission pursuant to Exchange Act Section 12(b) and trades on the New York Stock Exchange.

13.     Michael Laphen, 64, was CEO and Chairman of CSC from 2007 until his retirement in March 2012, after 35 years with the company. Laphen holds a bachelor's degree in Accounting from Pennsylvania State University and an MBA from the University of Pennsylvania. Laphen was licensed as a certified public accountant in Pennsylvania from 1975 to 1990, when his license became inactive.

14.     Michael Mancuso, 72, was CFO of CSC from December 2008 until his retirement in May 2012. Previously, Mancuso was the CFO of General Dynamics Corp. Mancuso holds a bachelor's degree in Business Administration from Villanova University and an MBA from Eastern College.

15.     Wayne Banks, 47, a citizen and resident of Australia, was CSC Australia's CFO from 2006 until he resigned in July 2011. Banks has a bachelor's degree in Business and is a Chartered Accountant in Australia.

16.     Paul Wakefield, 42, a citizen and resident of the UK, was the Finance Director of the Nordic region from April 2008 to April 2010. Wakefield resigned from CSC in April 2010.

Wakefield is an associate of the Chartered Institute of Management Accountants in the UK. Wakefield entered into a cooperation agreement with the Division of Enforcement pursuant to which he has agreed to cooperate fully in the SEC's investigation; in any related enforcement litigation or proceedings to which the SEC is a party; and, when directed by SEC Enforcement Division staff, in an official investigation or proceeding by any federal, state, or self-regulatory organization.

17.    Claus Zilmer, 48, a citizen and resident of Denmark, was a Finance Manager for CSC's Nordic region from April 2008 until June 2010. Zilmer left CSC in September 2010. Zilmer holds a degree in Economics and Business Administration from Odense University, now known as the University of Southern Denmark.

## OTHER RELEVANT PERSONS

18.    Robert Sutcliffe, 51, a citizen and resident of the UK, was CSC's Finance Director for the NHS account from April 2004 until May 2012. CSC suspended Sutcliffe in May 2012 and terminated his employment in 2013. Sutcliffe studied accounting and business finance at Manchester University. He is a fellow of the Chartered Institute of Management Accountants (CIMA) in the UK. The Commission has charged Sutcliffe for his role in the misconduct described in its Order.

19.    Edward Parker, 42, a citizen and resident of Australia, was CSC Australia's financial controller from 2007 until the company suspended him in August 2011. He left the company in October 2012. Parker has been a licensed Chartered Accountant in Australia since 1994. The Commission has charged Parker for his role in the misconduct described in its Order.

20.    Chris Edwards, 32, a citizen and resident of the UK, was the Finance Manager of the Nordic region Global Outsourcing Services Pools from December 2008 to June 2010. Edwards left CSC in October 2010. Edwards is a Chartered Accountant in the UK. The Commission has charged Edwards for his role in the misconduct described in its Order.

## FACTS

### Background of CSC's Contract with the NHS

21.    Having launched a plan in 2003 to electronically integrate patient medical records across the United Kingdom, the NHS awarded long-term contracts to CSC Computer Sciences, Ltd and three other IT contractors to build and deploy an electronic patient records system by 2013. The project experienced technical problems and delays almost from the start. As other contractors abandoned the project, the NHS encouraged and approved of CSC expanding its role. By 2007, CSC had assumed responsibility for the project throughout most of the UK.

22.    CSC had the potential to earn $5.4 billion in revenue if it were able to satisfy the terms of the NHS contract. CSC earned revenue under the contract only to the extent that it

delivered products and services to the NHS under the timeframes and volumes set forth in the contract's deployment plan. To incentivize CSC to meet the contract's deployment targets, the contract penalized CSC up to $160,000 per day for missed deadlines.[5]

23. CSC experienced substantial difficulty developing the software required to run the patient medical records system. Because of its delays in performing as required under the contract, and the UK government's expansion of CSC's role in the project, CSC sought contract amendments in 2008 to reset the deployment plan and to waive the penalties CSC was required to pay. According to the UK Department of Health's Director General for Informatics at the time, the NHS agreed to these amendments primarily to gain what it believed to be certainty on deployment dates. In March 2008, the NHS entered into a binding Memorandum of Understanding with CSC that reset the deadlines.

24. The NHS did not, however, have the authority to amend the contract without authorization from various levels of the UK government. In addition to the NHS, the UK's Department of Health, Treasury, and Cabinet Office all had to approve the amendments. After obtaining these authorizations, CSC and the NHS entered into an amended contract, which the parties called "SARPA," in April 2009.

**CSC Fails to Disclose Its Need to Renegotiate the NHS Contract and Paints a Misleadingly Optimistic View of the Company's Performance**

25. As CSC awaited authorization from the various levels of the UK government to enter into SARPA, the parties experienced difficulty in performing as required. During this period, CSC management, including former CEO Laphen, was aware that CSC would not be able to meet its obligations in SARPA's deployment plan.

26. Because of how the parties structured the contract, CSC's inability to comply with SARPA created a significant risk to the company. According to a former CSC executive, it was "self-evident" to anyone familiar with the contract that if CSC failed to successfully renegotiate SARPA there was "a lot of revenue that would be reduced from this contract that would flow straight to [CSC]'s bottom line…."[6] Though CSC's management knew the company could not

---

[5]     Currency amounts are stated in U.S. dollars throughout this Order. Any necessary conversions from British pounds to U.S. dollars reflect a dollar-to-pound ratio of 1.6 to 1.

[6]     CSC earned two types of revenue under the contract: deployment revenue and service revenue. CSC earned deployment revenue when it deployed the software products to the NHS. CSC then earned service revenue by running and maintaining those products until the contract expired. Because the contract had a fixed term, product delays could cause CSC to run out of time in which to complete all of the deployments contemplated in the contract, triggering a loss in potential deployment revenue. Further, product delays compressed CSC's run-and-maintain period, leading to a loss in potential service revenue. Finally, product delays (and the bad press associated with them) could lead to reduced demand for CSC's products among NHS constituents, triggering further losses in potential deployment and service revenue. Such a loss in revenue created a significant risk to CSC's expected profit margin on the contract. Absent cost savings sufficient to offset the lost revenue, which were uncertain given that the

meet its commitments under the new contract, and believed the NHS would not be able to meet its commitments, CSC signed SARPA in April 2009.

27.     Given that CSC's management did not believe the company would be able to satisfy the requirements of the amended contract, SEC disclosure rules and GAAP required CSC to disclose in its public filings that it would likely experience material adverse financial consequences if the UK government declined to amend the contract another time.[7]  However, the only substantive disclosures CSC made in its Form 10-K for FY2009, which the company filed on May 29, 2009, and which Laphen and Mancuso signed, were that the NHS contract was profitable and that CSC expected to recover the amounts it had invested in the contract, which were then over $1 billion.

28.     One week after filing its FY2009 Form 10-K, CSC missed the first of many key deployment milestones mandated in SARPA.  Several days later, the NHS sent CSC an "event of default" letter.  Over the next two and a half years, CSC and the NHS would exchange hundreds of dispute letters as they tried and repeatedly failed to agree on terms amid continuing deployment delays and an increasingly politically charged atmosphere.

29.     By mid-July 2009, Laphen was personally aware of the dispute with NHS over the missed milestone.  The President of CSC International informed Laphen that CSC had a "serious disconnect" with the NHS regarding the missed milestone.  Laphen subsequently received numerous updates concerning the unresolved milestone dispute with the NHS.  In late July 2009, account executives told Laphen that deployments were "not happening at the rate anticipated in the budget," and that negotiations with NHS were "required in a number of areas," including with regard to late penalties, product volumes, and deployment timeframes.

30.     During CSC's earnings call for Q1FY2010 one week later, however, Laphen painted a misleadingly optimistic picture of the NHS contract.  Though none of the issues discussed above had been resolved, Laphen reported to investors that CSC had "completed the activities scheduled within the quarter" and was "on pace to achieve [its] next key milestone." Laphen knew or should have known these disclosures were misleading because they failed to inform investors that CSC was not achieving the milestones set forth in the contract; that it had received numerous "event of default" letters from the NHS; that it was engaged in an ongoing

---

substantial majority of CSC's costs on the contract were to develop and deploy the software, CSC's expected profits would decline.

[7]     These disclosures were mandated by Regulation S-K Items 301, 303(a), and 303(b); FASB Accounting Standards Codification Topic 275 (*Risks and Uncertainties*); and AICPA Statement of Position 81-1 (*Accounting for Performance of Construction-Type and Certain Production-Type Contracts)* ("SOP 81-1"), Paragraph .84, *referencing* SFAS 154 (*Accounting for Changes and Error Corrections)*, Paragraph 22.  For all financial statement periods ending prior to September 15, 2009, SOP 81-1 was the authoritative accounting literature.  Subsequently, the applicable guidance became ASC 605-35 (*Construction-Type and Production-Type Contracts*).  FASB codification of this issue did not materially change the relevant accounting standards.

dispute with the NHS about which milestones applied; that its deployment projections were falling far short of expectations; and that CSC required the NHS and various other UK government bodies to agree to contract amendments for the company to avoid a reduction in its earnings.

**CSC's Use of Improper Accounting Models and
Further Disclosure Violations Relating to the NHS Contract**

A.      Background of CSC's Use of Percentage of Completion Accounting

31.     From the start of the project in 2003, CSC reported its financial results for the NHS contract using the percentage of completion ("POC") method of accounting.[8] So long as a company's estimates are reasonably dependable, POC accounting allows the company to derive a profit margin on a contract based on its estimates of total costs and revenues over the life of a long-term contract. GAAP requires companies using POC accounting to revise their estimates of expected costs and revenues continually as the work progresses.[9] These estimates are prepared in the form of accounting models. CSC's practice was to update its accounting models for the NHS contract in March and September of each year.

32.     Under POC accounting, if a company's accounting model reflects that its profit margin on a contract will be different than previously forecasted, it must make an "inception-to-date" adjustment in the current period to reflect the change in the estimated amount of total gross profit earned to date.[10] And if a company's accounting model reflects that a contract will result in a loss to the company, GAAP requires the company to record the entire anticipated loss on the contract in the current period.

33.     Further, companies often invest heavily on long-term projects before earning significant revenue. Under the POC accounting standards, a contractor typically records this spending as a "work-in-process" ("WIP") asset on its balance sheet. Then, as milestones are achieved and the contractor earns revenue, the contractor releases WIP to the income statement in proportion to the revenue earned during the current period.[11] If a contract becomes unprofitable

---

[8]      *See generally* ASC 605-35.

[9]      *Id*. at Paragraph .27.

[10]     For example, assume a company has previously recorded $10,000,000 in operating income using a 10% profit margin. If the company's accounting models reflect the margin is likely to be only 9%, the company must include a negative $1,000,000 offset in current period operating income to adjust for the impact of the lower margin on prior periods.

[11]     For example, assume a contractor has a $10,000,000 WIP balance and is estimating a 10% profit margin on the contract. If the contractor achieves a revenue milestone valued at $1,000,000, it records revenue of $1,000,000 and costs of $900,000 in its income statement, resulting in a remaining WIP balance of $9,100,000.

9

(due to cost overruns, inability to achieve revenue milestones, etc.), the WIP asset may be rendered wholly or partially unrecoverable, triggering a write-down in the value of the asset.

B.      CSC's Fraudulent September 2009 Accounting Model

34.      In June 2009, CSC's UK account team for the NHS contract held a two-day meeting to discuss the status of the contract.  Based on revised deployment estimates, Robert Sutcliffe, the Finance Director for the NHS account, reported to his colleagues (but not to Laphen or Mancuso) that CSC would fall over $1 billion short of the original $5.4 billion revenue target for the contract.  He reported further that the account had "no basis" for holding its operating income and revenue forecasts, and its accounting model was "non-sustainable."  Similarly, one of the operational leads on the account reported that deployment volumes for that fiscal year were "much lower than anticipated," and that there was "real concern about our ability to complete the contract."

35.      In September 2009, Sutcliffe and his team updated the accounting model for the NHS contract, using current deployment estimates.  This was CSC's first updated model since executing SARPA.  Whereas pre-SARPA models had forecasted CSC would earn a 16% profit margin on the NHS contract, the initial September 2009 calculation showed the contract would generate a significant loss.

36.      Sutcliffe then led a fraudulent "gap closing" exercise to drive the profit margin back to its previous level.  He and personnel working at his direction inserted into the accounting model hundreds of millions of dollars of revenue associated with products CSC had stopped developing and that the NHS had indicated it no longer intended to purchase.  When these steps failed to fully restore the profit margin to 16%, Sutcliffe closed the remaining gap by assuming in the model that the NHS would agree to future price increases sufficient to maintain CSC's profit margin.  This was a clear violation of GAAP, as there was no factual support of any kind for the assumed price increases.  They were simply an artificial means of restoring the profit margin to the target level.

37.      As a result of the fraudulent "gap closing" exercise, CSC continued to record a 16% profit margin on the NHS contract when it reported its financial results for Q2FY2010, thereby avoiding a material adverse charge to its operating income.[12]

C.      Laphen's Statements During CSC's November 2009 Investors Conference

---

[12]      This fraud also affected CSC's financial results in subsequent periods.  As discussed below, in Q3FY2010, CSC began to base its accounting model on CSC's proposed contract amendments, which were designed to maintain a 16% profit margin.  CSC's independent auditors endorsed the new accounting model on the belief that it did not result in any change in the existing margin.  Had Sutcliffe not engaged in the fraudulent gap closing exercise, neither CSC nor its auditors could have employed that rationale to maintain the 16% profit margin.

38. In early November 2009, the President of CSC International warned Laphen about the team's unsatisfactory progress on an important contract milestone. Laphen also knew at that point about the ongoing milestone dispute with the NHS and the broader contractual risks.

39. Two weeks later, however, when CSC held an investor's conference on November 18, 2009, Laphen again painted a misleadingly optimistic picture of the NHS contract, telling investors, "there was skepticism around our NHS contract and CSC's ability to succeed where other prominent companies had failed. We went on to accomplish the key development milestones last year, and we are on track again this year." As with the Q1FY2009 earnings call, Laphen knew or should have known these disclosures were misleading because they failed to inform investors that CSC was not achieving the milestones set forth in the contract; that it had received numerous "event of default" letters from the NHS; that it was engaged in an ongoing dispute with the NHS about which milestones applied; that its deployment projections were falling far short of expectations; and that additional negotiations with the NHS were required.

D. CSC's Improper Change in Accounting Model for the NHS Contract

40. In November 2009, CSC entered into negotiations with the NHS to potentially amend SARPA. CSC offered to reduce the total price the NHS would pay by about 10% in exchange for reducing the scope and volume of the products and services CSC was required to provide by approximately 30%. This lopsided proposal was driven by Laphen's instruction that any offers CSC made to the NHS had to preserve CSC's 16% profit margin. For this to happen, any reductions in deployment volume had to be offset by price increases on the remaining volumes. Put simply, to preserve its profit margin, CSC had to persuade the NHS and the UK government to agree to pay more for less.[13]

41. The NHS rejected CSC's offer. Though it expressed a willingness to engage in further discussions over potential contract amendments, the NHS cautioned that CSC "should not assume that there is any agreement at this stage to any element of scope or volume reduction…." The parties then entered into negotiations that would continue intermittently for the next two years. Throughout this period, CSC continued to work on the project and the NHS continued to pay CSC for work according to negotiated amended deployment dates. However, the NHS repeatedly advised CSC both orally and in writing that SARPA (which CSC recognized was enforceable) remained the operative contract, and that CSC should not assume the parties would ever agree on revised terms.

42. Nonetheless, in December 2009, CSC implemented a significant change to its accounting model for the NHS contract. It began to base the model on contract amendments CSC had proposed rather than the existing terms of the contract. In doing so, CSC incorporated in its

---

[13] CSC's internal models reflected an assumption that deployment unit prices would roughly double, and service unit prices would increase as much as fivefold.

models significantly higher prices than what the parties had agreed to in SARPA and were currently using.  This resulted in CSC continuing to recognize a 16% profit margin on the contract despite ongoing deployment delays and lower projected deployments.  On multiple occasions during the relevant period, Laphen and Mancuso received information indicating that CSC's use of the new accounting model was allowing the company to achieve materially better financial results in comparison to the previous, SARPA-based model

43.     The accounting standards provide expressly that a contractor may not recognize profit based on unapproved changes to a contract's price and scope.[14]  Laphen knew or should have known that CSC's shift to an accounting model based on its offering terms (rather than SARPA) violated GAAP.  As a result of the improper accounting models used on the NHS contract, CSC materially overstated its financial results during the period Q3FY2010 to Q2FY2012.

44.     In violation of various disclosure rules, CSC, Laphen, and Mancuso failed to inform investors that CSC was basing its accounting models on its proposed contract amendments, rather than the terms of the enforceable contract, and that without the contract amendments, CSC's operating income would fall significantly.[15]  This risk was heightened by the need for various levels of the UK government to approve the contract amendments CSC was seeking.  Laphen, who characterized the NHS contract as a "political football," understood that the political environment in the UK posed an additional obstacle to securing the contract amendments CSC was seeking.  In May 2010, a conservative party that had been highly critical of the NHS's IT program was elected. A month before the election, Laphen wrote to CSC's Board of Directors that the NHS "is under tremendous political pressure as the [Conservative] party highlights the program....  We run a risk that the upcoming election … and a potential change in government could complicate [the negotiations]."

E.     CSC's Improper Accounting and Disclosures in Q3FY2011

45.     After fifteen months of intermittent negotiations — during which the NHS consistently refused to agree to terms that would allow CSC to maintain its 16% profit margin — Laphen finally ended his insistence that all offers to the NHS maintain that level of profitability.

---

[14]     For accounting purposes, CSC treated its proposals as "change orders."  However, the accounting standards provide that "[i]f change orders are in dispute or are *unapproved in regard to both scope and price*, they should be evaluated as claims."  *See* SOP 81-1 at Paragraph .63 (emphasis added).  CSC's proposals were unapproved as to both scope and price, and therefore should have been evaluated as "claims."  CSC never evaluated its proposals as such.  Those proposals could not have met the strict requirements of "claim" accounting (*see* SOP 81-1, at Paragraphs .65-.67).  Further, even if CSC's proposals had met those requirements, the accounting standards prohibit a contractor from recording any profit on a claim.  *See* SOP 81-1 at Paragraph .65 ("If the foregoing requirements [for claim accounting] are met, revenue from a claim should be recorded only to the extent that contract costs relating to the claim have been incurred [*i.e.*, no profit].").  Indeed, as stated in CSC's own POC accounting training materials, it is "never appropriate to recognize [profit] margin on a claim."

[15]     These disclosures were mandated by Regulation S-K Items 301, 303(a), and 303(b); ASC 275; and SOP 81-1, Paragraph .84.

On February 7 or 8, 2011, Laphen approved a new offer to the NHS which would have resulted in CSC earning only a 12.7% profit margin. CSC submitted this proposal to the NHS on February 9, 2011.

46.    Later that day, CSC filed its Form 10-Q for Q3FY2011. As discussed above, CSC's use of the proposed contract amendments as the basis for its accounting models violated GAAP. Had CSC continued to follow its improper approach of basing its accounting models on the most recent offer it had made to the NHS, the company would have recorded a $52 million negative adjustment to operating income in Q3FY2011.[16]

47.    But CSC did not do so. Rather than preparing a new accounting model at that time reflecting its most recent offer (that, if accepted, would have resulted in a 12.7% profit), CSC instead prepared its financial statements for Q3FY2011 using the *prior* accounting model that had forecasted CSC would continue to earn a 16% profit.

48.    CSC failed to inform investors that it was basing its accounting models on offering terms rather than the enforceable contract. CSC further failed to inform investors that it was basing its financial statements on an offer that had not only been rejected by the NHS, but that had been superseded by a revised offer that would generate a significantly lower profit margin to the company and would require a large inception-to-date adjustment that would reduce CSC's earnings.

49.    In addition to its improper accounting and its failure to make required disclosures, CSC affirmatively misled investors about the contract. CSC stated in its Form 10-Q for Q3FY2011 that "[t]otal contract value, based on proposals submitted to the NHS, is currently estimated to be reduced between $800 and $950 million." In fact, the revised offer CSC had submitted to the NHS proposed an approximately $1.2 billion reduction in total contract value.

50.    CSC also held its Q3FY2011 earnings call on February 9, 2011. During the question-and-answer portion of the call, an analyst asked Laphen whether "there will be some kind of a write-down or some kind of cost and hit to the P&L" in connection with the contract amendments CSC was seeking. In his answer, Laphen stated (among other things), "I can't tell you there is no chance for some sort of a P&L hit. *We don't have that at this point in time*." (emphasis added). In fact, CSC's new offer reflected the company expected a significant "P&L hit" at that point in time.

51.    On the same day that CSC made its revised proposal to the NHS and filed its Form 10-Q, Laphen signed a management representation letter to CSC's independent auditors. Among other things, the representations falsely stated, "[c]ontract estimates have been prepared on the basis of the most current and best available information and the underlying assumptions used in those estimates are reflective of our intentions," and "the Company's [accounting model] on the

---

[16]    As noted above, GAAP requires companies to reflect the impact of a decrease in the profit margin on a contract such as this by recording an inception-to-date adjustment.

NHS contract used to prepare the third quarter 2011 financial statements represents the best estimate of the probable contract value, costs at completion, margin and margin rate based upon all known facts and contractual risks."

52.     Laphen knew or should have known that CSC's financial statements in Q3FY2011 were based on the wrong accounting model, and that his disclosures regarding the NHS contract to investors and to CSC's independent auditors were false.  Laphen knew the offer he authorized on February 7 or 8, 2011 would result in a lower profit margin for CSC than the company had been maintaining.  Laphen also knew or should have known that CSC's updated offer to the NHS would negatively impact the company's earnings.

F.     CSC's Continued Improper Accounting From Q4FY2011 Through Q2FY2012

53.     One day after CSC made its revised offer on February 9, 2011, the NHS rejected CSC's proposal and made a counteroffer that would have resulted in CSC earning a *negative* profit margin.  The parties then engaged in several additional months of negotiation.

54.     On May 2, 2011, CSC issued a press release in which it announced that it expected to sign a non-binding Memorandum of Understanding ("MOU") with the NHS "in the next few weeks pending final NHS and other government reviews and approvals."[17]  It was only then that CSC updated its accounting model to reflect the current status of the negotiations.

55.     The NHS could not amend SARPA without the approval of the UK government. Though NHS personnel indicated at that time that they supported the contract amendments envisioned in the draft non-binding MOU, they gave CSC no assurance that the required approvals would be forthcoming.  Indeed, by the time CSC filed its FY2011 Form 10-K on June 15, 2011, there had been significant developments that made the UK government's required approval of the proposed amendments unlikely.

56.     In May 2010, the Conservative party, which had been highly critical of the NHS's IT program, won the UK general election.  By May 2011, the UK National Audit Office ("NAO"), the House of Commons Public Accounts Committee ("PAC"), and the Major Projects Authority ("MPA") had all begun reviews of the program.  On May 11, 2011, while taking questions in the House of Commons, UK Prime Minister David Cameron reported, "We are very concerned that the NHS IT projects that we inherited were of poor value for money, an issue we raised repeatedly in opposition."  With regard to CSC's contract, the Prime Minister said, "we are absolutely determined to achieve better value for money…. [T]here are no plans to sign any new contract with Computer Sciences Corporation until the [NAO] report has been reviewed, and until the [PAC] meetings and [MPA] reviews have taken place."  The Prime Minister further stated, "The Department of Health and Cabinet Office will examine all available options under the current contract, including the option of terminating some of, or indeed all of, the contract."

---

[17]     The uncertainty about the contract amendments was underscored by the NHS's unwillingness to sign even a *non-binding* MOU with CSC.  This was in contrast to the *binding* MOU the NHS signed in 2008.

14

57.     One week later, the NAO issued a report finding "the [$4.3] billion spent on care records systems so far does not represent value for money, and we do not find grounds for confidence that the remaining planned spend of [$6.9] billion will be different." The report was critical of the performance of CSC and other IT contractors involved in the project.

58.     On May 23, 2011, the PAC held a public hearing concerning (among other things) the proposed contract amendments. Consistent with the Prime Minister's comments, NHS representatives stated that "all options" were under consideration, including termination of CSC's contract.

59.     Two days later, the Financial Times published an article reporting the findings of a leaked UK Cabinet Office memorandum. As quoted in the article, the Cabinet Office memorandum "condemned" the proposed contract amendments as "unattractive," in that the proposed savings to the NHS were disproportionately small in comparison to the proposed reductions in product scope and volume to be delivered by CSC. As further quoted in the article, when asked to comment on the leaked memorandum, the PAC Chair stated, "It would be unspeakably unacceptable to think that in return for a one-third reduction in the cost, CSC would do two-thirds less work. If this is an opening gambit from the company, it should be given short shrift. There is no way these guys ought to be working for the government."[18]

60.     Indeed, when CSC provided the NHS a proposed disclosure it intended to make in its FY2011 Form 10-K that described the MOU as "substantially agreed," the NHS refused to agree to that characterization. The NHS representative advised CSC's General Counsel, "The MOU remains unsigned and, at present, unagreed and in draft. As you know, I'm afraid that there is no guarantee that it will be signed in its current draft format or at all…. I cannot accept/agree if asked that the draft MOU is substantially agreed."

61.     As a consequence of these developments, CSC and Laphen knew or should have known that approval of its proposed contract amendments by the UK government was not probable. Nevertheless, when CSC filed its FY2011 Form 10-K on June 15, 2011, it continued to base its accounting model on the assumption that the UK government would approve the contract amendments and failed to write down the value of its contract-related assets as required. Moreover, notwithstanding the NHS's refusal to agree that the non-binding MOU was "substantially agreed," CSC provided CSC's independent auditors a June 14, 2011 letter stating (among other things) that "the parties had reached substantial agreement on the terms of the MOU."

62.     On August 3, 2011, the PAC released a report with findings critical of CSC's performance. The Committee recommended that the UK government consider whether to continue

---

[18]     The Financial Times article was circulated among CSC executives (including Laphen) on the date of its publication.

the IT program. The Committee also advised the government should "give[] serious consideration to whether CSC has proved itself fit to tender for other Government work."

63.     Eight days later, CSC filed its Form 10-Q for Q1FY2012.  In violation of GAAP, CSC continued to base its accounting model on the proposed MOU and to carry its contract-related assets at their full value (approximately $1.4 billion).

64.     On September 6, 2011, Laphen discussed the status of the MOU proposal with the account team.  The account team provided Laphen with an assessment of NHS's options and listed seven possible options: "Do Nothing, Enforce SARPA, Negotiate TARPA, Whole Termination, Partial Termination, Negotiate Whole Exit, or Negotiate Partial Exit."  They informed him that the MOU proposal was "probably best for the parties but politically not tenable."  On September 7, 2011, NHS agreed to engage in further negotiations.  On September 22, 2011, however, the MPA issued a report recommending several options, one of which included that the NHS's IT program should be "dismembered" and "reconstituted" under new management and organizational structures.

65.     On November 4, 2011, the NHS provided CSC written comments on a draft earnings call script for Q2FY2012.  Those comments included the following:  "[CSC] make[s] a number of revenue and profit estimations based on your view of how the contract will operate if the draft, without prejudice MOU were to be signed.  Whilst this is a matter for CSC, in view of your obvious historic and on-going stated doubt as to whether the draft, without prejudice MOU would be signed and our recent discussions on the subject, we question whether financial projections on that basis are appropriate."

66.     On the morning of November 9, 2011, NHS provided CSC with further written comments on the proposed statement.  Those comments included the following:  "[W]e have a concern that the tone of the proposed Q2 comments gives a misleadingly upbeat impression of a project that is many years behind both its original schedule and the current contracted schedule.  We are of the opinion that the comments could give the impression that the project is 'on track' with its delivery (which is clearly not the case).  They could also give the optimistic impression that the outcome of the discussions we are about to enter will be the acceptance of CSC's 'economic proposals.'  Again, it is for CSC to conclude how it must brief its shareholders on the possible or likely outcomes of the project and our discussion, but it would be remiss of us not to draw our concern to your attention, once more.  Whilst we adopt our usual stance of not commenting on CSC's affairs or disclosure, if asked, we will have to explain our (contrary) view of the current state of affairs."

67.     Nevertheless, when CSC filed its Form 10-Q for Q2FY2012, the company continued to base its accounting model on the MOU proposal, and still failed to write-down the value of its contract-related assets in violation of GAAP.

68.     On December 21, 2011, the NHS sent CSC a letter stating, "As you know, consistent with previous concerns expressed by the PAC and the MPA, we have clearly rejected

16

the MoU on the grounds that it does not represent value for money." The NHS further informed CSC that recent proposals under discussion were also unacceptable.[19] On December 27, 2011, the company filed a Form 8-K announcing that neither the MOU proposal nor recent proposed amendments under discussion with the NHS would be approved. CSC reported that, consequently, the company "will be required to recognize a material impairment of its net investment in the contract in the third quarter of fiscal year 2012." On the day of the announcement, CSC's common stock declined by 9%. On February 8, 2012, CSC filed its Form 10-Q for Q3FY2012. For this filing, CSC finally ceased basing its accounting models on its proposed contract amendments, and returned to using the enforceable contract as the basis for its models. CSC also wrote down approximately $1.5 billion in NHS contract assets from its balance sheet.

### Additional Disclosure Violations Relating to the NHS Contract

69.     In addition to the misconduct described above, Mancuso also made misleading statements to investors about the degree to which CSC had grown dependent on refundable cash advances from the NHS to drive its fourth quarter and annual free cash flow results and failed to make required disclosures about these advances.

A.     The Cash Advance Arrangement

70.     At the close of each fiscal year, CSC received cash advances from the NHS based on an estimate of anticipated charges in the next fiscal year. The sizes of these advances, which were negotiated in the closing days of each fiscal year, were based on the total charges CSC expected to bill under the contract in the following year. The NHS had a contractual right to suspend the advances if CSC committed an event of default. Thus, amid ongoing project delays and an unresolved contractual dispute, the arrangement became increasingly uncertain.

71.     The cash advance arrangement between the NHS and CSC operated like a secured loan. CSC effectively paid the NHS 5% interest for the advances.[20] CSC secured the advances by providing the NHS bank-issued standby letters of credit. CSC repaid the advances at the end of each year to the extent they had not been fully offset by CSC's actual charges ("the true-up"). Unlike traditional loans, though, which companies record as cash flows from *financing* activities, GAAP allowed CSC to record these advances as cash flows from *operating* activities. This

---

[19]     During the period December 8 to 19, 2011, CSC made further proposals to the NHS that, had they been accepted, would have limited CSC's write-down to approximately $700 million.

[20]     At the NHS's option, CSC could either provide the NHS a service credit valued at 5% of the advance payment or an equivalent cash payment at the end of the contract. The NHS told CSC it did not intend to use any of the service credits, favoring the cash payment.

provided a significant boost to the company's fourth quarter and annual free cash flow results — a metric that was important to investors.[21]

72.     The cash advance arrangement resulted in an economic loss to CSC.  In addition to paying the 5% charge to the NHS, CSC had to pay an additional 1 to 1.25% charge to banks for the standby letters of credit.  In October 2010, CSC's Treasurer recommended to Mancuso and CSC's Vice President International Finance that CSC "should [not] push the cash advances higher but rather attempt to lower them" because the arrangement "results in an economic loss to CSC." CSC's Vice-President International Finance replied, "You're right – it is an expensive drug we're on!"  Subsequently, however, Mancuso instructed that CSC should continue seeking the cash advances.

73.     The cash advances grew increasingly large over time, peaking in CSC's fiscal year 2010, when the Company received a $580 million advance from NHS in the closing days of the fiscal year.  The portions of the cash advances that CSC had to return to the NHS also grew larger over time as CSC continued to fall short of its deployment goals.  CSC repaid approximately 22%, 72%, and 93% of its cash advances for fiscal years 2010, 2011, and 2012, respectively.  In other words, CSC paid over 6% on hundreds of millions of dollars that it later returned to the NHS at a time when the company could have borrowed from traditional lenders for considerably less.

74.     Although CSC lost money from the cash advance arrangement, it was a boon to senior executive compensation in fiscal year 2010.  That fiscal year, CSC replaced another metric with free cash flow as one of four key performance measures in its Annual Management Incentive Plan.  CSC's free cash flow results exceeded the fiscal year 2010 plan target, resulting in significant payouts to Laphen, Mancuso, and others.[22]  Absent the $580 million NHS cash advance, CSC's free cash flow results would have fallen hundreds of millions of dollars short of the bonus plan target, resulting in no payout to the executives.

75.     SEC disclosure rules required CSC to disclose the impacts of this unusual cash advance arrangement on the company's financial results.[23]  However, neither Laphen nor Mancuso took any steps to ensure disclosure, and investors were kept in the dark about how CSC met its cash flow targets.

76.     Indeed, when the highest rated sell-side securities analyst covering CSC repeatedly asked CSC executives about how the NHS contract was impacting the company's results, and expressed skepticism about the reliability of CSC's reported free cash flow, Laphen and Mancuso

---

[21]     Financing cash flows were not a component of CSC's free cash flow; operating cash flows were.

[22]     Laphen received a $630,000 bonus award for exceeding the FY2010 free cash flow target.  Mancuso received a $175,500 award.

[23]     Regulation S-K Item 303(a) mandated these disclosures.

directed the company's head of Investor Relations not to allow that analyst to ask any questions during CSC's earnings call question-and-answer period.

77.    Moreover, on two occasions, Mancuso made public statements about the NHS advances that he knew or should have known were false and misleading.

B.    Mancuso's Statements During CSC's Q4FY2009 Earnings Call

78.    On the last day of CSC's FY2009, CSC negotiated a cash advance from the NHS of approximately $135 million.  Mancuso knew about this advance:  he wrote a "thank you" letter to a regional executive who helped to secure the advance, specifically noting his significant contribution to CSC's year-end "Cash Project."  This advance comprised over 15% of the company's fourth quarter free cash flow.

79.    However, when a financial analyst asked Mancuso during CSC's fourth quarter and fiscal year-end 2009 earnings call in May 2009 whether CSC had received "any large prepayments" from NHS or other clients during the fourth quarter of FY2009, Mancuso replied that the company had not.

C.    Mancuso's Statements During CSC's Q4 FY2010 Earnings Call

80.    At the end of FY2010, CSC worked hard to negotiate a large cash advance from the NHS.  Because CSC had missed a key deployment deadline in March 2010, the NHS's willingness to give CSC a large cash advance was in doubt.  Public reports of the missed deadline led to speculation that CSC would fall short of its cash flow guidance.

81.    Mancuso understood this was important to investors.  On March 27, 2010, Mancuso wrote to Laphen that CSC was "getting an endless string of questions from buyside and sellside analysts reacting to the british press clips [reporting on the missed NHS milestone]."  Mancuso told Laphen he was "having a continuing dialogue with [CSC's Vice-President International Finance] keeping me abreast by the hour" regarding negotiations with NHS over the cash advance.  Mancuso advised Laphen that the "cash is key to us being able to spin this story."

82.    On the morning of April 1, 2010, Mancuso informed Laphen that CSC had received a $580 million cash advance from the NHS.  Hours later, CSC reaffirmed its fiscal year-end cash flow guidance.  That afternoon, Mancuso sent his subordinates an email in which he referred to CSC having "dodged a bullet."  Shortly afterwards, CSC's Vice President International Finance told the NHS account team that CSC would not have been able to reaffirm its guidance "without the NHS cash and [other] work on the Q4 items…."  He closed by noting, "Mike Mancuso specifically asked me to pass on this thanks to the team."

83.    On May 20, 2010, during CSC's fourth quarter earnings call, Mancuso boasted to investors about the company's cash flow results, claiming "Cash is the big story."  Mancuso specifically highlighted CSC's fourth quarter free cash flow of $951 million.  During the earnings

19

call question-and-answer period, an analyst asked Mancuso to "help us understand how you hit that free cash flow number" assuming CSC "didn't hit" its NHS milestone and "didn't get a cash flow payment" from NHS.  Mancuso did not disclose to the analyst that approximately 62% of CSC's fourth quarter free cash flow was attributable to the $580 million cash advance received from NHS at the close of the fiscal year, for which the company was paying over 6%, and which the company would need to repay to the NHS if it were not able to begin meeting its deployment goals.  Instead, Mancuso replied that CSC had generated its free cash flow results "the old-fashioned hard way, frankly," attributing it to earnings, improvements in working capital, and "receivables."  He further described the result as "a glowing achievement" and "not unnatural."

84.     In addition to the accounting and disclosure fraud involving the NHS contract, two of CSC's international businesses engaged in accounting frauds as well.  CSC's Australia subsidiary and its Nordic region violated fundamental GAAP principles in a variety of ways to manipulate their financial results.

### CSC's Accounting Fraud in Australia

85.     CSC Australia's two most senior finance executives, the subsidiary's CFO Wayne Banks and Controller Edward Parker, manipulated the company's Q1FY2009 earnings through excess accruals they maintained in "cookie jar" reserves and by failing to record expenses as required.  This fraud materially overstated CSC's consolidated pretax income by over 5%.  Banks's fraud resulted in at least a 4.3% overstatement in Q1FY2009.  Parker's fraud encompassed all of Banks's fraud and went further, resulting in an overstatement of CSC's consolidated pretax income by 5.4% for that period.  But for their misconduct, CSC would have missed analysts' earnings targets in Q1FY2009.

A.     <u>CSC Australia's "Cookie Jar" Reserves</u>

86.     To offset future shortfalls in budgeted operating performance, Banks and Parker maintained excess, unsupportable balances in reserve accounts.  Banks and Parker built up these reserve balances primarily during CSC Australia's successful FY 2008.  For example, at the close of FY2008, Banks and Parker intentionally over-accrued for "gift cards" CSC Australia was giving its employees in recognition of their efforts in meeting annual budget targets.  Parker informed Banks, "while it's likely we'll pay [AUD] $150 per employee, we have booked an accrual equivalent to [AUD] $350 per employee, largely as a mechanism to carry forward a provision into FY09."  This resulted in an excess reserve balance of approximately AUD $1 million, which Banks and Parker subsequently released to boost CSC Australia's Q1FY2009 earnings when it appeared the subsidiary was falling short of targets.[24]

---

[24]     GAAP prohibits companies from maintaining excess accruals or "general reserves."  Under the applicable accounting standards, a loss contingency should be recorded only if the loss is probable and reasonably estimable. *See* ASC 450-20-25-2.

87.     As with the gift cards account, Banks and Parker fraudulently built up approximately AUD $2.25 million in excess reserve balances in FY2008 in accounts related to employee bonuses and a restructuring.  In violation of GAAP, they accrued AUD $590,000 for bonuses when CSC Australia had no obligation or intention to pay the bonuses and AUD $1.65 million for restructuring costs despite not having a formal management restructuring plan and not having notified the affected employees.[25]  Banks and Parker released most of the bonus and restructuring accruals in Q1FY2009, which boosted the subsidiary's earnings.

88.     Banks and Parker also created excess accruals in CSC Australia's labor accounts in each quarter in FY2008.  CSC Australia estimated labor costs each month and accrued for those expected costs.  Though they knew CSC Australia's actual labor costs were significantly lower than the subsidiary had estimated, Banks and Parker maintained those excess amounts in the labor account for future use.  Banks and Parker created additional excess accruals in CSC Australia's labor accounts by reserving for fictitious training costs.  These improper labor accruals totaled AUD $5.4 million by year-end FY2008.  Banks and Parker released AUD $3.5 million of these accruals — and Parker released the remaining AUD $1.9 million in Q1FY2009 to improve CSC Australia's reported results.

B.     CSC Australia's Failure to Record Expenses as Required

89.     Banks and Parker further misstated CSC's Q1FY2009 earnings by failing to record costs as required.  GAAP permitted CSC Australia to capitalize "contract acquisition costs" – i.e. expenses the company incurred in attempting to win business.[26]  However, if CSC Australia were unable to win this business, GAAP required the company to expense these costs in that period.[27]  In Q1FY2009, Banks and Parker knew CSC Australia had failed to win a contract with a potential customer on a project that had AUD $1.5 million in contract acquisition costs.  Nevertheless, CSC Australia did not expense the AUD $1.5 million as GAAP required.

**CSC's Accounting Fraud in the Nordic Region**

90.     During FY2010, finance personnel in CSC's Nordics region fraudulently overstated the region's operating results.  Former Nordics Finance Director Paul Wakefield, and Nordics Finance Managers Chris Edwards and Claus Zilmer improperly accounted for client disputes; overstated assets; and failed to record expenses as required.  This fraud overstated CSC's

---

[25]     GAAP requires management to commit to a plan of termination in order to record a termination reserve. *See* ASC 420-10-25-4.

[26]     *See* ASC 605-20-25-4 and ASC 310-20-35-2; *see also* SAB Topic 13.A.3(f).

[27]     *Id.*

21

consolidated operating income by 5% in Q1FY2010, 3% in Q2FY2010, 4% in Q3FY2010, and 7% in Q4FY2010.

A.     CSC's Improper Accounting for Client Disputes

91.     By improperly accounting for a settlement with a Danish client, CSC overstated its operating income by $9 million in Q4FY2010.  The client had agreed to forgo legal action against CSC if the company gave it $165,000 in cash and $9 million in service credits.  In February 2010, the Director of CSC Nordics' Denmark Public Sector and the client signed three agreements:  a settlement agreement reflecting the cash payment and two side agreements reflecting the much larger service credits.

92.     GAAP required CSC to record the entire $9,165,000 as an expense in Q4FY2010.[28] However, CSC did not do so because the Director concealed the connection between the three agreements.  The Director told local in-house counsel that the settlement agreement and two side agreements were unrelated.  When an early version of the settlement agreement referenced the price credits, he directed the attorney to remove that reference.  As a consequence of this misrepresentation, CSC expensed only the $165,000 portion of the settlement, thereby overstating its operating income by $9 million.

93.     CSC also overstated its unbilled receivables in Q3FY2010 and Q4FY2010 in connection with another client dispute.  In June 2009, a client terminated CSC Nordics' work on a project that CSC had forecast would generate $900,000 in revenue.  CSC Nordics asserted that the client was liable for the $900,000.  Though the client had not agreed to pay this amount, Zilmer recorded $900,000 as an unbilled receivable relating to this claim in November 2009.  This violated GAAP requirements for gain contingencies and improperly increased CSC's operating income by $900,000 in Q3FY2010.[29]

94.     In Q4FY2010, CSC Nordics agreed to accept only $90,000 from the client to resolve this claim.  Zilmer, who was responsible for the accounting for this transaction, received a copy of the settlement agreement during that period.  However, Zilmer waited to write-off the $810,000 in uncollectable revenue until *after* CSC had closed its books for FY2010, thereby overstating the company's results.

B.     CSC Nordics Manipulates its Earnings by Overstating the Value of an Asset

---

[28]     GAAP provides that a loss contingency is recorded if the loss is probable and reasonably estimable.  Both of these conditions were clearly met with the signed side agreements.  *See* ASC 450-20-25-2.

[29]     GAAP generally prohibits recording gain contingencies in financial statements.  *See* ASC 450-30-25-1

95.    In Q3FY2010, CSC overstated its income by over $4 million by failing to write-down the value of an asset as required by GAAP.  In October 2009, CSC Nordics contracted with a vendor to exchange one of the company's mainframe computers.  At that time, CSC Nordics valued the old mainframe at its net book value (cost minus accumulated depreciation) of $5.2 million though its fair market value was only a fraction of that amount.  When CSC Nordics disposed of this mainframe in the exchange transaction, GAAP required the company to record a $4.5 million write-down.[30]

96.    To avoid this result, CSC Nordics and the vendor entered into a sham arrangement that instead resulted in a gain from the transaction.  Rather than issue an invoice to CSC Nordics for the true value of the new mainframe, the vendor significantly over-charged CSC Nordics, then gave the company a credit note for the difference.  CSC Nordics personnel then used the credit note (which was for $5.6 million) to offset the $5.2 million write-down of the old mainframe.  This resulted in the company improperly recording a $400,000 gain from the deal, rather than a $4.5 million loss as required by GAAP.

C.    The Improper Capitalization of Expenses

97.    Throughout FY2010, CSC Nordics improperly overstated its income by failing to record expenses associated with certain labor costs.  These costs involved compensation the company paid to employees who were not working on any company projects ("bench labor").  Consistent with GAAP, CSC Nordics originally expensed the compensation it paid to these employees.  To improve its operating results, however, CSC Nordics later reversed these expenses.  With Wakefield's approval, Zilmer improperly capitalized bench labor costs totaling $8.2 million,[31] significantly reducing CSC Nordics' FY2010 expenses and artificially improving CSC's operating income.

98.    In addition, Wakefield, Zilmer, and Edwards improperly capitalized various other expenses using "prepaid" asset accounts.[32]  For example, Wakefield manipulated CSC Nordics' results in Q3FY2010 by directing that $1.4 million in office moving and capitalized server costs, which GAAP required the company to expense, be moved to a prepaid asset account to be amortized over time.[33]  In Q4FY2010, Zilmer improperly overstated CSC Nordics' income simply

---

[30]    GAAP provides that the cost of a nonmonetary asset acquired in exchange for another nonmonetary asset is the fair value of the asset surrendered to obtain it.  *See* ASC 845-10-30-1.

[31]    In violation of GAAP, Zilmer did this by improperly recording bench labor costs as "transition and transformation costs."  Under CSC policy, legitimate transition and transformation costs were capitalizable.

[32]    By the end of FY2010, CSC Nordics had over $30 million in prepaid assets that were unsupported.

[33]    GAAP prohibits recording current period expenses as prepaid expenses.  *See* ASC 340-10-5-4, "Other Assets and Deferred Costs" (defining prepaid expenses as a category of assets that are paid in advance of their use or consumption and providing that prepaid expenses should be deferred and expensed over time in the period in which they are utilized).

by reversing a journal entry that had properly expensed $1.4 million in contract costs, and re-recording these costs as prepaid assets on the company's balance sheet.  Edwards also improperly recorded current period costs in prepaid accounts, and mislabeled journal entries to make it appear as though those costs were prepaid assets that CSC could amortize over multiple periods.[34]

### Laphen's and Mancuso's Bonuses and Incentive-Based Compensation

99.    The misconduct described above resulted in material misstatements to CSC's financial statements in FY2010, FY2011, and FY2012.  CSC was required to restate its financial statements in those periods.  During the 12-month periods that followed the filing of these periodic reports, Laphen and Mancuso received bonuses and incentive-based compensation.  Neither Laphen nor Mancuso has reimbursed those amounts to CSC.

### VIOLATIONS

100.    Securities Act Section 17(a)(1), Exchange Act Section 10(b) and Rule 10b-5 thereunder prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities.

101.    Securities Act Section 17(a)(2) prohibits any person from obtaining money or property in the offer or sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    Securities Act Section 17(a)(3) prohibits any person from engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser in the offer or sale of securities.

103.    Exchange Act Section 13(a) and Rules 13a-1 and 13a-13 thereunder require that every issuer of a security registered pursuant to Exchange Act Section 12 file with the Commission, among other things, annual and quarterly reports as the Commission may require, and, pursuant to Rule 13a-14, mandate, among other things, that an issuer's principal executive and principal financial officers certify each periodic report.

104.    Rule 12b-20 under the Exchange Act requires that, in addition to the information expressly required to be included in a statement or report filed with the Commission, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.

---

[34]    *Id.*

105.    Exchange Act Section 13(b)(2)(A) requires reporting companies to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

106.    Exchange Act Section 13(b)(2)(B) requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP.

107.    Exchange Act Section 13(b)(5) prohibits any person from knowingly circumventing or knowingly failing to implement a system of  internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2).

108.    Rule 13b2-1 under the Exchange Act prohibits any person from, directly or indirectly, falsifying or causing to be falsified, any book, record, or account subject to Exchange Act Section 13(b)(2)(A).

109.    Section 304 of the Sarbanes-Oxley Act of 2002 requires the chief executive officer and chief financial officer of an issuer that is required to prepare an accounting restatement due to its material noncompliance, as a result of misconduct, with any financial reporting requirement under the securities laws to reimburse the issuer for any bonus or other incentive-based or equity-based compensation the chief executive officer or chief financial officer received during the 12-month period following the first public issuance or filing of the financial document embodying such financial reporting requirement, and any profits realized from the sale of the issuer's securities during that 12-month period.

110.    As a result of the conduct described above, CSC violated Securities Act Section 17(a) and Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 10b-5, 12b-20, 13a-1, and 13a-13.

111.    As a result of the conduct described above, Laphen willfully[35] violated Securities Act Sections 17(a)(2) and (a)(3), Exchange Act Rules 13a-14 and 13b2-1, and Sarbanes-Oxley Act Section 304, and caused CSC's violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 12b-20, 13a-1, and 13a-13 thereunder.

112.    As a result of the conduct described above, Mancuso violated Securities Act Sections 17(a)(2) and (a)(3) and Exchange Act Rule 13a-14, and Sarbanes-Oxley Act Section 304,

---

[35]    This use of the word "willfully" does not reflect a finding that Laphen acted with the intention to violate the law or knowledge that he was doing so.  As used in the governing provisions of law, "willfully" means only that the actor "intentionally committed the act which constitutes the violation." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965); *see also Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000).  "There is no requirement that the actor also be aware that he is violating one of the Rules or Acts . . . ." *Tager,* 344 F.2d at 8.

and caused CSC's violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 thereunder.

113.    As a result of the conduct described above, Banks willfully violated Securities Act Section 17(a), Exchange Act Sections 10(b) and 13(b)(5), and Rules 10b-5(a) and (c) and 13b2-1 thereunder, and willfully aided and abetted and caused CSC's violations of Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 10b-5, 13a-1, and 13a-13 thereunder.

114.    As a result of the conduct described above, Zilmer violated Exchange Act Rule 13b2-1 and caused CSC's violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 13a-1 and 13a-13 thereunder.

115.    As a result of the conduct described above, Wakefield willfully violated Securities Act Section 17(a), Exchange Act Sections 10(b) and 13(b)(5), and Rules 10b-5(a) and (c) and 13b2-1 thereunder, and willfully aided and abetted and caused CSC's violations of Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 10b-5, 13a-1, and 13a-13 thereunder.

## CSC'S REMEDIAL EFFORTS

In determining to accept CSC's Offer, the Commission considered remedial acts undertaken by CSC and cooperation afforded the Commission staff in connection with the misconduct in the Nordic region and Australia.

## IV.

Respondent CSC has undertaken to:

A.    Retain, at CSC's expense within 30 days of issuance of this Order, qualified independent ethics and compliance consultant (the "Consultant") with extensive experience in developing, implementing and overseeing organizational compliance and ethics programs, not unacceptable to the staff, to conduct an ethics and compliance program assessment focused on the components of the program delineated in (1)-(3) below.  The Consultant shall also have expertise in, or retain someone with expertise in, internal accounting controls and public company financial reporting as well as percentage of completion accounting.  Taking into account the Company's remedial actions to date, CSC shall cause the Consultant to analyze whether the components of CSC's ethics and compliance program as they relate to the areas described in (1)-(3) below have been implemented successfully and are having the desired effects.  The Consultant will determine whether the culture is supportive of ethical and compliant conduct, including strong, explicit, and visible support and commitment by the Board and senior management.  In discharging this undertaking, the Consultant shall:

26

1.  evaluate and assess the effectiveness of the internal accounting controls and financial reporting policies and procedures, including but not limited to:

a.  whether CSC's internal accounting controls are sufficient to provide reasonable assurances that the company is maintaining fair and accurate books, records and accounts, with particular emphasis on whether they are designed to address the integrity of its revenue accounting and ensure consistent accuracy and integrity given the global nature of CSC's business;

b.  whether CSC has specific accounting and financial reporting controls and procedures sufficient to ensure that all accounting models comply with applicable accounting rules and policies, and updated revenue accounting models are prepared as required.

2.  evaluate and assess whether CSC has disclosure controls and procedures designed to ensure that all material information necessary to understand CSC's financial condition and operating results, including material operational risks, uncertainties, and trends, are appropriately disclosed on a timely basis.  The review shall include, but not be limited to,

a.  whether the work of CSC's delivery assurance group receives appropriate visibility and consideration for disclosure purposes;

b.  whether CSC's disclosure committee is sufficiently independent to ensure broad and robust consideration of all potentially material operational risks and uncertainties; and

c.  whether CSC's corporate culture has any impact (positive or negative) on the company's ability to comply fully with its disclosure obligations.

3.  evaluate, for purposes of analyzing the areas addressed above in (1) and (2), whether there are proper resources, oversight and independence of the compliance and ethics function, including seniority of corporate executives responsible for implementation and oversight, reporting lines, autonomy and independence, compensation and rewards, consistent discipline, resources, and access to information and personnel.  The review shall include sufficiency of training and guidance, including regarding anti-retaliation and whistleblowing.

B.  Provide the Consultant with complete access and resources to review key documents (e.g., business principles, Code of Conduct, policies and procedures, risk assessments, performance evaluation forms, relevant internal training materials and internal communications).  In reviewing the creation, administration and implementation of the compliance and ethics program as it relates to the areas addressed in ¶ A, the Consultant shall conduct an assessment survey and interview relevant personnel.  The assessment need not be a comprehensive review of all business lines, activities and markets but can use a risk-based approach.  The Consultant shall consider, however, the breakdown of internal controls in multiple markets and continents during the relevant time period of this action;

C.     Provide a report to the Commission staff and CSC's General Counsel and Chief Ethics and Compliance Officer, as described below, regarding the Consultant's findings and recommendations;

D.     Provide a copy of the engagement letter detailing the Consultant's responsibilities to Stephen L. Cohen, Associate Director, Division of Enforcement, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, D.C. 20549;

E.     Cooperate fully with the Consultant, including providing the Consultant with access to its files, books, records and personnel as reasonably requested for the above-described review except to the extent such files, books, or records are protected from disclosure by any applicable protection or privilege such as the attorney-client privilege or the attorney work product doctrine.  To the extent that the Consultant believes that documents are being withheld unreasonably, CSC shall work cooperatively with the Consultant to resolve the matter, and if they are unable to reach agreement, the Consultant shall promptly notify the Commission staff. To ensure the independence of the Consultant, CSC shall not have the authority to terminate the Consultant without prior written approval of the Commission's staff and shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to this Order at their reasonable and customary rates;

F.     Require the Consultant to report to the Commission staff on his/her activities as the staff shall request;

G.     Permit the Consultant to engage such assistance, clerical, legal or expert, as necessary and at reasonable cost, to carry out his/her activities, and the cost, if any, of such assistance shall be borne exclusively by CSC;

H.     Require, within 120 days of the issuance of this Order unless otherwise extended by the Commission staff for good cause, the Consultant to complete the review and report to the Commission staff and CSC's General Counsel and Chief Ethics and Compliance Officer concerning:

1.     the scope and methodologies used by the Consultant in order to complete the review;

2.     CSC's compliance with the review;

3.     the adequacy of CSC's existing policies, practices and procedures regarding the matters assessed; and

4.     the Consultant's recommendations, if necessary, regarding modification or supplementation of CSC's policies, practices and procedures related to the matters assessed (the "Recommendations").

28

I.     Adopt and implement, within 120 days of CSC's receipt of the Recommendations, all of the Recommendations; provided, however, that as to any Recommendation that CSC considers to be, in whole or in part, unduly burdensome or impractical, CSC may submit in writing to the Consultant and the Commission staff (at the address set forth above), within 60 days of receiving the Recommendations, an alternative policy, practice or procedure designed to achieve the same objective or purpose. CSC and the Consultant shall then attempt in good faith to reach an agreement relating to each Recommendation that CSC considers to be unduly burdensome or impractical and the Consultant shall reasonably evaluate any alternative policy, practice or procedure proposed by CSC. Such discussion and evaluation shall conclude within 90 days after CSC's receipt of the Recommendations, whether or not CSC and the Consultant have reached an agreement. Within 14 days after the conclusion of the discussion and evaluation by CSC and the Consultant, CSC shall require that the Consultant inform CSC and the staff (at the address set forth above) of his/her final determination concerning any Recommendation that CSC considers to be unduly burdensome or impractical. CSC shall abide by the determinations of the Consultant and, within 60 days after final agreement between CSC and the Consultant or final determination by the Consultant, whichever occurs first, CSC shall adopt and implement all of the Recommendations that the Consultant deems appropriate;

J.     Within 14 days of CSC's adoption of all of the Recommendations that the Consultant deems appropriate, CSC's General Counsel and Chief Ethics and Compliance Officer shall certify in writing to the staff (at the address set forth above) that CSC has adopted and implemented all of the Consultant's Recommendations and that CSC has established policies, practices and procedures that are consistent with the findings of this Order;

K.     Require the Consultant to enter into an agreement that provides that, for the period of engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with CSC or any of their present or former affiliates, directors, officers, employees or agents acting in their capacity as such. The agreement will also provide that the Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Consultant in the performance of his/her duties under this Order shall not, without the prior written consent of the Commission staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with CSC, or any of their present or former affiliates, directors, officers, employees or agents acting in their capacity as such, for the period of the engagement and for a period of two years after the engagement;

L.     Certify in writing to the Commission staff (at the address set forth above), in the second year following the issuance of this Order, that CSC has established and continues to maintain policies, practices and procedures consistent with the findings of this Order;

29

CSC may apply to the Commission staff for an extension of the deadlines described above before their expiration, and upon a showing of good cause by CSC, the Commission staff may, in its sole discretion, grant such extensions for whatever time period it deems appropriate;

**V.**

In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, Respondents Laphen, Mancuso, and Wakefield (i) agree to appear and be interviewed by Commission staff at such times and places as the staff requests upon reasonable notice; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoint Respondents' undersigned attorneys as agents to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the interview or testimony reimburses Respondents' travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consent to personal jurisdiction over Respondents in any United States District Court for purposes of enforcing any such subpoena.

In determining whether to accept Laphen's, Mancuso's, and Wakefield's Offers, the Commission has considered these undertakings.

**VI.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Sections 4C and 21C of the Exchange Act, and Rule 102(e) of the Commission's Rules of Practice, it is hereby ORDERED, effective immediately, that:

A.     CSC cease and desist from committing or causing any violations and any future violations of Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder.

B.     Laphen cease and desist from committing or causing any violations and any future violations of Securities Act Sections 17(a)(2) and (a)(3), Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), Rules 12b-20, 13a-1, 13a-13, 13a-14, and 13b2-1 thereunder, and Sarbanes-Oxley Act Section 304.

C.     Laphen is denied the privilege of appearing or practicing before the Commission as an accountant.

30

D.      After three years from the date of this Order, Laphen may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Laphen's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.      an independent accountant.  Such an application must satisfy the Commission that:

(a)      Laphen, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)      Laphen, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

(c)      Laphen has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)      Laphen acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

E.      The Commission will consider an application by Laphen to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Laphen's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

F.      Mancuso cease and desist from committing or causing any violations and any future violations of Securities Act Sections 17(a)(2) and (a)(3), Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-13, and 13a-14 thereunder, and Sarbanes-Oxley Act Section 304.

G.      Zilmer cease and desist from committing or causing any violations and any future violations of Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 13a-1, 13a-13, and 13b2-1 thereunder.

H.      Banks cease and desist from committing or causing any violations and any future violations of Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5), and Rules 10b-5, 13a-1, 13a-13, and 13b2-1 thereunder.

I.      Banks be, and hereby is, prohibited for four years from the date of this Order from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

J.      Banks is denied the privilege of appearing or practicing before the Commission as an accountant.

K.      After four years from the date of this Order, Banks may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

    1.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Banks's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

    2.      an independent accountant.  Such an application must satisfy the Commission that:

        (a)      Banks, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

        (b)      Banks, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

        (c)      Banks has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)     Banks acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

L.     The Commission will consider an application by Banks to resume appearing or practicing before the Commission provided that his practicing certificate is current, and he has resolved all other disciplinary issues with Chartered Accountants Australia and New Zealand. However, if licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Banks's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

M.     Wakefield cease and desist from committing or causing any violations and any future violations of Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5), and Rules 10b-5, 13a-1, 13a-13, and 13b2-1 thereunder.

N.     Wakefield be, and hereby is, prohibited for three years from the date of this Order from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

O.     Wakefield is denied the privilege of appearing or practicing before the Commission as an accountant.

P.     After three years from the date of this Order, Wakefield may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1.     a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Wakefield's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.     an independent accountant.  Such an application must satisfy the Commission that:

(a)     Wakefield, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)     Wakefield, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

(c)     Wakefield has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)     Wakefield acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

Q.     The Commission will consider an application by Wakefield to resume appearing or practicing before the Commission provided that his practicing certificate is current, and he has resolved all other disciplinary issues with the Institute of Chartered Accountants in England and Wales.  However, if licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Wakefield's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

R.     Within 7 days of the entry of this Order, CSC shall pay a civil money penalty of $190,000,000; Laphen shall pay a civil money penalty of $750,000; Mancuso shall pay a civil money penalty of $175,000; and Banks shall pay disgorgement of $10,990, which represents profits gained as a result of the conduct described herein, and prejudgment interest of $2,400, to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600 or 31 U.S.C. § 3717.

S.     Payments must be made in one of the following ways:

(1)     Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center

34

Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

T.      Payments by check or money order must be accompanied by a cover letter identifying the Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Stephen L. Cohen, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

U.      Within 7 days of entry of this Order, Laphen shall pay CSC $3,771,000 and Mancuso shall pay CSC $369,100 pursuant to Sarbanes-Oxley Act Section 304. Laphen and Mancuso shall deliver proof of satisfying payment to Stephen L. Cohen, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

V.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the civil money penalties referenced in paragraph R above. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, each Respondent agrees that in any Related Investor Action, Respondent shall not argue that it/he is entitled to, nor shall it/he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, each Respondent agrees that it/he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against any Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

W.	Respondent CSC shall comply with the undertakings enumerated above in Section IV.


By the Commission.


Brent J. Fields
Secretary