LATHAM & WATKINS LLP
 Jamie L. Wine (Bar No. 181373)
 *jamie.wine@lw.com*
Kevin McDonough (*pro hac vice*)
 *kevin.mcdonough@lw.com*
 885 Third Avenue
 New York, New York, 10022-4834
 T:  +1.212.906.1200 / F: +1.212.906.1200

 Stephen P. Barry (*pro hac vice*)
 *stephen.barry@lw.com*
 555 Eleventh Street, NW, Suite 1000
 Washington, D.C.  20004
 T: +1.202.637.2200 / F: +1.202.637.2201

 Nada L. Boutros (Bar No. 287163)
 *nada.boutros@lw.com*
 505 Montgomery Street, Suite 2000
 San Francisco, CA  94111
 T: +1.415.391.0600 / F: +1.415.395.8095

*Attorneys for Defendants DXC Technology Company,*
*Mukesh Aghi, Amy E. Alving, David Herzog, Sachin*
*Lawande, J. Michael Lawrie, Julio A. Portalatin,*
*Peter Rutland, Manoj P. Singh, and Robert F. Woods*

*Additional counsel of record listed on signature page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN JOSE DIVISION

| | |
|---|---|
| NEIL COSTANZO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DXC TECHNOLOGY COMPANY, HEWLETT PACKARD ENTERPRISE COMPANY, RISHI VARMA, TIMOTHY C. STONESIFER, JEREMY K. COX, MUKESH AGHI, AMY E. ALVING, DAVID HERZOG, SACHIN LAWANDE, J. MICHAEL LAWRIE, JULIO A. PORTALATIN, PETER RUTLAND, MANOJ P. SINGH, MARGARET C. WHITMAN, and ROBERT F. WOODS,<br><br>Defendants. | CASE NO. 5:19-CV-05794-BLF<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Date:     June 4, 2020<br>Time:     9:00 a.m.<br>Place:    Courtroom 3, 5th Floor<br>Judge:    Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................. 1

II.    THE SAFE HARBOR IMMUNIZES DEFENDANTS' FORWARD-LOOKING STATEMENTS UNDER SECTION 11 ......................................................... 3

    A.     Plaintiffs Do Not And Cannot Allege That Defendants Knew Their Forward-Looking Statements Were False When Made ......................................... 3

    B.     The Forward-Looking Statements Contain Meaningful Cautionary Language That Is Specific To The Risks ................................................................ 5

    C.     Defendants' Forward-Looking Projections Are Not "Mixed" Statements Of Present And Future Fact ...................................................................... 7

    D.     There Is No PSLRA Safe Harbor Exception That Applies To The Forward-Looking Statements In The Registration Statement .............................. 8

III.   PLAINTIFFS FAIL TO PLEAD CLAIMS BASED ON PUFFERY ............................. 10

IV.    PLAINTIFFS FAIL TO PLEAD MISSTATEMENTS OF OPINION .......................... 12

V.     PLAINTIFFS FAIL TO PLEAD VIOLATIONS OF ITEMS 303 AND 503 ................................................................................................................... 13

VI.    PLAINTIFFS' SECTION 15 CLAIM MUST LIKEWISE BE DISMISSED ................................................................................................................ 15

VII.   CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Advanta, Corp.*,
No. 97-CV-4343, 1998 WL 387595 (E.D. Pa. July 9, 1998)......................................................4

*In re AT&T Corp. Sec. Litig.*,
2004 U.S. Dist. LEXIS 29588 (D.N.J. Sept. 2, 2004) ...............................................................9

*In re Atossa Genetics Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .....................................................................................................6

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ...................................................................................10

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
No. 18-CV-10320, 2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020).........................................10

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2014) ...................................................................................................6

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................................9

*In re FVC.COM Sec. Litig.*,
136 F. Supp. 2d 1031 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir. 2002) .....................5

*Gerneth v. Chiasma, Inc.*,
No. 16-11082, 2018 WL 935418 (D. Mass. 2018) .............................................................14, 15

*Golub v. Gigamon Inc.*,
372 F. Supp. 3d 1033 (N.D. Cal. 2019) .................................................................................5, 6

*Hanrahan v. Hewlett Packard Co.*,
No. C 05-02047 CRB, 2006 WL 1699573 (N.D. Cal. June 16, 2006) ...................................15

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)...............................................................................................................9, 10

*Jui-Yang Hong v. Extreme Networks, Inc.*,
No., 2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .................................................................12

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) .....................................................................................................7

*Lorenzo v. Sec. & Exch. Comm'n*,
139 S. Ct. 1094 (2019)..............................................................................................................10

*Marsh Grp. v. Prime Retail, Inc.*,
    46 F. App'x 140 (4th Cir. 2002) ............................................................................7

*In re Mikohn Gaming Corp. Sec. Litig.*,
    No. 205CV-01410-PMP-RJJ, 2006 WL 2547095 (D. Nev. Sept. 1, 2006)..........................3, 4

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008*)* ............................................................................7

*Mingbo Cai v. Switch, Inc.*,
    No. 2:18-cv-01471-JCM-VCF, 2019 WL 3065591 (D. Nev. July 12, 2019)..........................7

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ....................................................................11

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ......................................................................6, 7

*Omnicare, Inc. v. Laborers District Council Constr. Industry Pension Fund*,
    575 U.S. 175 (2015)....................................................................................12, 13

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................................................................14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ........................................................................6, 7

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ......................................................................7, 8, 11

*In re Restoration Robotics, Inc. Sec. Litig.*,
    2019 WL 5295059 (N.D. Cal. Oct 18, 2019)..........................................................13, 14

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ..............................................................................15

*Rubke v. Capitol Bancorp, Ltd.*,
    551 F.3d (9th Cir. 2009) ..................................................................................13

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ..............................................................................6

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. June 17, 2011) ..............................................................6

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ............................................................................14

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) (Freeman, J.)........................................................4

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

*In re VeriFone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ........................................................................14

**STATUTES**

15 U.S.C. § 77z-2(i)(1)(D) .............................................................................................7

15 U.S.C. § 77z-2(b)(2)(D) ............................................................................................8

**REGULATIONS**

17 C.F.R. § 229.503 .....................................................................................................15

**OTHER AUTHORITIES**

SEC, *Fast Answers – Initial Public Offerings (IPO)* (May 31, 2013),
    https://www.sec.gov/fast-answers/answersipohtm.html ...........................................8

Sec. Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44722
    (Aug. 3, 2005) ..........................................................................................................9

Statement of Comm'n Regarding Disclosure of Year 2000 Issues &
    Consequences by Pub. Cos., Inv. Adv., Inv. Cos., & Mun. Sec. Issuers, SEC
    Release No. 1149 (July 29, 1998) ............................................................................14

## I.   INTRODUCTION[1]

This is the rare federal securities lawsuit in which Plaintiffs complain about corporate predictions *that came true*.  That is not a coherent theory of liability, and Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss (Dkt. No. 48) ("Opposition" or "Opp.") does nothing to salvage their facially deficient claims.

Plaintiffs have misguidedly attempted to construct a claim about DXC's *first* (2018) fiscal year projections to pursue damages for a stock price decline that occurred when DXC announced disappointing news about its actual and projected performance for the Company's *third* (2020) fiscal year.  *See* Compl. ¶ 71 (discussing an August 2019 press release regarding DXC's "2020 financial results").  The central focus of both the Complaint and the Opposition is the statement in DXC's February 2017 Registration Statement that it expected to achieve approximately $1 billion in cost reductions in its first year following the merger of HPES and CSC, based on estimated savings from workforce reductions and other streamlining and cost-cutting initiatives.  *Id.* ¶¶ 2, 41, 77; Opp. at 1, 4, 6, 9, 18.  But Plaintiffs never allege—nor could they—that DXC's first-year cost cuts materially exceeded the $1 billion in savings DXC projected in the Registration Statement.  *See* Opp. at 2-3.

Plaintiffs nonetheless assert that DXC's $1 billion projection and a handful of related statements from the nearly 400-page Registration Statement were false when made because DXC allegedly had a secret plan to reduce costs by a much larger magnitude ($2.7 billion) in its first year, and never told investors.  *See* Compl. ¶¶ 3, 78(d), 80(c), 89; Opp. at 1-2.  Yet now, more than three years after the Registration Statement was published, and with access to numerous periodic SEC filings in which DXC has reported on its cost-savings and other financial performance, Plaintiffs do not (and cannot) point to a single fact suggesting that DXC ever actually implemented this supposed $2.7 billion cost-reduction plan in the Company's first fiscal year.

As Plaintiffs acknowledge in the Opposition, their sole supposed source for the theory that DXC had an undisclosed $2.7 billion first-year cost savings plan is the complaint that Stephen

---

[1] Capitalized terms herein have the same meaning as in Defendants' Joint Motion to Dismiss the Amended Complaint and Supporting Memorandum (Dkt. No. 39) ("Defs.' Br."), and "Ex." refers to an exhibit to the accompanying Declaration of Nada L. Boutros filed therewith (Dkt. No. 40).

Hilton, a former DXC employee, filed in his employment lawsuit against the Company.  *See* Compl. ¶¶ 43-57; Opp. at 2-5.  But Plaintiffs offer only self-serving mischaracterizations of that complaint, which Plaintiffs conspicuously did not attach to their own pleading, and Hilton's actual allegations squarely refute Plaintiffs' theory of liability.

Among their many distortions of Hilton's complaint, Plaintiffs suggest that DXC's then-CEO Michael Lawrie "demanded" $2.7 billion in cost cuts in the first year.  Opp. at 2.  But Hilton alleges no such thing—let alone that any such year-one "plan" was in place before DXC published the Registration Statement.  Defs.' Br. at 3, 15, 21.  Hilton alleged merely that he and Mr. Lawrie "agreed" DXC "could *ultimately* achieve . . . $2.7 billion in annual savings."  Ex. H ¶ 66 (emphasis added).  And to the extent Mr. Lawrie had a more ambitious goal, it was—in *Hilton's own words*—"universally understood to be purely aspirational" and nothing more than a "tool to reduce internal debate."  *Id.* ¶¶ 99(a), 69.  Indeed, the very premise of Hilton's lawsuit is that he was unfairly terminated for failing to achieve a plan that *never* existed, much less existed in DXC's first year.

Furthermore, Hilton makes clear that no $2.7 billion first-year savings plan was ever implemented at DXC.  Hilton says in his complaint that DXC's first-year cost reductions "met the expectations of Wall Street analysts"—*i.e.*, the expected $1 billion in cuts that DXC communicated to investors.  *Id.* ¶ 70; *see also id.* ¶ 69; Defs.' Br. at 2, 13-14.  Plaintiffs' Complaint does not allege otherwise.  And DXC's reported first-year financial results—which no one has questioned—as well as other public sources cited in Plaintiffs' pleading confirm that the Company achieved cost reductions in line with its Registration Statement projections.  *See* Ex. D at 1 ("[W]e delivered more than $1.1 billion dollars of in-year savings."); Compl. ¶¶ 57-58; Defs.' Br. at 6, 13-14.

In short, Plaintiffs have no answer for Hilton's actual allegations and they point to no alleged facts showing that DXC did anything other than deliver on the first-year projections stated in the Registration Statement.  Moreover, Plaintiffs offer nothing in the Opposition to overcome the settled legal doctrines and clear Ninth Circuit precedent that render inactionable, as a matter of law, the small number of forward-looking statements, puffery statements, and opinions they cherry-pick from DXC's lengthy Registration Statement.  Accordingly, the Opposition fails to cure

the numerous deficiencies in the Complaint, and Plaintiffs' claims should be dismissed in their entirety.

## II.    THE SAFE HARBOR IMMUNIZES DEFENDANTS' FORWARD-LOOKING STATEMENTS UNDER SECTION 11

Plaintiffs make four arguments to try to avoid application of the PSLRA safe harbor to the forward-looking statements in the Registration Statement.  First, ignoring basic logic and despite expressly disclaiming any allegations of fraudulent intent in their Complaint, they now contend that Defendants knew their estimates of future performance were "false" when made.  Second, ignoring settled Ninth Circuit case law, Plaintiffs baldly suggest that the extensive cautionary language accompanying Defendants' challenged statements was somehow "inadequate."  Third, perhaps recognizing that they cannot carry their burden as to either (let alone both) of those two inlets to the safe harbor, they argue Defendants' projections included at least some reference to present facts, and thus receive only partial protection under the PSLRA.  Finally, Plaintiffs assert, without authority, that the stock issued to CSC shareholders as part of the merger was an "initial public offering" ("IPO") exempt from the statutory safe harbor.  Each of these arguments fails.

### A.    Plaintiffs Do Not And Cannot Allege That Defendants Knew Their Forward-Looking Statements Were False When Made

In an obvious attempt to avoid the heightened pleading standards of Rule 9(b), Plaintiffs disclaimed in their Complaint any allegations of "knowing" misconduct on Defendants' part. Compl. ¶ 100.  Contradicting that explicit assertion, Plaintiffs now argue that Defendants actually *knew* their statements regarding DXC's plan to cut costs by approximately $1 billion were false. Opp. at 21-22.  This about-face is premised on Plaintiffs' total mischaracterization of the Hilton allegations, which they claim show that Defendants developed and intended to pursue an "undisclosed plan" to cut costs by $2.7 billion in DXC's first fiscal year.  *Id*.  Plaintiffs cannot have it both ways, availing themselves of a lower pleading standard by disclaiming allegations of fraud, while simultaneously asserting that Defendants made knowing misstatements—the very definition of fraud under the federal securities laws.  *See In re Mikohn Gaming Corp. Sec. Litig.*, No. 205CV-01410-PMP-RJJ, 2006 WL 2547095, at *16 (D. Nev. Sept. 1, 2006) ("[B]ecause the

PSLRA's safe harbor provision requires a plaintiff to prove a defendant acted with 'actual knowledge,' the plaintiff must plead actual knowledge with particularity."); *In re Advanta, Corp.*, No. 97-CV-4343, 1998 WL 387595, at *8 (E.D. Pa. July 9, 1998) (rejecting "Plaintiffs' . . . allegation that all speakers knew that their statements were false when made" while "mindful of the pleading requirements of Rule 9(b)").

In any case, Plaintiffs have not alleged—even under the basic *Iqbal* / *Twombly* pleading standard—that Defendants actually knew their $1 billion cost-cutting projections were false.[2] As is evident in their Opposition, Plaintiffs' sole theory that Defendants' forward-looking statements were knowingly false comes from Hilton's allegations in his employment suit. But Hilton does not allege that DXC hatched and then implemented a $2.7 billion cost-cutting plan for year one, while telling investors that they were only planning to cut $1 billion in DXC's first year. To the contrary, Hilton made expressly clear in his complaint that the $2.7 billion cost-cutting goal Mr. Lawrie allegedly advocated internally was not a plan at all—it was a purely aspirational notion that Mr. Lawrie did not expect Hilton or others to meet. Ex. H ¶¶ 69, 99(a).

Plaintiffs' pleading failure is particularly acute as they do not—and cannot—allege a single missed projection in this case. Despite Plaintiffs' rhetoric, nothing in the Complaint or Opposition states that DXC actually implemented $2.7 billion in cost cuts in its first year. To the contrary, DXC disclosed that it planned to reduce its costs by approximately $1 billion, and then reported that in fact it saved $1.1 billion in its first year—squarely in line with the Registration Statement predictions. *Compare* Ex. A at 69 (predicting "first-year synergies of approximately $1.0 billion post-closing, with a run rate of $1.5 billion at the end of year one"), *with* Ex. D at 1 ("[W]e delivered more than $1.1 billion dollars of in-year savings").[3] To plead falsity, Plaintiffs would

---

[2] Plaintiffs make no suggestion that Defendants Stonesifer, Cox, and Varma, who had no ongoing post-merger role and presumably would have no role in planning DXC's operations, and Defendant Whitman, who left DXC's board twenty months before DXC disclosed certain business setbacks, had actual knowledge of the alleged "secret plan." *See* Defs.' Br. at 14 n.3.

[3] Contrary to Plaintiffs' argument, Opp. at 22, Defendants' Exhibit D—a May 24, 2018 press release announcing DXC's first-year results—is properly subject to judicial notice. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 802 (N.D. Cal. 2019) (Freeman, J.) (taking judicial notice of "publicly available articles or other news releases of which the market was aware"). In fact, Plaintiffs' attorneys themselves rely on DXC press releases in the Complaint. Compl. at 1, ¶¶ 69, 71, 73. Plaintiffs do not otherwise challenge Defendants' request for judicial notice, and this Court and others have routinely granted such requests. *See* Defs.' Br. at 1 n.1.

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

need to allege facts showing that, contrary to the disclosed projections concerning $1 billion in cuts, DXC actually implemented a plan to cut $2.7 billion in costs at the time of the Registration Statement. The Complaint, despite its attempts to distort the Hilton Complaint, fails to do so.

Plaintiffs' puzzling request for "further discovery" to "test" the fact that DXC achieved $1.1 billion in cost savings—"including" in order to assess "when and how those savings were realized and booked"—turns their pleading burden on its head. Opp. at 22. Even putting aside that the challenged statements are forward-looking, opinions, and puffery, Plaintiffs are required to allege facts establishing that DXC's projection of $1 billion in first-year cost savings was false. They cannot meet that burden by speculating that DXC's publicly reported and independently audited results, which validate the Company's earlier projections and are corroborated by Hilton's allegations (Ex. H ¶ 70), might possibly be false (which they are not). *See In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1037 (N.D. Cal. 2000) (dismissing complaint based on "pure speculation," without allowing discovery), *aff'd*, 32 F. App'x 338 (9th Cir. 2002). Alleging falsity under these circumstances requires more than conjecture, yet that is all Plaintiffs offer here.

**B.    The Forward-Looking Statements Contain Meaningful Cautionary Language That Is Specific To The Risks**

Plaintiffs do not dispute that the Registration Statement contained extensive disclosures regarding the risks and uncertainties attendant to Defendants' business projections, but they nonetheless criticize Defendants' cautionary language as "[not] meaningful," "generalized," "boilerplate," and "obligatory." Opp. at 19-20. Specifically, Plaintiffs argue that DXC's warnings that it "cannot predict with certainty if or when these . . . synergies . . . will occur, or the extent to which they will . . . be achieved" are inadequate because they do not discuss the "undisclosed cost-cutting plan" described in the Hilton Complaint. *Id.* at 20. But courts in the Ninth Circuit consistently have held similar language to be adequate under the PSLRA.

*Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033 (N.D. Cal. 2019), is instructive. There, the court deemed meaningful the defendant's admonitions (i) that there "can be no assurance that the Management Projections will be realized, and actual results may be materially better or worse than those contained in the Management Projections"; (ii) cautioning "stockholders . . . not to place

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

undue, if any, reliance on the projections included in this proxy statement'"; and (iii) that "[i]mportant factors . . . may affect actual results and cause the Management Projections not to be achieved." *Id.* at 1049-1050. And numerous other cases are to the same effect. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059-60 (9th Cir. 2014) (finding sufficient a disclaimer that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2014) (upholding a warning that defendant's "'ability to continue increasing sales performance worldwide' could cause variance in the results").

DXC's cautionary statements were similar—the Registration Statement expressly disclosed that DXC could not "predict" future results "with certainty" (Opp. at 20) and warned investors of particular risks, including (among others) that (i) "the loss of personnel could impair" DXC's ability to "perform under certain contracts"; (ii) DXC's performance could suffer in the event it was unable to hire and utilize employees with the right skills to meet client demands; and (iii) an unsuccessful integration or failure to "realize the anticipated synergies and other benefits" of the merger could harm DXC. Ex. A at 33, 43; *see also* Defs.' Br. at 11-12.[4]

Plaintiffs' cases (Opp. at 19-20) involving generic warnings stand in stark contrast to DXC's robust cautionary language. *See In re Atossa Genetics, Inc. Sec. Litig.*, 868 F.3d 784, 797-98 (9th Cir. 2017) (generalized warnings as to potential regulatory action were inadequate); *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217, at *30 (C.D. Cal. June 17, 2011) (boilerplate warnings failed to "address [the] risks of the [relevant] Agreement"). The remainder of Plaintiffs' authorities are inapposite cases where the warned-of risk already had occurred or which do not address forward-looking statements at all. *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1172 (9th Cir. 2009) (disclosure regarding impact of possible litigation was misleading where a lawsuit had already been filed); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (considering challenges to risk

---

[4] Defendants have not argued that the *actual* hiring and retention risk factor was not meaningful, as Plaintiffs misleadingly suggest. Opp. at 23-24. Defendants merely noted that even if one accepted Plaintiffs' selective excerpting of Defendants' risk disclosure to make it sound like an affirmative statement of hiring actions DXC would take, that *manufactured* statement would be inactionable puffery. *Compare* Compl. ¶ 79, *with* Ex. A at 43; *see also* Defs.' Br. at 17.

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

disclosures); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008*)* (same); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 947-48 (9th Cir. 2005) (declining to apply the safe harbor to statements of historical or present fact); *Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-01471-JCM-VCF, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (assessing alleged violation of Item 303 of Regulation S-K based on purported failure to disclose already-executed business change in risk disclosures).

### C.    Defendants' Forward-Looking Projections Are Not "Mixed" Statements Of Present And Future Fact

Failing to overcome either the knowledge-of-falsity or cautionary-language inlets of the PLSRA safe harbor for forward-looking statements (let alone both, as required to avoid dismissal), Plaintiffs offer the fallback position that because Defendants' future estimates were premised on present expectations, they constitute "mixed" statements of present and future facts and should receive only partial protection.  Opp. at 17-19 (citing Registration Statement language indicating Defendants' projected cost savings "were" based on and "include[]" certain future business plans).  But the mere fact that Defendants' predictions referred to or were based on existing *plans* does not make those statements any less forward-looking.  Indeed, "[a]ll projections can be characterized as presently held beliefs" to some extent.  *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002).  Plaintiffs' position, if accepted, would eviscerate the safe harbor's protections— particularly given that the statute expressly covers "any statement of the assumptions underlying or relating to" forward-looking statements.  15 U.S.C. § 77z-2(i)(1)(D).  Because Defendants' statements, "examined as a whole," are unquestionably future-focused, they are entitled to full protection. *Intuitive Surgical, Inc.*, 759 F.3d at 1059.

Plaintiffs cite *In re Quality Systems, Inc. Securities Litigation* in support of their mixed-statements argument, but the facts of that case only undercut Plaintiffs' position.  There, the Ninth Circuit—addressing for the first time the status of so-called "mixed statements under the PSLRA"—analyzed representations that the defendant company's current performance was "very consistent, and there's nothing out of character in the pipeline that we're reporting *today* versus what we have seen there the past couple of years[,]" and that there was "nothing currently drying

up and there is nothing slowing down." 865 F.3d 1130, 1141, 1143 (9th Cir. 2017). The court found that those statements, to the extent they described the defendant's "current" sales pipeline as of "today," included discrete assertions of present fact, and were thus forward-looking only in part. *Id.* at 1143. By contrast, DXC stated that it "*expects* the merger [to] produce first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion *by the end of year one*." Compl. ¶ 77 (emphasis added). Examining those statements "as a whole," as the Ninth Circuit has instructed, it is evident that DXC's projections are purely forward-looking, falling within the heartland of the safe harbor. *Quality Sys.*, 865 F.3d at 1141.

### D.   There Is No PSLRA Safe Harbor Exception That Applies To The Forward-Looking Statements In The Registration Statement

The PSRLA's safe harbor for forward-looking statements does not apply to statements "made in connection with an initial public offering." 15 U.S.C. § 77z-2(b)(2)(D). This is a limited exception. Plaintiffs concede the transaction here (a spin-off merger) was not, in fact, an IPO. Opp. at 16 (conceding that DXC's stock offering was "not a vanilla IPO"). Indeed, there is not a single statement in the nearly 400-page Registration Statement describing DXC's offering as an IPO. Plaintiffs nonetheless argue, without legal basis and as a last-ditch attempt to avoid the statutory protections, that this exception should apply here because they believe the transaction bore sufficient "hallmarks of an initial public offering." *Id*. This argument fails.

An IPO is the process by which a private company offers its stock to the public for the first time to raise capital, typically pursuant to a Form S-1 registration statement filed with the SEC. *See* SEC, *Fast Answers – Initial Public Offerings (IPO)* (May 31, 2013), https://www.sec.gov/fast-answers/answersipohtm.html. In contrast, DXC filed an S-4 registration statement, which is used for merger-related stock offerings like the spin-off merger offering at issue here. *See* Ex. A at 1 (describing the series of transactions that culminated in the spin-off and merger). There is no exemption from the statutory safe harbor for forward-looking statements made in an S-4 registration statement for purposes of a spin-off merger stock offering, and Plaintiffs do not contend otherwise.

The safe harbor exemption that Plaintiffs now seek to manufacture also ignores the policy

considerations behind the narrow exception to the safe harbor.  In enacting the PSLRA, Congress "concluded that the safe harbor should not apply" to forward-looking statements made in connection with IPOs "because companies engaging in IPOs are 'generally untested' and thus especially likely to produce uncertain projections." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 507 n.21 (S.D.N.Y. 2013) (citing Sec. Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005)).  But no such concern could exist here:  the DXC merger combined CSC with a division of HPE—two well "tested" companies, with a collective total of more than 100 years of public financial reporting against which investors could assess Defendants' predictions about DXC.  Accordingly, Plaintiffs' position contradicts both the plain language and legislative history of the PSLRA.

The only authority Plaintiffs offer is a footnote from an unpublished and inapposite out-of-circuit case.  Opp. at 16-17 (citing *In re AT&T Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 29588 at *36 n.6 (D.N.J. Sept. 2, 2004)).  Unlike here, the newly formed company at issue in *AT&T Corp.* explicitly stated in its registration statement that it was conducting an IPO—and the transaction in question involved the issuance of a brand new tracking stock.  *Compare AT&T Corp.*, 2004 U.S. Dist. LEXIS 29588 at *36 n.6 (noting that "the Prospectus referred to the Wireless IPO as an initial public offering"), *with* Ex. A (no such language in DXC's Registration Statement).[5]  None of those facts are present in this case, and there is no authority in the PSLRA or in the relevant case law for the new safe harbor exemption Plaintiffs ask this Court to create.

Plaintiffs next resort to the similarly unsupported argument that the DXC stock offering "should be considered an offering by CSC" and that, consequently, a June 2015 administrative order relating to CSC should bar the safe harbor's application to any forward-looking statements in the Registration Statement.  Opp. at 17.  Plaintiffs' attempt to impute statements by DXC to a legally distinct entity is contrary to settled law.  Under the federal securities laws, only the "maker" of an alleged statement can be liable for that statement. *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 144 (2011) ("[T]he maker of a statement is the entity with authority over

---

[5] The only other citation Plaintiffs muster is to a passing reference in a Latham & Watkins LLP tax piece regarding the firm's experience with tax-free spin-offs that has nothing to do with the PSLRA safe harbor, much less its applicability to spin-off merger stock offerings.  Opp. at 17.

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

the content of the statement and whether and how to communicate it."); *see also Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1103 (2019).  Indeed, Plaintiffs do not cite, and Defendants are not aware of, any case deeming a company ineligible for the safe harbor based on administrative action involving one of the company's predecessor entities years earlier.

Accordingly, the PSLRA safe harbor applies, and it protects DXC from liability for the forward-looking statements Plaintiffs challenge in the Complaint, for the reasons detailed in Defendants' Opening Brief and above.  *See* Defs.' Br. at 9-15; *supra* § II.A-C.  In any event, even if the statutory safe harbor were inapplicable, DXC's risk disclosures and other warnings protect Defendants against liability for their forward-looking statements under the common law "bespeaks caution" doctrine, which survived enactment of the PSLRA and applies to all types of stock offerings.  *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, No. 18-CV-10320, 2020 WL 1529371, at *7 (S.D.N.Y. Mar. 30, 2020) ("[C]ourts have long protected forward-looking statements, even those made in connection with an IPO, under the bespeaks caution doctrine."); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1080 (N.D. Cal. 2010) (statements made in connection with an IPO included "cautionary language [that was] sufficiently specific so as to support application of the [bespeaks caution] doctrine").

## III.   PLAINTIFFS FAIL TO PLEAD CLAIMS BASED ON PUFFERY

Plaintiffs do not dispute that the language they challenge is exactly the kind of generalized corporate optimism courts have deemed immaterial as a matter of law.  Defs.' Br. at 15-17 (citing cases).  But they nonetheless argue that Defendants' puffery statements are materially false when read in context because, in describing a "turn-around plan" that would yield anticipated "net synergies" and "financial benefits," Defendants cited more particularized "reasons" for their predictions—including "a collective workforce of approximately 178,000 employees" and "strong customer relationships."  Opp. at 22-23.  And according to Plaintiffs, Defendants' puffery statements were false because Defendants did not disclose Mr. Lawrie's "wildly excessive workforce reduction" goals, which DXC undisputedly did not implement in its first year.  *Id.*  Plaintiffs' argument fails for at least three reasons.

*First*, even when viewed in context, the puffery statements at issue are not actionable

because they describe only in broad and generalized terms the future financial benefits the merging companies expected to realize.  In Plaintiffs' cases, the defendant companies offered a "concrete description of the past and present state of" "specific aspects of" their "operation"—including, for example, "reassuring investors that 'everything [was] going fine' with FDA approval when the company knew FDA approval would never come."  *Quality Sys.*, 865 F.3d at 1143-44 (finding defendants "went beyond 'feel good' optimistic statements" where they "repeatedly assured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters"); *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) (statements that company "had responded to [an] FDA Warning Letter" and made "various changes to the manufacturing and/or quality control procedures" were not puffery because they "contain[ed] factual representations at their core").

Defendants' statements, in contrast, were the epitome of corporate optimism regarding future results—not concrete representations of present or past facts.  Defendants referenced "strategic and financial benefits" and "net synergies" merely to describe the benefits that "*could be* achieved" and were "*expected* to be realized" through the merger.  Ex. A at 68 (emphasis added).  The "turn-around plan" referenced in the Registration Statement similarly described only in general terms what DXC "must execute" in the future "[t]o be successful."  *Id.* at 45.  And risk warnings that DXC might not hire, attract, and retain employees with the right "resources and expertise" simply informed investors of the various ways DXC could fall short of its business objectives.  *Id.* at 68-69; *see* Defs.' Br. at § IV.A.4 (citing cases deeming risk disclosures not actionable because they are inherently forward-looking).

*Second*, to the extent "net synergies" and "strategic and financial benefits" are measurable, DXC achieved them, as predicted in the Registration Statement, by executing its "turn-around plan" to undisputed success in the Company's first year.  Plaintiffs do not allege otherwise.  Further, Plaintiffs do not assert that the merging companies did not consider the "strategic and financial benefits" and "net synergies" they expected from the merger.  Instead, they claim Defendants' statements were false because, in their view, the merger did not yield the anticipated financial benefits.  Opp. at 23.  But that argument is fatally flawed because:  (1) DXC never

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

guaranteed the merger would achieve certain benefits and synergies, and instead described them as projections; and (2) in any event, Plaintiffs do not plead that DXC failed to achieve the first-year cost savings it projected.

*Third*, Plaintiffs fail to address—let alone grapple with—the numerous cases cited in Defendants' Opening Brief finding statements identical to DXC's to be inactionable puffery as a matter of law. *See e.g.*, *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-cv-04883-BLF, 2017 WL 1508991, at *12 (N.D. Cal. Apr. 27, 2017) (Freeman, J.) ("[G]eneral statements in anticipation of synergies resulting from the merger . . . are not actionable."); *see also* Defs.' Br. at 15-17 (citing cases). Those cases are squarely applicable here and confirm that the handful of generalized optimistic predictions Plaintiffs challenge from DXC's voluminous Registration Statement are not the sort of "concrete" factual representations capable of supporting a Section 11 claim.

## IV.   PLAINTIFFS FAIL TO PLEAD MISSTATEMENTS OF OPINION

Plaintiffs also fail to overcome the high hurdle for Section 11 liability based on Defendants' subjective opinion statements under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), because they do not (and cannot) allege that Defendants either disbelieved, or omitted material information regarding the basis for, their opinions. At the outset, Plaintiffs profess ignorance—making a puzzling suggestion that "[i]t is unclear what specific Defendants statements [sic] claim are 'opinions,' and why." Opp. at 24. Defendants' Opening Brief clearly identified Paragraphs 77 and 79 of the Complaint as challenging classic opinion statements concerning (i) the synergies that could be achieved through the merger, and the potential impact of management's turnaround plan, Compl. ¶ 77; and (ii) the effectiveness of the merged company's hiring practices, *id*. ¶ 79; *see* Defs.' Br. at 17-18. In any event, Plaintiffs barely attempt a substantive response.

Plaintiffs contend that these opinion statements are actionable because Defendants were "aware of Lawrie's existing parallel plan to cut costs nearly double the amount publicly stated," and therefore Defendants either did not actually believe their opinions, or omitted to disclose the internal "plan" purportedly bearing on those opinions. Opp. at 25. Once again, a review of the Hilton Complaint itself—the sole basis for Plaintiffs' contention—confirms there was no such

"plan," only internal aspirational discussions.  Ex. H ¶¶ 67-69.  Regardless, even assuming such an undisclosed "plan" did exist, Plaintiffs at most allege that it was proposed months *after* the merger creating DXC, and therefore only after publication of the Registration Statement.  *See, e.g.,* Compl. ¶ 87; Ex. H ¶¶ 67-69.  The timing forecloses Plaintiffs' claims, as they cannot establish that the alleged misstatements did not "fairly align[] with the information in the issuer's possession *at the time.*"  *Omnicare*, 575 U.S. at 189 (emphasis added).

## V.   PLAINTIFFS FAIL TO PLEAD VIOLATIONS OF ITEMS 303 AND 503

Plaintiffs' Items 303 and 503 allegations are also entirely based on Hilton's description of the post-merger aspirations that Mr. Lawrie allegedly advocated internally but which were never pursued.  *See* Compl. ¶¶ 83-91.  Plaintiffs' Opposition fails to surmount the numerous independently fatal deficiencies in these claims.

*First*, because Plaintiffs do not allege that the supposed "plan" described in the Hilton Complaint was ever implemented (or even meant to be), Plaintiffs do not plead at the time of the Registration Statement's filing that any material impact was likely to result from the purported "trends" Defendants allegedly failed to disclose.  *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1264 (N.D. Cal. Oct. 18, 2019) (dismissing an Item 303 claim because "Plaintiff's Complaint does not demonstrate that a material impact from any such . . . trend was 'reasonably likely to occur' at the time of the [offering]").

*Second*, the "risks" Plaintiffs complain of are, in reality, the subjective concerns of one former employee that were raised well after the merger was completed.  *See* Ex. H. ¶¶ 87-89 (citing "concerns" that Hilton purportedly expressed about the pace of DXC's cuts during the first year, and cost reduction targets in September/October 2017).  That an employee *later* voiced concerns about newly articulated goals cannot establish that those concerns were reasonably likely to materialize at the time the earlier-filed Registration Statement became effective.  *See Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d at 1156, 1164 (9th Cir. 2009).  Plaintiffs do not meaningfully contest this point.  Instead, they attempt to salvage their claims and assert that Hilton "personally discussed" his concerns prior to the merger, and that such discussions were "corroborated by numerous other sources."  Opp. at 14.  The Court should ignore these new characterizations, as the

Hilton Complaint—which forms the basis of Plaintiffs' allegations—is itself devoid of any indication that such discussions predated the merger.  Ex. H. ¶¶ 87-89.

*Third*, Plaintiffs' Items 303 and 503 claims also fail because Plaintiffs specifically disclaim the knowledge requirement of both provisions.  "The law is clear that what must be disclosed are material '*known* trends' or 'uncertainties,' or the 'most significant' risk factors with respect to an offering, which are *known* to the offering company at the time the registration statements are made."  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) (emphasis added); *see also Restoration Robotics*, 417 F. Supp. 3d at 1263 (requiring disclosure only of "trends" or "uncertainties" that are "presently known to management").  But Plaintiffs "specifically disclaim[ed] any allegations that are based on fraud, recklessness, or intentional misconduct."  Compl. ¶ 100; *see also supra* § II.A.  And Plaintiffs' back-handed treatment of Defendants' arguments concerning the knowledge requirement as a mere "gimmick" (Opp. at 14-15) ignores Ninth Circuit authority requiring knowledge of an adverse trend in order to trigger a company's disclosure obligations.  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1297-98 (9th Cir. 1998); *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992).

*Fourth*, Plaintiffs argue that Defendants violated Item 503 because the "24 pages of risk disclosures in the Registration Statement" did not warn of a "then-existing plan to cut $2.7 billion in costs for the first year[.]"  Opp. at 15-16.  But again, Plaintiffs allege no facts showing there was any such "plan" at the time of the merger.  *See supra* § I; *Panther Partners*, 538 F. Supp. 2d at 669 (noting that Item 503 requires disclosure of the most significant risks "known . . . at the time the registration statements are made").  And Plaintiffs' own authority confirms that Item 503 requires disclosure of *known* events only.  *See* Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Cos., Inv. Adv., Inv. Cos., & Mun. Sec. Issuers, SEC Release No. 1149 (July 29, 1998) ("The essence of MD&A is whether the consequences of a known event, trend, or uncertainty are likely to have a material effect on the company's results of operations, liquidity, and financial condition."); *Gerneth v. Chiasma, Inc.*, No. 16-11082, 2018 WL 935418, at *4 (D. Mass. 2018) (requiring plaintiff to "allege sufficient facts to infer that a registrant knew, as of the time of an offering," of purported problems with risk disclosures in the

registration statement).

*Finally*, Plaintiffs' assertion that the extensive risk disclosures in the Registration Statement lack the "specificity" required by Item 503 falls flat. Even assuming Hilton's *concerns* were a cognizable "risk" known to management at the time of the Registration Statement, they were certainly not among the "most significant risks" that are subject to disclosure under Item 503. 17 C.F.R. § 229.503. Internal debates among employees as to corporate strategy are not material. *See Hanrahan v. Hewlett Packard Co.*, No. C 05-02047 CRB, 2006 WL 1699573, at *4 (N.D. Cal. June 16, 2006). In any case, and as discussed in Section II.C *supra*, courts in the Ninth Circuit routinely approve of risk disclosures like the ones presented in DXC's Registration Statement.

## VI.   PLAINTIFFS' SECTION 15 CLAIM MUST LIKEWISE BE DISMISSED

Plaintiffs do not dispute that their secondary claim under Section 15 rises and falls with their primary Section 11 claim, *see* Opp. at 25, and the same pleading deficiencies therefore mandate dismissal of the Section 15 claim, *see In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

## VII.   CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint in its entirety.

Dated:  May 11, 2020                    Respectfully submitted,

                                        LATHAM & WATKINS LLP

                                        By: */s/ Jamie L. Wine*
                                            Jamie L. Wine (Bar No. 181373)
                                            Kevin McDonough (*pro hac vice*)
                                            885 Third Avenue
                                            New York, NY 10022-4834
                                            T:  +1.212.906.1200 / F:  +1.212.906.1200
                                            jamie.wine@lw.com
                                            kevin.mcdonough@lw.com

                                            Stephen P. Barry (*pro hac vice*)
                                            555 Eleventh Street, NW, Suite 1000
                                            Washington, D.C. 20004
                                            T: +1.202.637.2200 / F: +1.202.637.2201
                                            stephen.barry@lw.com

                                            Nada L. Boutros (Bar No. 287163)
                                            505 Montgomery Street, Suite 2000
                                            San Francisco, CA 94111
                                            T: +1.415.391.0600 / F: +1.415.395.8095
                                            nada.boutros@lw.com

                                            *Attorneys for Defendants DXC Technology
                                            Company, Mukesh Aghi, Amy E. Alving, David
                                            Herzog, Sachin Lawande, J. Michael Lawrie,
                                            Julio A. Portalatin, Peter Rutland, Manoj P.
                                            Singh, and Robert F. Woods*

Dated:  May 11, 2020                    WILSON SONSINI GOODRICH & ROSATI

                                        By: */s/ Steven M. Schatz*
                                            Steven M. Schatz (Bar No. 118356)
                                            Benjamin J. Tolman (Bar No. 301942)
                                            Douglas W. McManaway (Bar No. 317067)
                                            650 Page Mill Road
                                            Palo Alto, CA 94304-1050
                                            T: +1.650.493.9300 / F: +1.650.565.5100
                                            sschatz@wsgr.com
                                            btolman@wsgr.com
                                            dmcmanaway@wsgr.com

                                            Katherine L. Henderson (Bar No. 242676)
                                            One Market Street
                                            Spear Tower, Suite 3300
                                            San Francisco, CA 94105-1126
                                            T: +1.415.947.2000 / F: +1.415.947.2099
                                            khenderson@wsgr.com

Dated:  May 11, 2020

MORGAN, LEWIS & BOCKIUS LLP


By: */s/ Joseph E. Floren*
    Joseph E. Floren (Bar No. 168292)
     One Market, Spear Street Tower
     San Francisco, CA 94105
     T: +1.415.442.1391 / F: +1.415.442.1001
     joseph.floren@morganlewis.com

    Marc J. Sonnenfeld (*pro hac vice*)
    Laura H. McNally (*pro hac vice*)
    Karen Pieslak Pohlmann (*pro hac vice*)
     1701 Market Street
     Philadelphia, PA 19103-2921
     T: +1.215.963.5000 / F: +1.215.963.5001
     marc.sonnenfeld@morganlewis.com
     laura.mcnally@morganlewis.com
     karen.pohlmann@morganlewis.com

*Attorneys for Defendants*
*Hewlett Packard Enterprise Company, Rishi*
*Varma, Timothy C. Stonesifer, Jeremy K. Cox, and*
*Margaret C. Whitman*

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY

**ATTESTATION**

I, Jamie L. Wine, am the ECF user whose ID and password are being used to file Defendants' Joint Reply in Support of Their Motion to Dismiss the Amended Complaint. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other Signatories.

Dated: May 11, 2020

/s/ Jamie L. Wine
Jamie L. Wine

CASE NO. 5:19-cv-05794-BLF
DEFENDANTS' JOINT REPLY