UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NEIL COSTANZO, et al.,

Plaintiffs,

v.

DXC TECHNOLOGY COMPANY, et al.,

Defendants.

Case No. 19-cv-05794-BLF

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

[Re: ECF 39]

This is a putative class action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") arising from the prospectus and registration statement (the "Registration Statement") issued in connection with the merger of Computer Sciences Corporation and the Enterprise Services division of Hewlett Packard Enterprise Company completed in April 2017 (the "Merger").

Before the Court is Defendants' Motion to Dismiss the Amended Complaint. Motion, ECF 39. The Court heard oral arguments on June 4, 2020 (the "Hearing"). For the reasons stated below, the Court GRANTS Defendants' Motion with leave to amend.

## I.   BACKGROUND

Defendant DXC Technology Company ("DXC") is a Fortune 500 company, providing "end-to-end IT services" to its clients. Amended Class Action Complaint ("Compl.") ¶ 31. DXC is the result of the combination of two large IT services businesses, Computer Sciences Corporation ("CSC") and HPE's Enterprise Services division ("HPES"). *Id.* ¶ 33. In May 2016, CSC and HPE publicly announced the merger of CSC and HPES, which was completed in April 2017. *Id.* The Merger was structured as a "Reverse Morris Trust," wherein Hewlett Packard spun off HPES into a new company, and then the new company purchased CSC to form DXC. *Id.* CSC shareholders' stock was converted to DXC stock on a one-to-one basis. *Id.* On November 2, 2016, DXC filed a

United States District Court
Northern District of California

United States District Court
Northern District of California

draft registration statement on Form S-4 with the SEC to register the DXC shares to be issued and exchanged in the Merger.  *Id.* ¶ 34.  After filing several amendments, on February 24, 2017, DXC filed with the SEC a final amendment to the Registration Statement on Form S-4/A, which forms part of the Registration Statement.  *Id.* ¶ 35.  On February 27, 2017, the SEC declared the Registration Statement effective.  *Id.* ¶ 36.  DXC was formed on April 1, 2017 through various transactions.  *Id.* ¶ 37.  On April 3, 2017, DXC common stock began publicly trading on the NYSE under the symbol "DXC" at approximately $59 per share.  *Id.* ¶ 39.

This suit arises from the disclosures in the Registration Statement.  Specifically, Neil Costanzo, Ronald Jackson, and Ronald W. Fallness ("Lead Plaintiffs" or "Plaintiffs") allege that the Registration Statement failed to adequately disclose facts and risks that existed at the time of the Merger regarding DXC's "workforce optimization" plan.  Compl. ¶ 40.  Plaintiffs allege that the Registration Statement "touted the more than $1 billion in synergies that DXC would purportedly experience in the first year after the Merger due to a 'workforce optimization' plan that would 'align [DXC's] costs with its revenue trajectory" without disclosing that "the cuts to DXC's workforce would be too large, too soon, resulting in client dissatisfaction and the departure of key employees, which, consequently, would materially harm DXC's ability to secure and generate revenue on new or renewed contracts."  *Id.* ¶¶ 41-42.

Specifically, the Registration Statement provided:

> The combined company expects that the merger of Everett with CSC will produce first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one.  The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs.

Compl. ¶ 77.  Further, the Registration Statements detailed a "turnaround plan" that would "align [DXC's] costs with its revenue trajectory" and purportedly included "initiatives to improve execution in sales performance and accountability."  *Id.*  Plaintiffs allege that these statements were false and misdealing because "they failed to disclose and/or misrepresented [certain] adverse facts

that existed at the time of the Merger." *Id.* ¶ 78.  Plaintiffs also allege that the Registration Statement misleadingly represented that DXC could "attract and retain highly motivated people with the skills necessary to serve their customers," and that DXC would continue to "hire, train, motivate and effectively utilize employees with the right mix of skills and experience to meet the needs of it clients." *Id.* ¶ 79.

For support, Plaintiffs rely on a lawsuit filed by a former DXC executive, Stephen J. Hilton ("Hilton").  Following the Merger in April 2017, Hilton (an Executive Vice President at CSC) became DXC's Executive Vice President and Head of Global Delivery.  Compl. ¶ 45.  Hilton's employment was, however, terminated on July 20, 2018, following disagreements between Hilton and Defendant Lawrie – who was Chairman of the DXC Board, President, and CEO of DXC.  *Id.* ¶¶ 45, 23.  Hilton commenced a lawsuit against his former employer in the U.S. District Court for the Southern District of New York, titled *Hilton v. DXC Technology Company*, Case No. 1:19-cv-01157-PKC.  *Id.* ¶ 43.  The complaint filed in that action on February 6, 2019 (the "Hilton Compl.", ECF 40-8), brought various breach of contract claims related to Hilton's termination by DXC.  *Id.*

According to the Hilton Complaint, Defendant Lawrie told Hilton that he wanted to achieve major cuts to DXC's total expenses.  Compl. ¶ 50.  Lawrie and Hilton agreed that DXC could eventually cut the Global Delivery division's annual expenses by approximately $2.7 billion— meaning that Hilton's division could spend $2.7 billion less annually than its legacy entities, CSC and HPES, together had spent in the year before the April 2017 Merger.  *Id.* ¶ 51; Hilton Compl. ¶ 68.  The bulk of these cuts would be obtained through workforce reductions.  *Id.*  Based on Hilton's allegations, Plaintiffs claim that DXC had an internal target to "to make approximately $2.7 billion in cuts within the first 12 months after the Merger." *Id.* ¶ 53.  In his complaint, Hilton claims that he "repeatedly advised Lawrie about his reservations concerning the pace of cuts." *Id.* ¶ 54; *see also* Hilton Compl. ¶ 69.  Hilton alleged that to meet the internal target of $2.7 billion in cuts, his department "would have to fire far more people far more quickly, with the resulting negative impact on customer satisfaction." Compl. ¶ 53; *see also* Hilton Compl. ¶ 68.  At Lawrie's direction, Hilton alleges, "DXC slashed Global Delivery's workforce by approximately 20% worldwide." Compl. ¶ 56.

1     Plaintiffs allege that DXC's workforce reduction plan "hamper[ed]its ability to deliver on

2     its client contracts, leading to widespread client dissatisfaction."  Compl. ¶ 65.  But according to

3     Plaintiffs "[t]he negative impact of the extreme workforce reduction plan on service delivery,

4     customer satisfaction, and revenues had a built-in lag."  *Id.* ¶ 64.  Starting in the fall of 2018 through

5     the end of 2019, these negative impacts reached the media.  *See id.* ¶¶ 66-67.  On May 23, 2019,

6     August 8, 2019, and November 11, 2019, DXC issued press releases announcing disappointing

7     financial results.  *Id.* ¶¶ 69, 71, 73.  On November 11, 2019, DXC's new CEO Mike Salvino

8     acknowledged "delivery and personnel retention problems," which Plaintiffs allege "directly

9     resulted from his predecessor's workforce reduction plan[.]"  *Id.* ¶ 74.  By the commencement of

10    this action, DXC stock was trading at $32.70 per share, a nearly 45% decline from the $59 price of

11    DXC stock at the time of the Merger.  *Id.* ¶ 75.

12    Relying on the Hilton Complaint, Plaintiffs allege that the Registration Statement failed to

13    disclose the following adverse facts: "(a) the […] 'workforce optimization' highlighted in the

14    Registration Statement involved crippling the Company's workforce infrastructure; (b) DXC

15    planned to jettison tens of thousands of employees on a destructively expeditious timeline, including

16    some of the Company's most highly skilled and longest-tenured employees; (c) these workforce

17    reductions were made to inflate reported earnings and other financial metrics in the short-term at

18    the expense of client service delivery; (d) Defendant Lawrie had plans for $2.7 billion of cost

19    reductions in the first year, nearly double the $1.5 billion run rate savings target that was made

20    public; (e) as a result of these workforce reductions, DXC materially hampered its ability to deliver

21    on client contracts, endangering longer-term revenue growth; and (f) internally, senior executives

22    had voiced concerns that the targeted reductions would be unachievable without causing massive

23    damage to the Company's customer relationships."  Compl. ¶ 78.

24    Based on the foregoing, Lead Plaintiffs bring this class action on behalf of themselves and

25    all other persons or entities who purchased or otherwise acquired the publicly-traded common stock

26    of DXC pursuant and/or traceable to the Registration Statement.  Compl. ¶ 1.  Lead Plaintiffs allege

27    that they "purchased or otherwise acquired DXC common stock pursuant and/or traceable to the

28    Registration Statement" and "suffered damages."  Compl. ¶¶ 11-13.  Plaintiffs bring this action

against DXC, HPE and thirteen DXC officers (Rishi Varma, Timothy C. Stonesifer, Jeremy K. Cox, Mukesh Aghi, Amy E. Alving, David Herzog, Sachin Lawande, J. Michael Lawrie, Julio A. Portalatin, Peter Rutland, Manoj P. Singh, Margaret C. Whitman, and Robert F. Woods (together, the "Individual Defendants")). *Id.* ¶¶ 14-28. Plaintiffs allege that Individual Defendants "were key members of the Merger working group and the executives and directors of DXC who pitched CSC investors to exchange their shares in the Merger." *Id.* ¶ 30. Each of the Individual Defendants either signed the Registration Statement or was identified in the document as an incoming director of DXC. *Id.* ¶¶ 16-28.

Plaintiffs bring two causes of actions: (1) for Violation of Section 11 of the Securities Act (15 U.S.C. § 77k) against all Defendants and (2) for Violation of Section 15 of the Securities Act (15 U.S.C. § 77o) against Individual Defendants and HPE. *See* Compl. ¶¶ 100-116.

## II.    REQUEST FOR JUDICIAL NOTICE

While the scope of review on a motion to dismiss is generally limited to the contents of the complaint, under Fed. R. Evid. 201(b), courts may take judicial notice of facts that are "not subject to reasonable dispute." Courts have taken judicial notice of documents on which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

Defendants request that the Court take judicial notice of (1) the Registration Statement (Exh. A to Boutros Decl. at ECF 40-1); (2) excerpts of DXC's 2018 Annual Report (Form 10-K), filed with the SEC on May 29, 2018 (Exh. B to Boutros Decl. at ECF 40-2); (3) Everett SpinCo, Inc., General Form for Registration of Securities (Form-10), filed with the SEC on November 2, 2016 (Exh. C to Boutros Decl. at ECF 40-3); (4) DXC press release titled, "DXC Technology Delivers Fourth Quarter Growth in Revenue, Earnings per Share, Margins, and Cash Flow," issued on May 24, 2018 2016 (Exh. D to Boutros Decl. at ECF 40-4); (5) an analyst report from J.P. Morgan titled "F4Q – Core Thesis of Margin Expansion Driven Earnings Growth is Reinforced – Positive," published on May 25, 2018 (Exh. E to Boutros Decl. at ECF 40-5); (6) transcription of DXC's Q1

5

1   2020 Earnings Call, held on August 8, 2019 (Exh. F to Boutros Decl. at ECF 40-6); (7) transcription

2   of DXC's Q2 2020 Earnings Call, held on November 11, 2019 (Exh. G to Boutros Decl. at ECF 40-

3   7); and (8) the Hilton Complaint (Exh. H to Boutros Decl. at ECF 40-8). *See* Motion at 1, n.1.

4        These documents are either referenced in the Complaint or are matters of public record of

5   which the market was aware.  Accordingly, the Court takes notice of Exhibits A-H to Boutros's

6   declaration at ECF 40.  The Court does not take notice of the truth of any of the facts asserted in

7   these documents.

8   **III.    LEGAL STANDARD**

9        "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

10  claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force*

11  *v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732

12  (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all

13  well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese*

14  *v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not

15  "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations

16  that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re*

17  *Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations

18  omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient

19  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

20  *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

21  claim is facially plausible when it "allows the court to draw the reasonable inference that the

22  defendant is liable for the misconduct alleged."  *Id.*  On a motion to dismiss, the Court's review is

23  limited to the face of the complaint and matters judicially noticeable.  *MGIC Indem. Corp. v.*

24  *Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581

25  (9th Cir. 1983).

26       In deciding whether to grant leave to amend, the Court must consider the factors set forth by

27  the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth

28  Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009).  A district court

United States District Court
Northern District of California

6

1    ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue

2    delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4)

3    undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at

4    1052. "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight."

5    *Id.* However, a strong showing with respect to one of the other factors may warrant denial of leave

6    to amend. *Id.*

## IV.    DISCUSSION

8            Defendants move to dismiss the Complaint, arguing that Plaintiffs fail to plead any material

9    false statement or omission of fact in DXC's Registration Statement. *See generally*, Motion.

### A.    Section 11 of the Securities Act (Count I)

11           Section 11 of the Securities Act contains a private right of action for purchasers of a security

12   if the issuer publishes a registration statement in connection with the security that "contain[s] an

13   untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or

14   necessary to make the statements not misleading." 15 U.S.C. § 77k(a). "To prevail in such an

15   action, a plaintiff must prove (1) that the registration statement contained an omission or

16   misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have

17   misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp*

18   *Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted). "By definition, a

19   plaintiff must show that a purported misstatement in a registration statement was misleading at the

20   time the registration statement was issued." *In re: Resonant Inc. Sec. Litig.*, No.

21   CV1501970SJOPJWX, 2016 WL 1737959, at *7 (C.D. Cal. Feb. 8, 2016). For example, "[a] claim

22   under section 11 based on the omission of information must demonstrate that the omitted

23   information existed at the time the registration statement became effective." *Rubke*, 551 F.3d at

24   1164.

#### 1.    Allegations in the Hilton Complaint

26           The Complaint makes clear that the factual basis for Plaintiffs' allegations are taken solely

27   from the Hilton Complaint. Thus, the Court first addresses Defendants' challenges to Plaintiffs'

28   reliance on Hilton's allegations.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

As an initial matter, Defendants point out that the allegations in the Hilton Complaint are "unverified" and argue that "Plaintiffs cannot blindly parrot allegations by another party in another lawsuit—none of which Plaintiffs themselves have independently validated (or even attempted to confirm)—to support their claim." Motion at 3, 21. But at the Hearing, Defendants' counsel conceded that allegations from a pleading in an unrelated case may be relied upon at this stage of litigation. *See* Hr'g Tr. at 33:4-5 (Defendants' Counsel: "We could rely on another pleading in theory, if that pleading actually said what Plaintiffs are saying it says here."). Because there is no dispute, the Court need not address whether the allegations in the Hilton Complaint may generally be used as the factual basis for Plaintiffs' allegations. That said, the Court notes that the Ninth Circuit has relied on allegations brought by government agencies on motions to dismiss. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706–07 (9th Cir. 2012) (relying on allegations in an SEC complaint incorporated into the plaintiff's pleadings); *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 (9th Cir. 2015) (relying on allegations in an FTC complaint and settlement).

Defendants' key objection to the allegations in the Hilton Complaint is that those allegations – even if taken as true for the purposes of this Motion – do not support Plaintiffs' claim that the Registration Statement included false or misleading statements. *See* Motion at 15. Defendants argue that the Hilton Complaint alleges that Lawrie's $ 2.7 billion cost-cutting target (1) was an aspirational internal goal (*i.e.*, not real) and (2) was set after the merger was completed and thus cannot be the basis for allegations that the disclosures in the Registration Statement were false when made. Motion at 15, 21-22.

a. Lawrie's Internal Cost Cutting Goal

The Court agrees with Defendants that Plaintiffs' allegations are insufficient to show that Lawrie's $2.7 billion internal cost cutting target – even if true – was anything more than an aspirational goal. As a sister court in Eastern District of Virginia recently found in a companion case, "the allegations in the complaint filed by Hilton in connection with his employment dispute with DXC, even assuming they are true, do not do make plausible that Defendants' statements to investors were actually or knowingly false." *In re DXC Tech. Co. Sec. Litig.*, No.

118CV01599AJTMSN, 2020 WL 3456129, at *12 (E.D. Va. June 2, 2020). Plaintiffs do not present a fair reading of the Hilton Complaint. Read in its entirety, Hilton challenged his termination from DXC by alleging that he successfully executed the workforce optimization plan and achieved the goals that were set for purposes of revenue projections. As Judge Trenga explained, "Hilton's 'reservations' that he allegedly conveyed to Lawrie did not relate to the workforce cuts that had been achieved, and which Hilton appears, by his allegations, to have supported, but rather more extensive aspirational goals, not achieved, reflected in an internal budget." *Id.* The Hilton Complaint makes clear that "Lawrie understood his own internal budget to be merely aspirational and a tool to reduce internal debate." Hilton Compl. ¶ 69. And Plaintiffs have not alleged facts, outside of the Hilton Complaint, supporting an inference that DXC intended to achieve this $ 2.7 billion cost-cutting target within the first year after the Merger was concluded.

Importantly, there are no allegations in the Complaint that DXC actually achieved this alleged internal target or cut costs in excess of the disclosed $1 billion. Defendants cite to a press release to claim that "in May 2018, DXC reported that during its first year of operation, the Company achieved $1.1 billion in cost savings and generated $24.5 billion in revenue with earnings per share of $6.04." Motion at 13-14 (citing Exh. D to Boutros Decl. at 1-2, ECF 40-4). Plaintiffs challenge Defendants' "reach outside the pleadings to cite its own press release" but argue that even if true, "further discovery is needed to test this assertion, including when and how those savings were realized and booked, or how much 'over' that figure was cut (the reported number of jobs cut suggest a higher figure)." Plaintiffs' Opposition to Motion ("Opp'n") at 22, ECF 48. The Court agrees that the truth of DXC's press release Defendants cite is not subject to judicial notice and thus may not be considered in connection with the present Motion. But the Complaint does ***not*** allege that DXC cut any more cost than it said it would in the ***first year*** after the Merger– the only year that is relevant because the challenged statements only cover the first after the Merger was completed. The earliest allegations of the impacts of the workforce reduction are two years after the Registration Statement was issued. *See* Compl. ¶¶ 66-71.

Put differently, if DXC disclosed in the Registration statement that that it intended to cut $1 billion in costs through workforce optimization in the first year post-Merger, and then went on to

9

United States District Court
Northern District of California

cut that same $1 billion in cost, the investors were not misled.  DXC's use of an internal aspirational goal to "reduce internal debate" and achieve the promised cuts, would simply be a business decision without any consequence to the investors.  *See* Hilton Compl. ¶ 69 ("Lawrie understood his own internal budget to be merely aspirational and a tool to reduce internal debate.").  This is the story of Plaintiffs' Complaint, relying on Hilton's allegations.

On the other hand, if Plaintiffs had alleged that while DXC told the investors that it would cut $1 billion dollars in costs in the first year, but was secretly cutting more – presumably by eliminating more employees than the investors would have expected – then Plaintiffs would have had a basis for alleging that DXC misled the investors.  But the Complaint is devoid of any facts to show that the alleged $2.7 billion goal was anything more than an aspirational (and not achieved, or even meant to be achieved) internal target.

In sum, while the Court accepts as true for the purpose of deciding this Motion, that an internal but aspirational target to cut costs by $2.7 billion existed at DXC, that fact – without more – is not sufficient basis for allegations of securities violation.

### b.  The Timing of Hilton's Allegations

The parties dispute whether Lawrie's $2.7 billion internal goal existed before or after the Merger – *i.e.*, when the Registration Statement was issued.  *See* Motion at 21-22 (citing Hilton Compl. ¶¶ 87-89; Opp'n at 14.  The Court is not persuaded that the Hilton Complaint – filed in an unrelated employment matter – establishes, one way or the other, whether the referenced $2.7 billion internal goal was set before or after the Merger.  The same is true about Hilton's allegations that he "repeatedly advised Lawrie about his reservations concerning the pace of cuts" which Hilton believed would have "negative impacts on customer satisfaction."  *See* Compl. ¶ 54; Hilton Compl. ¶ 69.  It is unclear from the Hilton Complaint *when* the discussions between Lawrie and Hilton occurred.  Viewing all factual allegations in the light most favorable to Plaintiffs in deciding this Motion, the Court accepts that Plaintiffs have sufficiently pled that Lawrie's $2.7 billion internal budget was set and Hilton's concerns were communicated to Lawrie before the Registration Statement was issued.

***

In conclusion, the Court is persuaded that Plaintiffs have sufficiently pled that there was an internal goal at DXC to cut $2.7 in costs at the time the Registration Statement was issued.  But Plaintiffs have failed to sufficiently allege that this goal was anything more than an aspirational internal target or that it was actually achieved (or was even meant to be achieved).  Thus, the allegations from the Hilton Complaint – even if accepted as true at this juncture – cannot support Plaintiffs' claim for violations of securities laws.

### 2.  Safe Harbor

Defendants challenge that certain alleged misstatements are forward-looking and therefore protected under PSLRA's Safe Harbor provisions.  PSLRA's Safe Harbor precludes liability for forward-looking statements in either of two circumstances: "if they were identified as forward-looking statements and accompanied by meaningful cautionary language," or "if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111–12 (9th Cir. 2010); 15 U.S.C. § 78u-5(c)(1).  A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A).

Defendants argue that the following statements are "forward-looking on their face" and protected by Safe Harbor:

- The combined company expects that the merger of Everett with CSC will produce first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one. The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs.  (Compl. ¶ 77).

- [W]ith a collective workforce of approximately 178,000 employees, the size and scale of the combined company will enhance its ability to provide value to its customers through a broader range of resources and expertise to meet their needs.  (Compl. ¶ 79).

Motion at 10.

According to Defendants, these statements are subject to PSLRA's Safe Harbor provision

United States District Court
Northern District of California

and exempt from liability under Section 11 because (1) the Registration Statement contains meaningful cautionary language and (2) Plaintiffs have not alleged actual knowledge. Motion at 9-15. Plaintiffs respond that Defendants' statement are not protected by the PSLRA Safe Harbor provisions because (1) those provisions do not apply to initial public offerings of stock and the Merger "ha[d] all the salient hallmarks of an initial public offering," or alternatively, the Merger should be considered an offering by CSC; (2) the alleged misstatements are "mixed" and concern present facts while looking to the future; (3) the cautionary language was "inadequate" or "itself misleading;" and (4) Defendants' actual knowledge of undisclosed facts is sufficiently pled. Opp'n at 16-22.

   a. Public Offering

  There is no dispute that the PSLRA's Safe Harbor provisions do not apply to statements "made in connection with an initial public offering" of stock. *See* 15 U.S.C. §77z–2(b)(2)(D); Opp'n at 16; Reply in Support of Motion ("Reply") at 8, ECF 52. Plaintiffs acknowledge that the Merger "was not a vanilla IPO." Opp'n at 16. But Plaintiffs nevertheless argue that because the Merger "entailed the issuance of a brand new, never-before publicly traded security, of a new (and thus previously non-reporting) company," it should be treated as an IPO. Opp'n at 16-17. To support this theory, Plaintiffs cite to a footnote from an out-of-district decision with clearly distinguishable facts. In *In re AT&T*, the court rejected defendants' assertion that "***the Wireless IPO*** was not an initial public offering." *In re AT&T Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 29588, *36 n.6 (D.N.J. Sept. 2, 2004) (emphasis added). This was because "the Prospectus referred to the Wireless IPO as an initial public offering" and stated that "share of AT&T Wireless tracking stock have not been publicly traded before this offering." *Id.* There are no similar allegations in this case. The Court is not persuaded that the Merger should be treated an IPO.

  Similarly, Plaintiffs' assertion that the Merger "should be considered an offering by CSC" is unsupported and unpersuasive. Plaintiffs argue that because CSC was the subject of an "administrative order finding that CSC had violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j" less than three years before DXC's Registration Statement was issued, the Safe Harbor provisions are inapplicable to the Registration Statement. *See* Opp'n at 17 (citing 15

U.S.C. §77z–2(b)(1)(A)(iii)).  Under this theory, Plaintiffs ask this Court to treat CSC and DXC – two legally distinct entities – as one entity and hold an administrative order related to one against the other.  The Court declines to do so.  And unsurprisingly, Plaintiffs fail to provide any authority supporting this proposition.

In short, the Court is not persuaded that the challenged statements in DXC's Registration Statements are exempt from PSLRA's Safe Harbor provisions.

### b.  Forward-Looking Statements

Plaintiffs further argue that the challenged statements are not protected because they "concerned or omitted present facts, or at best, were 'mixed' statements that both concerned present facts and looked to the future; such 'mixed' statements are not entitled to the safe harbor, at least with respect to the part of the statement that refers to the present."  Opp'n at 17 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017)).  The gist of Plaintiffs' argument is that DXC's statements misled the investors because they disclosed "*there existed a current* plan for $1.0 to $1.5 billion in cost cuts, *which had already been calculated using* cost savings from workforce 'optimization' and elimination of 'duplicative' roles as a basis" while there was a "true, undisclosed plan, which *had set nearly double* the stated amount, or $2.7 billion, as the cost-cutting amount."  Opp'n at 18.

As the Court noted above, the Complaint fails to allege that the $2.7 billion target in cost cuts – taken from the Hilton Complaint – was anything more than an aspirational and internal goal or that it had any impact on how the $1.0 billion expectation was calculated at the time the Registration Statement was filed.  Accordingly, Plaintiffs have failed to allege that DXC's $1 billion *expectation* in cost cut – which is facially forward-looking and related to financials – was a "mixed" statement and not entitled to the Safe Harbor protections.

### c.  Cautionary Language

Next, Defendants contend that the Registration Statement contains meaningful cautionary language.  Motion at 11.  For example, the Registration Statement included the following language:

- Even if CSC and Everett successfully integrate, CSC and Everett cannot predict with certainty if or when these cost and revenue synergies, growth opportunities and benefits will occur, or the extent to which they actually

United States District Court
Northern District of California

will be achieved.  Registration Statement at 33, ECF 40-1.

- The amount of synergies actually realized in the Transactions, if any, and the time periods in which any such synergies are realized, could differ materially from the expected synergies discussed in this proxy statement/prospectus-information statement, regardless of whether the two business operations are combined successfully.  Registration Statement at 33.

- CSC, Everett and the combined company may have difficulty attracting, motivating and retaining executives and other employees in light of the Transactions.  Registration Statement at 34.

- The ability of the combined company to provide customers with competitive services is dependent on the ability of the combined company to attract and retain qualified personnel.  Registration Statement at 42.

- The loss of personnel could impair the ability of the combined company to perform under certain contracts, which could have a material adverse effect on the consolidated financial position, results of operations and cash flows of the combined company.  Registration Statement at 43.

Plaintiffs argue that these warnings were "boilerplate, obligatory disclaimers" and again cite to the allegedly undisclosed cost-cutting plan of $2.7 billion from the Hilton Complaint.  Opp'n at 20.

The Court does not find the cautionary language in DXC's Registration Statement to be boilerplate or conclusory.  The challenged statement itself clearly disclosed that DXC expected to achieve the disclosed $1 billion in cost reductions by, *inter alia*, "workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs." *See* Compl. ¶ 77.  This clearly means layoffs were to be expected.  And the cautionary language warned investors that those layoffs "could impair the ability of the combined company to perform under certain contracts" which is precisely what Plaintiffs allege eventually happened.  Registration Statement at 43; *see* Compl. ¶ 67 ("[A]n inside DXC source told The Register that 'the company is in chaos as all the cuts are leading to mounting customer complaints.'"); *see also City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1062 (N.D. Cal. 2012) (finding sufficient the cautionary language that the company's "ability to develop, market, and sell products could be harmed if [it is] unable to retain or hire key personnel").  In short, a business decision that according to Plaintiffs "backfire[d]" by undermining the Company's ability to attract and retain qualified staff, without more, is not a violation of securities laws.  *See* Compl. ¶ 68.

14

1   It is true that the cautionary language did not warn the investors of the internal $2.7 billion

2   cost-cutting goal from Hilton's Complaint – but the Registration Statement **did** warn about the

3   eventualities that Plaintiffs complain of (*e.g.*, customer complaint).  And in any event, as discussed

4   above, Plaintiffs have failed to allege facts to show that the internal target was either material or

5   actually achieved.

6   In sum, the Court finds that the cautionary language in the Registration Statement

7   sufficiently warned investors of the risks at issue in this case.

8   <center>d.  Defendants' Actual Knowledge</center>

9   Finally, Defendants argue that "Plaintiffs' claims fail for the independent reason that

10  Plaintiffs have not satisfied their heavy burden of alleging facts establishing that Defendants actually

11  knew the forward-looking statements in the Registration Statement were false when made."  Motion

12  at 13.  Defendants are of the opinion that Plaintiffs disavowed all allegations of actual knowledge

13  by "disclaim[ing] any allegations that are based on fraud, recklessness, or intentional misconduct"

14  in an attempt to "to avoid triggering fraud-based pleading standards."  *Id.* (citing Compl. ¶ 100).

15  Defendants further argue that because DXC, in fact, achieved the promised $1 billion cost savings, it is

16  "axiomatic that an accurate prediction cannot have been knowingly false when made."  *Id.* at 13-14.

17  Plaintiffs respond that they have properly pled knowledge because they allege that Lawrie,

18  DXC's CEO, established the undisclosed plan to achieve $2.7 billion in cost-reductions in the first

19  year post-Merger.  Opp'n at 21-22.  Plaintiffs further object to Defendants' "reach outside the

20  pleadings" for the assertion that DXC achieved the expected $1 billion on savings.  *Id.* at 22.

21  The Court is not persuaded that Plaintiffs' disavowed allegations of "knowledge" when they

22  "disclaim[ed] any allegations that are based on fraud, recklessness, or intentional misconduct."  *See*

23  Compl. ¶ 100.  Reading the Complaint in the light most favorable to Plaintiffs, they have disclaimed

24  only "fraud, recklessness, or intentional misconduct."  The Court also agrees with Plaintiffs, as noted

25  earlier in this Order, that Defendants may not rely on DXC's press release – not incorporated in the

26  Complaint or otherwise subject to judicial notice for the truth of its contents – to assert that DXC

27  saved approximately $1 billion in the first year post-Merger.  That said, because the $2.7 billion

28  internal target is pled as nothing more than an aspirational goal, allegations of Defendants'

United States District Court
Northern District of California

<center>15</center>

1    knowledge of it does not help Plaintiffs' cause.  Plaintiffs have properly pled that Lawrie knew of

2    the $2.7 billion cost saving target because he is alleged to have set that goal according to the Hilton

3    Complaint.  But because the mere existence of this goal is not a sufficient basis for securities

4    violations, Defendants' knowledge of it is irrelevant to this Complaint.  And Plaintiffs have not

5    alleged that DXC cut any more costs than it told the investors it would in the first year following

6    the Merger.

7                                                       ***

8           In sum, the Court agrees with Defendants that the alleged misstatements (Compl. ¶¶ 77, 79)

9    about the expected cost reductions tied to DXC's workforce optimization plan are forward-looking

10   and protected by PSLRA's Safe Harbor provision.

11               **3.  Puffery**

12          Defendants argue that three alleged misstatements are non-actionable puffery.  A material

13   misrepresentation differs significantly from corporate puffery.  Puffery is an expression of opinion,

14   while a misrepresentation is a knowingly false statement of fact.  *Oregon Pub. Emps. Ret. Fund v.*

15   *Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119

16   (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification").

17   Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment

18   decisions.  *In re Cutera*, 610 F.3d at 1111.  Finally, "mildly optimistic, subjective assessment[s] ...

19   [do not] amount[ ] to a securities violation."  *Id.*

20          First, Defendants contend that statements touting "net synergies" and "strategic and financial

21   benefits" are not actionable.  *See* Motion at 16 (citing Compl. ¶ 77).  Plaintiffs respond that these

22   representations were "misleading not merely by themselves but in conjunction with the surrounding

23   statements," which touted the "size and scale of the combined company" that was expected to

24   "enhance [DXC's] ability to provide value to its customers through a broader range of resources and

25   expertise to meet their needs."  Opp'n at 23.

26          While "general statements in anticipation of synergies resulting from [a] merger" are non-

27   actionable puffery, *Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-CV-04883-BLF, 2017 WL

28   1508991, at *12 (N.D. Cal. Apr. 27, 2017), the Court agrees with Plaintiffs that when read in context,

United States District Court
Northern District of California

the synergies and benefits mentioned in the challenged statements are tied to the disclosure of the anticipated $1 billion cost redetection target and therefore are not merely expressions of corporate optimism.  Specifically, the Registration Statements disclosed "[t]he $1.0 billion post-close and $1.5 billion run rate at the end of year one ***were each calculated by*** estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs."  Compl. ¶ 77 (emphasis added).  Viewing the statement in light most favorable to Plaintiffs – as the Court must – the challenged statement at ¶ 77 of the Complaint is not puffery.

Second, Defendants argue that Plaintiffs' challenge the Registration Statement detailing a "turnaround plan" that would "align [DXC's] costs with its revenue trajectory" and included "initiatives to improve execution in sales performance and accountability" should be dismissed as non-actionable puffery.  Motion at 16 (citing Compl. ¶ 77).  According to Defendants, these are "vague descriptions of the Company's plans."   Motion at 16.   Plaintiffs respond that these statements were "*materially* false and misleading (not 'puffing')" because "DXC's true, undisclosed plan had set nearly double the stated amount, or $2.7 billion, as the cost-cutting amount," which was "not aligned to revenue trajectory, but recklessly cut jobs without regard to revenue impact, and would gravely undercut revenues and 'sales performance and accountability.'"  The Court agrees with Defendants.  The challenged statement does not mention the amount by which the Company was to cut costs, but instead, expresses vague corporate optimism that DXC's "costs" would align with its "revenue trajectory" and "improve execution in sales performance and accountability."  Such statements are incapable of objective verification and constitute non-actionable puffery.  *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167 (C.D. Cal. 2007) (finding non-actionable puffery a statement that the company was "on track to deliver improved financial performance in the fall, in line with our turnaround plan").

Third, Defendants challenge the following allegations:

> [T]he Registration Statement represented that DXC could "attract and

17

1   retain highly motivated people with the skills necessary to serve their customers," and that DXC would continue to "hire, train, motivate
2   and effectively utilize employees with the right mix of skills and experience to meet the needs of its clients."

3   Compl. ¶ 79; *see* Motion at 17.   Defendants first argue that "Plaintiffs mischaracterize these

4   statements" and that DXC "made no such promises but rather *warned* investors about its potential

5   inability to execute on the above."  Motion at 17.  Defendants are correct on this issue because the

6   challenged statements are represented out of context in the Complaint.  Specifically, the Registration

7   Statement reads:

8   The ability of the combined company to grow and provide customers with competitive services is partially dependent on the ability of the
9   combined company to attract and retain highly motivated people with the skills necessary to serve their customers.

10  Registration Statement at 42-43. And:

11

12  If the combined company does not hire, train, motivate and effectively utilize employees with the right mix of skills and experience in the
13  right geographic regions to meet the needs of its clients, its financial performance could suffer.

14  *Id.* at 43.   Plaintiffs do not directly respond to this argument but appear to concede that the

15  challenged statements are, in fact, "risk disclosures."  *See* Opp'n at 23.  When read in their entirety,

16  the quoted portions of the Registration Statement do not make the promises Plaintiffs allege, but

17  instead, warn investors of potential risks.

18       Nevertheless, Defendants argue that even if DXC had made the statements as represented

19  by Plaintiffs, "such statements are puffery and thus cannot be actionable under the securities laws."

20  Motion at 17.  Plaintiffs respond that DXC's "undisclosed massive, intended cuts" establish that

21  "these statements were themselves false and misleading, and failed to disclose material facts" and

22  are not "corporate cheerleading."   Opp'n at 23-24.  Because these statements are clearly "risk

23  disclosures" and do not convey a general corporate optimism, they cannot be fairly categorized as

24  puffery.[1]

25       The remaining challenged statement in paragraph 79 of the Complaint, however, is not a risk

26

27

28  _____

[1] Defendants separately challenge these risk disclosures as non-actionable "because they warn of future events."  Motion at 19-20.  The Court addresses those arguments later in this Order.

United States District Court
Northern District of California

18

disclosure:

> [W]ith a collective workforce of approximately 178,000 employees, the size and scale of the combined company will enhance its ability to provide value to its customers through a broader range of resources and expertise to meet their needs

Compl. ¶ 78; Registration Statement at 69.  Plaintiffs contend that it was misleading for Defendants to tout the "size and scale of the new company" that would "enhance its ability to provide value to its customers" because at that time "Lawrie had internally set plans for well over 20% of those employees."  Opp'n at 9 (citing Compl. ¶¶ 52-53, 56-57, 62).  The Court agrees with Plaintiffs that because touting of the Company's "size and scale" is tied to DXC's measurable headcount – which admittedly was to be reduced under the workforce optimization plan – the challenged statement, when read in its entirety, is more than mere puffery.

<div align="center">***</div>

In sum, the Court finds that the alleged misstatement regarding DXC's "turnaround plan" (the second section of Compl. ¶ 77) is non-actionable puffery.

### 4.  Opinion Statements

Separately, Defendants challenge Plaintiffs' allegations of "synergies," "turnaround plan," and hiring practices as non-actionable opinion statements.  *See* Motion at 17-18 (Compl. ¶¶ 77, 79). As an initial matter, the Court notes that Defendants label the alleged misstatements as "opinion statements" without explaining why the statements describe a "belief, a view, or a sentiment which the mind forms of persons or things" as opposed to a fact.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (citation and alterations omitted). The challenged statements do not, on their face, include any clear indication (*e.g.*, "we believe" or "we think") that they describe an opinion.  *See* Compl. ¶¶ 77, 79.

With that in mind, the Court addresses the parties' arguments.  Defendants argue that these statements are not actionable because Plaintiffs fail to allege that Defendants (1) did not actually believe they could achieve the synergies described in the Registration Statement or (2) omitted material information regarding the basis for their opinions.  Motion at 18-19.  Plaintiffs respond that "Defendants were aware of Lawrie's existing parallel plan to cut costs nearly double the amount

1   publicly stated." Opp'n at 25.

2       In the Ninth Circuit, there are three different standards for pleading falsity of opinion

3   statements: (1) "when a plaintiff relies on a theory of material misrepresentation, the plaintiff must

4   allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively

5   untrue," (2) "when a plaintiff relies on a theory that a statement of fact contained within an opinion

6   statement is materially misleading, the plaintiff must allege that the supporting fact the speaker

7   supplied is untrue" or (3) "when a plaintiff relies on a theory of omission, the plaintiff must allege

8   facts going to the basis for the issuer's opinion whose omission makes the opinion statement at issue

9   misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn*

10  *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017)

11  (citation omitted).

12      Plaintiffs' reliance on the allegedly undisclosed cost-cutting target is misplaced for the same

13  reasons stated earlier in this Order.  While Plaintiffs allege that there existed an undisclosed plan to

14  cut costs more than what was revealed to the investors in the first year post-Merger, Plaintiffs have

15  failed to allege facts establishing that the internal target was more than aspirational to make its

16  omission misleading.  Thus, assuming the challenged statements can properly be categorized as

17  "opinion statement," Plaintiffs have failed to sufficiently plead that the omission of Lawrie's internal

18  target was "misleading to a reasonable person reading the statement fairly and in context." *City of*

19  *Dearborn Heights*, 856 F.3d at 615–16.

20          **5.  Risk Disclosures**

21      Defendants next argue that DXC's challenged risk disclosures are not actionable because

22  "the prospective nature of the risk factors renders them inactionable in light of Plaintiffs' theory of

23  liability, which is based on conduct that occurred after the transaction closed."  Motion at 19.

24  Plaintiffs' position is that the risk disclosers are themselves misleading because Lawrie's plan to cut

25  $2.7 billion (more than double what was disclosed) was in place before the Merger and was

26  misleadingly left out of the Registration Statement.  Opp'n at 10-11.

27      Generally, risk disclosures – like any other statement – may be misleading if they

28  affirmatively create an impression of a state of affairs that differs in a material way from the one

United States District Court
Northern District of California

20

that actually exists. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 855 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017).  The risk disclosures here, however, warned of the eventualities that, even according to the Complaint, did not take place until years later.  Specifically, DXC warned:

> The ability of the combined company to grow and provide customers with competitive services is partially dependent on the ability of the combined company to attract and retain highly motivated people with the skills necessary to serve their customers.

Registration Statement at 42-43.  And:

> If the combined company does not hire, train, motivate and effectively utilize employees with the right mix of skills and experience in the right geographic regions to meet the needs of its clients, its financial performance could suffer.

*Id.* at 43.  Moreover, the Registration Statement disclosed to the investors that DXC intended to cut costs through its "workforce optimization" plan.  Compl. ¶ 77.  Thus, the Registration Statement disclosed the state of affairs as they were are the time: DXC planned to optimize its workforce and eliminate duplicative roles, which could lead to problems with providing service to its customers.

Plaintiffs' sole factual basis for their allegations that the risk disclosures were misleading on their own is the $2.7 billion internal target taken from the Hilton Complaint, which the Court has found to be no more than an aspirational goal.  Thus, Plaintiffs have failed to allege sufficient facts supporting their allegations that DXC's risk disclosures were false or misleading.

### 6.  Falsity

Alternatively, Defendants argue that even if the Court were to find  the challenged statements actionable, Plaintiffs' claims must be dismissed because they fail to allege sufficient facts to show that those statements were "false when made—or that Defendants omitted facts they were required to disclose."  Motion at 20.

To prevail in such an action under Section 11 of the Securities Act, a plaintiff "must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *Rubke*, 551 F.3d at 1161 (internal quotation marks omitted).  "To plead materiality, the complaint's allegations must 'suffice to raise a reasonable expectation

United States District Court
Northern District of California

1   that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to

2   draw the reasonable inference that the defendant is liable.'" *Reese v. Malone*, 747 F.3d 557, 568

3   (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights*, 856 F.3d 605 (9th Cir.

4   2017) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011)).   "Although

5   determining materiality in securities fraud cases should ordinarily be left to the trier of fact,

6   conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

7   dismiss for failure to state a claim."  *In re Cutera*, 610 F.3d at 1108.

8           Again, to plead falsity, Plaintiffs rely on Hilton's Complaint and argue that "the Registration

9   Statement was false and misleading in failing to disclose DXC's true, internal plan to cut critical

10  staff by nearly double the amount told to investors, and despite the dire warnings of top management

11  of the inevitable adverse impact on DXC, which did occur."  Opp'n at 10.  Because the Court has

12  concluded that Plaintiffs' allegations do not show that the Lawrie's internal budget was anything

13  more than an aspirational goal within the Company, or that it was actually achieved (or even meant

14  to be achieved) in the first year after the Merger, the Court finds that falsity of the Registration

15  Statement is not sufficiently pled.

16          **B.     Violations of Items 303 or 503**

17          Defendants also challenge Plaintiffs' allegations under Items 303 and/or 503(c) of SEC

18  Regulation S-K.   Those provisions, require disclosure of (1) "known trends or uncertainties that

19  have had or that the registrant reasonably expects will have a material favorable or unfavorable

20  impact on net sales or revenues or income from continuing operations," (17 C.F.R. §

21  229.303(a)(3)(ii)) and (2) under the caption "Risk Factors," a discussion of the most significant

22  factors that make the offering speculative or risky (17 C.F.R. § 229.305(c)).

23          Plaintiffs' allegations under this provision arise from the alleged non-disclosure of "Lawrie's

24  aggressive workforce reduction plan," which according to Plaintiffs, "would negatively impact

25  client service delivery, retention of necessary personnel, and future revenues and profitability."

26  Opp'n at 13.  Defendants argue that violations of Items 303 or 503 are not sufficiently pled because

27  (1) Hilton's "subjective concerns" were raised ***after*** the Merger was completed and (2) Plaintiffs

28  have disclaimed "any knowledge on Defendants' part of material misstatements or omissions."

Motion at 23-24.

As concluded earlier in this Order, the Court is not persuaded that Hilton's concerns were raised after the Merger was completed or that Plaintiffs have disclaimed Defendants' "knowledge" of the alleged misstatements.  But once again, Plaintiffs have failed to allege facts sufficient to lead to a reasonable inference that the $2.7 billion internal target was achieved or was even meant to be achieved in the first year after the Merger was concluded.  Thus, Plaintiffs' allegations for violations of Items 303 or 503 fail.

**C.    Section 15 of the Securities Act (Count II)**

Section 15 of the Securities Act requires an underlying primary violation of the securities laws.  15 U.S.C. §§ 77o.  Because Plaintiffs here have failed to adequately plead a violation of Section 11, it follows that Plaintiffs also have failed to adequately plead violations of Section 15.  *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

**V.    ORDER**

For the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss at ECF 39 WITH LEAVE TO AMEND.  Any amended complaint shall be filed within 60 days of this Order.

**IT IS SO ORDERED.**

Dated: July 27, 2020

BETH LABSON FREEMAN
United States District Judge