ROBERT V. PRONGAY (#270796)
  rprongay@glancylaw.com
KARA M. WOLKE (#241521)
  jcrowell@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

ADAM M. APTON (#316506)
  aapton@zlk.com
ADAM C. McCALL (#302130)
  amccall@zlk.com
LEVI & KORSINSKY, LLP
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671

*Attorneys for Lead Plaintiffs Neil Costanzo,
Ronald Jackson, and Ronald W. Fallness and Lead
Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| NEIL COSTANZO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DXC TECHNOLOGY COMPANY, HEWLETT PACKARD ENTERPRISE COMPANY, RISHI VARNA, TIMOTHY C. STONESIFER, JEREMY K. COX, MUKESH AGHI, AMY E. ALVING, DAVID HERZOG, SACHIN LAWANDE, J. MICHAEL LAWRIE, JULIO A. PORTALATIN, PETER RUTLAND, MANOJ P. SINGH, MARGARET C. WHITMAN, and ROBERT F. WOODS, <br><br> Defendants. | Case No. 5:19-CV-05794-BLF <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> Hon. Beth Labson Freeman |

631515.1

| Amended Class Action Complaint | Case No. 5:19-CV-05794-BLF |
|---|---|

# TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................................... 1

II.     JURISDICTION AND VENUE................................................................................ 5

III.    PARTIES .................................................................................................................. 5

        A.      Lead Plaintiffs ............................................................................................. 5

        B.      Defendants.................................................................................................... 6

IV.     SUBSTANTIVE ALLEGATIONS .......................................................................... 8

        A.      DXC's Business and History........................................................................ 8

        B.      The Merger and Issuance of DXC Shares .................................................. 9

        C.      Misrepresentation of DXC's Workforce Optimization Plan...................... 9

        D.      DXC's Extreme Workforce Reduction Plan ............................................ 10

                1.      The Hilton Complaint...................................................................... 10

                2.      CSC's Pre-Merger Cuts and the Organization of DXC ............... 11

                3.      DXC's Harmful Implementation of Its Extreme Workforce Reduction Plan
                        12

        E.      The Disastrous Impact of Extreme Workforce Reduction Plan .............. 15

V.      CONFIDENTIAL WITNESSES CONFIRM THE EXISTENCE OF AN UNDISCLOSED
        REDUCTION PLAN, AND THE NEGATIVE IMPACTS IT HAD ON DXC'S POST-
        MERGER OPERATIONS ...................................................................................... 18

VI.     DEFENDANTS'  ACTIONABLE  MISREPRESENTATIONS  AND  OMISSIONS  IN
        DXC'S REGISTRATION STATEMENT ............................................................. 21

        A.      Material Misrepresentations..................................................................... 22

        B.      Failure To Make Required Disclosures .................................................... 24

                1.      Disclosure Obligations Under the Securities Act........................... 24

                2.      Item 303 Disclosure Requirements ................................................ 24

                3.      Item 503 Disclosure Requirements ................................................ 26

VII.    CLASS ACTION ALLEGATIONS........................................................................ 28

VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR.................................... 29

IX.     COUNTS ................................................................................................................ 30

COUNT I.............................................................................................................................. 30

COUNT II ................................................................................................................................ 31

X.      PRAYER FOR RELIEF ............................................................................................... 32

XI.     JURY DEMAND ......................................................................................................... 32

Lead Plaintiffs Neil Costanzo, Ronald Jackson, and Ronald W. Fallness ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. Such investigation included, among other things, a review of Defendants' public statements and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DXC Technology Company, securities analysts' reports, news stories, the documents filed in *Hilton v. DXC Technology Company*, No. 1:19-cv-01157-PKC (S.D.N.Y.), and interviews conducted with former employees with knowledge of the facts and circumstances alleged herein. Plaintiffs believe that additional substantial evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      Plaintiffs bring this class action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of themselves and all other persons or entities who purchased or otherwise acquired the publicly-traded common stock of DXC Technology Company ("DXC" or the "Company") pursuant and/or traceable to the prospectus and registration statement (the "Registration Statement") issued in connection with the merger of Computer Sciences Corporation ("CSC") and the Enterprise Services division of Hewlett Packard Enterprise Company ("HPE") completed in April 2017 (the "Merger"), and who were damaged thereby (the "Class").

2.      Defendants issued the Registration Statement to solicit investors to purchase DXC shares and to convince CSC shareholders to vote in favor of the Merger, pursuant to which they would exchange their CSC shares for DXC shares. The Registration Statement touted the more than $1 billion in synergies that DXC would achieve in the first year after the Merger due to a "workforce optimization" plan. This plan purportedly involved the "elimination of duplicative roles and other duplicative general, administrative and overhead costs" and would "align [DXC's] costs with its revenue trajectory." In addition, the Registration Statement highlighted the size, breadth and

1    experience of DXC's workforce, as well as the newly formed Company's ability to optimize its

2    workforce through improved hiring and retention practices.

3        3.    These and similar representations in the Registration Statement were materially false

4    and misleading when made because Defendants failed to disclose to investors that: (a) the so-called

5    "workforce optimization" plan actually involved crippling DXC's workforce infrastructure;

6    (b) DXC planned to jettison tens of thousands of employees, including some of its most highly

7    skilled and longest-tenured employees, on a precipitous timeline; (c) these workforce reductions

8    were made to inflate reported earnings and other financial metrics in the short-term at the expense

9    of client service delivery; (d) DXC planned $2.7 billion of cost reductions in the first year, nearly

10   double the $1.5 billion run rate savings target that was made public; (e) as a result of these workforce

11   reductions, DXC materially hampered its ability to deliver on client contracts, endangering longer-

12   term revenue growth; (f) internally, senior executives had voiced concerns that targeted reductions

13   would be unachievable without causing massive damage to the Company's customer relationships;

14   and (g) the aggressive personnel cuts seriously harmed DXC's ability to attract and retain high-

15   quality personnel, further undermining client service delivery.

16       4.    Instead of a rational, measured workforce optimization process designed to eliminate

17   duplication and align costs with revenue, as represented in the Registration Statement, at the time

18   of the Merger, DXC had already planned a dramatic and accelerated workforce reduction at a scale

19   much larger than what was indicated to investors. This plan involved major undisclosed risks that

20   the cuts to DXC's workforce would be too large, too soon, particularly in the key Global Delivery

21   division, resulting in client dissatisfaction and the departure of key employees, which, consequently,

22   would materially harm DXC's ability to secure and generate revenue on new or renewed contracts.

23   Pursuant to Items 303 and 503 of SEC Regulation S-K, the Registration Statement was required to

24   disclose these specific risks and uncertainties. Defendants failed to do so.

25       5.    Executive Vice President Stephen J. Hilton ("Hilton") was the head of Global

26   Delivery, one of DXC's three main operating divisions (the others being "Sell" and "Build"). Global

27   Delivery was the division that housed the Company's IT personnel who served clients in the field.

28   Because most of DXC's personnel were located in Global Delivery, most of the Company's

workforce cuts were to occur within that division. As alleged in a breach of complaint that he filed against DXC, Hilton warned that "[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers." Hilton stated that the plan for $2.7 billion in cuts in Global Delivery would entail having "to fire far more people far more quickly, with the resulting negative impact on customer satisfaction." He "repeatedly advised [Defendant Chief Executive Officer ("CEO") Michael Lawrie ("Lawrie")] about his reservations concerning the pace of cuts."

6.    Other former employees confirm that the workforce reductions planned internally greatly exceeded the amount that was publicly disclosed to investors, and that the internal budgets were actual, not merely aspirational, targets that managers were expected to reach.  For example, as alleged in greater detail herein, CW1—a Senior VP at DXC from April 2017 to January 2018— reports that DXC had a specific internal budget for workforce cuts set by Lawrie and Saleh that was almost double the budget cut goal stated publicly.  These internal budges were discussed during monthly Lawrie- and Saleh-led executive committee meetings in 2017 and presented in PowerPoint slide presentations during those meetings.  Moreover, executive compensation and bonus structure was tied to attaining the internal budget cuts, not the external numbers.  CW1 recalled that the budget cut goal for the Global Delivery division *alone* was $1 billion to $1.8 billion.  By the time CW1 left the Company in January 2018, Global Delivery *alone* had cut more than $800 million.  CW1 also stated that the overly-aggressive internal workforce cuts "undermined" the Company and its long-term prospects because it was "starting to cause long term deterioration of our deliverability with our customers."

7.    CW2 largely confirmed Hilton's account.  CW2 likewise stated that the workforce cuts in Global Delivery conducted in connection with the Merger were "too fast and too much" and that it was negatively "impacting our business down the line."  According to CW2, the cuts were not well-planned and instead were implemented by an outside consulting firm, McKinsey & Co., that was "not collaborative" and did not understand the complexities of DXC's business.  According

3

1   to CW2, the workforce cuts were "completely suboptimal" and hurt the Global Delivery business

2   by causing multiple important customer losses in 2017 and 2018.

3       8.    DXC nonetheless proceeded with sweeping workforce reductions in the Global

4   Delivery division. Although the risks of taking this course of action were internally discussed among

5   DXC's senior management before the Merger, they were not disclosed to investors in the

6   Registration Statement. In the first year following the Merger, according to Hilton, DXC slashed

7   Global Delivery's workforce by approximately 20%, with more workforce reductions underway.

8   These reductions were not designed to optimize the workforce, eliminate duplication, and align costs

9   with revenue; rather, they were designed to achieve arbitrary cost savings to boost short-term

10   profitability. Doing so, however, undermined the Company's ability to deliver client service and

11   attract and retain desired personnel, which negatively affected customer satisfaction and future sales.

12   DXC personnel began telling the media that "customer support delivery . . . is strained due to the

13   headcount reduction," and that "the company is in chaos as all the cuts are leading to mounting

14   customer complaints."

15       9.    CW3 confirms that high numbers of US-based employees with specialized skills and

16   institutional knowledge were laid off in connection with the Merger in a "major push" cheaper and

17   less experienced "off-shore staffing."   According to CW3, the deep cuts of highly-skilled and

18   experienced employees "ignored the ability of delivery of the technology" and ultimately

19   "hamstrung" DXC's business.

20       10.   Although DXC's profitability was initially rewarded by Wall Street, this financial

21   performance later proved to be illusory. After the short-term financial benefits of the extreme

22   workforce reduction plan had dissipated, and it had become clear that the strategy had backfired,

23   leading to declining revenues and profits, DXC replaced CEO Lawrie. Soon thereafter, his successor

24   tacitly acknowledged the materialization of the very risks that Hilton had warned about at the time

25   of the Merger, disclosing to investors that: (a) "we will invest to stabilize key accounts and ensure

26   that our delivery is meeting our clients' expectations"; and (b) "execution challenges from recent

27   delivery actions have negatively impacted some of our large customers, which results in lower

28   margins, delayed revenue and bookings as customers have placed the additional work on hold."

11.     By the commencement of this action, DXC stock was trading as low as $32.70 per share, a nearly 45% decline from the $59 price of DXC stock at the time of the Merger. As a result of the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o. This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v.

13.     Venue is also proper in this District under § 22 of the Securities Act, 15 U.S.C. § 77v(a), which provides that any suit under the Securities Act may be brought "in the district wherein the defendant is found or is an inhabitant or transacts business[.]" Many of the violations of law alleged herein occurred in this District, including the dissemination of the material misrepresentations and omissions complained of herein and the sale of DXC shares by Defendants into this District. Additionally, each of the Defendants also has sufficient contacts with this District, or otherwise purposefully availed himself or itself of benefits of this District, so as to render the exercise of jurisdiction over each by this District consistent with traditional notions of fair play and substantial justice. For instance, Defendants HPE and Jeremy K. Cox are located or reside in this District, and many of the witnesses and documents relevant to this litigation can be found in this District.

## III.     PARTIES

### A.     Lead Plaintiffs

14.     Neil Costanzo, as set forth in his previously filed certification (ECF No. 1), incorporated by reference herein, purchased or otherwise acquired DXC common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's Merger, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Ronald Jackson, as set forth in his previously filed certification (ECF No. 16-2), incorporated by reference herein, purchased or otherwise acquired DXC common stock pursuant

and/or traceable to the Registration Statement issued in connection with the Company's Merger, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Ronald W. Fallness, as set forth in his previously filed certification (ECF No. 12-1), incorporated by reference herein, purchased or otherwise acquired DXC common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's Merger, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.     Defendants**

17.     DXC is an information technology company that services private and public-sector enterprises. A Nevada corporation headquartered in Tysons, Virginia, the Company maintains offices around the world, including offices in Northern California. DXC's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DXC."

18.     HPE is an information technology company based in Northern California. Before the Merger, HPE was the sole controlling shareholder of DXC. After the Merger, HPE shareholders held a controlling majority (approximately 50.1%) of the outstanding common shares of DXC. HPE exercised its control over DXC and the Merger by designating HPE employee representatives as officers and directors of DXC who, within the scope of their employment with HPE, reviewed, contributed to, signed, or agreed to be named as incoming officer and director designees in the Registration Statement.

19.     Rishi Varma ("Varma") was an employee and General Counsel of HPE at the time of the Merger. In his capacity as an employee representative of HPE, he served as President, Secretary, Principal Executive Officer, and a director of DXC until the Merger's completion, at which time he was replaced by J. Michael Lawrie. Varma signed the Registration Statement.

20.     Timothy C. Stonesifer ("Stonesifer") was the Chief Financial Officer ("CFO") of HPE at the time of the Merger. In his capacity as an employee representative of HPE, he served as CFO and a director of DXC until the Merger's completion, at which time he was replaced as CFO by Paul Saleh. Stonesifer signed the Registration Statement.

21.     Jeremy K. Cox served as a director of DXC until the Merger's completion and signed the Registration Statement.

22.     Mukesh Aghi is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

23.     Amy E. Alving is named in the Registration Statement as an incoming DXC director. She reviewed and contributed to the Registration Statement.

24.     David Herzog is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

25.     Sachin Lawande is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

26.     J. Michael Lawrie ("Lawrie") is named in the Registration Statement as the incoming Chairman of the DXC Board, as well as the incoming President and CEO of DXC. He is the former President and CEO of CSC. DXC announced Lawrie's retirement as CEO of the Company in September 2019. He reviewed and contributed to the Registration Statement.

27.     Julio A. Portalatin is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

28.     Peter Rutland is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

29.     Manoj P. Singh is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

30.     Margaret C. Whitman is named in the Registration Statement as an incoming DXC director. At the time of the Merger, she was the President and CEO of HPE. In her capacity as CEO and employee representative of HPE, she reviewed, contributed to, and was named as an incoming DXC director in the Registration Statement.

31.     Robert F. Woods is named in the Registration Statement as an incoming DXC director. He reviewed and contributed to the Registration Statement.

32.     The defendants listed in ¶¶ 19-31 are collectively referred to herein as the "Individual Defendants." DXC, HPC, and the Individual Defendants are collectively referred to herein as "Defendants."

33.     As major shareholders, directors, and/or executive officers of DXC, all of the Individual Defendants participated in the solicitation and sale of DXC common stock in the Merger for their own benefit and the benefit of DXC. The Individual Defendants were key members of the Merger working group and the executives and directors of DXC who pitched CSC investors to exchange their shares in the Merger. For instance, Lawrie presented during DXC's Investor Day on March 29, 2017, before completion of the Merger in April 2017.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     DXC's Business and History

34.     A Fortune 500 company, DXC is, according to its 2018 annual report, "the world's leading independent, end-to-end IT services company, serving nearly 6,000 private and public-sector clients from a diverse array of industries across 70 countries."

35.     DXC has two reporting segments: Global Business Services ("GBS"), Global Infrastructure Services ("GIS"). GBS offers enterprise, cloud applications, and consulting; application services; analytics; business process services; and industry software and solutions. GIS offers cloud and platform services, workplace and mobility services, and security solutions. DXC previously had a United States Public Sector ("USPS") segment, which delivered IT services and business solutions to all levels of government in the United States. On May 31, 2018, DXC announced its plan to spin off the USPS business, which it completed on May 31, 2018.

36.     DXC is the result of the combination of two large IT services businesses, CSC and HPE's Enterprise Services division ("HPES"). In May 2016, CSC and HPE publicly announced the merger of CSC and HPES, which was completed in April 2017. The Merger was structured as a so-called "Reverse Morris Trust," wherein HP spun off HPES into a new company, and then the new company purchased CSC to form DXC. CSC shareholders' stock was converted to DXC stock on a one-to-one basis.

8

B.      **The Merger and Issuance of DXC Shares**

37.      On November 2, 2016, DXC filed with the SEC a draft Registration Statement on Form S-4 with the SEC to register the DXC shares to be issued and exchanged in the Merger.

38.      After filing several amendments, on February 24, 2017, DXC filed with the SEC a final amendment to the Registration Statement on Form S-4/A, which forms part of the Registration Statement.

39.      On February 27, 2017, the SEC declared the Registration Statement effective. On the same day, DXC filed with the SEC its prospectus on Form 424B3, which forms part of the Registration Statement.

40.      DXC was formed on April 1, 2017, when CSC, HPE, Everett SpinCo, Inc. ("Everett"), a wholly-owned subsidiary of HPE, and New Everett Merger Sub Inc., a wholly-owned subsidiary of Everett ("Merger Sub"), completed the combination of CSC with HPES. The combination was accomplished through a series of transactions that included the transfer by HPE of HPES to Everett, spin-off by HPE of Everett on March 31, 2017, and the merger of Merger Sub with and into CSC on April 1, 2017. At the time of the Merger, Everett was renamed DXC, and as a result of the Merger, CSC became a direct wholly-owned subsidiary of DXC.

41.      When the Merger was completed on April 1, 2017, DXC issued approximately 141 million new shares of DXC common stock directly to former shareholders of CSC. These new shares of DXC stock were issued pursuant to the Registration Statement.

42.      On April 3, 2017, DXC common stock began publicly trading on the NYSE under the symbol "DXC" at approximately $59 per share.

C.      **Misrepresentation of DXC's Workforce Optimization Plan**

43.      DXC's Registration Statement issued in connection with the Merger contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and omitted required disclosures, in violation of Section 11 of the Securities Act, because the Registration Statement failed to adequately disclose facts and risks that existed at the time of the Merger regarding DXC's so-called "workforce optimization" plan.

44.     The DXC Registration Statement touted the more than $1 billion in synergies that DXC would purportedly experience in the first year after the Merger due to a "workforce optimization" plan that would "align [DXC's] costs with its revenue trajectory." In DXC's Investor Day presentation on March 29, 2017, just days before the Merger, the Company highlighted "[w]orkforce optimization," which entailed, among other things, "[c]onsolidat[ing] redundant roles across all functions," "[i]increas[ing] productivity," and "[a]lign[ing] costs to benchmarks."

45.     In stark contrast with the rational workforce optimization process presented above, in reality, DXC planned a dramatic and accelerated workforce reduction in the first year following the Merger, at a scale much larger than that indicated to investors. This actual plan involved major undisclosed risks that the cuts to DXC's workforce would be too large, too soon, resulting in client dissatisfaction and the departure of key employees, which, consequently, would materially harm DXC's ability to secure and generate revenue on new or renewed contracts. Unfortunately for DXC's investors, these undisclosed risks ultimately materialized.

**D.     DXC's Extreme Workforce Reduction Plan**

**1.     The Hilton Complaint**

46.     Stephen J. Hilton ("Hilton"), a former Executive Vice President ("EVP") at DXC, commenced a lawsuit against his former employer in the U.S. District Court for the Southern District of New York, titled *Hilton v. DXC Technology Company*, Case No. 1:19-cv-01157-PKC (the "*Hilton Action*"). The complaint filed in the *Hilton Action*, alleging various breach of contract claims, was filed on February 6, 2019 (the "Hilton Complaint").

47.     Hilton was hired by CSC in March 2015 as its EVP and General Manager of Global Infrastructure Services ("GIS"). He was personally recruited and interviewed by CSC's CEO at the time, Defendant Lawrie. As head of GIS, Hilton led a department of approximately 15,000 employees and an annual profit and loss of approximately $4 billion. Before joining CSC, Hilton was employed by Credit Suisse as a Managing Director and Chief Information Officer of IT Infrastructure, among other titles.

48.     Following the Merger in April 2017, Hilton became DXC's EVP and Head of Global Delivery. As one of the most senior executives at DXC, Hilton was formally named in the

1   Company's "succession plan" as a candidate to replace Defendant Lawrie as CEO in the event of

2   the latter's death or departure. Following disagreements between Hilton and Lawrie, however, DXC

3   terminated Hilton's employment effective July 20, 2018.

4        **2.    CSC's Pre-Merger Cuts and the Organization of DXC**

5        49.    Even before the Merger was completed, Hilton had already made significant cuts at

6   CSC. When Hilton became the head of CSC's GIS in March 2015, the division had been missing

7   its internal budget targets by hundreds of millions of dollars per year. These targets were generally

8   set by Defendant Lawrie. Hilton immediately began cutting costs within GIS in an effort to bring

9   the division within its budget targets, including by canceling programs and creating operational

10   efficiencies. Throughout 2015 and 2016, CSC's board of directors was contemplating a merger with

11   several potential partners, including HPES. For this reason, cutting costs and increasing profitability

12   was important for purposes of finalizing a favorable merger transaction. Nonetheless, illustrating

13   the severity of Lawrie's demanded cuts, GIS missed its internal budget targets in 2015 and 2016.

14        50.    For the approximately ten months between the announcement of the Merger in May

15   2016 and the finalization of the Merger in April 2017, Hilton was responsible for running the GIS

16   division.

17        51.    Defendant Lawrie, the CEO of the newly formed DXC, decided to organize the new

18   company into three divisions based on three main functions: Build, Sell, and Deliver. Each of these

19   divisions was led by an EVP. Hilton was named EVP of the Global Delivery division. Notably, the

20   heads of each of these three main divisions, including Hilton, all departed DXC within 15 months

21   after the Merger.

22        52.    DXC's Global Delivery division had approximately 120,000 employees and 60,000

23   contractors worldwide and an expense base of approximately $14 billion across 6,000 clients and

24   70 countries. Approximately three-quarters of DXC's total personnel were located within the Global

25   Delivery division, providing support to the Sell and Build divisions.

26

27

28

Second Amended Class Action Complaint           Case No. 5:19-CV-05794-BLF

### 3. DXC's Harmful Implementation of Its Extreme Workforce Reduction Plan

53.     As part of the planning and organization process leading up to the Merger, Defendant Lawrie told Hilton that he wanted to achieve major cuts to DXC's total expenses. That primarily meant reducing the number of personnel. Because most of DXC's personnel were located in Global Delivery, most of the Company's workforce cuts would have to occur within that division. Critically, the Global Delivery division included DXC's IT Operations, Application Management, and Business Process Services. In other words, this was the division that housed the Company's IT personnel who served clients in the field.

54.     Lawrie and Hilton agreed that DXC could *eventually* cut the Global Delivery division's annual expenses by approximately $2.7 billion—meaning that the division could spend $2.7 billion less annually than its legacy entities, CSC and HPES, together had spent in the year before the April 2017 Merger. The bulk of these cuts would be obtained through workforce reductions. However, it was also acknowledged that aggressive cuts could cause significant loss to the quality of the service that Global Delivery provided to DXC clients. To preserve quality of service, the Global Delivery cuts would have to be implemented over time.

55.     DXC could not achieve the $2.7 billion in Global Delivery cuts in one year without causing serious disruption to its customer service. As Hilton alleged in his Complaint, "it was people employed by Global Delivery who provided customer support to the clients won for DXC by sales. *Precipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers*." (Emphasis added.)

56.     Despite these substantial risks and concerns, DXC's internal budget, established by Defendant Lawrie, called for Global Delivery to make approximately $2.7 billion in cuts within the first 12 months after the Merger. As Hilton alleged, to meet this internal budget target, "*Global Delivery would have to fire far more people far more quickly, with the resulting negative impact on customer satisfaction*." (Emphasis added.)

57.     Hilton "*repeatedly advised Lawrie* about his reservations concerning the pace of cuts." (Emphasis added.) Based on these discussions, Hilton believed that "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without *negative impacts on customer satisfaction*." (Emphasis added.) Although these legitimate and material risks were internally discussed at DXC before the Merger, including by Defendant Lawrie and Hilton, they were not disclosed to investors in the Registration Statement.

58.     Even if, as Hilton alleged, "Lawrie understood his own internal budget to be merely aspirational," it still underscored Defendant Lawrie's desire to aggressively pursue steep and immediate workforce cuts in the Global Delivery division.

59.     At Defendant Lawrie's direction, Hilton faithfully executed sweeping workforce reductions in the Global Delivery division. In the first year following the Merger, according to the Hilton Complaint, DXC *slashed Global Delivery's workforce by approximately 20%* worldwide. And further workforce reductions were soon underway. In addition, Hilton cut hundreds of millions of dollars in annual IT expenditures.

60.     Given Hilton's figure that the division had approximately 180,000 employees and contractors, 20% equates to *36,000 personnel cut in a single year*. This number is roughly consistent with what has been reported in the media. As reported in *The Register*: "DXC started life in April last year with 170,000 employees and by last month this figure was down to at least 150,000. Rumours on The Layoff peg that figure at closer to 134,999, but this remains unconfirmed."[1] Based on the rumored figures, DXC eliminated 35,000 personnel. Thus, Hilton achieved much of the workforce reductions that Lawrie sought within the first 12 months after the Merger.

61.     As *The Register* observed, "It isn't just the grunts getting chopped by CEO Lawrie - a bunch of execs left in January, followed by a smattering of others. DXC has a labour pyramid in mind and wants high paid earners out too."[2] This is what DXC has called a "pyramid correction."

---

[1] https://www.theregister.co.uk/2018/08/17/dxc_latest_in_a_long_line_of_redundancies.

[2] https://www.theregister.co.uk/2018/08/17/dxc_latest_in_a_long_line_of_redundancies.

For example, during an earnings call on August 8, 2017, Defendant Lawrie said, "In our delivery and support organizations, we have removed 4 management layers."

62.     The magnitude of the workforce reductions in year one was much larger than what analysts anticipated based on their communications with DXC's management. For example, in J.P. Morgan's analyst report initiating coverage of DXC, dated April 19, 2017, said: "The company expects delivery optimization, including workforce optimization, could drive **$1.1B in cost cutting over three years (or $400M in year 1)**." (Emphasis added.) Moreover, J.P. Morgan recognized the risks associated with such blood-letting: "**Attracting skills/talent remains a key risk.** There's an inherent culture clash in executing a big cost takeout of labor while re-mixing to high-growth digital areas where the labor market is extremely tight." (Emphasis in original.) In this way, an overly aggressive workforce reduction plan, such as the one implemented by DXC, can backfire if it repels high-quality personnel needed to execute the company's business strategies.

63.     The Hilton Complaint provides an illustration of the rash and accelerated pace of the workforce reductions: "In one instance dating to September and October 2017, Lawrie gave Hilton one set of targets for workforce reductions in the U.K. and Ireland region team and in the North Central Europe region team-and then, two weeks later, nearly doubled the size of the expected cuts and said he expected those cuts to happen within just weeks." This shows that DXC's workforce reductions were designed to achieve arbitrary cost savings targets, rather than a workforce optimization plan designed to "align [DXC's] costs with its revenue trajectory," as the Registration Statement had claimed.

64.     According to Hilton, the "many iterations of organizational and personnel plans for the new company" were handled by the head of Human Resources and management consulting firm McKinsey & Co. Hilton observed that the process "was *chaotic and non-collaborative* and that many of the decisions were suboptimal for the future success of DXC."

65.     Yet these drastic workforce cuts were still not adequate for Defendant Lawrie. As alleged in the Hilton Complaint, within six months after the Merger, Lawrie sought a substantial reorganization of the Global Delivery division. The resulting restructuring eliminated all but four of Hilton's direct reports and consolidated the vast majority of the Global Delivery division under a

one of Hilton's direct reports—essentially replacing the leadership of the Global Deliver division. In Hilton's termination letter from Lawrie, one of the cited reasons for the termination was Hilton's "[f]ailure to meet the target in Lawrie's budget for spending cuts within the Global Delivery division."

66.     Ultimately, as Hilton alleged, the cuts made in the Global Delivery division "were instrumental in the remarkable increases in earnings per share ["EPS"] that DXC experienced in the first five quarters after the merger." This short-term boost in EPS, however, came at the expense of quality customer service and, in turn, sales. Although the savings were initially rewarded by Wall Street, DXC's financial performance later proved to be illusory.

67.     The negative impact of the extreme workforce reduction plan on service delivery, customer satisfaction, and revenues had a built-in lag. As DXC's 2017 annual report stated, "[revenues] are generated by providing services on a variety of contract types lasting from less than six months to ten years or more." Given that the workforce reduction plan could not begin to be implemented until after the Merger, the consequences of inadequate service delivery and dissatisfied clients would not be felt for several quarters.

**E.     The Disastrous Impact of Extreme Workforce Reduction Plan**

68.     DXC's workforce reduction plan, substantially executed by Hilton and other senior executives, was simply an earnings management scheme: jettisoning scores of personnel so that the Company could report more favorable quarterly EPS figures in the short term. But the workforce reductions fell most heavily on the largest of the Company's three divisions, Global Delivery, which included the tens of thousands of employees who were tasked with actually performing the contracts DXC had with its clients—the business unit that actually provided client services in the field. Due to the Company's efforts to reduce costs for purposes of boosting short-term profitability, it had made such drastic workforce reductions that it was hampering its ability to deliver on its client contracts, leading to widespread client dissatisfaction.

69.     In the Fall of 2018, DXC personnel leaks to the media revealed the negative impact of the Company's extreme workforce reduction on customer service delivery. On August 17, 2018, *The Register* published an article titled "DXC Technology asks field-based techies if they'd like to

leave,"[3] which reported that "***customer support delivery – we are told by DXCers – is strained due to the headcount reduction*** . . . ." (Emphasis added.)

70.     On October 24, 2018, *The Register* published an article titled "DXC axes Americas boss amid latest deck chair musical,"[4] which reported that the head of DXC Americas, Karan Puri, had been pushed out due to "a double-digit drop in the region's sales." In addition, an inside DXC source told *The Register* that "'***the company is in chaos as all the cuts are leading to mounting customer complaints***.'" (Emphasis added.) Other DXC sources similarly told the publication that they "were concerned about the impact on serving customers." Indeed, "[o]ne insider told us '***DXC is descending into turmoil***,' and that earlier this month Lawrie called a 'town hall' meeting to confirm more redundancies on the shop floor and 'blamed Puri for a ***10 to 15 per cent shortfall in [forecast] revenues***.'" (Emphasis added.)

71.     An article in the Spring of 2019 revealed that DXC's harsh workforce reductions were continuing to backfire. On March 27, 2019, *The Register* published an article titled "DXC: Slashing costs affects ability to attract, develop and retain staff? Who'd have thunk it!"[5] The article reported that an DXC executive, during an internal conference call, "said he had experienced layoffs in every quarter since he'd joined DXC Security in August last year, and admitted that chopping overheads had given his unit some challenges." The executive further said, "'Hats off' to the managers who were 'trying to work through growth revenue targets, annual booked revenue, total contract value, aligning hiring needs associated with that and then executing[.]'" According the article, "[h]e described the situation as 'one step forward, two back, two steps forward, one back[,]'" particularly in the United States and United Kingdom—DXC's two largest geographic markets. The article concluded that "[e]fforts to lure, evolve and hold on to staff are proving quite troublesome

---

[3] https://www.theregister.co.uk/2018/08/17/dxc_latest_in_a_long_line_of_redundancies.

[4] https://www.theregister.co.uk/2018/10/24/dxc_axes_americas_boss_amid_latest_deck_chair_musical.

[5]
https://www.theregister.co.uk/2019/03/27/dxc_cost_cutting_impacts_ability_to_attract_develop_and_retain_staff.

for DXC Technology's Security practice as the beleaguered outsourcing biz continues to wage war on its cost base."

72.     DXC's disastrous workforce reduction plan continued to have repercussions throughout 2019. On May 23, 2019, DXC issued a press release announcing disappointing financial results for the fiscal year ended March 31, 2019. The Company achieved diluted EPS of $4.35, a 17% decline from the prior year. Revenues likewise declined year-over-year. The Company also provided disappointing 2020 revenue guidance of between $20.7-$21.2 billion.

73.     On May 24, 2019, *The Register* published an article titled "DXC: We axed 10k staff, shut nine data centres, closed 4.6m sq ft of office space . . . and sales tumbled, funnily enough."[6]

74.     On August 8, 2019, DXC issued a press release announcing its first quarter 2020 financial results, which were again deeply disappointing to the market. The Company stated that diluted EPS for the quarter had declined 22% year-over-year to $0.61 and revised downward its already-disappointing 2020 revenue targets by $500 million.

75.     After the illusory, short-term benefits of the extreme workforce reduction plan had dissipated, and it had become clear that the short-sighted strategy backfired, DXC changed its leadership. On September 11, 2019, DXC announced Defendant Lawrie's retirement as DXC's President and CEO and the appointment of Mike Salvino ("Salvino") as his replacement, effective immediately.

76.     On November 11, 2019, DXC issued a press release announcing disappointing financial results for second quarter 2020. The Company achieved diluted EPS of –$8.19, compared to $0.92 in the prior year second quarter. Revenues also declined year-over-year by 3.2%. In addition, the Company revised its 2020 annual revenue guidance downward from a range of $20.2-$20.7 billion to a range of $19.5-$19.8 billion.

77.     During Salvino's first earnings conference call as DXC's CEO on November 11, 2019, he tacitly acknowledged the foregoing service delivery and personnel retention problems, which directly resulted from his predecessor's workforce reduction plan:

---

[6] https://www.theregister.co.uk/2019/05/24/dxc_fy2019_q4_results.

a.    "[W]e will invest to **stabilize key accounts** and **ensure that our delivery is meeting our clients' expectations**." (Emphasis added.)

b.    "We need to focus more on our people and strengthening our employee value proposition. Our people need to be clear about their career path at DXC, the opportunities to work with new clients, and also the opportunities for rescaling and retraining. Being clear about these items will help create an environment where people are acknowledged, recognized and rewarded, which will **improve employee satisfaction and increase retention**." (Emphasis added.)

c.    "*[E]xecution challenges from recent delivery actions have negatively impacted some of our large customers, which results in lower margins, delayed revenue and bookings as customers have placed the additional work on hold*. We have recovery plans under way for these accounts, but we need to do a better job running operations. By doing this, we will earn the right to expand our footprint with customers." (Emphasis added.)

d.    "This [downward] revised revenue guidance is driven by three primary factors. . . . Second, **due to execution at existing customers, we now expect $250 million less revenue this year. $75 million of that amount is due to certain customers placing revenue opportunities on hold. This was due to recent delivery execution issues**. Now we have recovery plans under way to improve service levels on these accounts. We also adjusted our revenue outlook by $175 million to reflect potential disruptions given the announcement that we are pursuing strategic alternatives for three of our businesses." (Emphasis added.)

78.    By the commencement of this action, DXC stock was trading as low as $32.70 per share, a nearly 45% decline from the $59 price of DXC stock at the time of the Merger. As a result of Defendants' violations of the Securities Act, and the precipitous decline in the market value of the Company's stock, Plaintiffs and other Class members have suffered significant losses and damages.

## V.    CONFIDENTIAL WITNESSES CONFIRM THE EXISTENCE OF AN UNDISCLOSED REDUCTION PLAN, AND THE NEGATIVE IMPACTS IT HAD ON DXC'S POST-MERGER OPERATIONS

79.    CW1 was Senior VP and General Manager of Security at DXC Technology from April 2017 to January 2018. Prior to the merger, CW1 was SVP and Global GM of Enterprise

Security Systems at HPE from April 2013 to March 2017.  While at DXC, CW1 reported to Eric Harmon, Executive VP of DXC's Build division. CW1 also reported directly to CEO Michael Lawrie.  CW1 was on the executive Operational Committee, the Ethics Committee, and the Investment Committee.  Regular meetings of the executive Operations Committee were held in the months following the Merger and were attended by CW1, Lawrie and Saleh as well as other senior executives such as DXC's general counsel, the Executive VPs of each division, such as Harmon for the Build division, and area managers in each division. About 28 people attended the Operational Committee meeting.  They were held in the board room of DXC headquarters in Virginia.

80.    CW1 reports that DXC had an internal budget cut goal that was nearly double the goal stated publicly at the time of the Merger.  According to CW1, the internal budget goal was not publicly disclosed and it "was a much bigger internal number than (the) external number given to the Street."  CW1 stated that the internal workforce reduction target was the "real" goal that managers were expected to attain; it was not merely aspirational.  The internal budget cuts were the milestones to which executive bonuses were tied.  According to CW1, the Global Delivery division *alone* had a workforce reduction goal as high as $1.8 billion.

81.    According to CW1, the internal budget cut numbers came from CEO Michael Lawrie and CFO Paul Saleh.  The internal numbers were discussed by Lawrie and Saleh with the Company's top executives during executive committee meetings, several of which CW1 attended.  CW1 attended executive Operations Committee meetings on, at least, June 21, 2017, August 20, 2017, October 12, 2017, and November 15, 2017.  According to CW1, during "every single meeting that we [the executive Operations Committee] had," CFO Paul Saleh gave a PowerPoint presentation about the Company's overall numbers for revenue, costs, budgets and budget cuts, and forecasts. CW1 explained that the PowerPoint presentation included internal numbers about the Company's financial goals -- including internal budget cut targets, revenue targets, and cost targets – that were different than the numbers reported to the public.  The PowerPoint slides revealed that the internal budget cut targets were at least double the budget cut target reported publicly in connection with the Merger. CW1 recalls that the budget cut target for Delivery was about the $2.7 billion number alleged by Hilton in his complaint.

82.     The official internal budget was used throughout the year as a measure of corporate performance.  At the Operations Committee meetings, CFO Paul Saleh would compare performance to the internal budget. Saleh would also identify where certain regions or divisions were falling short of budgeted cost reductions and set forth methods to close any gap. For example, at the June 21, 2017 Operations Committee meeting, Saleh identified cost overruns compared to budget that needed to be recovered in the second quarter and described means to accelerate the impact of cost reductions. At each Operations Committee meeting, Saleh discussed efforts to accelerate workforce cuts as a way of reaching the budgeted cost reductions.

83.     According to CW1, the workforce reduction cuts occurred too quickly, damaging DXC's business.  CW1 stated that "The cost cutting was causing and starting to cause long term deterioration of our deliverability with our customers.  We were starting to not be able to deliver to customer satisfaction. This was ultimately going to hurt the company because of all the cost cutting. Our delivery performance would be severely impaired and would have customers at some point in the future, for example when they are going out of contract, they would leave the company. That was the feeling of many of the executives and many of the people in the company."

84.     CW2 was a Delivery Lead in the automotive division of Global Delivery at DXC from 2003 until May 2020.  According to CW2, the workforce reduction cuts were "too fast and too much. It was impacting our business down the line."  According to CW2, experienced employee headcount was quickly and dramatically reduced, which hampered their ability to complete work that customers were expecting, or at the level customers had come to know.   CW2 stated: "We were not able to deliver quality of service.  It was impacting customers.  We were not meeting our commitments in terms of deliverables."  According to CW2, the problems with meeting deliverables due to the workforce cuts were evident by early 2018.

85.     CW2 explained that the cuts were implemented by McKinsey & Co., but "they didn't know the business.  They didn't know about the complexities" and that McKinsey was "completely not collaborative" with employees within Global Delivery about what and who should be cut. Instead, in collaboration with McKinsey, DXC cut senior level employees in Global Delivery who had specialized skills specific for the accounts they were handling and/or had long-term good

relationships with customers.  According to CW2, the cuts were not well-targeted and ended up negatively impacting Global Delivery's ability to complete jobs and maintain its prior level of quality.  "Customers trust people (they've worked with) not the company," CW2 said.  According to CW2, the poorly planned and executed workforce cuts led to the loss of "multiple" customers in 2017 and 2018.  CW2 and other Global Delivery employees reported complaints about the negative impact of the cuts to DXC leadership, including Stephen Hilton.

86.     CW3 was a Technical Delivery Manager at DXC Technology from April 2017 to June 2019, and previously held the same position at CSC since May 2015.  CW3 reiterated that the massive workforce cuts, and the move of some jobs off-shore, following the Merger quickly impacted the business in a negative way.  CW3 stated: "You had people intimately familiar with the system and that intimacy disappeared. Then you'd bring in a group of people I would consider more junior, and you would have none of the history, none of the knowledge of why something was configured the way it was."  CW3 said the loss of skills and intimate knowledge of systems made his job of providing quality service to the client more difficult.

87.     CW3 stated that DXC "hamstrung" itself with the sudden cuts.  CW3 expressed that "The cuts were done purely financially motivated and ignored the ability of delivery of the technology."  Prior to the merger, CW3 had a team of U.S.-based technicians who knew the client's computer system "like the back of their hands."  For example, if CW3 had any problem, CW3 could call the technicians, describe what was happening, and with the technicians' intimate knowledge of the system, they could quickly identify the problem and fix it.  "All the sudden, those resources were gone," CW3 said.

88.     Furthermore, the internal budget was used to set the level of executive bonuses for DXC. CW1 recalls that, for fiscal year 2018, executive bonuses were significantly reduced because DXC did not meet its internal budgeted goals for cost reductions, including workforce reductions.

## VI.     DEFENDANTS' ACTIONABLE MISREPRESENTATIONS AND OMISSIONS IN DXC'S REGISTRATION STATEMENT

89.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements

made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

**A.      Material Misrepresentations**

90.      The Registration Statement repeatedly claimed that the Merger would generate enormous "net synergies" and "strategic and financial benefits." In particular, the Registration Statement in several places highlighted more than $1 billion in synergies that DXC would purportedly experience in the first year after the Merger due to "workforce optimization," as well as a $1.5 billion synergy run rate. For example:

> The combined company expects that the merger of Everett with CSC will produce *first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one*. The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as *cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs*.

(Emphasis added.) Moreover, the Registration Statement detailed a "turnaround plan" that would "*align [DXC's] costs with its revenue trajectory*" and purportedly included "initiatives to improve execution in sales performance and accountability." (Emphasis added.)

91.      The statements above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that existed at the time of the Merger:

a.      the so-called "workforce optimization" highlighted in the Registration Statement involved crippling the Company's workforce infrastructure;

b.      DXC planned to jettison tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees;

c.      these workforce reductions were made to inflate reported earnings and other financial metrics in the short-term at the expense of client service delivery;

d.      Defendant Lawrie had plans for $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public;

e.      as a result of these workforce reductions, DXC materially hampered its ability to deliver on client contracts, endangering longer-term revenue growth; and

f.      internally, senior executives had voiced concerns that the targeted reductions would be unachievable without causing massive damage to the Company's customer relationships.

92.      In addition, the Registration Statement highlighted the size, breadth and experience of DXC's workforce, as well as the newly formed Company's ability to bolster its workforce through improved hiring and retention practices and workforce optimizations. Specifically, the Registration Statement represented that DXC could "attract and retain highly motivated people with the skills necessary to serve their customers," and that DXC would continue to "hire, train, motivate and effectively utilize employees with the right mix of skills and experience to meet the needs of its clients." The Registration Statement also stated that, "with a collective workforce of approximately 178,000 employees . . . the size and scale of the combined company [would] enhance its ability to provide value to its customers through a broader range of resources and expertise to meet their needs."

93.      The statements above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that existed at the time of the Merger:

a.      the so-called "workforce optimization" highlighted in the Registration Statement involved crippling the Company's workforce infrastructure;

b.      DXC planned to jettison tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees;

c.      Defendant Lawrie had plans for $2.7 billion of cost reductions in the first year, nearly double the $1.5 billion run rate savings target that was made public; and

d.      as a result of these workforce reductions, DXC seriously harmed its ability to attract and retain high-quality personnel, which in turn undermined its ability to deliver client services.

B.     **Failure To Make Required Disclosures**

1.     **Disclosure Obligations Under the Securities Act**

94.     "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

95.     To effectuate this purpose, a company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."); *see also* 15 U.S.C. § 77k(a).

2.     **Item 303 Disclosure Requirements**

96.     Item 303 of SEC Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations." Mgmt.'s Discussion & Analysis of Fin. Condition & Results of Operations, SEC Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). "[T]he Instructions to Item 303 state that MD&A 'shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.'" *Id.*

97.     Pursuant to Item 303(a), a registrant is required to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events

1
that will cause a material change in the relationship between costs and revenues (such
as known future increases in costs of labor or materials or price increases or inventory
2
adjustments), the change in the relationship shall be disclosed.

3   17 C.F.R. § 229.303(a)(3)(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 ("Other

4   non-recurring items should be discussed as unusual or infrequent events or transactions that

5   materially affected the amount of reported income from continuing operations.") (citation and

6   quotation marks omitted).

7          98.     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of

8   results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the

9   registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage;

10  or the likely non-renewal of a material contract." *Id.* at *4.

11         99.     Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item

12  303 [as set forth above] require disclosure of forward-looking information." *See id.* at *3. Indeed,

13  the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor

14  an opportunity to look at the company through the eyes of management by providing both a short

15  and long-term analysis of the business of the company" and "a historical and prospective analysis

16  of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for

17  the future." *Id.* at *3, *17. Thus, "material forward-looking information regarding known material

18  trends and uncertainties is required to be disclosed as part of the required discussion of those matters

19  and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion & Analysis

20  of Fin. Condition & Results of Operations, SEC. Release No. 8350, 2003 WL 22996757, at *11

21  (December 19, 2003).

22         100.    As the facts set forth in the Hilton Complaint show, DXC's senior executives were

23  aware of—and actually discussed—concerns that implementation of Defendant Lawrie's aggressive

24  workforce reduction plan, due to its magnitude and accelerated timing, would negatively impact

25  client service delivery, desired personnel retention, and future revenues and profitability. Thus, the

26  workforce reduction plan created "uncertainties that [DXC] reasonably expect[ed] [would] have a

27  material impact on net sales, revenues, or income from continuing operations."

28

### 3.      Item 503 Disclosure Requirements

101.      Item 503(c) of SEC Regulation S-K ("Item 503") is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors "must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment." Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Companies, Inv. Advisers, Inv. Companies, & Mun. Sec. Issuers, SEC Release No. 1149 (July 29, 1998).

102.      The Registration Statement violated Item 503 by failing to adequately disclose the risks posed by DXC's actual workforce reduction plan, even though they were some of the most significant factors that made an investment in DXC shares speculative or risky. Specifically, the Registration Statement omitted the specific risks arising from DXC's plan to achieve up to $2.7 billion in cost savings in the first year after the Merger—the vast majority of which would be generated by jettisoning tens of thousands of employees on a destructively expeditious timeline, including some of the Company's most highly skilled and longest-tenured employees. The omitted risks include that the so-called "workforce optimization" highlighted in the Registration Statement would:

a.      cripple DXC's workforce infrastructure;

b.      materially hamper DXC's ability to deliver on client contracts, endangering its longer-term revenue growth; and

c.      seriously harm DXC's ability to attract and retain high-quality personnel, which in turn would undermine its ability to deliver client services.

103.      The "Risk Factors" section of the Registration Statement contains the following risk disclosures:

***The combined company may not realize the anticipated benefits from the Transactions.***

The combined company is expected to realize cost and revenue synergies, growth opportunities, and other financial and operating benefits as a result of the Transactions. The combined company's success in realizing these benefits, and the timing of their realization, depends on the successful integration of the business operations of Everett with CSC. Even if CSC and Everett successfully integrate, CSC and Everett cannot predict with certainty if or when these cost and revenue synergies, growth opportunities and benefits will occur, or the extent to which they actually will be achieved. For example, the benefits from the Transactions may be offset by costs incurred in integrating the companies or in required capital expenditures related to the acquired Everett business. In addition, the quantification of synergies expected to result from the Transactions is based on significant estimates and assumptions that are subjective in nature and inherently uncertain. Realization of any benefits and synergies could be affected by a number of factors beyond CSC's, Everett's or the combined company's control, including, without limitation, general economic conditions, increased operating costs, regulatory developments and the other risks described in these risk factors. The amount of synergies actually realized in the Transactions, if any, and the time periods in which any such synergies are realized, could differ materially from the expected synergies discussed in this proxy statement/prospectus-information statement, regardless of whether the two business operations are combined successfully. If the integration is unsuccessful or if the combined company is unable to realize the anticipated synergies and other benefits of the Transactions, there could be a material adverse effect on the combined company's business, financial condition and results of operations.

\*   \*   \*   \*

***The ability of the combined company to provide customers with competitive services is dependent on the ability of the combined company to attract and retain qualified personnel.***

The ability of the combined company to grow and provide customers with competitive services is partially dependent on the ability of the combined company to attract and retain highly motivated people with the skills necessary to serve their customers. The markets the combined company expects to serve are highly competitive and competition for skilled employees in the technology outsourcing, consulting and systems integration and enterprise services markets is intense for both on-shore and offshore locales. The loss of personnel could impair the ability of the combined company to perform under certain contracts, which could have a material adverse effect on the consolidated financial position, results of operations and cash flows of the combined company.

The combined company will be dependent upon the management skills and continued services of members of its senior management team. The failure of such key personnel to continue to be active in the management of the business could have a material adverse effect on relationships with third parties, business, financial condition and results of operations. In addition, the combined company's failure to attract and retain key personnel would adversely impact its ability to grow the Everett business.

If the combined company does not hire, train, motivate and effectively utilize employees with the right mix of skills and experience in the right geographic regions to meet the needs of its clients, its financial performance could suffer. For example,

if its employee utilization rate is too low, the combined company's profitability and the level of engagement of its employees could suffer. If that utilization rate is too high, it could have an adverse effect on employee engagement and attrition and the quality of the work performed, as well as the combined company's ability to staff projects. If the combined company is unable to hire and retain a sufficient number of employees with the skills or backgrounds to meet current demand, the combined company might need to redeploy existing personnel, increase its reliance on subcontractors or increase employee compensation levels, all of which could also negatively affect the combined company's profitability. In addition, if the combined company has more employees than it needs with certain skill sets or in certain geographies, the combined company may incur increased costs as it works to rebalance its supply of skills and resources with client demand in those geographies.

104.    These risk statements, however, fail to adequately disclose the specific risks identified above regarding DXC's drastic workforce reduction plan.

## VII.    CLASS ACTION ALLEGATIONS

105.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons or entities who purchased or otherwise acquired DXC common stock issued pursuant to and/or traceable to the Registration Statement in connection with the Merger, and who were damaged thereby. Excluded from the Class are each of the Defendants, their respective successors, assigns, parents and subsidiaries, the past and current executive officers and directors of DXC, the legal representatives, heirs, successors or assigns of the Individual Defendants, and any entity in which any of the foregoing excluded persons have or had a majority ownership interest.

106.    The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to Plaintiffs at this time, but it is believed to be in the hundreds of thousands. The Company issued over 141 million shares of DXC common stock to former CSC shareholders in the Merger. Members of the Class may be identified by records maintained by DXC or its transfer agents and may be notified by the pendency of this action by mail, using a form of notice customarily used in securities class actions.

107.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

108. Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

109. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws as alleged herein;

b. whether the Registration Statement issued by Defendants to the investing public omitted and/or misrepresented material facts about DXC's and its business, operations, or prospects; and

c. whether the members of the Class have sustained damages and, if so, the proper measure of damages.

110. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

111. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

112. Alternatively, to the extent that the statutory safe harbor otherwise would apply to any of the allegedly false or misleading forward-looking statements, Defendants are liable for those statements because, at the time each of these statements was made, the speaker knew the statement

29

was false or misleading and the statement was authorized or approved by an executive officer, director, or other control person of DXC who knew that the statement was false. These and similar arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## IX.    COUNTS

### COUNT I

**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
**(Against all Defendants)**

113.    Plaintiffs repeat and reallege each and every allegation contained above. Plaintiffs specifically disclaim any allegations that are based on fraud, recklessness, or intentional misconduct.

114.    This count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants. Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration statement; and/or were directors who are appropriate defendants in this Count.

115.    This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who purchased or otherwise acquired DXC common stock pursuant to and/or traceable to the Company's Registration Statement issued in connection with the Merger.

116.    The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

117.    DXC is the registrant and issuer for the common stock sold in the Merger. As the issuer, DXC is strictly liable to Plaintiffs and the Class for the misrepresentations and omissions in the Registration Statement. The other Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.

118.    Defendants named in this Count owed to the purchasers of the shares obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

119. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

120. Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, Defendants named in this Count violated and/or controlled a person who violated Section 11 of the Securities Act.

121. At the times they obtained their shares of DXC, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

122. By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants named in this Count and each of them, jointly and severally.

## COUNT II

### FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT
(Against the Individual Defendants and HPE)

123. Plaintiffs repeat and reallege each and every allegation contained above. Plaintiffs specifically disclaim any allegations that are based on fraud, recklessness, or intentional misconduct.

124. This Count is brought by Plaintiffs against the Individual Defendants and HPE pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class.

125. This Count is asserted against the Individual Defendants and HPE, each of whom was a control person of DXC during the relevant time period.

126. The Individual Defendants were each control persons of DXC by virtue of their positions as directors, senior officers, and/or authorized representatives of DXC. The Individual Defendants had the ability to cause their respective companies to agree to and complete the Merger and disseminate the Registration Statement in connection therewith.

127.   HPE owned and controlled DXC before, during, and after the Merger by virtue of its control of HPE Enterprise Services and control over the most senior executives of DXC and the members of the DXC's Board of Directors. Even after the Merger, HPE shareholders owned 50.1% of DXC's outstanding common shares.

128.   Defendants named in this Count were each culpable participants in the violations of Section 11, based on their having prepared and disseminated the Registration Statement, signed or authorized the signing of the Registration Statement, facilitated the spin-merger transaction, and having otherwise participated in the process that allowed the issuance of DXC shares in the Merger to be completed. Further, Defendants named in this Count were in positions to control, and did control, the misrepresentations and omissions contained in the Registration Statement.

129.   By reason of the above conduct, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as DXC pursuant to Section 15 of the Securities Act.

## X.     PRAYER FOR RELIEF

130.   Plaintiffs demand judgment against Defendants as follows:

a.     determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives and certifying lead counsel as class counsel;

b.     requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

c.     awarding Plaintiffs and the Class prejudgment and post-judgment interest, as well as their reasonable counsel fees and expert fees, and other costs and expenses reasonably incurred by this action; and

d.     awarding such other relief as the Court may deem just and proper.

## XI.    JURY DEMAND

131.   Plaintiffs hereby demand a trial by jury.

///

///

DATED:  September 25, 2020        LEVI & KORSINSKY, LLP

By:  s/ Adam M. Apton
Adam M. Apton
Adam C. McCall
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

-and-

Nicholas I. Porritt (admitted pro hac vice)
1101 30th Street N.W., Suite 115
Washington, D.C. 20009
Telephone: (202) 524-4290
Email: nporritt@zlk.com

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Kara Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
Email: kwolke@glancylaw.com

*Attorneys for Lead Plaintiffs Neil Costanzo, Ronald Jackson, and Ronald W. Fallness and Lead Counsel for the Class*

## <u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On September 25, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 25, 2020.

*s/ Adam M. Apton*
Adam M. Apton

631515.1