**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: 415-373-1671
Fax: 415-484-1294

*Attorneys for Lead Plaintiffs*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| NEIL COSTANZO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DXC TECHNOLOGY COMPANY, HEWLETT PACKARD ENTERPRISE COMPANY, RISHI VARNA, TIMOTHY C. STONESIFER, JEREMY K. COX, MUKESH AGHI, AMY E. ALVING, DAVID HERZOG, SACHIN LAWANDE, J. MICHAEL LAWRIE, JULIO A. PORTALATIN, PETER RUTLAND, MANOJ P. SINGH, MARGARET C. WHITMAN, and ROBERT F. WOODS, <br><br> Defendants. | Case No. 5:19-CV-05794-BLF <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** <br><br> Date: April 29, 2021 <br> Time: 9:00 a.m. <br> Place: Courtroom 3, 5th Floor <br> Judge: Hon. Beth Labson Freeman |

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

I.      INTRODUCTION ................................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................................... 2

        A.      DXC Holds an IPO Amid an Undisclosed Plan for Massive Personnel Cuts. ............... 2

        B.      Lawrie Pushes His $2.7 Billion Workforce Reduction Plan in Spite of Clear, Explicit Warnings about the Severe Fallout. .............................................................................. 3

        C.      The Undisclosed Extreme Personnel Reductions Devastate DXC. ............................... 4

        D.      The Misrepresentations and Omissions in the Registration Statement. ........................ 6

III.    ARGUMENT ...................................................................................................................... 7

        A.      Plaintiffs State Claims for Violations of Section 11 of the Securities Act. ................... 7

                1.      Legal Standard. ............................................................................................ 7

                2.      The SAC Alleges Material Misstatements and Omissions. ............................. 7

                3.      Having Established DXC's Internal $2.7 Billion Target, Defendants' Arguments for Dismissal Must Be Rejected................................................. 10

                4.      Defendants Had a Duty to Disclose Omitted Facts Under Items 303 and 503. 17

                5.      Defendants Cannot Avail Themselves of the Safe Harbor for Forward-Looking Statements. ..................................................................................... 19

        B.      The Individual Defendants and HPE are Liable under Section 15 of the Securities Act. ................................................................................................................................. 22

IV.     CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*In re Advance Auto Parts, Inc.*,

No. 18-212-RGA, 2020 U.S. Dist. LEXIS 21271 (D. Del. Feb. 7, 2020) ......................................... 9

*Ashcroft v. Iqbal*,

556 U.S. 662 (2009).......................................................................................................................... 7

*Atlas v. Accredited Home Lenders Holding Co.*,

556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........................................................................................ 16

*In re Atossa Genetics Sec. Litig.*,

868 F.3d 784 (9th Cir. 2017) ................................................................................................... 17, 20

*Backe v. Novatel Wireless, Inc.*,

642 F. Supp. 2d 1169 (S.D. Cal. 2009) ........................................................................................ 15

*Cai v. Switch, Inc.*,

2019 U.S. Dist. LEXIS 116702 (D. Nev. July 12, 2019)....................................................... 17, 21, 22

*City of Dearborn Hgts. Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

856 F.3d 605 (9th Cir. 2017) ......................................................................................................... 17

*Costanzo v. DXC Tech. Co.*,

No. 19-cv-05794-BLF, 2020 U.S. Dist. LEXIS 132658 (N.D. Cal. July 27, 2020) .................. passim

*In re Daou Sys., Inc. Sec. Litig.*,

411 F.3d 1006 (9th Cir. 2005) .................................................................................................... 7, 11

*In re Dura Pharms., Inc. Sec. Litig.*,

548 F. Supp. 2d 1126 (S.D. Cal. 2008) ........................................................................................ 15

*Eminence Capital, LLC v. Aspeon, Inc.*,

316 F.3d 1048 (9th Cir. 2003) ....................................................................................................... 22

*In re Exodus Commc'ns, Inc. Sec. Litig.*,

2005 WL 1869289 (N.D. Cal. Aug. 5, 2005)................................................................................. 11

*Gerneth v. Chiasma, Inc.*,

2018 WL 935418 (D. Mass. Feb. 15, 2018)................................................................................... 18

*In re HD Supply Holdings, Inc. Sec. Litig.*,

  341 F. Supp. 3d 1342 (N.D. Ga. 2018) .......................................................................................... 9

*Herman & Maclean v. Huddleston*,

  459 U.S. 375 (1983) ....................................................................................................................... 8

*Hildes v. Arthur Andersen LLP*,

  734 F.3d 854 (9th Cir. 2013) ......................................................................................................... 8

*In re Immune Response Sec. Litig.*,

  375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................................................... 15

*In re InfoSonics Corp. Sec. Litig.*,

  No. 06cv1231 BTM(WMc), 2007 U.S. Dist. LEXIS 57784 (S.D. Cal. Aug. 7, 2007) ................ 15

*Kaplan v. Rose*,

  49 F.3d 1363 (9th Cir. Oct. 11, 1994) .......................................................................................... 11

*Khoja v. Orexigen Therapeutics, Inc.*,

  899 F.3d 988 (9th Cir. 2018) ............................................................................................ 7, 12, 15

*Litwin v. Blackstone Grp., L.P.*,

  634 F.3d 706 (2d Cir. 2011) ......................................................................................................... 17

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,

  416 F.3d 940 (9th Cir. 2005). ...................................................................................................... 20

*In re Merck & Co. Sec. Litig.*,

  432 F.3d 261 (3d Cir. 2005) ........................................................................................................ 10

*Meyer v. JinkoSolar Holdings Co., Ltd.*,

  761 F.3d 245 (2d Cir. 2014) ........................................................................................................ 21

*Miller v. Thane Int'l, Inc.*,

  519 F.3d 879, (9th Cir. 2008) ................................................................................................. 12, 21

*Murphy v. Precision Castparts Corp.*,

  No. 3:16-cv-00521-SB, 2020 U.S. Dist. LEXIS 126337 (D. Or. July 3, 2020) .............................. 9

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

  320 F.3d 920 (9th Cir. 2003) ....................................................................................................... 13

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 19-cv-01975-RS

*Novak v. Kasaks*,

  216 F.3d 300 (2d Cir. 2000) ............................................................................................. 10, 14

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,

  780 F. App'x 480 (9th Cir. 2019) ............................................................................................. 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,

  575 U.S. 175 (2015) ............................................................................................. 16

*Prodanova v. H.C. Wainwright & Co., LLC*,

  2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) ............................................................................................. 20

*In re Quality Sys., Inc. Sec. Litig.*,

  865 F.3d 1130 (9th Cir. 2017) ............................................................................................. 19

*Reese v. Malone*,

  747 F.3d 557 (9th Cir. 2014) ............................................................................................. 12

*SEC v. Capital Gains Research Bureau, Inc.*,

  375 U.S. 180 (1963) ............................................................................................. 19

*In re SeeBeyond Techs. Corp. Sec. Litig.*,

  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................................................. 22

*Siracusano v. Matrixx Init., Inc.*,

  585 F.3d 1167 (9th Cir. 2009) ............................................................................................. 12, 13, 21

*In re Snap Inc. Sec. Litig.*,

  2018 WL 2972528 (C.D. Cal. June 7, 2018) ............................................................................................. 21

*In re STEC Inc. Sec. Litig.*,

  2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) ............................................................................................. 20

*Steckman v. Hart Brewing*,

  143 F.3d 1293 (9th Cir. 1998) ............................................................................................. 17

*In re Time Warner, Inc. Sec. Litig.*,

  9 F.3d 259 (2d Cir. 1993) ............................................................................................. 16

*In re Ubiquiti Networks, Inc. Sec. Litig.*,

  33 F. Supp. 3d 1107 (N.D. Cal. 2014) ............................................................................................. 13

iv

*In re Violin Memory Sec. Litig.*,

  2014 U.S. Dist. LEXIS 155428 (N.D. Cal. Oct. 31, 2014) ....................................................... 7, 17

*Webb v. SolarCity Corp.*,

  884 F.3d 844 (9th Cir. 2018) .................................................................................................. 10

*Westley v. Oclaro, Inc.*,

  897 F. Supp. 2d 902 (N.D. Cal. 2012) .................................................................................... 20

*Zaghian v. Farrell*,

  675 F. App'x 718 (9th Cir. 2017) ..................................................................................... 20, 21

*In re Zynga Inc. Sec. Litig.*,

  2015 U.S. Dist. LEXIS 38722, (N.D. Cal. Mar. 25, 2015) ...................................................... 12

**Statutes**

15 U.S.C. §77k ........................................................................................................................ 7

15 U.S.C. §77z-2 .................................................................................................................... 19

17 C.F.R. §229.303 ................................................................................................................ 17

17 CFR § 229.503 .................................................................................................................. 17

**Other Authorities**

*Sec. Offering Reform*, SEC Release No. 8501,

  2004 WL 2610458 (Nov. 3, 2004) ......................................................................................... 18

*Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Cos., Inv.*

  *Adv., Inv. Cos., & Mun. Sec. Issuers*,

  SEC Release No. 1149 (July 29, 1998) ................................................................................... 18

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Case No. 19-cv-01975-RS

## I.   INTRODUCTION

Plaintiffs allege strict liability violations against Defendants under Section 11 of the Securities Act of 1933. In its February 27, 2017 prospectus and registration statement ("Registration Statement"), DXC Technology Company represented that it would be executing a "workforce optimization" plan with a goal of "$1.0 billion" in savings in its first year. This was false. Internal documents show instead that DXC was targeting $2.7 billion in savings and, to achieve that target, needed to cut personnel so severely that it would harm overall operations. Plaintiffs pleaded this theory of liability in their prior First Amended Complaint ("FAC"), but the Court dismissed the case because the alleged $2.7 billion target appeared to be "aspirational" only and therefore not materially in contradiction with the Registration Statement. Plaintiffs' present complaint, the Second Amended Complaint ("SAC"), cures that issue. The Court should deny Defendants' motion to dismiss and allow the case to proceed to discovery.

Plaintiffs' SAC features allegations from a former employee of DXC referred to as CW1. CW1 worked first for Hewlett Packard Enterprise Company ("HPE") from April 2013 through March 2017, and then for DXC when it was created from HPE's merger with Computer Sciences Corporation ("CSC") in April 2017, until he left DXC in January 2018. CW1 held effectively the same position throughout CW1's tenure at the companies, Senior Vice President and General Manager of Security. As a SVP, CW1 attended Executive Operational Committee meetings with approximately 28 other senior-level executives at DXC's headquarters in Virginia. Defendant Michael Lawrie, DXC's Chief Executive Officer, attended these meetings along with DXC's Chief Financial Officer, General Counsel, and Executive Vice Presidents. Critically, it was at these meetings that DXC's senior leadership repeatedly discussed, tracked, and enforced the $2.7 billion target. Far from being simply "aspirational" in nature, it was a hard, concrete target. These Operational Committee meetings occurred routinely and, according to CW1, always included detailed discussion of DXC's progress towards meeting the $2.7 billion target.

Having now established that the $2.7 billion target was an actual, operational objective that DXC intended and attempted to achieve, and not merely an "aspirational" number, Defendants face an extremely tough burden on their motion to dismiss. This Court's previous holdings concerning DXC's cost-cutting plan, the Registration Statement's cautionary language, and compliance with Regulation S-K all turned on whether or not the $2.7 billion target was a real goal or something simply "aspirational"

in nature. As the Court held, "if Plaintiffs had alleged that while DXC told the investors that it would cut $1 billion dollars in costs in the first year, but was secretly cutting more - presumably by eliminating more employees than the investors would have expected - then Plaintiffs would have had a basis for alleging that DXC misled the investors. But the Complaint is devoid of any facts to show that the alleged $2.7 billion goal was anything more than an aspirational (and not achieved, or even meant to be achieved) internal target." *Costanzo v. DXC Tech. Co.*, No. 19-cv-05794-BLF, 2020 U.S. Dist. LEXIS 132658, at *19-20 (N.D. Cal. July 27, 2020). The SAC alleges exactly that.

Defendants respond to Plaintiffs' SAC by asking the Court to discredit or discount CW1's allegations, primarily because they "pertain to a time period *after* the Registration Statement was issued in February 2017." Defendants' arguments are misguided. CW1 was a longtime employee of DXC having worked at its predecessor, HPE, for nearly four years prior to its merger with CSC. As a Senior Vice President throughout this time period, CW1 attended numerous Operational Committee meetings and not just the four meetings in 2017 listed in the SAC (June 21, August 20, October 12, and November 15). In addition, CW1 corroborates the statements from Stephen Hilton, a former DXC Executive Vice President, regarding the $2.7 billion target which the Court accepted as sufficient to plead that the target existed at the time of the Registration Statement. *Id*. at *20-21. Thus, even if CW1 did not attend any Operational Committee meetings prior to June 21, 2017, CW1's allegations still serve to confirm that the $2.7 billion target was a real target. Presently, there is ***nothing*** before this Court showing otherwise.

The Court should deny Defendants' motion to dismiss in its entirety.

## II.   STATEMENT OF FACTS

### A.   DXC Holds an IPO Amid an Undisclosed Plan for Massive Personnel Cuts.

In May 2016, CSC and HPE announced the merger of CSC and the Enterprise Services division of HPE ("HPES"), and the public offering of common stock of the combined entity, DXC. ¶¶2, 36, 40-42. (Unless otherwise indicated, citations to "¶_" are to the Second Amended Class Action Complaint (ECF 78) ("SAC") and capitalized terms are as defined in the SAC.)  Defendant Lawrie, the former President and CEO of CSC, was named as the incoming Chairman of the Board, President and CEO of DXC. ¶26. In such capacity, Lawrie set the strategy and planning for DXC leading up to, and through, the merger. ¶¶51, 53-65. While at CSC, Lawrie recruited and hired Hilton to lead its Global Infrastructure

Services ("GIS"), including implementing certain of Lawrie's cost-cutting initiatives. ¶¶47-49. After the May 2016 merger announcement, Lawrie, as DXC's incoming CEO, organized the new company into three divisions, Build, Sell, and Delivery. ¶51. Hilton was named EVP and head of the Global Delivery division. ¶5. Approximately three-quarters of DXC's total personnel were located within the Global Delivery division, providing support to the Sell and Build divisions. ¶¶47, 49-52.

Planning for the merger began in May 2016 with its announcement, including the planning of DXC's 2017 budget. ¶¶50-53. As part of the planning and budgeting, Lawrie told Hilton he planned to achieve major cuts to DXC's expenses, primarily by cutting personnel in Global Delivery. ¶53. Critically, Global Delivery was to house DXC's IT personnel who served its clients. ¶53. However, by the time of the Registration Statement's February 27, 2017 effective date (and contrary to DXC's statements therein, as explained below), at Lawrie's behest, "DXC had already planned a dramatic and accelerated workforce reduction at a scale much larger than what was indicated to investors." ¶¶3-4.

**B.  Lawrie Pushes His $2.7 Billion Workforce Reduction Plan in Spite of Clear, Explicit Warnings about the Severe Fallout.**

Hilton personally and directly warned Lawrie that his plan for "[p]recipitous cuts in Global Delivery could be disastrous for DXC's long-term revenue, because those cuts would have a direct impact on customer satisfaction, a point routinely expressed to Hilton by his 'Sell' and 'Build' peers [*i.e.*, division leaders]." ¶¶5, 55. Indeed, instead of targeting $1.0 billion in cuts the first year (with a run rate of $1.5 billion by the end of year one) as the Registration Statement told investors, at Lawrie's insistence, DXC's internal budget "demanded" that Global Delivery make *$2.7 billion* in cuts the first year. ¶¶3, 56; ECF 40-8, ¶68. While Hilton had agreed in principle that Global Delivery could "*ultimately*" achieve a target of $2.7 billion in savings, Hilton was clear that such aggressive cuts would have to be implemented *over time* to prevent significant loss in quality of customer service (¶54; ECF 40-8, ¶65), and that the undisclosed plan to cut $2.7 billion within *12 months* would be "disastrous." ¶55; ECF 40-8, ¶67. Achievement of the target meant having "to fire far more people far more quickly, with the resulting negative impact on customer satisfaction" and, inevitably, revenues; he "*repeatedly advised Lawrie about his reservations concerning the pace of cuts*"; and that based on these discussions, Hilton

believed "Lawrie understood that workforce reductions could not be achieved at the pace required by his internal budget without negative impacts on customer satisfaction." ¶¶5, 53, 55-57; ECF 40-8, ¶¶67-68.

Notwithstanding Hilton's warnings, Lawrie set the $2.7 billion target and began immediately laying waste to DXC's workforce following completion of the merger on April 1, 2017. ¶40. In Operational Committee meetings, Lawrie and other executives made clear that the workforce reduction target was $2.7 billion, a figure "much bigger . . . than [the] external number given to the Street." ¶¶80, 81. CW1, DXC's Senior VP and General Manager, attended these Operational Committee meetings with Lawrie and witnessed firsthand Paul Saleh, DXC's Chief Financial Officer, track their progress against the $2.7 billion target using detailed PowerPoint presentations. ¶¶81-82. Saleh would discuss ways to accelerate workforce cuts at each meeting in order to meet the $2.7 billion target. ¶82. CW1 regularly attended the Operational Committee meetings, recalling in particular the ones held in 2017 after the merger on June 21, August 20, October 12, and November 15. ¶81. The meetings consistently featured discussion about DXC's workforce reductions and its progress towards achieving the $2.7 billion target. ¶81.

By the time CW1 left DXC in January 2018, Global Delivery alone had cut more than $800 million. ¶6. Within the first year after the merger, DXC slashed Global Delivery's workforce by about 20%, or 36,000 employees in a single year. ¶¶59-60. During an August 8, 2017 earnings call, Lawrie reported that "In our delivery and support organizations, we have removed 4 management layers." ¶61. Despite the frenetic pace of cuts under Hilton, with a 20% workforce reduction in a year, one of the reasons Lawrie cited for terminating Hilton was "[f]ailure to meet the target in Lawrie's budget for spending cuts within the Global Delivery division." ¶65; ECF 40-8, ¶¶83, 99a (also indicating Lawrie considered meeting 80% of his internal budget as the minimum to earn any bonus); ¶70 (firing another senior manager for 10-15% shortfall from *internal* budget). Thus, Lawrie's internal budgets (rather than "aspirational") were serious, every effort was to be made to make them, and failure had consequences.

**C.    The Undisclosed Extreme Personnel Reductions Devastate DXC.**

With the massive cuts, Lawrie achieved his hoped-for cosmetic short-term EPS boost. ¶¶66, 68, 75. Given the nature of DXC's contracts, the impact of the bloodletting on its revenues and earnings had a built-in lag. ¶67. However, by Fall 2018, leaks to the media revealed the impact of the prior massive

headcount reduction on customer support problems. ¶69. News accounts described DXC current and former employees confirming that "customer support … is strained due to the headcount reduction (¶69); the "latest" senior management firings (¶70); that DXC "'is in chaos as all the cuts are leading to mounting customer complaints'" (¶70); and "'is descending into turmoil'" due to the cuts and adverse impact on serving customers (¶70). *See also* ¶¶71-73 (additional media reports discussing DXC's personnel cuts having negative impact on operations). Rather than being "aligned" with "revenue trajectory" the draconian cuts were "chaotic," "non-collaborative" and arbitrary. ¶¶63-64. Similar media reports ensued, and the inevitable negative impact on revenue and EPS hit in Q1 2019, when DXC reported a 17% year-to-year EPS decline, and disappointing revenue guidance, attributed in the industry press as the natural result of its excessive cost-cutting. ¶¶72-73.

After further disappointing quarterly results, in September 2019, DXC replaced Lawrie as President and CEO with Mike Salvino. ¶¶74-75. Following another poor quarter, Salvino acknowledged the service delivery and personnel retention problems resulting from Lawrie's undisclosed draconian workforce reduction plans, noting that DXC need to "stabilize key accounts," "ensure that our delivery is meeting our clients' expectations" and that employee satisfaction and retention problems presented execution problems with DXC's customers, "which results in lower margins, delayed revenue and bookings as customers have placed the additional work on hold." ¶77.

Lawrie's reductions occurred too quickly and too deeply, as Hilton had warned. According to CW1, the "cost cutting was causing and starting to cause long term deterioration" among DXC's customer satisfaction. ¶83. The workforce reductions were "too fast and too much" and consequently "impact[ed] [DXC's] business down the line," according to CW2, one of DXC's Delivery Leads. ¶¶84-85. CW3, a Technical Delivery Manager, explained that without the personnel, DXC was unable to successfully interface with its customers or provide them with the support necessary to deliver the technology being sold. ¶¶86-87. Having cut its workforce at such a rapid and dramatic pace, DXC became unstable and at risk of losing business. As Hilton had told Lawrie, achieving a $2.7 billion target in the span of just one year was likely to have "disastrous" effects due to the loss in quality of customer service. ¶¶54-55; ECF 40-8, ¶¶65, 67. By the time Lawrie saw that Hilton was right, it was too late; the severe damage to DXC had already been done.

**D.    The Misrepresentations and Omissions in the Registration Statement.**

Plaintiffs bring this suit to recover the damages they sustained as a result of Lawrie's undisclosed workforce reduction plan. Contrary to Lawrie's plan at the time of DXC's IPO, the Registration Statement misrepresented and did not disclose Lawrie's $2.7 billion cut target. ¶¶43-45. Instead, it highlighted the size of DXC's workforce as one of its most important assets, promoted cost savings as part of the "net synergies" of the merger, and misleadingly indicated to investors that the impact on DXC's vaunted workforce would be through "workforce *optimization*" and the elimination of "*duplicative* roles." ¶90. Under "Financial Considerations," the Registration Statement falsely represented that "the Merger is expected to produce first-year synergies of *approximately $1.0 billion* post-closing, with a run rate of $1.5 billion by the end of year one." ¶92, quoting ECF 40-1 at 69; *see also* ¶90. It elsewhere explained that those amounts were "calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale … as well as cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs." ¶90, quoting ECF 40-1 at 131.

These statements were materially misleading because Lawrie was targeting workforce reductions yielding $2.7 billion in savings within the first year of the merger. This directly contradicted the benefits of the merger described in the Registration Statement and ensured a tumultuous existence for the company going forward. Instead of using a scalpel to achieve the publicly-stated target, internally Lawrie was cleaving off personnel with reckless abandon and against the advice of DXC's senior leadership. ¶5. Indeed, as JP Morgan noted in its April 19, 2017 analyst report, there was already "a big cost takeout of labor" associated with DXC's "$1.1 billion in cost cutting" from "workforce optimization"; thus, anything greater posed a detrimental threat to its operations given the need to have sufficient personnel to service its clients. ¶62. JP Morgan was correct in this regard, as evidenced by DXC's performance and share price in the wake of the events at issue. By the initial filing of this action, DXC stock traded at $32.70 per share, down nearly 45% from its $59 price at the time of the merger. ¶78.

## III.    ARGUMENT

### A.    Plaintiffs State Claims for Violations of Section 11 of the Securities Act.

#### 1.    Legal Standard.

A Rule 12(b)(6) motion should be denied if the complaint "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1013 (9th Cir. 2005).

Plaintiffs allege that Defendants violated Sections 11 and 15 of the Securities Act of 1933. 15 U.S.C. §§77k, 77o. To defeat Defendants' motion to dismiss, Plaintiffs need satisfy the notice pleading standard under Rule 8(a). *See In re Violin Memory Sec. Litig.*, 2014 U.S. Dist. LEXIS 155428, at *23-25 (N.D. Cal. Oct. 31, 2014). Rule 9(b) does not apply here given that no fraud claims are asserted. *Violin Memory*, 2014 U.S. Dist. LEXIS 155428, at *23-25. Further, Defendants cannot hold Plaintiffs to a higher pleading standard by, among other things, relying on documents extraneous to the complaint that are neither incorporated by reference nor subject to judicial notice. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (holding documents may not be used to dispute well-pleaded facts or where their substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes"). A court should especially guard against defendants' attempts "to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.* at 1002-03.

#### 2.    The SAC Alleges Material Misstatements and Omissions.

Plaintiffs allege Defendants violated Section 11 of the Securities Act. ¶114. Section 11 imposes liability on "every person who signed [a] registration statement" that contains "an untrue statement of a material fact" or "omit[s] to state a material fact required ... to make the statements therein not misleading," as well as any director or "every person who, with his consent, is named is named in [such] registration statement as being or about to become a director, [or] person performing similar functions." 15 U.S.C. §77k(a). Section 11 "places a relatively minimal burden on a plaintiff," as it "was designed to

… impos[e] a stringent standard of liability on the parties who play a direct role in a registered offering" and "to provide greater protection to purchasers of registered securities." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-383 (1983) (footnotes omitted). As long as "a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Id*. at 382. Once a material misrepresentation or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id*.; *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013).

"To prevail in [a Section 11] action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment. By definition, a plaintiff must show that a purported misstatement in a registration statement was misleading at the time the registration statement was issued." *Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *14-15 (citations and internal quotations omitted). The Court held previously that Plaintiffs did not make this showing, primarily because they "failed to sufficiently allege that [the $2.7 billion] goal was anything more than an aspirational internal target or that it was actually achieved (or was even meant to be achieved)." *Id*. at *21. That holding can no longer stand given Plaintiffs' new allegations about Lawrie's and Saleh's ongoing and serious attempts to achieve the $2.7 billion cut target, as repeatedly discussed in Operational Committee meetings following the merger.

Plaintiffs' new allegations go far beyond what they pleaded previously. The SAC provides a front-row seat to budget discussions at Operational Committee meetings attended by DXC's senior leadership in the board room at DXC's headquarters in Virginia. ¶79. Over two dozen members of DXC's most senior leadership attended these meetings in the months following the merger, including DXC's General Counsel, Executive Vice Presidents, Area Managers, Saleh (Chief Financial Officer), and, of course, Lawrie as DXC's President and Chief Executive Officer. ¶79. In each meeting, including the ones identified by CW1 in 2017 on June 21, August 20, October 12, and November 15, Lawrie and Saleh used PowerPoint presentations to track DXC's progress against the $2.7 billion target. ¶¶81, 82. The $2.7 billion target was not "aspirational" in nature, but a "real" goal that managers were expected to

attain. ¶80. When DXC was behind schedule, Saleh would identify ways in which certain regions or divisions could close any gaps and accelerate the cost reductions to meet the $2.7 billion target. ¶82.

These allegations establish for pleading purposes that the $2.7 billion target was a concrete objective that "DXC intended to achieve . . . within the first year after the Merger was concluded," contrary to what the Court found was alleged in the FAC. *Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *17-18. When accepted as true for the purposes of the motion, CW1's allegations about the budget discussions during the Operational Committee meetings show that DXC and its senior leadership (including Lawrie) were targeting and working towards $2.7 billion in cuts during the first year after the merger. CW1 and Hilton are two high-level sources from within DXC confirming the existence of the $2.7 billion target, and the extraordinary steps Lawrie and DXC were taking to attain it. These allegations are sufficient to establish the fact that the $2.7 billion target was a real target. *See Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2020 U.S. Dist. LEXIS 126337, at *94-96 (D. Or. July 3, 2020) (holding testimony of lone "junior analyst" was sufficient to raise "dispute of material fact as to the existence of an 'internal consensus' that contradicted [defendants'] earnings guidance"); *In re Advance Auto Parts, Inc.*, No. 18-212-RGA, 2020 U.S. Dist. LEXIS 21271, at *8-9 (D. Del. Feb. 7, 2020) (confidential witness allegations from "low-level employee" sufficient to plead "internal forecasts" contradicting public statements); *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1355-56 (N.D. Ga. 2018) (plaintiffs adequately alleged that defendants knew they were "not meeting the Company's internal targets" by relying on witness accounts about discussions during "Firefight Meetings" with senior executives).

Defendants challenge this conclusion by attacking CW1. They argue that CW1 cannot speak to DXC's plans at the time of the Registration Statement (February 2017) because he did not begin working for DXC until two months later (April 2017). Defs. Br. at 7, 15-16. This argument has no merit. CW1 worked at DXC's predecessor, HPE, as Senior Vice President and Global General Manager of Enterprise Security Systems from April 2013 through March 2017. ¶79. Then, upon completion of the merger, CW1 continued working in the same capacity for the merged entity, DXC, as Senior Vice President and General Manager of Security through January 2018. ¶79. If Defendants' argument about CW1's start-date were accepted, it would be impossible for any DXC employee to speak about the Registration

Statement because DXC did not exist at the time it was published. Regardless, Defendants' argument ignores the law on this point, which holds that information from before or after a particular point in time still evidences what existed or what was known at that particular point in time. *See Webb v. SolarCity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) ("Information from before the class period is relevant because it can 'confirm what a defendant should have known during the class period.'"); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (holding pre- and post-class data relevant to show defendants' knowledge during class period); *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000) (holding that "report showing inventory information 'six months after the Class Period . . . supports the inference that inventory during the Class Period was similar'").

        3.     <u>Having Established DXC's Internal $2.7 Billion Target, Defendants' Arguments for Dismissal Must Be Rejected.</u>

          a.     *The Registration Statement contained false and materially misleading statements.*

The Court previously held that, "if Plaintiffs had alleged that while DXC told the investors that it would cut $1 billion dollars in costs in the first year, but was secretly cutting more - presumably by eliminating more employees than the investors would have expected - then Plaintiffs would have had a basis for alleging that DXC misled the investors. But the Complaint is devoid of any facts to show that the alleged $2.7 billion goal was anything more than an aspirational (and not achieved, or even meant to be achieved) internal target." *Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *19-20. Assuming the Court now accepts Plaintiffs' allegation that DXC had an actual $2.7 billion cut target, it follows that Plaintiffs adequately stated a claim for relief under Section 11. In particular, the Registration Statement represented (multiple times) that DXC's target was to achieve savings of "approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one." ¶90. This statement was false when made, because at that time DXC had an undisclosed, internal budgeted target of $2.7 billion in savings the first year post-merger, nearly double the amount represented to investors. ¶¶3, 5, 56-57, 80-81, 91d., 93c., 102.

The Registration Statement also misrepresented DXC's workforce by, for example, emphasizing its purported size and breadth to service customer relationships when, in fact, DXC had a plan at the time that focused on massive employee headcount-related cost reductions, dwarfing the amount publicly

disclosed in the Registration Statement. ¶¶3-8, 45, 56, 59-60, 80-81, 91. It was thus misleading to stress, as one of the primary "Reasons for the Merger" - "Strategic Considerations," that "with *a collective workforce of approximately 178,000 employees* ... the *size and scale of the combined company* [would] enhance [DXC's] ability to provide value to its customers through a broader range of resources and expertise to meet their needs," as well as the "strong customer relationships that the management and employees … will bring to the combined company" (¶¶90, 92), when by that time Lawrie had internally set plans for well over 20% of those employees – in the most critical customer-facing roles – to be eliminated in the immediate term. ¶¶55-56, 59-60, 65, 80-81.

Relatedly, the Registration Statement falsely claimed (as one of the "Financial Considerations" for the merger, and elsewhere) that any personnel-related cost reductions would consist of "workforce *optimization*" and at most the elimination of "*duplicative* roles and other *duplicative* general, administrative and overhead costs." ¶¶90, 92. These statements were false when made, as DXC's plan at the time was for massive headcount reductions to achieve Lawrie's mandated drastic, undisclosed cost-cutting targets, without regard to "optimization" or eliminating "duplicative" roles (¶¶3-8, 43-45, 63, 80-81, 91a., 93a., 102), as subsequent accounts confirmed (¶¶56-57, 59-61, 69-77). Similarly, the Registration Statement falsely claimed that DXC's "plan … includes a cost reduction initiative *to align its costs with its revenue trajectory*" (¶90), when its undisclosed plan entailed wildly accelerated and excessive cost-cutting, that was cannibalizing to revenues, "chaotic," "non-collaborative" and arbitrary. ¶¶63-64, 80-88. Plaintiffs thus adequately allege false statements. *See Daou*, 411 F.3d at 1020, 1027 (sustaining claims for misrepresentation of levels of employee turnover); *Kaplan v. Rose*, 49 F.3d 1363, 1371-72 (9th Cir. 1994). Under Section 11, nothing more is required. *See In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289, at *13 (N.D. Cal. Aug. 5, 2005).

Further, it is well-settled that "'once [DXC] chose to tout [*inter alia*, (i) the size and scale of the combined company's workforce and its breadth to service customer relationships, (ii) cost reduction targets of $1.0 - $1.5 billion in the first year post-close, (iii) that any personnel reductions would focus on "workforce *optimization*" and at most the elimination of "*duplicative* roles," (iv) that its plan had "a cost reduction initiative *to align its costs with its revenue trajectory*," and "initiatives to improve execution"], they were bound to do so in a manner that wouldn't mislead investors.'" *Schueneman v.*

*Arena Pharm., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *see also Matrixx*, 563 U.S. at 44-45 (duty to disclose triggered by choosing to make statements that can mislead investors); *Khoja*, 899 F.3d at 1009; *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) (omission of contrary internally available information rendered statement misleading and actionable). In other words, having made such representations, the Registration Statement was false and misleading in failing to disclose DXC's true, internal plan to cut critical staff by nearly double the amount told to investors, and despite the dire warnings of top management of the inevitable adverse impact on DXC, which did occur.

Likewise, DXC's discussions of potential failure to achieve the projected cost synergies, or being unable to "hire," "attract" or "retain" sufficient personnel, were deeply misleading, due to the plan it had in place to massively reduce key personnel; and, contrary to a "risk" of "failing to achieve" cost reduction targets, the ***opposite*** extreme was happening, as DXC was targeting cutting exponentially more than publicly stated, in a reckless, arbitrary and self-destructive manner, at Lawrie's insistence, for short-term appearance. ¶¶63, 80-88, 92-93, 102-03. It is well-settled that purported risk disclosures such as these can themselves be misleading and actionable. *See Siracusano v. Matrixx Init., Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) ("risk factors" held misleading and actionable); *Berson*, 527 F.3d at 986 (cautionary language misleading where investors told contract cancellations "may" occur although facts suggested they were "at serious risk of being cancelled"); *In re Zynga Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 38722, at *17-18 (N.D. Cal. Mar. 25, 2015) (liability under §10(b) where company "warned investors that changes ... *could* materially adversely impact its business" but "Plaintiff contends that Defendants knew about the specific content of an impending change ... that would in fact" have such an impact). No ordinary investor would be able to divine DXC's extreme change in strategy from such misleading statements. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("the disclosure required by the securities laws is … measured … by the ability of the material to accurately inform rather than mislead"); *see also Reese*, 747 F.3d at 570.

There should be no question about the materiality of these misrepresentations and omissions. First, the sheer dollar and headcount amount of the planned personnel cuts, among DXC's most critical client-servicing staff, is self-evidently material. ¶¶56-60. Second, Defendants themselves highlighted the

importance of the size and scale of DXC's workforce, the total target amount of all cost-cutting measures, and the purportedly carefully calibrated manner of any reductions for "duplicative" roles, prominently showcasing them among the "Reasons for the Merger" – "Strategic Considerations" and "Financial Considerations." ECF 40-1 at 68-69. And third, when, as DXC's top management warned Lawrie, the "disastrous" cuts impacted DXC's earnings and their extent was revealed, DXC's stock dropped approximately 45%, further indicating the materiality of the undisclosed facts. ¶78; *see also No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (stock drop following disclosure supported finding of materiality). In any event, materiality cannot be resolved on a motion to dismiss where, as here, it is not "so obviously unimportant to an investor, that reasonable minds cannot differ on the question of materiality." *Siracusano*, 585 F.3d at 1178; *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1126 (N.D. Cal. 2014), *aff'd in part, rev'd in part and remanded*, 669 F. App'x 878 (9th Cir. 2016) (resolution of materiality for Section 11 purposes rarely appropriate to decide on motion to dismiss).

                                b.        *The $2.7 billion budget existed at the time of the Registration Statement.*

Defendants suggest that the $2.7 billion target did not exist at the time of the Registration Statement, arguing that "CW1 does not specify when DXC developed [it]." Defs. Br. at 7. This is wrong. First and foremost, Defendants' argument ignores that this Court previously accepted Plaintiffs' allegation that the budget existed at the time of the Registration Statement. *See Costanzo*, 2020 U.S. Dist. LEXIS 132658, at \*21 ("In conclusion, the Court is persuaded that Plaintiffs have sufficiently pled that there was an internal goal at DXC to cut $2.7 in costs at the time the Registration Statement was issued."). The Court reached this conclusion after carefully reviewing Plaintiffs' allegations premised on the Hilton Complaint, and then determining that they supported Plaintiffs' arguments when "[v]iewing all factual allegations in the light most favorable to Plaintiffs in deciding [the] Motion . . . ." *Id.* Those same allegations are presently before the Court and, accordingly, require the same conclusion. *See* ¶57.

Second, contrary to Defendants' argument, CW1's allegations strongly suggest that the Court's previous finding on this point was correct. CW1 worked for DXC both prior to and after the merger in the same position with the same title. *See* ¶79 (specifying title and dates of employment for HPE pre-merger and DXC post-merger). In his role as a Senior Vice President, he was a member of the Executive

Operational Committee and, consequently, attended the Operational Committee meetings that occurred after the merger. ¶79. CW1 states that the $2.7 budget was discussed at these meetings, which **included** the June 21, August 20, October 12, and November 15 meetings, *i.e.*, CW1 attended meetings in addition to these few. ¶81. Even if, as Defendants suggest, CW1 did not attend any Operational Committee meetings prior to June 21, 2017, the fact that the merger had occurred just 60 days earlier suggests strongly that the $2.7 billion target was in existence prior to that first meeting and, importantly, at the time of the Registration Statement, as this Court previously concluded. *See Novak*, 216 F.3d at 312-13.

> c.      *Lawrie's undisclosed $2.7 billion target damaged DXC, even if the cuts fell short of his goal.*

Defendants argue that they cannot be held liable under any circumstance because the total amount of cuts achieved was in line with the $1 billion target they provided to the public. Defs. Br. at 7-9. This argument misconstrues the legal elements of a Section 11 claim and also overlooks the facts, as alleged. Section 11 is often referred to as a "strict liability" statute. *See*, *e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 U.S. Dist. LEXIS 141724, at *11 (N.D. Cal. Aug. 7, 2020) (citing *Daou*, 411 F.3d at 1028. Thus, as long as a registration statement contains an untrue statement at the time it became effective, a violation of the Securities Act exists. Unlike claims under Section 10(b) of the Exchange Act of 1934, Plaintiffs do not need to plead "loss causation" to properly state a claim for relief. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir 1994), *cert. denied sub. nom. Miller v. Pezzani*, 516 U.S. 868 (1995); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) ("[P]laintiffs alleging violations of Section[] 11 . . . need [not] plead scienter, reliance, or loss causation." (internal quotation marks omitted)). In other words, whether the alleged statutory violation in fact caused Plaintiffs' damages is not a question for determination at the pleading stage; the sole issue at hand is whether or not the Registration Statement contained an untrue statement.

Defendants' argument also contradicts Plaintiffs' alleged facts concerning the effects of the $2.7 billion target. Based on numerous sources (*i.e.*, Hilton, CW1, CW2, CW3, and news reports), Plaintiffs allege that Lawrie's personnel cuts damaged DXC's operations. *See* ¶¶68-78 (alleging operational fallout due to personnel cuts); 83-87 (firsthand accounts of impact from firings). According to Hilton and Plaintiffs' confidential witnesses, the cuts implemented by Lawrie were different in both degree and kind

from those described in the Registration Statement. By targeting $2.7 billion, Lawrie necessarily had to reduce costs at a dangerous pace that ultimately placed DXC's operational performance in jeopardy, as acknowledged by Salvino when he replaced Lawrie as DXC's CEO. ¶77. Alternatively, had Lawrie been truly aiming for $1 billion, the personnel cuts could have been carried out with more thought and flexibility in terms of timing, giving DXC an opportunity for correction if needed.

Finally, Defendants' argument also misplaces reliance on the notion that DXC's cuts in the first year after the merger did not exceed $1 billion. Defs. Br. at 8. Defendants raised this argument in their prior motion, citing a press release from DXC stating that it achieved "$1.1 billion in cost savings," which the Court correctly rejected. *Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *18-19. Whether DXC achieved $1.1 billion in cost savings and how it came to calculate that figure will be key topics of discovery. Evidence may ultimately show that DXC's reductions met the $2.7 billion target, but were reported as $1.1 billion due to unrelated accounting reasons. The Court should not accept "the truth of DXC's press release" because it is a fact that is "not subject to judicial notice and thus may not be considered in connection with the present Motion." *Id*. at *18; *see also Khoja*, 899 F.3d at 1000.

d.    *Defendants abandon the majority of their "puffery" arguments.*

Defendants challenge only one alleged misrepresentation as non-actionable "puffery," the statement in which Defendants discuss their "turn-around plan." Defs. Br. at 12 (citing ¶90). This is the only alleged misrepresentation they characterize as "puffery," meaning that they have abandoned their previous arguments concerning DXC's "net synergies" and "strategic and financial benefits" (¶90) and risk disclosures relating to DXC's workforce (¶92). *See Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *32-37 (holding in favor of Plaintiffs with respect to these particular misrepresentations). Concerning Defendants' "turn-around plan," the difference between what DXC stated publicly and what Plaintiffs now allege occurred internally is stark enough to render the former a material misrepresentation. *See In re Dura Pharms., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1136-1137 (S.D. Cal. 2008) ("close to" bringing product to market); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) ("ramp[ing]" production to meet demand); *In re InfoSonics Corp. Sec. Litig.*, No. 06cv1231 BTM(WMc), 2007 U.S. Dist. LEXIS 57784, *19-20 (S.D. Cal. Aug. 7, 2007) (product "well received"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) (denying

motion to dismiss where statements were "incomplete" and therefore improperly "portray[ed] the results . . . in an unduly optimistic light"). Indeed, the frequency with which DXC discussed its "turn-around plan" furthers the conclusion that it was material to the company and, therefore, investors as well. *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (materiality of statement was "illustrated by the frequency with which Defendants emphasized" it in "press releases and other public statements").

> e.    To the extent any of Defendants' statements were "opinions," they omitted the undisclosed plan to cut $2.7 billion in costs.

Defendants misclassify several of the alleged false statements as "opinions," including those about the "synergies" of the merger and DXC's "hiring practices." Defs. Br. at 12. As the Court previously pointed out, these statements "do not, on their face, include any clear indication (*e.g.*, 'we believe' or 'we think') that they describe an opinion." *Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *37-38. Nothing has changed in this regard and, therefore, evaluating them as opinion statements would be incorrect. If, however, this Court is inclined to do so, Defendants' arguments still fail in light of Plaintiffs' new allegations concerning the $2.7 billion target being "more than aspirational." *Id*. at *39.

DXC's statements concerning synergies and hiring practices omitted its plan to terminate a substantial portion of its workforce. Thus, Defendants are liable for these statements because "the speaker did not hold the belief she professed" and "the supporting fact[s] she supplied were untrue." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015). As previously highlighted, Defendants were aware of Lawrie's existing parallel plan to cut costs nearly double the amount publicly stated, with Hilton and others "repeatedly" telling him it would be "disastrous" for revenue. *See In re Time Warner*, *Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) (duty to disclose alternatives to company goal may arise even when "under active and serious consideration"). Plaintiffs thus sufficiently allege (i) the speaker(s) could not and did not believe the assertions professed, even if negligently; (ii) the facts DXC supplied were untrue; or (iii) Defendants knew of facts incompatible with their statements, and/or omitted material facts rendering their statements misleading to reasonable investors, or conflicting with what investors would take away from such statements; or were aware of undisclosed facts seriously undermining the statements' accuracy. *See City of Dearborn*

*Hgts. Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017); *In re Atossa*, 868 F.3d at 802.

### 4. Defendants Had a Duty to Disclose Omitted Facts Under Items 303 and 503.

SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") imposes an affirmative a duty on issuers to disclose "*any known trends or uncertainties* that have had or that the registrant reasonably expects will have a *material favorable or unfavorable impact on net sales or revenues or income* from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues … the change in the relationship shall be disclosed." *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998) (noting Item 303 requires disclosure of known trends "reasonably likely to have material effects on the registrant's financial condition or results of operation."). "'[A]ny omission of facts 'required to be stated' under Item 303 will produce liability under Section 11.'" *Violin Memory*, 2014 U.S. Dist. LEXIS 155428, at *50 (quoting *Steckman*, 143 F.3d at 1296).

Defendants failed to disclose that, leading up to the IPO, DXC's senior executives were aware of—and actually discussed—concerns that implementation of Lawrie's aggressive workforce reduction plan, due to its magnitude and accelerated timing, would negatively impact client service delivery, retention of necessary personnel, and future revenues and profitability. That plan was thus certainly a substantial and known uncertainty that existed prior to the IPO which "[DXC] reasonably expect[ed] [would] have a material impact on net sales, revenues, or income from continuing operations." ¶100. Defendants' failure to disclose this known trend was a violation of Item 303 and, thus, creates liability under Section 11. *See Steckman*, 143 F.3d at 1296; *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 710-71, 715-20 (2d Cir. 2011) (sustaining Item 303-based §11 claim under Rule 8(a) where defendants failed to disclose subsidiary's shift toward more risky strategy and plaintiff pleaded plausible inference of actual knowledge); *Cai v. Switch, Inc.*, 2019 U.S. Dist. LEXIS 116702, at *15-16 (D. Nev. July 12, 2019) (failure to disclose change in sales strategy actionable under Item 303).

Similarly, SEC Reg. S-K Item 503(c) ("Item 503") requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors "must be specific to the

particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment." *Statement of Comm'n Regarding Disclosure of Year 2000 Issues & Consequences by Pub. Cos., Inv. Adv., Inv. Cos., & Mun. Sec. Issuers*, SEC Release No. 1149 (July 29, 1998). Item 303 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004); *see Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *4 (D. Mass. Feb. 15, 2018) ("a complaint alleging violation of Section 11 in Item 503 disclosures must 'allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely affect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor.'") (citations omitted).

The Registration Statement violated Item 503 by failing to adequately disclose the risks posed by DXC's actual workforce reduction plan, even though they were some of the most significant factors that made an investment in DXC shares speculative or risky. Specifically, the Registration Statement omitted that, in fact, DXC's true, internal plan was to achieve approximately $2.7 billion in cost savings in the first year after the merger, primarily by terminating tens of thousands of DXC's most highly-skilled, client-facing employees, and the severe risks to expected revenue and income therefrom. ¶102. These severe risks were not only known to DXC and top management, but protested by top management to the plan's originator, Chairman and CEO Lawrie, because the excessive cuts would be "disastrous for DXC's long-term revenues" as they "could not be achieved … without negative impacts on customer satisfaction." ¶¶55-57. Yet, the Registration Statement disclosed neither the internal plan to cut $2.7 billion in costs the first year, nor the concomitant (warned of) risks that this would cripple DXC's workforce infrastructure, significantly harm DXC's ability to deliver on client contracts, endangering its longer-term revenue, and harm DXC's ability to attract or retain other personnel needed to service those contracts. ¶102.

The only basis for rejecting these allegations previously was that Plaintiffs had "failed to allege facts sufficient to lead to a reasonable inference that the $2.7 billion internal target was achieved or was even meant to be achieved in the first year after the Merger was concluded." *Costanzo*, 2020 U.S. Dist.

LEXIS 132658, at *44. Having now established that the $2.7 billion target was not simply "aspirational" in nature, but instead a hard target that senior management tracked and discussed routinely at executive-level meetings, Plaintiffs have overcome that obstacle. *See* ¶¶5-6, 56-57, 80-81. Defendants present no other arguments in response to Plaintiffs' allegation in their motion. *See* Defs. Br. at 16.

5.    Defendants Cannot Avail Themselves of the Safe Harbor for Forward-Looking Statements.

The safe harbor does not apply to forward-looking statements made in connection with an initial public offering. 15 U.S.C. §77z-2(b)(2)(D). This coincides with the purpose of the Securities Act, which was "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). Companies without a history of public filings for investors to study are thus held to a higher standard of disclosure. In the same vein, companies who have been the subject of a judicial or administrative decree are also not allowed to avail themselves of the safe harbor in light of their past transgressions. 15 U.S.C. §77z-2(b)(1)(A)(ii). DXC meets both of these exceptions, having no public track record for investors to rely upon other than its predecessor companies, which include CSC and its recent violations of the federal securities laws. ECF 49-1 (copy of CSC's cease-and-desist order). But even if DXC is eligible for safe harbor protection, the Court should decline to apply it because Defendants' statements concerned a cost reduction target that existed at the time of the Registration Statement and, therefore, were not forward-looking or accompanied by meaningful cautionary language.

When assessing Defendants' safe harbor defense previously, the Court held that Plaintiffs "failed to allege that DXC's $1 billion expectation in cost cut – which is facially forward-looking and related to financials – was a 'mixed' statement," *i.e.*, "concerned present facts and looked to the future." *Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *25-26 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017)). This holding was premised on the conclusion that Plaintiffs failed to show that "the $2.7 billion target in cost cuts . . . was anything more than an aspirational and internal goal." *Id.* at *26. Having now established that the $2.7 billion target was a real objective, it follows that Defendants' statements did in fact concern or omit facts that existed at the time. Defendants' statements, therefore, are not protected by the safe harbor. *See Quality Sys.*, 865 F.3d at 1141-42; *Prodanova v. H.C.*

*Wainwright & Co., LLC,* 2018 WL 8017791, *34 (C.D. Cal. Dec. 11, 2018) (safe harbor "does not apply" where statement allegedly "misleading because it omitted a disclosure of a present fact," including pertaining to a future announcement).

The fact that DXC's $2.7 billion cost reduction target existed at the time of the Registration Statement also undercuts Defendants' reliance on any cautionary language. As to Defendants' above-described omissions, or "mixed" forward-looking and current status statements, virtually no cautionary language will be sufficient. *Quality Sys.*, 865 F.3d at 1148 ("virtually no cautionary language" can shield misrepresentations or omissions of present fact). To the extent Defendants' statements regarding future forecasts and events may be considered forward-looking, they were not accompanied by "meaningful" cautionary statements that conveyed "substantive information about factors that realistically could cause results to differ materially from those projected." *In re STEC Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 75093, at *26 (C.D. Cal. June 17, 2011) (quotations omitted); *see also Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (warnings insufficient as they "did not 'counterbalance [the] misleading impression created by [the initial misrepresentations]'") (citation omitted); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 919-20 (N.D. Cal. 2012) ("The cautionary warning ought to be precise" and "relate directly to" the misleading aspect of the challenged statement). The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the cautionary language prong of the safe-harbor provision. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). To constitute meaningful cautionary language, a disclaimer must "sufficiently address *the harm that resulted*." *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (reversing dismissal). Risk warnings must be clear enough that "'reasonable minds' could not disagree that the challenged statements were not misleading." *In re Atossa Genetics Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017). The "warnings" Defendants cite here are boilerplate, obligatory disclaimers that do not come close to meeting this standard, and tell investors nothing about the actual, highly material facts then-existing, and their likely material impact on DXC.

Defendants' disclosures were extremely generalized and did not disclose the central facts at issue here, contrary to their argument in the motion. Defs. Br. at 9-10. No ordinary investor would be able to divine that DXC had adopted an undisclosed cost-cutting plan nearly double the amount represented to

investors, primarily by terminating its most critical client-servicing staff, together with the virtually assured devastating impact on revenues and income, from such boilerplate hypotheticals, which could apply to the merger of any two companies. *See Miller*, 519 F.3d at 886 (courts must assess registration statement disclosures considering "[t]he fair and reasonable implication an ordinary investor would derive from" a disclosure); *Cai*, 2019 U.S. Dist. LEXIS 116702, at *15 ("the sections [of the registration statement] defendants quote do not indicate that [the company] had already changed its … strategy"). Similarly, Defendants' warnings concerning DXC's ability to provide customers with competitive services depended in part on its ability to "*attract and retain* qualified personnel;" "[t]he loss of personnel *could* impair the ability of the combined company to perform under certain contracts, which could have a material adverse effect," and "if [DXC] does not hire, train, motivate and effectively utilize employees with the right mix of skills and experience … to meet the needs of its clients, its financial performance could suffer" told investors nothing about DXC's undisclosed plan to *itself cut* such personnel, *en masse*, and thus were themselves misleading. *See Siracusano*, 585 F.3d at 1181-82; *Berson*, 527 F.3d at 986; *see also Zaghian*, 675 F. App'x at 720 (generic risk warning not meaningful regarding specific sales risk at issue, due to company's strategic choice); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) ("[H]ypothetical risk disclosures … do not absolve Defendants of their duty to disclose known material adverse trends"). Defendants' cautionary language was not "meaningful," but instead materially misleading (contrary to Defendants' arguments otherwise, *see* Defs. Br. at 14-15).

In sum, assuming *arguendo* that DXC qualifies for safe harbor protection (it does not) and that Defendants' statements were forward-looking (they were not), the safe harbor still does not apply because the Registration Statement's cautionary language was not "meaningful," as that term is defined under the case law. *See Berson*, 527 F.3d at 986 (disclosure "speaks entirely of as yet-unrealized risks and contingencies" while "[n]othing alerts the reader that some of these risks may already have come to fruition"); *Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). Moreover, as alleged and this Court already held, Lawrie knew that the $2.7 billion target existed at the time of the Registration Statement. *See Costanzo*, 2020 U.S. Dist. LEXIS 132658, at *30-31 ("Plaintiffs have properly pled that Lawrie knew of the $2.7 billion cost

saving target because he is alleged to have set that goal according to the Hilton Complaint."). Defendants' arguments to the contrary do not change the outcome on this issue. Defs. Br. at 10. This is especially so given Lawrie's attendance at the Operational Committee meetings described by CW1 further supports that conclusion. *See* ¶¶80-82. Lawrie's knowledge of the target prevents Defendants' from taking advantage of the safe harbor. *See also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165-66 (C.D. Cal. 2003) (holding that actual knowledge bars application of safe harbor because "Congress could not have intended to foster the dissemination of information that is known to be false or misleading.").

**B.    The Individual Defendants and HPE are Liable under Section 15 of the Securities Act.**

Defendants do not challenge Plaintiffs' Section 15 claim except insofar as they challenge an underlying Section 11 violation. Defs. Br. at 17. Because Plaintiffs have stated a Section 11 claim against Defendants, the Section 15 claim should be upheld as well. *See Cai*, 2019 U.S. Dist. LEXIS 116702, at *20.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety. Alternatively, should the Court dismiss any aspect of the Complaint, Plaintiffs respectfully request leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: December 21, 2020                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ Adam M. Apton
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel.: 415-373-1671
Fax: 415-484-1294

Nicholas I. Porritt (admitted pro hac vice)
1101 30th Street, Suite 115
Washington, D.C. 20007
Tel.: (202) 524-4290

Fax: (212) 363-7171

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (SBN 270796)
Kara Wolke (SBN 241521)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: kwolke@glancylaw.com

*Attorneys for Lead Plaintiffs
and Lead Counsel for the Class*