# EXHIBIT A

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| GREGORY WOCHOS, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>and<br><br>KURT FRIEDMAN; UPPILI SRINIVASAN, Individually and on Behalf of All Others Similarly Situated<br><br>*Plaintiffs-Appellants*,<br><br>v.<br><br>TESLA, INC.; ELON MUSK; and DEEPAK AHUJA,<br><br>*Defendants-Appellees.* | No. 19-15672<br><br>D.C. No.<br>3:17-cv-05828-CRB<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted April 30, 2020
San Francisco, California

Filed January 26, 2021

2                    FRIEDMAN V. TESLA

Before:  J. Clifford Wallace, Susan P. Graber, and
         Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Securities Fraud

The panel affirmed the district court's dismissal with prejudice of a putative securities fraud class action brought under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, alleging that Tesla, Inc., and two of its officers misled the investing public during 2017 about Tesla's progress in building production capacity for the Model 3, its first mass-market electric vehicle.

The panel held that, to the limited extent that the specific statements challenged in plaintiffs' operative second amended complaint were not protected by the "safe harbor" for forward-looking statements in the Private Securities Litigation Reform Act, plaintiffs failed adequately to plead falsity.

The panel held that plaintiffs' proposal to amend the complaint further, to challenge an additional statement, failed for lack of the requisite loss causation.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

FRIEDMAN V. TESLA                                         3

## COUNSEL

Jacob A. Goldberg (argued) and Gonen Haklay, The Rosen Law Firm P.A., Jenkintown, Pennsylvania; Laurence M. Rosen, The Rosen Law Firm P.A., Los Angeles, California; for Plaintiffs-Appellants.

Dean S. Kristy (argued) and Jennifer Bretan, Fenwick & West LLP, San Francisco, California; Alison Jordan, Fenwick & West LLP, Mountain View, California; for Defendants-Appellees.

## OPINION

COLLINS, Circuit Judge:

Plaintiffs Kurt Friedman and Uppili Srinivasan, on behalf of a putative class of shareholders, allege that Tesla, Inc. and two of its officers, Chairman and Chief Executive Officer Elon Musk and Chief Financial Officer Deepak Ahuja, (collectively, "Defendants") misled the investing public during 2017 about Tesla's progress in building production capacity for the Model 3, its first mass-market electric vehicle. We conclude that, to the limited extent that the specific statements challenged in Plaintiffs' operative Second Amended Complaint are not protected by the "safe harbor" for forward-looking statements in the Private Securities Litigation Reform Act ("PSLRA"), *see* 15 U.S.C. § 78u-5(c), Plaintiffs have failed adequately to plead falsity. We also hold that Plaintiffs' proposal to amend the complaint further, to challenge an additional statement, fails for lack of the requisite loss causation. We therefore affirm the district court's dismissal of this action with prejudice.

4                    FRIEDMAN V. TESLA

**I**

When reviewing a motion to dismiss, we accept Plaintiffs' well-pleaded factual allegations as true, keeping in mind the heightened pleading standards established in the PSLRA. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989–91 (9th Cir. 2009); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007). We may also consider "materials incorporated into the complaint by reference" and any "matters of which we may take judicial notice." *Zucco Partners*, 552 F.3d at 989.

**A**

As of 2016, Tesla remained a "niche" carmaker, delivering only 76,000 electric vehicles a year. All of these were luxury vehicles with a suggested retail price of over $74,000. For years, though, Musk had been hoping to expand Tesla's production into mass-market electric vehicles, and the fruit of those efforts was the "Model 3." In 2016, Tesla first announced concrete plans to build the Model 3, which was envisioned as a sedan with a recommended retail price starting at $35,000. At such prices, Musk anticipated selling hundreds of thousands of cars a year by 2018. To achieve this scale of production, Tesla planned to develop fully automated production lines for the Model 3 at a factory in Fremont, California, and to produce the vehicle's battery in-house at a factory in Reno, Nevada, called "Gigafactory 1." In a May 2017 quarterly report filed with the U.S. Securities and Exchange Commission ("SEC"), Tesla described its production goals for the Model 3, but it warned that the production of the vehicle might not be a seamless process: "We have experienced in the past . . . significant delays or other complications in the design, manufacture, launch and production ramp of new vehicles and other products," and

FRIEDMAN V. TESLA                    5

"may also experience similar delays or other complications in bringing to market and ramping production of new vehicles, such as Model 3." Tesla further cautioned that it had "no experience to date in manufacturing vehicles" at such a high volume and that its "ability to achieve these plans" depended on a number of risk factors.

**B**

Plaintiffs' claims in this case are based on a number of statements Tesla made to investors between May 3, 2017 and November 1, 2017, during the ramp-up to mass production of the Model 3.[1] Plaintiffs' theory is that, during this "Class Period," Tesla announced Model 3 production goals for the end of 2017 that it knew it would not be able to achieve, and it repeatedly reaffirmed that it was on track to reach those targets, even as the end-of-the-year deadline drew closer and as delays grew increasingly significant. Plaintiffs start with May 3, 2017, because on that date Tesla publicly affirmed that its 2017 production goal was to manufacture 5,000 Model 3s per week. Specifically, Plaintiffs stated, in a Form 8-K filed that day, that "preparations at our production facilities are on track to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017." The Class Period ends on November 1, 2017, because that is the day Tesla publicly admitted that it would

---

[1] Most of the alleged misrepresentations and omissions stem either from Tesla's disclosures of financial data and strategic risks in its various filings with the SEC or from statements made during "earnings calls." The various SEC filings at issue involved reports that, as a public company, Tesla was required to make at periodic intervals: for example, Form 10-Ks are required annually, Form 10-Qs are required quarterly, and Form 8-Ks are required when specified events occur. The "earnings calls" at issue here were conference calls to investors and investment analysts that were typically conducted on the day of an SEC filing.

6                    FRIEDMAN V. TESLA

not, in fact, be able to produce 5,000 vehicles per week by the end of 2017.

Plaintiffs allege that, long before the May 3, 2017 announcement, Defendants were aware that, due to a variety of logistical issues, producing 5,000 vehicles a week in 2017 was unattainable. Plaintiffs allege that Former Employee ("FE") 1, who was then the Fremont plant's director of manufacturing, told Musk at a meeting in late April or early May 2016 that "there was zero chance that the plant would be able to produce 5,000 Model 3s per week by the end of 2017." FE1 "told Musk directly at the meeting that the *start* of manufacturing would be at least 6 months later than July 2017, *i.e.*, in 2018." At the end of the meeting, "Musk told FE1 that he should look for new employment," and FE1 resigned shortly thereafter. The vice president of manufacturing likewise told Musk around the same time that Tesla would never be able to produce 5,000 Model 3s by the end of 2017, and Musk responded by forcing him out of the company in May 2016.

The complaint alleges that, as 2017 progressed, Tesla struggled to build the automatic assembly line that would be necessary to produce Model 3s at the hoped-for rate by year's end. FE4, a manufacturing engineer who left Tesla in June 2017, stated that the automated production line was not finished when FE4 left and that the few Model 3s being produced were made "mostly by hand." FE4 was told by the technician who oversaw FE4's team that "the new projection for completion of the automated line was in 2018." FE5, a subcontractor employee who was onsite from June or July 2017 to September 2017, estimated that the full production line was only about 45 percent complete by September. A production supervisor, FE3, stated that "until October 18,

2017," when he left Tesla, he "never saw a single Model 3 being constructed on the assembly line."

In addition, there were problems with battery manufacture at the Gigafactory throughout 2017. FE9, a technician at the Gigafactory until October 2017, stated that the Gigafactory did not accomplish even partial automation until September. Production problems continued through FE9's departure, such that the Gigafactory produced only about two battery packs per day, and prior to October, none of these were "customer saleable" battery packs that were ready to be installed in a Model 3. Shortly after joining the Gigafactory as operations planning manager in May 2017, FE12 realized that the Gigafactory would be unable to produce 5,000 batteries a week by the end of the year. FE12 stated that, nonetheless, Musk (who regularly visited the Gigafactory) "was still saying 5,000, 5,000, 5,000" in July. FE12 estimated that the shift from manual to automatic battery production did not occur until the end of the third quarter of 2017, and even then the automatic production was so beset by problems that the Gigafactory subsequently shifted back to manual production.

At a July 28, 2017 event that was streamed online, Tesla "'handed over' the first 30 Model 3s to buyers." During the event, Musk referred to the vehicles as "production cars," which, according to the complaint, implied that they had been produced on an automatic production line. But "every part of those Model 3s had actually been built by hand, and Tesla was not even close to automated production of the Model 3" at that time.

On October 6, the *Wall Street Journal* broke the news that:

8                       FRIEDMAN V. TESLA

Unknown to analysts, investors and the hundreds of thousands of customers who signed up to buy it, as recently as early September major portions of the Model 3 were still being banged out by hand, away from the automated production line . . . .

Automotive experts say it is unusual to be building large parts of a car by hand during production. . . .

It isn't uncommon for much larger auto makers to hand build pre-production versions of a car prior to the sales launch, but . . . [b]y the time a car goes on sale, the body shop is typically fully automated.

By October 9, Tesla's stock had dropped 3.9 percent.

On November 1, 2017, Tesla formally confirmed in a Form 8-K filing with the SEC that it would not meet its end-of-year production goal. On November 2, an article in the car blog *Jalopnik* detailed a large number of supply and production delays at Tesla. Tesla's stock fell 6.8 percent between the close of the market on November 1 and 2. Overall, Tesla's closing stock price fell from $356.88 on October 6 to $299.26 on November 2.

According to Plaintiffs, Tesla was still producing only 2,266 Model 3s per week at the end of September 2018.

## C

Gregory Wochos filed this putative class action in the district court on October 10, 2017. Kurt Friedman, a member of the putative class, thereafter moved to be

FRIEDMAN V. TESLA                    9

appointed "lead plaintiff" in accordance with the PSLRA, and the district court granted that unopposed motion on February 2, 2018. Thereafter, a First Amended Complaint was filed adding Friedman and Uppili Srinivasan as additional named plaintiffs.[2] On Defendants' motion, the district court dismissed that complaint with leave to amend, and Plaintiffs Friedman and Srinivasan filed the operative Second Amended Complaint ("SAC") in September 2018. The SAC alleges that Defendants' challenged statements concerning Tesla's production of the Model 3 were false and misleading in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The complaint also asserted an additional claim against the individual defendants, Musk and Ahuja, alleging that they were "controlling persons" who were liable under § 20 of the Securities Exchange Act, 15 U.S.C. § 78t, for Tesla's alleged violation of § 10(b) and Rule 10b-5.

Defendants again moved to dismiss for failure to state a claim, and this time the district court dismissed the action with prejudice and without leave to amend. The district court concluded that, as to the challenged statements made by Tesla, Plaintiffs had failed to plead any material misrepresentation that was not within the PSLRA's safe harbor for "forward-looking" statements "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). The district court expressly declined to reach the additional issues of scienter or loss causation that had also been raised in the motion to dismiss.

---

[2] Jason Wheeler, who had been Ahuja's immediate predecessor as Chief Financial Officer, had been named as a defendant in the original complaint, but he was dropped from the First Amended Complaint.

Plaintiffs Friedman and Srinivasan timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's dismissal de novo. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 700–01 (9th Cir. 2012).

**II**

Section 10(b) of the Securities Exchange Act generally makes it "unlawful" to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). The SEC has implemented this provision by promulgating Rule 10b-5, which in turn generally makes it unlawful, "in connection with the purchase or sale of any security," to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "Though the text of the Securities Exchange Act does not provide for a private cause of action for § 10(b) violations, the [Supreme] Court has found a right of action implied in the words of the statute and its implementing regulation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* On appeal, the parties contest whether Plaintiffs adequately pleaded falsity, scienter, and loss causation.

In addressing the adequacy of the operative SAC, we find the issue of falsity to be dispositive, and we therefore do not reach the issues of scienter or loss causation with respect to that complaint.  In reviewing the question of falsity, we begin by reviewing the general substantive standards that govern the pleading of falsity in Rule 10b-5 claims, and we then apply those standards to the specific statements challenged by Plaintiffs in their complaint.

**A**

In addition to the normal rule that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), the PSLRA imposes heightened pleading requirements that require a securities fraud complaint, *inter alia*, to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *see also* Fed. R. Civ. P. 9(b).  In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory.  *See* 17 C.F.R. § 240.10b-5(b).  Under Rule 10b-5, an affirmative misrepresentation is an "untrue statement of a material fact," and a fraudulent omission is a failure to "state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Id*.

Because both of these theories require falsity with respect to a "material *fact*," *id*. (emphasis added), there are substantial limits in applying such theories to a pure statement of honest *opinion*.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015); *see also City of Dearborn Heights Act 345*

12                    FRIEDMAN V. TESLA

*Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) ("Although *Omnicare* concerned Section 11 claims, we conclude that the Supreme Court's reasoning is equally applicable to Section 10(b) and Rule 10b-5 claims."). But *Omnicare* identified three ways in which a statement of opinion may nonetheless involve a representation of material fact that, if that representation is false or misleading, could be actionable. First, every statement of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief." *Omnicare*, 575 U.S. at 184. Second, "some sentences that begin with opinion words like 'I believe' contain *embedded* statements of fact." *Omnicare*, 575 U.S. at 185 (emphasis added). As the Court explained, a statement that "'I believe our TVs have the highest resolution available because we use a patented technology'" could give rise to misrepresentation liability if the speaker's technology was not patented. *Id*. Third, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Id*. at 188. For example, if a company declares that "'We believe our conduct is lawful,'" a reasonable investor "likely expects such an assertion to rest on some meaningful legal inquiry." *Id*. Accordingly, if in fact that company made "that statement without having consulted a lawyer," the statement "could be misleadingly incomplete," potentially giving rise to liability under an omission theory. *Id*.

But even if a statement would otherwise be actionable under these standards, the PSLRA carves out a "safe harbor for forward-looking statements" by adding § 21E to the Securities Exchange Act. 15 U.S.C. § 78u-5 (heading). This safe harbor "is designed to protect companies and their

FRIEDMAN V. TESLA                    13

officials" when they merely fall short of their "optimistic projections." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). The relevant statutory language states:

> (c) SAFE HARBOR
>
> > (1) IN GENERAL
> >
> > > Except as provided in subsection (b), in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
> > >
> > > > (A) the forward-looking statement is—
> > > >
> > > > > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> > > > >
> > > > > (ii) immaterial; or
> > > >
> > > > (B) the plaintiff fails to prove that the forward-looking statement—

14                    FRIEDMAN V. TESLA

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).  As we explained in *Quality Systems*, the use of the disjunctive term "or" between subclauses (A) and (B) confirms that "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading."  865 F.3d at 1141; *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112–13 (9th Cir. 2010). Consequently, where a defendant has made a sufficient showing that a challenged forward-looking statement was accompanied by meaningful cautionary statements, *see* 15 U.S.C. § 78u-5(e), a plaintiff cannot defeat that invocation of § 21E's safe harbor merely by alleging, for example, that the company knew that the announced forward-looking objective was unlikely to be achieved. Rather, the plaintiff must plead additional facts that would vitiate an element of *that* version of the safe harbor—such

FRIEDMAN V. TESLA                    15

as, for example, facts indicating that the "cautionary statements" cited by the defendant were not "meaningful."

Importantly, however, *Quality Systems* held that the PSLRA's safe harbor does not apply in an all-or-nothing fashion, because some statements about the future may combine non-actionable forward-looking statements with separable—and actionable—non-forward-looking statements. 865 F.3d at 1142. In the context of such "mixed" statements, only the forward-looking aspects could be immunized from liability, because the safe harbor is not "designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Id.* at 1141–42 (collecting cases from multiple circuits).

**B**

In applying these standards to the 15 challenged statements identified in the SAC, we group those statements into three chronological sets—those made in May 2017, those made in July, and those made in August. We conclude that Plaintiffs have not adequately pleaded falsity as to any of these statements.

**1**

With respect to each of the challenged statements from May 2017, we hold that Plaintiffs have failed to plead sufficient facts to avoid the PSLRA's safe harbor or to establish falsity.

16                              FRIEDMAN V. TESLA

**a**

The SAC specifically alleges that the following seven statements Tesla made in May 2017 were materially false and misleading.

(1)  On May 3, 2017, Tesla filed a Form 8-K announcing, in part, that "preparations at our production facilities are on track to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017."

(2)  During a related May 3, 2017 earnings call, Musk stated:

> Well, actually it seems to be—we're not really seeing any significant change that needs to occur with Model 3.  So it's coming in as expected, as the design continuation has predicted, it's getting pretty close to the bull's-eye, and I'm not aware of anything that would affect our prior statements about volume target. . . .
>
> . . .
>
> There's plenty of things with uncertainty, but I don't know anything that would prevent us from starting firstly in July, and exceeding 5,000 units per week by the end of the year.

(3)    Later during this same earnings call, Musk responded to a question about "the biggest challenges or bottlenecks in ramping production to 5,000 vehicles per week by some point in 2017."  He did so by contrasting Tesla's approach to the Model 3 with the approach Tesla had taken to its luxury Model X cars:

FRIEDMAN V. TESLA                    17

[The Tesla Model] X became kind of like a technology bandwagon of every cool thing you can imagine all at once. . . . That was a terrible strategy. You really want to start off simple and add things over time. . . . So with Model 3 it's the opposite. We've designed it to be easy to make. We've got I think a much better supply chain in place where we've got the A team from the A suppliers. We didn't have that for the Model X or the S. And as far as we know, there are no issues.

(4) In its Form 10-Q, filed on May 10, 2017, Tesla stated that "Model 3 vehicle development is nearly complete as we approach the start of initial production in July of this year. . . . [P]reparations at our production facilities are progressing to support the ramp of Model 3 production to 5,000 vehicles per week at some point in 2017."

(5) This same 10-Q also stated: "We have started the installation of Model 3 manufacturing equipment at the Fremont Factory and Gigafactory 1, and we are on-track for start of Model 3 production in July 2017."

(6) The 10-Q further stated that:

Although we continue to remain on track with our progress at Gigafactory 1, given the size and complexity of this undertaking, it is possible that future events could result in the cost of building and operating Gigafactory 1 exceeding our current expectations and Gigafactory 1 taking longer to expand than we currently anticipate. In addition, we continue to expand production capacity at our

18                    FRIEDMAN V. TESLA

Fremont Factory and are exploring additional production capacity in Asia and Europe.

(7)    Finally, Plaintiffs alleged that the following disclosure of risk factors in this 10-Q was materially incomplete and misleading:  "We may experience delays in realizing our projected timelines and cost and volume targets for the production, launch and ramp of our Model 3 vehicle, which could harm our business, prospects, financial condition and operating results."

**b**

The district court held that Tesla's various statements that it was "on track" were protected by the PSLRA's safe harbor because they were "forward-looking statements regarding plans and objectives for future operations" and "were accompanied by meaningful cautionary statements." Plaintiffs challenge this ruling, asserting that these predictive statements contain embedded assertions concerning *present* facts that are actionable under *Quality Systems*, 865 F.3d at 1142.  We disagree.

The definition of "forward-looking statement[s]" in § 21E(i)(1) expressly includes "statement[s] of the *plans and objectives* of management for future operations," 15 U.S.C. § 78u-5(i)(1)(B) (emphasis added), and "statement[s] of the *assumptions* underlying or relating to" those plans and objectives, *id*. § 78u-5(i)(1)(D) (emphasis added). Consequently, in order to establish that a challenged statement contains non-forward-looking features that avoid this definition, a plaintiff must plead sufficient facts to show that the statement goes *beyond* the articulation of "plans," "objectives," and "assumptions" and instead contains an express or implied "concrete" assertion concerning a specific "current or past fact[]."  *Quality Sys*., 865 F.3d

FRIEDMAN V. TESLA                    19

at 1142, 1144.  Thus, in *Quality Systems*, we held that, even though they were combined with forward-looking projections about revenue growth, the defendants' affirmative statements that the defendant company's *current* sales and performance were comparable to those in the past were not forward-looking because they "provided a concrete description of the past and present state of the [company's sales] pipeline."  *Id*. at 1143–44.  With only one exception, Plaintiffs have failed to plead that the challenged May statements contain any such representation of current or past fact.

Tesla's goal to produce 5,000 vehicles per week is unquestionably a "forward-looking statement" under § 21E, because it is a "plan[]" or "objective[]" of management for future operations," and this plan or objective "relat[es] to the products" of Tesla.  15 U.S.C. § 78u-5(i)(1)(B).  Contrary to what Plaintiffs contend, Tesla's various statements that it was "on track" to achieve this goal and that "there are no issues" that "would prevent" Tesla from achieving the goal are likewise forward-looking statements.  Because any announced "objective" for "future operations" *necessarily* reflects an implicit assertion that the goal is achievable based on current circumstances, an unadorned statement that a company is "on track" to achieve an announced objective, or a simple statement that a company knows of no issues that would make a goal impossible to achieve, are merely alternative ways of declaring or reaffirming the objective itself.  The statutory safe harbor would cease to exist if it could be defeated simply by showing that a statement has the sort of features that are inherent in *any* forward-looking statement.

The question, then, is whether Plaintiffs have sufficiently pleaded that any of the challenged May statements went

20                    FRIEDMAN V. TESLA

beyond the mere declaration of the year-end goal in a way that includes a non-forward-looking statement.   In this regard, we reiterate that it is not enough to plead that a challenged statement rests on subsidiary premises about how various *future* events will play out over the timeframe defined by the forward-looking statement.  As noted earlier, such "statement[s] of the assumptions underlying or relating" to a declared objective are also deemed to be forward-looking statements.   15 U.S.C. § 78u-5(i)(1)(D). This reasoning precludes Plaintiffs' theory that Tesla's year-end goal rested on scheduling assumptions that Tesla knew it was unlikely to meet.  Any such schedule about how future production would play out on the way toward the announced goal is simply a set of the "assumptions" about future events on which that goal is based.   Like the goal itself, such projected timelines are forward-looking statements.

In contrast to such "assumptions" about future events, a concrete factual assertion about a specific present or past circumstance goes *beyond* the assertion of a future goal, and beyond the articulation of predicate assumptions, because it describes specific, concrete circumstances *that have already occurred*.    Such statements are therefore not forward-looking, and—unlike "on track" assertions—they do not rest on the sort of features that are intrinsic to all forward-looking statements.  Thus, while one cannot declare a goal without implicitly or explicitly stating that it is achievable, one can readily announce an objective *without* stating, for example, that the reason why it is achievable is because production of relevant units actually rose 75% over the last quarter or because the company has actually hit certain intermediate benchmarks.  If such factual assertions are made and are false, then they are outside the safe harbor and potentially actionable.

FRIEDMAN V. TESLA                    21

Although Plaintiffs claim to have pleaded such actionable statements, we disagree.  The closest that Plaintiffs come to alleging that one of Tesla's May statements conveyed a representation as to a specific past or present fact was in the fifth of the seven statements listed above. *See supra* at 17.  In that statement, Tesla represented, in its first quarter 2017 10-Q, that it had "started the installation of Model 3 manufacturing equipment."  We agree with Plaintiffs that this aspect of the statement is not itself forward-looking, because it asserts a fact about what Tesla's operations had already achieved.  We nonetheless conclude that the statement is not actionable, because Plaintiffs have not pleaded sufficient facts to establish that the statement is materially false or misleading.  Plaintiffs' brief rewrites this statement as if it asserted that Tesla had "begun installation of *automated* equipment in the first quarter" (emphasis added).  But that is not what the statement says—it simply confirms that some unspecified "manufacturing" equipment had been installed at the Tesla facilities, and the complaint does not plead any facts to establish that *that* representation was false.  Plaintiffs argue that, under the standards applicable to Rule 12(b)(6) motions, we must accept as true their assertion that installation of "manufacturing equipment" actually means installation of "automatic manufacturing equipment."  This contention overlooks the heightened pleading requirements imposed by the PSLRA.  Where, as here, a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead facts that will support this crucial premise in order to satisfy the PSLRA's requirement that a private securities plaintiff adequately plead "the *reason or reasons* why [a] statement is misleading." 15 U.S.C. § 78u-4(b)(1) (emphasis added).

22                    FRIEDMAN V. TESLA

**c**

Because the remaining May statements are forward-looking, the safe harbor applies if they were accompanied by "meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A)(i). The district court correctly concluded that all of the challenged statements, including the May ones, were accompanied by such cautionary statements.

As the district court highlighted, Plaintiffs did not directly challenge the adequacy of Tesla's cautionary statements below, and the same is true of Plaintiffs' briefs in this court.[3]  The only issue Plaintiffs have raised in this regard concerns the district court's express assumption that, if Plaintiffs had adequately pleaded that the relevant Tesla officer *knew* that "it was *impossible*" to meet the company's forward-looking projections, and "not merely highly unlikely," then any accompanying "cautionary" language that failed to reveal this impossibility would not be "meaningful" (emphasis added).  We need not decide whether the district court was correct in this assumption,

---

[3] That is unsurprising, because Tesla's cautionary statements were detailed and specific.  For example, Tesla's May 3, 2017 Form 8-K enumerated important "[r]isk [f]actors" that could lead to results that "differ materially from those projected," such as "risk of delays in the manufacture, production, delivery and/or completion of our vehicles . . . particularly Model 3" and "the ability of suppliers to meet quality and part delivery expectation at increasing volumes."  Tesla's May 10, 2017 Form 10-Q also enumerated a wide range of risks, including "[t]he loss of any single or limited source supplier or the disruption in the supply of components," that "could lead to product design changes and delays in product deliveries."  Tesla acknowledged in this document that it had "experienced in the past . . . significant delays or other complications in the design, manufacture, launch and production ramp of new vehicles" and that it "may also experience similar delays . . . in bringing to market and ramping production of new vehicles, such as Model 3."

FRIEDMAN V. TESLA                          23

because we agree with that court that Plaintiffs failed to plead such a known "impossibility" during the entire May through August timeframe in which Defendants made the various challenged statements.

Plaintiffs rely on allegations that two employees told Musk in 2016 that the goal of producing 5,000 cars per week by the end of 2017 was impossible to achieve, but the district court correctly held that Plaintiffs failed to plead any facts showing that Musk ever accepted those employees' views that the goal was impossible.  In particular, the district court properly held that Plaintiffs had failed to plead facts showing that Defendants adopted the conservative timeline for production on which these employees' pessimism was based.  Similarly, Plaintiffs' allegations that "[s]uppliers had informed Tesla that the production timelines were impossible" do not establish that Defendants (who were still in the process of choosing suppliers) *shared* that gloomy view.   Because Plaintiffs therefore failed to plead that Defendants *knew* their year's end goal was *impossible* to achieve, there is no basis for concluding that any of their cautionary statements were supposedly deficient on that ground.

**2**

Plaintiffs allege that one statement made by the Defendants in July 2017 constitutes an actionable misrepresentation. We disagree.

During a televised event at which Tesla "handed over" the first Model 3s to buyers, Musk stated that "there's actually a total of 50 production cars that we made this month."   Plaintiffs argue that, by using the phrase "production car," Musk was implying that these Model 3s had been made on an *automated* assembly line.  For reasons

24                    FRIEDMAN V. TESLA

similar to those discussed above with respect to the fifth May 2017 statement, we agree with the district court that Plaintiffs failed sufficiently to plead that this statement was false.  Because the statement would not be false unless the term "production car" actually means "car produced on a fully automated line," Plaintiffs had to plead sufficient facts to establish that the actual term used had the distinctive, and false, meaning that Plaintiffs claim.  *See* 15 U.S.C. § 78u-4(b)(1); *see also supra* at 21.  But as the district court correctly held, Plaintiffs pleaded no facts to support their premise that "production car" would be understood as referring exclusively to the *fully automated* production of identical vehicles.  Plaintiffs' allegations concerning this alleged misrepresentation consequently fail to meet the heightened pleading standards of the PSLRA.

**3**

Plaintiffs' SAC challenged seven statements made in August 2017, but we conclude that none of them is actionable.

**a**

The SAC alleges that the following seven statements that Tesla made in August 2017 were materially false and misleading.

(1)  In its August 2, 2017 Form 8-K, Tesla repeated that "[b]ased on our preparedness at this time, we are confident we can . . . achieve a run rate of 5,000 vehicles per week by the end of 2017."

(2)  Similarly, during Tesla's August 2, 2017 earnings call, Musk stated that "we remain—we believe on track to achieve a 5,000 unit week by the end of this year."

FRIEDMAN V. TESLA                              25

(3)  During the same call, Musk stated that Tesla was "also making great progress on the battery front."

(4)  When asked during the earnings call about Tesla's unfavorable third quarter profit margin forecast, Musk responded that "Model 3 [has] fundamentally negative gross margin in the very beginning, because you've got a gigantic machine producing—that's meant for 5,000 vehicles a week and it's producing a few hundred vehicles a week."

(5)  Two days later, Tesla filed its quarterly 10-Q report. In that report, Tesla represented that "[w]e may experience delays in realizing our projected timelines and cost and volume targets for the production, launch and ramp of our Model 3 vehicle, which could harm our business, prospects, financial condition and operating results," and restated that "[w]e . . . have announced our goal to increase Model 3 vehicle production to 5,000 vehicles per week by the end of 2017."

(6)  In this same 10-Q report, Tesla also addressed progress at the Gigafactory: "While we currently believe that our progress at Gigafactory 1 will allow us to reach our production targets, our ultimate ability to do so will require us to resolve the types of challenges . . . that we have experienced to date, including at Gigafactory 1."

(7)  In this 10-Q report, Tesla also made these further disclosures about problems at the Gigafactory:

> While Gigafactory 1 began producing lithium-ion cells for energy storage products in January 2017 and has since begun producing lithium-ion cells for Model 3, we have no other direct experience in the production of lithium-ion cells.  Given the

size and complexity of this undertaking, it is possible that future events could result in . . . Gigafactory 1 taking longer to ramp production and expand than we currently anticipate.   In order to reach our planned volume and gross margin for Model 3, we must have significant cell production from Gigafactory 1 . . . .   We are now in the early stages of production and have experienced the types of challenges that typically come with a production ramp.  We expect that we will continue to experience challenges . . . .  While we currently believe that we will reach our production targets, if we are unable to resolve ramping challenges and expand Gigafactory 1 production in a timely manner and at reasonable prices, . . . our ability to supply battery packs to our vehicles, especially Model 3, and other products could be negatively impacted.

**b**

We agree with the district court that none of these statements is actionable.  The August reaffirmations of Tesla's year-end goal—*e.g.*, "we are confident we can . . . achieve a run rate of 5,000 vehicles per week by the end of 2017" and "we remain . . . on track to achieve a 5,000 unit week by the end of the year"—are forward-looking for the same reasons that Tesla's original projections and assumptions in May are.  *See supra* at 18–19.  Accordingly, Tesla's reiterations of its ultimate "objective[]" for 2017 production rates in its first, second, and fifth August statements are therefore forward-looking statements within the meaning of the PSLRA.  *See* 15 U.S.C. § 78u-5(i)(1)(B).

FRIEDMAN V. TESLA                    27

Tesla's fifth, sixth, and seventh August statements are also forward-looking to the extent that they describe the future challenges Tesla might confront over the remaining months of 2017. In explaining these issues, these statements set forth the "assumptions underlying or relating to" the announced year-end goal and therefore fall squarely within the statute's definition of a forward-looking statement. 15 U.S.C. § 78u-5(i)(1)(D). Plaintiffs contend that, by failing to disclose that some of these types of risks had *already* been experienced, Tesla's statements constituted misleading omissions about current or past challenges. But unlike the affirmative statements about "backlog" figures at issue in the case on which Plaintiffs rely, *see Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008) ("backlog reports" were misleading because they failed to disclose that they included, as backlog, work that had been halted due to stop-work orders), these challenged statements contain no explicit or implicit representation that Tesla had *not* already experienced such issues. On the contrary, the sixth statement affirmatively acknowledges that Tesla *has* "experienced to date" the sort of "challenges" that it would have to overcome in order to achieve its stated objective.

Plaintiffs contend that the first, third, and fourth August statements contain material misrepresentations concerning specific present or past facts, but the district court correctly rejected these claims. Because, as explained earlier, every announcement of a production goal implicitly represents an assertion that the goal is presently achievable, *see supra* at 19, Tesla's unadorned comment in its first statement that its "preparedness at this time" would allow it to achieve its year-end goal does not go beyond what is inherent in declaring any forward-looking objective. Such a generic statement does not include the sort of "concrete description"

28                    FRIEDMAN V. TESLA

about the facts concerning the "past and present state" of
production that we confronted in *Quality Systems*.  *See*
865 F.3d at 1144.  On appeal, Plaintiffs now argue that the
reference to "preparedness" in the first statement (which is
from Tesla's August 2, 2017 Form 8-K filing) should be
understood as a cross-reference to *another statement* that
was made in that same filing and that is not mentioned in the
complaint.   But Plaintiffs cannot properly rely on such
unpleaded additional statements in defending the adequacy
of their SAC, because the PSLRA explicitly requires that the
complaint "specify each statement alleged to have been
misleading" and "the reason or reasons why the statement is
misleading."  15 U.S.C. § 78u-4(b)(1).  This argument thus
presents, at most, a question of whether leave to amend
should have been granted, and we address that question
separately below.  *See infra* at 29–33.

To the extent that the third and fourth statements
arguably contain representations about current facts, we
agree with the district court that Plaintiffs have failed to
allege sufficient facts to establish falsity.  Given that a "pure
statement of opinion" is generally not actionable, *see
Omnicare*, 575 U.S. at 187, Tesla's remark in the third
statement that "great progress" was being made on battery
production would potentially be an actionable false
statement only if, as the district court put it, Tesla had been
"making no progress at all."  Plaintiffs pleaded no facts that
would establish falsity in that sense.  As to the fourth
statement's contrast between third-quarter performance and
Tesla's year-end goal, the district court correctly concluded
that it was a "projection, rather than a statement about then-
current production levels."  This August 2 statement was
made in response to a question about anticipated gross
margins for the third quarter of 2017, which still had nearly
two months left to go.  Given that the question sought an

FRIEDMAN V. TESLA                                   29

explanation for the projected third-quarter margins, the ensuing reference to a production system that is "meant for 5,000 vehicles a week and it's producing a few hundred vehicles a week" can be understood only as contrasting *overall* third-quarter expectations with the year-end goal.

Plaintiffs have thus failed to plead falsity as to any August 2017 statement that is not forward-looking. As to the statements that *are* forward-looking, they were accompanied by meaningful cautionary statements, as explained earlier. *See supra* at 22–23.

*          *          *

As a result, the district court correctly concluded that none of the 15 statements challenged in the SAC was actionable. And because Plaintiffs have "not sufficiently alleged violations of Section 10(b) and Rule 10b-5," they likewise "cannot establish control person liability" under § 20(a). *See City of Dearborn Heights*, 856 F.3d at 623. The SAC was therefore properly dismissed.

**III**

The only remaining question is whether the district court erred in dismissing the SAC without leave to amend because of the futility of further amendment. "We review the denial of leave to amend for an abuse of discretion, but we review the question of futility of amendment de novo." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1172 (9th Cir. 2016) (citations omitted); s*ee also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–53 (9th Cir. 2003) (per curiam). We conclude that further amendment would be futile and that leave to amend was properly denied.

30                    FRIEDMAN V. TESLA

As stated earlier, Plaintiffs' briefs on appeal place heavy reliance on an additional August 2017 statement that was not pleaded in the SAC.  Specifically, Plaintiffs contend that the following statement from Tesla's August 2, 2017 Form 8-K filing is false and misleading:

> During Q2, our engineering, manufacturing and supply chain teams were focused on the final stages of Model 3 product development and building the "machine-that-makes-the-machine" *for the start of production*. . . .
>
> . . .
>
> *Having started production* of Model 3 on schedule in July, and having installed the first Solar roofs, our teams are now focused on ramping the production rate of these products to support our mission of accelerating the world's transition to sustainable energy.

Plaintiffs argue that the reasonable import of this statement is that Tesla had completed the "machine-that-makes-the-machine"—that is, the *automated* assembly line—and had started such automated production in July.  We need not decide whether Plaintiffs have demonstrated that they can sufficiently plead falsity and scienter for this additional statement.  Even assuming arguendo that they have done so, we conclude that such an amendment would be futile because Plaintiffs have failed to show that they can plead loss causation as to this statement.

The loss causation element of a § 10(b) claim "is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some

other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Loss causation thus focuses on whether a loss can be attributed to "'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam) (citation omitted). Because the nature of a fraud is that it conceals "underlying facts . . . that affect the stock price," *id*. at 754, then if the stock price falls shortly after the disclosure of the true facts, that decline suggests that the fraud had artificially propped up the stock price. The analysis is contextual, and where, for example, a "modest" drop in the stock price coincides with the disclosure of certain news but then "recover[s] very shortly after," the allegation of loss causation may be insufficient. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064–65 (9th Cir. 2008).

The record here confirms that Plaintiffs have failed to show that they can adequately allege loss causation based on the theory that Tesla misrepresented in August 2017 that automatic production had begun in July. Any such misrepresentation would have been revealed by the *Wall Street Journal*'s report, after market hours on Friday, October 6, 2017, that "[u]nknown to analysts, investors and the hundreds of thousands of customers who signed up to buy it, as recently as early September major portions of the Model 3 were still being banged out by hand, away from the automated production line, according to people familiar with the matter." The same article further explained that, "[w]hile the car's production began in early July, the advanced assembly line Tesla has boasted of building still wasn't fully ready as of a few weeks ago." Because this October 6 article disclosed precisely the fact that Plaintiffs contend had been misrepresented—*viz*., that automatic production had not started in July—it provides a singularly appropriate context

32                    FRIEDMAN V. TESLA

for assessing the adequacy of Plaintiffs' theory of loss causation.[4]  Tesla's stock price, which had closed at $356.88 on October 6, closed at $342.94 on the next trading day, October 9.   However, the stock price immediately rebounded, closing at $355.59 on October 10 and trading between $350 and $360 over the next week.  The quick and sustained price recovery after the modest October 9 drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price. *See Metzler*, 540 F.3d at 1064–65; *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("To adequately plead loss causation . . . a plaintiff must allege that the 'share price *fell significantly* after the truth became known.'" (emphasis added) (citation omitted)); *cf.* 4 T. Hazen, Law of Securities Regulation § 12.93 (2020 update) ("If the price movement of the stock in question is not in sync with the plaintiff's theory of recovery, loss causation will be extremely difficult, if not impossible, to prove.").

Plaintiffs have thus failed to show that they can adequately plead loss causation as to the additional August 2 statement that they did not include in the SAC.  Because Plaintiffs have not shown any other basis for concluding that

---

[4] Plaintiffs are therefore wrong to focus on the asserted impact of a later November 2, 2017 article in the car blog *Jalopnik*.  The alleged falsity in the August 2 statement had already been revealed by the *Wall Street Journal* article in October, and the November 2 article came after Tesla's public acknowledgment, in its November 1, 2017 Form 8-K filing, that it would not produce 5,000 cars per week until at least the end of the first quarter of 2018.  The October 6 article thus provides the appropriate point of reference for assessing whether the alleged falsity in the August 2 statement affected Tesla's stock price.

FRIEDMAN v. TESLA 33

further amendment would not be futile, the district court correctly dismissed this action with prejudice.

**AFFIRMED.**