1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NEIL COSTANZO, ET AL., | Case No.  19-cv-05794-BLF |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND** |
| DXC TECHNOLOGY COMPANY, et al., | |
| Defendants. | [Re:  ECF No. 98] |

Before the Court is Defendants' Motion to Dismiss the Third Amended Complaint.  This is a putative class action alleging violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Plaintiffs' claims pertain to representations in the prospectus and registration statement (the "Registration Statement") issued in connection with the merger of Computer Sciences Corporation ("CSC") and the Enterprise Services division of Hewlett Packard Enterprise Company ("HPE") completed in April 2017 (the "Merger") to form Defendant DXC Technology Company ("DXC"), an IT services company.  Plaintiffs allege that Registration Statement disclosures related to an expectation of $1 billion in cost cuts during the first year following the Merger were false and misleading in light of an internal goal at DXC to cut $2.7 billion in costs set by CEO J. Michael Lawrie.  At issue in this Motion is whether Plaintiffs' addition of confidential witness allegations in the Third Amended Complaint focused on the $2.7 billion goal being a "real" target for the first year following the Merger is sufficient to overcome the deficiencies of the prior pleadings.

For the reasons stated below, the Court GRANTS Defendants' Motion WITHOUT LEAVE TO AMEND.

**I.   BACKGROUND**

This case arises from disclosures in the Registration Statement filed in connection with the

Merger. Plaintiffs allege that DXC disclosed a "workforce optimization" plan involving expected cost cuts of approximately $1 billion during the first year following the Merger while internally planning to reach a much larger cost-cutting goal involving $2.7 billion in first-year cuts. Third Amended Complaint ("TAC"), ECF No. 94 ¶¶ 43-45, 54. Plaintiffs allege that this $2.7 billion cost-cutting goal required DXC to cut its workforce too quickly and too deeply and involved undisclosed risks to DXC's ability to effectively provide IT services to its clients, which DXC's executives were aware of at the time of the merger. *Id.* ¶¶ 43-45, 53-57. Plaintiffs further allege that these risks ultimately materialized during the years after the Merger and significantly impeded DXC's ability to serve its clients and caused its stock price to drop. *Id.* ¶¶ 58-77. But Plaintiffs do not allege that DXC actually reached the $2.7 billion cost-cutting goal during the first year following the Merger, or that the budget cuts they made during the first year exceeded the $1 billion in cuts disclosed in the Registration Statement. *Id.* ¶¶ 6, 64, 87. Still, Plaintiffs allege that the Registration Statement disclosures related to DXC's expectation of $1 billion in cost cuts during the first year following the merger constituted false or misleading statements in violation of Sections 11 and 15 of the Securities Act given the existence of the internal $2.7 billion cost-cutting goal.

The Court provided a complete summary of the background in this case in its order dismissing the First Amended Complaint. ECF No. 75 at 1–5.

Plaintiffs' First Amended Complaint was based on the allegations of former DXC Executive Vice President Stephen J. Hilton filed in *Hilton v. DXC Technology Company*, No. 1:19–cv–01157–PKC (S.D.N.Y.). The Court dismissed the First Amended Complaint with leave to amend because Plaintiffs failed to allege that the $2.7 billion cost-cutting goal was met during the first year following the merger or that the goal was anything more than "aspirational." *See generally* Order Dismissing First Amended Complaint ("FAC"), ECF No. 75.

In the Second Amended Complaint, Plaintiffs added allegations from confidential witness CW1 indicating that the $2.7 billion cost-cutting goal was "real" and "concrete" and from confidential witnesses CW2 and CW3 regarding negative impacts of cost cuts on DXC. *See generally* Second Amended Complaint ("SAC"), ECF No. 78. The Court dismissed the Second Amended Complaint with leave to amend because Plaintiffs failed to plead facts indicating that the

alleged $2.7 billion cost-cutting goal pertained to the first year following the merger. *See generally* Order Dismissing SAC, ECF No. 87.

On June 1, 2021, Plaintiffs filed the Third Amended Complaint, which added CW1 allegations to support that the $2.7 billion cost-cutting goal pertained to the first year following the merger. *See generally* TAC, ECF No. 94. Defendants moved to dismiss the Third Amended Complaint on July 8, 2021. *See* Motion, ECF No. 98. Plaintiffs filed an Opposition on August 16, 2021. *See* Opposition, ECF No. 99. Defendants filed a Reply on September 9, 2021. *See* Reply, ECF No. 100. The Court held a hearing on the Motion on October 28, 2021.

This order focuses primarily on the new allegations in the Third Amended Complaint and considers them in light of the deficiencies previously outlined by the Court in its orders dismissing the First and Second Amended Complaints. The new allegations appear primarily as CW1, CW2, and CW3's expanded allegations.

## A. CW1 Allegations

The Third Amended Complaint includes allegations from CW1, who was a Senior VP and General Manager of Security at DXC from April 2017 to January 2018 and had worked at HPE since April 2013. *See* TAC, ECF No. 94 ¶¶ 6, 78–82, 87. According to CW1, Lawrie had a $2.7 billion budget cut goal for the first year following the merger that was "not merely aspirational." *Id.* ¶¶ 6, 79. Rather, it was a "'real' goal that managers were expected to attain." *Id.* ¶ 79. The budget cut goal included a $1 billion to $1.8 billion budget cut goal for DXC's Global Delivery division alone. *Id.* ¶¶ 6, 79. Lawrie's internal budget was discussed with top company executives during regular executive committee meetings on, at least, June 21, 2017, August 20, 2017, October 12, 2017, and November 15, 2017. *Id.* ¶ 80. Further, executive bonuses were tied to the $2.7 billion budget cut goal, *id.* ¶¶ 79, 87, and divisional and regional progress was measured in relation to the goal, *id.* ¶ 81. CW1 alleges that workforce reductions happened too quickly to meet budget cut targets, which led to customer satisfaction problems. *Id.* ¶ 82. By the time CW1 left DXC in January 2018, the Global Delivery division had cut more than $800 million. *Id.* ¶ 6. Further, CW1 alleges that executive bonuses were significantly reduced because DXC did not meet its internal budgeted goals for cost reductions, including workforce reductions. *Id.* ¶ 87.

### B.   CW2 and CW3 Allegations

The Third Amended Complaint also includes allegations from CW2 and CW3 confirming the negative consequences of DXC's cost cutting that Plaintiffs had already alleged based on the Hilton complaint.  *See* TAC ¶¶ 7, 9, 83–86.  CW2 was a Delivery Lead in the automotive division of Global Delivery at DXC.  *Id.* ¶ 83.  CW2 alleges workforce reduction cuts were "too fast and too much" and were "not well-targeted," cutting senior level employees and hampering customer service.  *Id.* ¶¶ 83–84.  CW2 alleges that problems were evident by early 2018.  *Id.* ¶ 83.  CW3 was a Technical Delivery Manager at DXC.  *See* TAC ¶ 85.  CW3 alleges that workforce cuts "quickly impacted the business in a negative way," including by cutting experienced U.S.-based technicians.  *See* TAC ¶¶ 85–86.

## II.   LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by

4

the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003).  A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present:  (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment.  *Eminence Capital*, 316 F.3d at 1052.  "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight."  *Id.*  However, a strong showing with respect to one of the other factors may warrant denial of leave to amend.  *Id.*

## III.    DISCUSSION

### A.    Section 11 of the Securities Act (Count I)

Section 11 of the Securities Act contains a private right of action for purchasers of a security if the issuer publishes a registration statement in connection with the security that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  "To prevail in such an action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation and internal quotation marks omitted).  "By definition, a plaintiff must show that a purported misstatement in a registration statement was misleading at the time the registration statement was issued."  *In re: Resonant Inc. Sec. Litig.*, No. CV 15–01970 SJO (PJWx), 2016 WL 1737959, at *7 (C.D. Cal. Feb. 8, 2016).  For example, "[a] claim under section 11 based on the omission of information must demonstrate that the omitted information existed at the time the registration statement became effective."  *Rubke*, 551 F.3d at 1164.

#### 1.    Confidential Witness Allegations

##### a.    CW1 Allegations

The CW1 allegations added in the Third Amended Complaint characterize Lawrie's $2.7 billion cost-cutting target as a "real" goal.  *See, e.g.,* TAC ¶¶ 6, 79.  These new allegations appear

United States District Court
Northern District of California

to be in response to the Court's previous finding that Plaintiffs had alleged no more than that the goal was merely "aspirational." *See, e.g.,* Order Dismissing FAC, ECF No. 75 at 8–9.  In light of the new CW1 allegations, the two main points of disagreement between the parties are (1) whether Plaintiffs state a Section 11 claim that DXC's representations regarding $1 billion in cuts were false or misleading statements of material fact and (2) whether Plaintiffs allege sufficient facts regarding the timing of the $2.7 billion goal to plead that representations in the Registration Statement were false when made.

     i. Sufficiency of Allegations Regarding "Real" $2.7 Billion Cost-Cutting Goal

  Defendants argue that Plaintiffs continue to fail to state a claim for relief under Section 11 because they have not alleged facts indicating that DXC failed to meet its publicly disclosed cost-cutting expectation of $1 billion during the first year post-Merger.  Motion, ECF No. 98 at 9–12.  Plaintiffs argue that they have alleged sufficient facts to show that Lawrie's $2.7 billion cost-cutting budgets "were serious, every effort was to be made to make them, and failure had consequences," which is what the Court previously found was missing from their allegations.  Opposition, ECF No. 99 at 7–9.  In response, Defendants argue that whether "aspirational" or "concrete," the $2.7 billion cost-cutting goal that DXC failed to meet did not render its disclosure of a $1 billion cost-cutting expectation false or misleading.  Reply, ECF No. 100 at 3–5.

  The Court agrees with Defendants.  The only deficiency of the prior complaints Plaintiffs attempt to address with the CW1 allegations is the failure to plead that the $2.7 billion internal target was "anything more than an aspirational goal."  Order Dismissing FAC, ECF No. 75 at 8–9; *see* Opposition, ECF No. 99 at 7–9.  Plaintiffs incorrectly suggest that in purportedly addressing this deficiency, they have "provid[ed] what the Court previously found was lacking in the FAC." Opposition, ECF No. 99 at 8.  This ignores the other deficiencies the Court identified in the prior pleadings.  In dismissing the First Amended Complaint, the Court found that "if DXC disclosed in the Registration statement that … it intended to cut $1 billion in costs through workforce optimization in the first year post-Merger, and then went on to cut that same $1 billion in cost, the investors were not misled."  Order Dismissing FAC, ECF No. 75 at 9–10.  CW1's allegations fail

to support that DXC cut more than $1 billion in costs during the first year post-Merger. As Defendants point out, CW1's allegations of $800 million in cost cuts by the time he or she left DXC in January 2018 were on track with a total $1 billion in cuts in the first year after the merger. Reply, ECF No. 100 at 6–7; *see also* TAC ¶ 87 ("DXC did not meet its internal budgeted goals for cost reductions, including workforce reductions[.]"). Accordingly, the Third Amended Complaint does not address one of the main deficiencies the Court identified in the prior complaints—Plaintiffs do not plead facts to support that DXC was ever on target to cut more than $1 billion in the first year.

Without allegations of a reality that differed from DXC's publicly disclosed $1 billion cost-cutting expectation, Plaintiffs continue to point only to the discrepancy between DXC's $1 billion cost-cutting expectation and an internal $2.7 billion cost-cutting goal. Opposition, ECF No. 99 at 7–12. But the Court previously found that absent facts to indicate that DXC cut more than $1 billion in the first year post-Merger, the $2.7 billion internal goal "would simply be a business decision without any consequence to the investors." Order Dismissing FAC, ECF No. 75 at 10. The Court remains skeptical that an aggressive internal cost-cutting goal—even a "serious," "real," or "concrete" one—is sufficient on its own to state a claim that a more modest publicly disclosed cost-cutting expectation was false or misleading.[1] A goal is not the same as an expectation. *See In re*

---

[1] Defendants argue that the Court should take judicial notice of a Hilton allegation from the Second Amended Complaint that "Lawrie understood his own internal budget to be merely aspirational," which Plaintiffs dropped from the Third Amended Complaint. Motion, ECF No. 98 at 11 (citing Second Amended Complaint, ECF No. 78 ¶ 58). Plaintiffs argue that taking judicial notice of this allegation would be improper, since (1) the Third Amended Complaint supersedes the prior complaints and (2) Defendants rely on the Hilton allegation for the truth of the matter asserted. Opposition, ECF No. 99 at 13–14. The Court may take judicial notice of a document "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citing *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). Furthermore, the Court may consider allegations in a prior complaint as part of its "context-specific" inquiry into whether a later complaint plausibly suggests

United States District Court
Northern District of California

*Exodus Commc'ns, Inc. Secs. Litig.*, No. C 01–2661 MMC, 2005 WL 1869289, at *42 (N.D. Cal. Aug. 5, 2005) ("[T]he setting of an internal 'revenue goal' of 40% growth is not the equivalent of a public forecast that such growth would actually be achieved."). A company can have an ambitious internal target and disclose publicly that it expects to meet a more modest target without misleading investors. Finding otherwise would deny companies an important tool in their motivational arsenal—using an optimistic goal internally to ensure they can meet more modest publicly disclosed expectations. Order Dismissing FAC, ECF No. 75 at 9–10. CW1's allegations indicating that DXC linked executive bonuses and regional and divisional benchmarks to the $2.7 billion cost-cutting goal are consistent with the goal being an internal motivational tool. Opposition, ECF No. 99 at 8 (citing TAC ¶¶ 79, 81). Accordingly, even if Plaintiffs have adequately alleged that the $2.7 billion cost-cutting goal was a "real" goal, the Court does not find that this is sufficient on its own to support that the challenged statements in the Registration Statement were false or misleading when made.[2]

_____

an entitlement to relief. *See Cole v. Sunnyvale*, No. C–08–05017 RMW, 2010 WL 532428, at *4 (N.D. Cal. Feb. 9, 2010) (citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009)). Accordingly, the Court takes judicial notice of the previously pled Hilton allegation regarding Lawrie's internal budget being "merely aspirational." Second Amended Complaint, ECF No. 78 ¶ 58. This allegation supports that it is at least equally plausible to infer from the alleged facts that Lawrie's $2.7 billion budget cut target was an aspirational goal as opposed to a "real" or "serious" one. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation.") (citations omitted).

[2] At the October 28, 2021 hearing, Plaintiffs raised the argument that the existence of the $2.7 billion cost-cutting goal changed *how* DXC cut costs during the first year after the Merger, even if it did not impact the *amount* of costs that DXC cut. The Court does not find support for this theory in the Third Amended Complaint. The citations to the Third Amended Complaint Plaintiffs offered at the hearing—¶¶ 53–61, all of which were pled in the previously dismissed prior pleadings, *see* FAC ¶¶

Plaintiffs argue that it does not matter whether DXC actually cut more than the disclosed $1 billion, because the existence of the $2.7 billion goal was enough to render the $1 billion figure misleading on its own.   Opposition, ECF No. 99 at 2.   Plaintiffs argue that Section 11 is a "strict liability" statute, so factoring in the actual costs DXC cut is "essentially a loss causation argument that is not required in Section 11 cases."   *Id.*; *see also id.* at 11–12.   The Court disagrees.   As outlined above, the size of DXC's cost cuts is significant because it shows that DXC's publicly disclosed cost-cutting expectations were accurate—not false or misleading.   The Court is not convinced that a company's statement of expectation that turned out to be accurate can be false or misleading in light of an internal target the company failed to reach.   Plaintiffs cannot point to a single case in support of this seemingly novel theory of liability.   As Defendants point out, Plaintiffs' cited cases involve (1) projections that were not met and (2) contemporaneous data that contradicted those projections when they were made.   Reply, ECF No. 100 at 4–5; *see, e.g., Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, at **19–20 (D. Or. July 17, 2020) ("Lead Plaintiffs … present evidence that Defendants knew that the assumptions underlying the FY16 Target '"would not be achievable" given the "dismal economic data"' … before Defendants announced the FY16 Target.").   Without authority to indicate that a statement of expectation that proved true is still actionable under Section 11, the Court is not convinced that it is misconstruing the requirements of Section 11 by rejecting Plaintiffs' theory here.

Plaintiffs further argue that Defendants should be liable because once DXC chose to tout its cost-cutting and workforce optimization plan, it was required to do so in a way that would not mislead investors.   Opposition, ECF No. 99 at 10–11 (citing, *inter alia*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707–08 (9th Cir. 2016).)   In response, Defendants argue Plaintiffs' supporting cases stand only for the unremarkable proposition that once a company speaks on a topic,

---

50–54, 56–59—do not support that the existence of the goal itself caused DXC to make different cuts than it would have otherwise.   These allegations merely support the unremarkable proposition that had DXC reached the $2.7 billion first-year cost-cutting goal—which Plaintiffs have not alleged—then the cuts would have been more severe.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    it is bound to do so in a manner that would not mislead.  Reply, ECF No. 100 at 5.  The Court agrees

2    with Defendants.  Since the $2.7 billion internal cost-cutting goal is not a sufficient basis to show

3    that any of the challenged statements in the Registration Statement were false or misleading,

4    Plaintiffs' caselaw fails to move the needle.

5         Plaintiffs argue that the CW1 allegations regarding DXC's "real" $2.7 billion goal are

6    sufficient to state a claim that a variety of statements in the Registration Statement were false or

7    misleading.  Plaintiffs argue that statements about (1) the importance of the size and scale of DXC's

8    workforce, (2) "workforce optimization" and elimination of "duplicative roles," and (3) the

9    importance of hiring, attracting, and retaining personnel are misleading given DXC's internal plan

10   to cut a massive part of its workforce.  Opposition, ECF No. 99 at 9–10 (citing TAC ¶¶ 89, 91).  But

11   the Registration Statement disclosed workforce cuts.  *See* Registration Statement, Boutros Decl.,

12   ECF No. 40, Ex. A at 131 (disclosing "expected economies of scale such as … cost synergies

13   expected from workforce optimization such as elimination of duplicative roles and other duplicative

14   general, administrative and overhead costs"); Order Dismissing FAC, ECF No. 75 at 14 (disclosures

15   about workforce optimization "clearly means layoffs were to be expected"); TAC ¶¶ 89–91.  Absent

16   factual allegations that DXC cut more than it said it would, the Court finds that Plaintiffs have not

17   stated a claim that these statements were false or misleading.  Further, Plaintiffs point to a

18   Registration Statement disclosure of a risk that DXC might not be able to reach cost reduction targets

19   as misleading where "the opposite extreme was happening."  Opposition, ECF No. 99 at 11.  The

20   fact that DXC had an internal goal more aggressive than its publicly disclosed expectations did not

21   remove the possibility that DXC would have trouble satisfying its more modest publicly disclosed

22   expectations.  In fact, the existence of a more aggressive internal goal to motivate DXC employees

23   is consistent with DXC having concerns it would not be able to meet its publicly disclosed

24   expectations.

25        Accepting the allegations that Lawrie had an internal goal of cutting $2.7 billion, Plaintiffs

26   still fail to allege sufficient facts to demonstrate that Defendants' aggressive internal cost-cutting

27   goal rendered public statements about $1 billion in expected cost cuts false or misleading.

28   Accordingly, the Court finds that the added allegations from CW1 do not cure the defects in the

1    prior pleadings and thus Plaintiffs have failed to state a claim for a Section 11 violation.

2                    ii.    Timing of Cost-Cutting Goal

3            To plead a Section 11 violation, Plaintiffs must allege facts demonstrating that the statements

4    were false or misleading when made.  *See Resonant*, 2016 WL 1737959, at *7.  The parties dispute

5    whether CW1's allegations are sufficient to adequately plead that the alleged $2.7 billion first-year

6    cost-cutting goal existed at the time the Registration Statement became effective on February 27,

7    2017.  Defendants argue that CW1's allegations are insufficient because (1) CW1 was employed at

8    HPE prior to the April 1, 2017 Merger, whereas Lawrie was a senior executive at CSC and (2) CW1

9    did not learn about the alleged $2.7 billion first-year cost-cutting plan until a June 21, 2017 meeting,

10   nearly four months after the Registration Statement's effective date.  Motion, ECF No. 98 at 10–11;

11   Reply, ECF No. 100 at 6.  Plaintiffs argue that, since the Merger happened only 60 days prior to the

12   June 21, 2017 meeting, this strongly suggests that the $2.7 billion target was in existence at the time

13   of the Registration Statement.  Opposition, ECF No. 99 at 13.  Further, Plaintiffs point out that the

14   Court previously held that Plaintiffs adequately alleged that the $2.7 billion cost-cutting goal existed

15   at the time of the Registration Statement.  *Id.*

16           The Court agrees with Plaintiffs.  The Court already found based on the allegations in the

17   Hilton complaint that Plaintiffs had sufficiently pled that "Lawrie's $2.7 billion internal budget was

18   set and Hilton's concerns were communicated to Lawrie before the Registration Statement was

19   issued."  Order Dismissing FAC, ECF No. 75 at 10.  CW1's allegations add nothing to the Hilton

20   allegations regarding timing of the $2.7 billion cost-cutting goal.  CW1 was not in a position prior

21   to the Merger to know whether the alleged $2.7 billion cost-cutting target was in existence, since he

22   was at a different company than Lawrie.  Although it may not be a reasonable inference based on

23   CW1's allegations that the $2.7 billion goal was in existence nearly four months prior to when it

24   was first discussed at an Operations Committee meeting,  the Court sees no reason to reconsider its

25   prior finding that the Hilton allegations sufficiently pled that the $2.7 billion goal existed at the time

26   of the Registration Statement.

27           Accordingly, the Court finds that Plaintiffs have adequately alleged that the $2.7 billion

28   internal cost-cutting goal existed by the Registration Statement's effective date.

United States District Court
Northern District of California

United States District Court
Northern District of California

### b.  CW2 and CW3 Allegations

The CW2 and CW3 allegations have no bearing on the deficiencies the Court has previously identified in Plaintiffs' pleadings.  Defendants point out that there is only a single mention of CW2 and CW3 in Plaintiffs' Opposition, where their allegations are used to describe the alleged impact of DXC's cost-cutting. Reply, ECF No. 100 at 7 (citing Opposition, ECF No. 99 at 5).  Accordingly, the Court finds that the CW2 and CW3 allegations have no impact on the outcome of Defendants' Motion to Dismiss.

***

In sum, the Court finds that Plaintiffs have sufficiently pled that there was an internal goal at DXC to cut $2.7 billion in costs at the time the Registration Statement was issued.  But notwithstanding Plaintiffs' new allegations that it was a "serious" or "real" target, Plaintiffs have failed to adequately allege that the $2.7 billion goal rendered false or misleading any statements in the Registration Statement given the lack of facts supporting DXC's achievement of that goal or failure to meet its publicly disclosed expectations.  Accordingly, Plaintiffs' new confidential witness allegations do not remedy the deficiencies previously found by the Court.

### 2.  Safe Harbor

Defendants argue that certain alleged misstatements are forward-looking and therefore protected under PSLRA's Safe Harbor provisions.  PSLRA's Safe Harbor precludes liability for forward-looking statements in either of two circumstances:  (1) "if they were identified as forward-looking statements and accompanied by meaningful cautionary language," or (2) "if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111–12 (9th Cir. 2010) (emphasis omitted); 15 U.S.C. § 78u–5(c)(1).  A forward-looking statement is "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items."  15 U.S.C. § 78u–5(i)(1)(A).

Defendants argue that the following statements are forward-looking and protected by the PSLRA's Safe Harbor provision:

- "The combined company expects that the merger of Everett with CSC will produce first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one. The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs." (TAC ¶ 89).

- "[W]ith a collective workforce of approximately 178,000 employees, the size and scale of the combined company will enhance its ability to provide value to its customers through a broader range of resources and expertise to meet their needs." (TAC ¶ 91).

Motion, ECF No. 98 at 12.

Defendants argue these statements are subject to the PSLRA Safe Harbor provision because (1) they contain meaningful cautionary language and (2) Plaintiffs have not plausibly alleged actual knowledge. *Id.* at 12–15. In response, Plaintiffs argue that these statements are not subject to the PSLRA Safe Harbor because (1) the Safe Harbor should not apply to companies like DXC without a history of public filings, particularly when its predecessor CSC has a history of violating the federal securities laws, (2) the alleged misstatements are "mixed" in light of Plaintiffs' alleged facts about a "real" $2.7 billion target, (3) any cautionary language was "generalized" or "boilerplate" and not "meaningful," and (4) Defendants' actual knowledge of undisclosed facts is sufficiently pled. Opposition, ECF No. 99 at 14–17.

a. Public Offering

Plaintiffs argue that since the PSLRA Safe Harbor does not apply to forward-looking statements made in connection with an initial public offering, it should not apply to DXC, because DXC has no public track record for investors to rely on. Opposition, ECF No. 99 at 14 (citing 15 U.S.C. §77z–2(b)(2)(D)). Further, Plaintiffs argue that the Safe Harbor does not apply to companies who have been the subject of a judicial or administrative decree, and DXC's predecessor company CSC was subject to an administrative decree before the Merger. *Id.* (citing 15 U.S.C. §77z–2(b)(1)(A)(ii)). In response, Defendants argue that the Court previously rejected both of these arguments. Reply, ECF No. 100 at 8.

The Court agrees with Defendants. In its order dismissing the First Amended Complaint, the Court previously found that the Merger should not be treated as an IPO. Order Dismissing FAC,

United States District Court
Northern District of California

1    ECF No. 75 at 12.  Further, the Court declined to "treat CSC and DXC – two legally distinct entities

2    – as one entity and hold an administrative order related to one against the other."  *Id.* at 12–13.

3    Plaintiffs provide no reason why the Court should reconsider its prior ruling.

4        Accordingly, the Court is not persuaded that the challenged statements in DXC's

5    Registration Statement are exempt from PSLRA's Safe Harbor provisions.

6            b.  Forward-Looking Statements Accompanied by Meaningful Cautionary
             Language

7    The Court previously found that Defendants' statements regarding cost-cutting expectations

8    in the Registration Statement were "facially forward-looking" and entitled to the protections of the

9    PSLRA Safe Harbor, and not "mixed" statements.  Order Dismissing FAC, ECF No. 75 at 13.

10   Plaintiffs now argue that the "real" $2.7 billion goal was a present fact Defendants omitted from the

11   Registration Statement, so the Safe Harbor does not apply.  Opposition, ECF No. 99 at 14–15.  In

12   response, Defendants argue that Plaintiffs cannot convert facially forward-looking statements into

13   a present representation of fact based on the Registration Statement's omission of an internal goal.

14   Reply, ECF No. 100 at 9.

15       The Court agrees with Defendants.  The Court considers the challenged statements to be

16   facially forward-looking disclosures of financial expectations.  *See Police Ret. Sys. of St. Louis v.*

17   *Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (finding statements of expectation to

18   be facially forward-looking); 15 U.S.C. § 78u–5(i)(1)(A) ("forward-looking statements" include "a

19   statement containing a projection of revenues, income (including income loss), earnings (including

20   earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items").

21       The Court disagrees with Plaintiffs that the existence of Lawrie's $2.7 billion internal goal

22   was a material present fact that rendered the challenged statements of expectation misleading or

23   "mixed statements."  As the Court outlined above, a goal and an expectation are different, and the

24   existence of a goal on its own does not render a statement of expectation false or misleading.  In

25   *Wochos*, the Ninth Circuit stated that "in order to establish that a challenged statement contains non-

26   forward-looking features …, a plaintiff must plead sufficient facts to show that the statement goes

27   beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express

28

or implied 'concrete' assertion concerning a specific 'current or past fact[].'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (citations and emphasis omitted).   The Court finds it implausible that Defendants' statement of expectation about a $1 billion cost reduction contained "an express or implied 'concrete' assertion" that DXC did not have a more aggressive internal cost-cutting goal for motivational purposes.  *Id.*  Plaintiffs point to the *Prodanova* case, which holds that a forward-looking statement does not qualify for safe harbor protections where it is "misleading because it omit[s] a disclosure of a present fact."  Opposition, ECF No. 99 at 15 (citing *Prodanova v. H.C. Wainwright & Co., LLC*, No. LA CV17–07926 JAK (ASx), 2018 WL 8017791, at **12–13 (C.D. Cal. Dec. 11, 2018).)  But as outlined above, the Court does not consider the existence of the $2.7 billion internal cost-cutting goal to be a present fact that rendered the disclosure of $1 billion in expected cost cuts misleading.  Further, Plaintiffs cite cases involving disclosures that intertwined material present or past facts with forward-looking statements.  *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1021 (N.D. Cal. 2020) (no Safe Harbor protections for company's financial forecasts "intertwined with its misstatements of current revenues"); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (no Safe Harbor protections for statements that "provided a concrete description of the past and present").  The Court previously found that Plaintiffs failed to allege that the $2.7 billion internal cost-cutting goal "had any impact on how the $1.0 billion expectation was calculated at the time the Registration Statement was filed."  Order Dismissing FAC, ECF No. 75 at 13.  Seeing no reason to reconsider its prior holding, the Court finds Plaintiffs' cases about intertwined present and past facts are inapposite.

Because the Court finds that the challenged statements of expectation are indeed forward-looking, it turns now to the question of whether those forward-looking statements were accompanied by meaningful cautionary language.  Defendants argue that the Court previously found that the Registration Statement contains meaningful cautionary language that adequately warned investors of the risks at issue in this case.  Motion, ECF No. 98 at 14 (citing Order Dismissing FAC, ECF No. 75 at 14–16).  Plaintiffs argue that (1) virtually no cautionary language is sufficient for mixed statements, (2) Defendants' boilerplate disclaimers do not meet the standard for "meaningful" cautionary language given the $2.7 billion undisclosed cost-cutting goal, and (3) Defendants'

United States District Court
Northern District of California

United States District Court
Northern District of California

1   disclosures about attracting, retaining, and losing personnel told investors nothing about DXC itself

2   cutting employees.  Opposition, ECF No. 99 at 15–16.  In response, Defendants argue that (1)

3   Plaintiffs cite to cases where then-existing facts contradicted cautionary language, when DXC's

4   then-existing goal had not been implemented at the time of the Registration Statement and (2)

5   Plaintiffs' "boilerplate" argument ignores detailed cautionary language in the Registration

6   Statement.  Reply, ECF No. 100 at 10–11.

7        The Court agrees with Defendants.  The Court previously found the cautionary language in

8   the Registration Statement to be meaningful, because the Registration Statement warned investors

9   about "the eventualities that Plaintiffs complain of (*e.g.*, customer complaint)."  Order Dismissing

10  FAC, ECF No. 75 at 14–15.  Plaintiffs fail to point to any newly alleged eventualities.  For example,

11  Plaintiffs argue that the cautionary language in the Registration Statement was not sufficient to warn

12  about DXC itself cutting its workforce.  Opposition, ECF No. 99 at 16.  But the Court previously

13  found that the Registration Statement's cautionary language about "workforce optimization such as

14  elimination of duplicative roles and other duplicative general, administrative and overhead costs"

15  warned investors that "clearly … layoffs were to be expected."  Order Dismissing FAC, ECF No. 75

16  at 14.  Accordingly, the Court finds that Plaintiffs have not alleged sufficient facts to change the

17  Court's prior holding that the Registration Statement contained meaningful cautionary language that

18  warned investors about "the eventualities that Plaintiffs complain of."  *Id.* at 14–15.

19       Further, Plaintiffs argue that the cautionary language in the Registration Statement is not

20  meaningful in light of the $2.7 billion internal cost-cutting goal.  The Court previously found that

21  the cautionary language in the Registration Statement "did not warn the investors of the internal

22  $2.7 billion cost-cutting goal."  Order Dismissing FAC, ECF No. 75 at 15.  But the Court

23  nonetheless found the cautionary language meaningful because "the Registration statement *did* warn

24  about the eventualities that Plaintiffs complain of[.]"  *Id.*  In light of their new allegations that the

25  $2.7 billion cost-cutting goal was "serious" and "real," Plaintiffs point to cases finding cautionary

26  language insufficient where risks had already materialized and a company had already changed its

27  strategy.  Opposition, ECF No. 99 at 16–17.  But Plaintiffs fail to allege that $2.7 billion in cost cuts

28  was anything more than an internal goal that DXC failed to reach in the first year post-Merger.  And

there are no allegations that the pace of budget cuts was any greater than needed to achieve the expected $1 billion in cuts in year one.  Accordingly, Plaintiffs have failed to adequately allege per their cited cases that any risks associated with the $2.7 billion goal had materialized at the time of the Registration Statement or that DXC had already changed its strategy.  *See, e.g., Mingbo Cai v. Switch, Inc.*, No. 2:18–cv–01471–JCM–VCF, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) ("the sections [of the registration statement] defendants quote do not indicate that Switch had already changed its sales strategy"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) ("complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized.")

Further, since the Court rejected Plaintiffs' contention that the challenged language in the Registration Statement constitutes "mixed" statements, the Court also rejects Plaintiffs' argument that virtually no cautionary language accompanying a mixed statement is sufficient.   Opposition, ECF No. 99 at 15.

Accordingly, the Court finds that the challenged statements of expectation in the Registration Statement are facially forward-looking and contain meaningful cautionary language. They therefore qualify for PSLRA Safe Harbor protection.

### c.  Defendants' Actual Knowledge

Defendants argue that even if they were not able to satisfy the cautionary language prong of the PSLRA Safe Harbor, they can satisfy the prong that offers Safe Harbor protection where "the plaintiff fails to prove that the forward-looking statement … if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading[.]" 15 U.S.C. § 78u–5(c)(1)(B)(i).  Defendants argue that Plaintiffs have failed to show that actual knowledge of the $2.7 billion internal cost-cutting goal indicated that Defendants knew their $1 billion public cost-cutting expectation was false or misleading.  Motion, ECF No. 98 at 14–15. Plaintiffs argue that Lawrie's actual knowledge of the $2.7 billion cost-cutting goal prevents Defendants from taking advantage of this prong of the PSLRA Safe Harbor.  Opposition, ECF No. 99 at 17.

17

United States District Court
Northern District of California

The Court found in its order dismissing the First Amended Complaint that "because the mere existence of this goal is not a sufficient basis for securities violations, Defendants' knowledge of it is irrelevant to this Complaint." Order Dismissing FAC, ECF No. 75 at 16. Since the Court has again found that Plaintiffs have failed to adequately plead that the existence of the $2.7 billion internal cost-cutting goal without any allegations that the goal was realized in the first year is a sufficient basis for securities violations, the Court again finds that knowledge of the $2.7 billion cost-cutting goal does not defeat the PSRLA Safe Harbor protection.

Accordingly, the Court finds that the challenged statements qualify for PSLRA Safe Harbor protections under the "actual knowledge" prong, in addition to the "cautionary language" prong.

*** 

In sum, the Court agrees with Defendants that the alleged misstatements (TAC ¶¶ 89, 91) about the expected cost reductions tied to DXC's workforce optimization plan are forward-looking and protected by PSLRA's Safe Harbor provision.

### 3. Opinion Statements

Separately, Defendants challenge Plaintiffs' allegations related to representations in the Registration Statement regarding "synergies," a "turnaround plan," and hiring practices as non-actionable opinion statements, including the following:

- "The combined company expects that the merger of Everett with CSC will produce first-year synergies of approximately $1.0 billion post-close, with a run rate of $1.5 billion by the end of year one. The $1.0 billion post-close and $1.5 billion run rate at the end of year one were each calculated by estimating the expected value of harmonizing policies and benefits between the two companies, supply chain and procurement benefits from expected economies of scale such as volume discounts as well as cost synergies expected from workforce optimization such as elimination of duplicative roles and other duplicative general, administrative and overhead costs." (TAC ¶ 89).

Motion, ECF No. 98 at 15 (citing TAC ¶¶ 89–92). Defendants argue that the new allegations do not change the Court's prior conclusion that the challenged opinion statements are non-actionable. Motion, ECF No. 98 at 15–16 (citing Order Dismissing FAC, ECF No. 75 at 20). Defendants argue that despite Plaintiffs' new allegations regarding the $2.7 billion cost-cutting goal, Plaintiffs still fail to allege that the goal so undermined the basis for the opinion statements to render them misleading. Motion, ECF No. 98 at 16. Plaintiffs argue that by alleging the $2.7 billion cost-cutting

18

United States District Court
Northern District of California

1    goal was "more than aspirational," they have sufficiently alleged that the opinion statements were

2    false, misleading, and omitted material facts.  Opposition, ECF No. 99 at 18.

3          An opinion statement is defined as "a belief, a view, or a sentiment which the mind forms of

4    persons or things."  *Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, 575 U.S.

5    175, 183 (2015) (citation and alterations omitted).  There are three different standards for pleading

6    falsity of opinion statements: (1) "when a plaintiff relies on a theory of material misrepresentation,

7    the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the

8    belief is objectively untrue," (2) "when a plaintiff relies on a theory that a statement of fact contained

9    within an opinion statement is materially misleading, the plaintiff must allege that the supporting

10   fact the speaker supplied is untrue" or (3) "when a plaintiff relies on a theory of omission, the

11   plaintiff must allege facts going to the basis for the issuer's opinion whose omission makes the

12   opinion statement at issue misleading to a reasonable person reading the statement fairly and in

13   context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d

14   605, 615–16 (9th Cir. 2017) (citation omitted).  Plaintiffs argue that the alleged opinion statements

15   meet all three standards under *Dearborn Heights*.  Opposition, ECF No. 99 at 18.

16         To the extent that these statements could be considered opinions, the Court will evaluate

17   them under *Omnicare* and *Dearborn Heights*.

18         For the first *Dearborn Heights* standard, in order to plead a material misrepresentation,

19   Plaintiffs must adequately allege that (1) Defendants did not hold the belief they professed and

20   (2) that the belief was objectively untrue.  *Dearborn Heights*, 856 F.3d at 615–16.  Defendants argue

21   that Plaintiffs "fail to allege (even conclusorily) that Defendants disbelieved any of the opinion

22   statements in the Registration Statement."  Motion, ECF No. 98 at 15.  Plaintiffs argue that

23   Defendants "could not and did not believe the assertions professed, even if negligently," due to the

24   $2.7 billion cost-cutting goal.  Opposition, ECF No. 99 at 18.  The Court agrees with Defendants.

25   Plaintiffs have not explained how an aggressive internal cost-cutting goal that did not produce

26   greater actual cost reductions in the first year rendered false Defendants' belief in synergies or hiring

27   practices following the merger, particularly where an internal goal like Plaintiffs allege came with

28   the possibility that it would not be met.

For the second *Dearborn Heights* standard, in order to allege that a statement of fact contained within an opinion statement is materially misleading, Plaintiffs must allege that the supporting fact Defendants supplied was untrue. *Dearborn Heights*, 856 F.3d at 616. Plaintiffs have failed to adequately allege that DXC's aggressive internal cost-cutting goal rendered false any fact in the challenged opinion statements. For example, the Court does not see how an internal goal DXC failed to reach renders false any fact about expected cost synergies, DXC's turnaround plan, or any of its hiring practices, particularly where Plaintiffs have failed to allege that DXC cut more than the $1 billion in expected cost cuts disclosed in the Registration Statement during the first year post-Merger.

For the third *Dearborn Heights* standard, in order to allege that an opinion statement contained an actionable omission, Plaintiffs must allege facts going to the basis for Defendants' opinion whose omission made the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. *Dearborn Heights*, 856 F.3d at 616. Defendants argue that Plaintiffs failed to allege the $2.7 billion first-year cost-cutting goal so undermined the basis for the opinion statements regarding future synergies or hiring practices as to render them misleading. Motion, ECF No. 98 at 16. Plaintiffs argue "Defendants omitted its [sic] plan to terminate a substantial portion of its workforce," thereby "conflicting with what investors would take away from such statements." Opposition, ECF No. 99 at 18. The Court finds that Plaintiffs have not sufficiently alleged that the $2.7 billion cost-cutting goal was a fact "going to the basis for [Defendants'] opinion." *Dearborn Heights*, 856 F.3d at 16. As the Court found above, a goal is not the same as an expectation. It is implausible that investors would have "take[n] away" from Defendants' opinion statements that DXC did not have an aggressive internal cost-cutting goal. Opposition, ECF No. 99 at 18. This is particularly true where language like "workforce optimization such as elimination of duplicative roles" clearly meant layoffs were to be expected. Order Dismissing FAC, ECF No. 75 at 14. Further, the statements about DXC's hiring practices are sufficiently generalized that they could still be accurate after significant workforce cuts. TAC ¶ 91.

Accordingly, assuming the challenged statements can properly be categorized as "opinion statements," the Court finds that the statements are still non-actionable despite Plaintiffs' new

1    confidential witness allegations in the Third Amended Complaint.

2                    **4.  Risk Disclosures**

3          Defendants argue that DXC's challenged risk disclosures are not actionable.  Generally, risk

4    disclosures—like any other statement—may be misleading if they affirmatively create an

5    impression of a state of affairs that differs in a material way from the one that actually exists.  *City*

6    *of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F.Supp.3d 840, 855

7    (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017).

8          Defendants argue the Court should reject Plaintiffs' claims based on the following risk

9    disclosures:

10

11                    The ability of the combined company to grow and provide customers
                      with competitive services is partially dependent on the ability of the
12                    combined company to attract and retain highly motivated people with
                      the skills necessary to serve their customers.

13   Registration Statement, Boutros Decl., ECF No. 40, Ex. A at 42–43.  And:

14                    If the combined company does not hire, train, motivate and effectively
                      utilize employees with the right mix of skills and experience in the
15                    right geographic regions to meet the needs of its clients, its financial
                      performance could suffer.
16

17   *Id.* at 43.  Defendants argue that these statements are non-actionable as the Court previously found

18   because (1) Plaintiffs still fail to allege that DXC actually implemented more significant cuts than

19   it disclosed publicly and (2) the Registration Statement disclosed "workforce optimization" plan

20   cost cuts that could lead to problems with providing customer service, which was the state of affairs

21   at the time.  Motion, ECF No. 98 at 17.  Plaintiffs argue that these statements are actionable "due to

22   the business strategy [DXC] had in place to massively reduce key personnel[.]"  Opposition, ECF

23   No. 99 at 11.

24          The Court agrees with Defendants.  Plaintiffs have not alleged that DXC had a "business

25   strategy … in place to massively reduce key personnel" beyond the disclosed $1 billion in cuts as

26   Plaintiffs argue.  Opposition, ECF No. 99 at 11.  Plaintiffs can only allege a $2.7 billion cost-cutting

27   goal DXC never met, which is insufficient on its own to render the challenged risk disclosures false

28   or misleading.   Further, even if the $2.7 billion cost-cutting goal were sufficient, the Court

United States District Court
Northern District of California

previously found the challenged risk disclosures "disclosed the state of affairs as they were [at] the time: DXC planned to optimize its workforce and eliminate duplicative roles, which could lead to problems with providing service to its customers."  Order Dismissing FAC, ECF No. 75 at 21. Plaintiffs' new allegations that the $2.7 billion cost-cutting goal was "serious" and "real" do not change the Court's conclusion.

Plaintiffs' cases finding risk disclosures false or misleading where there was evidence that the disclosed risks had already materialized are inapposite.  *See, e.g., Alphabet*, 1 F.4th at 704 ("complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized."); *Siracusano v. Matrixx Init., Inc.*, 585 F.3d 1167, 1181–82 (9th Cir. 2009) ("Form 10-Q was misleading because it spoke of the risk of product liability actions against the company without revealing that a lawsuit already had been filed."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) ("The passage, moreover, speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition[.]").  Plaintiffs fail to allege that DXC ever reached the $2.7 billion goal, or at any time in the first year after the Merger was on pace to meet that goal, so the Third Amended Complaint does not sufficiently allege that the disclosed risks had materialized at the time of the Registration Statement.  *See, e.g.,* TAC ¶¶ 6, 87.

Accordingly, the Court finds that Plaintiffs have failed to plausibly allege that the challenged risk disclosures were false and misleading based on DXC's $2.7 billion internal cost-cutting goal.

### 5.  Puffery

Defendants argue that certain alleged misstatements are non-actionable puffery.  A material misrepresentation differs significantly from corporate puffery.  Puffery is an expression of opinion, while a misrepresentation is a knowingly false statement of fact.  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (finding that puffery includes statements "not capable of objective verification").  Moreover, the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions. *In re Cutera*, 610 F.3d at 1111.  Finally, "mildly optimistic, subjective assessment[s] ...

1    [do not] amount[] to a securities violation." *Id.*

2           Defendants argue that language in the Registration Statement referencing a "turnaround

3    plan" that would "align [DXC's] costs with its revenue trajectory" and included "initiatives to

4    improve execution in sales performance and accountability" was non-actionable puffery.  Motion,

5    ECF No. 98 at 17 (citing TAC ¶¶ 89, 90).  Plaintiffs argue that based on (1) the starkness of the

6    difference between what DXC stated publicly and what Plaintiffs now allege occurred internally

7    and (2) the frequency with which DXC discussed its "turn-around plan," the Court should find the

8    alleged "puffery" statement to be a material misrepresentation.  Opposition, ECF No. 99 at 18.  In

9    response, Defendants argue that the Court's prior order found the challenged "turn-around plan"

10   statement to be "vague corporate optimism" on its face and as a matter of law.  Reply, ECF No. 100

11   at 12–13 (citing Order Dismissing FAC, ECF No. 75 at 19).

12          The Court agrees with Defendants.  The Court previously found that "[t]he challenged

13   statement does not mention the amount by which the Company was to cut costs, but instead,

14   expresses vague corporate optimism that DXC's 'costs' would align with its 'revenue trajectory'

15   and 'improve execution in sales performance and accountability.'  Such statements are incapable of

16   objective verification and constitute non-actionable puffery."  Order Dismissing FAC, ECF No. 75

17   at 17 (citing *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167 (C.D. Cal. 2007).)  The

18   Court is not convinced that the "turn-around plan" statement is now magically capable of objective

19   verification because of new allegations in the Third Amended Complaint.  Nothing has changed

20   about the statement itself—it is just as incapable of objective verification as the Court found it was

21   before.  Plaintiffs' cases, which pertain to verifiable facts and have no bearing on the "puffery"

22   issue, fail to change the Court's mind.  *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983,

23   1019 (S.D. Cal. 2005) (relating to reporting of "statistically flawed" results); *Atlas v. Accredited*

24   *Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (relating to company's

25   underwriting practices and standards).

26          Accordingly, the Court finds that the challenged "turn-around plan" statement in the

27   Registration Statement is non-actionable puffery.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.      Violations of Items 303 or 503**

Defendants also challenge Plaintiffs' allegations under Items 303 and 503(c) of SEC Regulation S-K.  Those provisions require disclosure of (1) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," (17 C.F.R. § 229.303(a)(3)(ii) (2020)) and (2) under the caption "Risk Factors," a discussion of the most significant factors that make the offering speculative or risky (17 C.F.R. § 229.503(c) (2019)).

Regarding Plaintiffs' Item 303 claim, Defendants argue that the internal $2.7 billion cost-cutting goal was not a "known trend" as Item 303 requires.  Motion, ECF No. 98 at 18.  Plaintiffs argue that the $2.7 billion cost-cutting goal was a substantial and known uncertainty and trend that DXC reasonably expected would have a material impact on its financial condition, which is sufficient for Item 303.  Opposition, ECF No. 99 at 19 (citing *Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998).)

The Court agrees with Defendants.  The TAC does not plausibly allege that the $2.7 billion cost-cutting goal was a known trend when Plaintiffs have not alleged that DXC met that goal or was even on pace to meet it in the first year following the Merger.  Further, the Court does not find that the mere existence of an internal goal makes it "reasonably likely" that it will be achieved, or that any consequences will result.  *See Steckman*, 143 F.3d at 1296–97.  Plaintiffs can only point to cases where at the time of the Registration Statement, a known downward trend or deleterious change in strategy already existed or had taken place.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) ("Plaintiffs allege that the downward trend in the real estate market was already known and existing at the time of the IPO[.]"); *Switch*, 2019 WL 3065591, at *5 ("Switch had already changed its sales strategy[.]")  Since Plaintiffs have not alleged facts to indicate that DXC ever reached or even approached the $2.7 billion cost-cutting goal, they have not plausibly alleged an Item 303 violation.

Under Item 503, Defendants argue that they were not required to disclose risk factors related to an alleged internal, aspirational business target—however, "serious."  Motion, ECF No. 98 at 18–19; Reply, ECF No. 99 at 20.  Plaintiffs argue that Defendants' failure to disclose the severe risks

of the $2.7 billion cost-cutting goal to employee retention and expected revenue and income constituted an Item 503 violation. Opposition, ECF No. 99 at 20. The Court agrees with Defendants. Since Plaintiffs have not made sufficient allegations to show that the $2.7 billion cost-cutting goal was ever reached, the TAC does not plausibly allege that Defendants were obliged to disclose risk factors related to that goal.

Accordingly, the Court finds that Plaintiffs have failed to state a claim that Defendants violated Item 303 or 503 based on their $2.7 billion cost-cutting goal. At the end of the day, there is no getting around the fact that Defendants announced an expectation to cut $1 billion in year one after the Merger and that is what they did. Even if they accomplished that expectation by internally pushing for more cuts, nothing in the Third Amended Complaint plausibly supports Plaintiffs' claims.

**C.      Section 15 of the Securities Act (Count II)**

Plaintiffs' only basis for the adequacy of their Section 15 claim is that the Third Amended Complaint stated a Section 11 claim. Opposition, ECF No. 99 at 20. Having found that Plaintiffs have failed to state a claim under Section 11, the Court finds that Plaintiffs' Section 15 claim is inadequately pled as well.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**D.    Leave to Amend**

Since this is the third time that the Court has dismissed Plaintiffs' complaint, the Court finds that Plaintiffs have repeatedly failed to cure deficiencies in their allegations by amendment. Accordingly, the Court DISMISSES Plaintiffs' Third Amended Complaint WITHOUT LEAVE TO AMEND.

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Third Amended Complaint is DISMISSED WITHOUT LEAVE TO AMEND.

Dated:  December 14, 2021

BETH LABSON FREEMAN
United States District Judge